U.S. DISTRICT COURT
DISTRICT OF NH

2019 JAN 30 AM 11: 38

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| JOHN DOE[1], ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. |
| ) | |
| TRUSTEES OF DARTMOUTH COLLEGE, ) | |
| ) | |
| Defendant, ) | |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. This lawsuit arises out of the unjust and unlawful expulsion of plaintiff John Doe from Dartmouth College ("Dartmouth"), and the disciplinary hearing procedures plaintiff was subjected to prior to his expulsion that transpired between September 2017 and February 2018.

2. Plaintiff seeks justice against Dartmouth as it is responsible for the actions of a small group of administrators and employees who failed and refused to adhere to the College's own policies and laws meant to protect Plaintiff.

[1] Plaintiff seeks to file this complaint and all pleadings under pseudonym due to the serious and false nature of the allegations against him and the privacy implications to both himself and Sally Smith and has concurrently filed with this complaint a motion requesting such a designation. For reasons articulated in this motion, plaintiff has signed all documents submitted to this court which are, or could potentially be unsealed, using the alias "John Doe" in place of his own name, and respectfully asks that the court allow Doe to do this, and treat any certifying signatures or other implementations of this alias as that of the pro se plaintiff in this case (whose name, address, email, and phone number are contained in the financial affidavit filed concurrently with this complaint).

3. Plaintiff has been subjected to extraordinary suffering and loss as a result of Dartmouth's actions, including but not limited to the loss of his Dartmouth degree, loss of other educational opportunities, loss of job opportunities, reputational harm, financial harm, and excruciating emotional distress.

## JURISDICTION AND VENUE

4. This action arises out of Dartmouth's breach of its contractual and other obligations to the plaintiff, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681).

5. The plaintiff is an out-of-state resident of modest means, and the defendant is a resident of New Hampshire. The amount in controversy is over $75,000.

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

7. Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

8. Plaintiff John Doe "Doe," or "John") is a U.S. citizen who resides outside the state of New Hampshire.

9. Defendant Trustees of Dartmouth College ("Dartmouth") is a partially federally funded private liberal arts college in Hanover, New Hampshire.

## FACTS

2

10. Between October 2012 and January 2017, John Doe was in a relationship with Sally Smith, who is an undergraduate student attending university in a state outside of New Hampshire and does not attend Dartmouth College.

11. Sometime about early March 2017, Sally Smith's mother told Doe and his mother that Sally Smith and herself intended to entice Dartmouth into imposing a disciplinary sanction upon Doe to get revenge upon him for grievances they held against him, in hopes that Doe would become ineligible to keep the full ride scholarship he'd been awarded during his senior year in high school for his academic, leadership, and community-oriented accomplishments, and which was of incredible personal and financial importance to the plaintiff.

12. On March 29th, Sally submitted an 18-page report ("the March 29th report") composed of un-contextualized messages John had sent months prior to her college's police department, and requested a restraining order be issued against Doe.

13. John Doe had not ever been accused of committing malicious behavior, or causing another individual harm in his time at Dartmouth, or at any other point in his life prior to these events.

14. Dartmouth received the March 29th report from Sally's university's police department about March 29th 2017.

15. Dartmouth's Student Handbook states; "The JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations," & "Hearings will be scheduled as soon as possible after an incident."

16. In accordance with Dartmouth's policies, its Judicial Affairs Office ("JAO") investigated the contents of the report, and Doe was forced to attend a mandatory meeting with

3

Dartmouth Undergraduate Dean Kristi Clemens to discuss its contents, but based on said investigation, the JAO determined it was not appropriate to initiate disciplinary allegations against Doe based on the contents of the March 29th report.

17. During March and/or April of 2017, Sally and her mother repeatedly contacted Dartmouth College saying they felt threatened by Doe and asking them to intervene, resulting in Dartmouth's Safety & Security and Hanover Police Department visiting Doe's dorm room on several different occasions. At this point, Doe had not communicated with any member of the Smith family in the previous month since they'd threatened to get revenge against Doe by enticing Dartmouth to take disciplinary action against him, other than about March 28th when he communicated with Sally and her mother, asking them to stop making unsolicited contact with Doe's parents.

18. About May 4th 2017, Doe sent the following message to Smith and her mother: "I just wanted to write and formally remind you one more time that you're not allowed to talk to any of my family members."

19. Shortly after Doe sent this message, Sally's mother submitted it to the police and claimed John had violated a restraining order that'd been issued against him on March 29th, and Doe was arrested later that day by Hanover Police Department.

20. On May 10th Adam Knowlton-Young issued a letter to notify Doe that Dartmouth had raised two allegations against him regarding the actions he'd performed about May 4th which precipitated his arrest – that these actions were in violation of Dartmouth's Standard of Conduct II, and that they were in violation of Standard of Conduct VI.

21. Later in 2017, John Doe had a public court hearing regarding his arrest, and was found guilty of violating Sally's restraining order against him.

22. Doe went on to deny both allegations Dartmouth raised against him before his judicial hearing on September 21st, 2017 at the suggestion of his College appointed advisor.

### The Sanctioning Process

23. At Doe's hearing on September 21st, the Committee on Standards did not determine either of the allegations that'd been raised against him, and which Dartmouth had provided Doe notice of in advance of his hearing were true.

24. Despite having already decided not to raise disciplinary allegations or impose a sanction upon Doe based on its investigation of the March 29th report 177 days prior to Doe's disciplinary hearing on September 21st, and in an extraordinary violation of its own written policies, Dartmouth imposed a sanction of expulsion upon Doe based on the contents of the March 29th report at his hearing on September 21st, and without ever raising allegations against Doe pertaining to the contents of the report.

25. At Doe's hearing on September 21st, he was found guilty of an allegation that is materially different in substance than either of the two allegations Dartmouth raised against Doe in advance of his hearing, an extraordinary violation of Dartmouth's own policies and procedures which severely undermined the fairness of Doe's hearing.

26. Dartmouth's Student Handbook reads: "The Judicial Affairs Office (JAO) shall be responsible for receiving all complaints and issuing allegations," and "The Director of Judicial Affairs shall determine whether information available in support of an allegation could result in suspension of separation if the student were found responsible."

27. The Handbook specifically stipulates that the JAO (and no other entity, including the COS) is responsible for investigating all information supporting allegations of

5

misconduct brought to Dartmouth's attention and determining whether or not it is appropriate, necessary, and/or otherwise suitable to initiate formal disciplinary allegations against the student, implement other disciplinary measures, or refrain from action.

28. The JAO investigated all of the materials in the complaint Dartmouth indirectly received from Sally about March 29th, 2017 and determined the information in this report did not justify initiating disciplinary allegations, or potentially imposing suspension or separation, or having Doe attend a disciplinary hearing before the COS.

29. Dartmouth's Student Handbook states; "Students are entitled to reasonable written notice of the substance of the allegation(s) against them," "At the beginning of the student's hearing, the Chair shall determine that students have received a copy of the allegation(s) against them and notification or their rights in the COS proceeding," "The student will have an opportunity to admit or deny the allegation within five days of the written notice of the allegations," & "In order for the COS to conclude that a student has violated a College rule, the COS must be persuaded that a preponderance of the evidence supports such a finding. To find a violation under this standard, the COS must conclude that it is more likely than not that the student committed the alleged violation." Dartmouth violated each of these policies (amongst others) during Doe's disciplinary hearing on September 21st 2017.

30. Dartmouth did not simply fail to provide John any such reasonable written notice that the COS would consider imposing a sanction upon him based on the information in the March 29th report – it had investigated the report months prior to Doe's hearing,

determined that by its own policies and standards it was not appropriate to raise

disciplinary allegations about it, and informed Doe of this decision.

31. In conversation with the plaintiff in November of 2017, Dartmouth's Director of Judicial

Affairs, Dean Katharine Strong, conceded that the JAO had reviewed and investigated all

the information in the March 29th report at the time Dartmouth received it, and based off

said investigation, decided it wasn't appropriate to raise disciplinary allegations against

Doe at that time. Strong also argued that it was still somehow appropriate for Dartmouth

to expel Doe based on this same report 6-months later, without having ever raised an

allegation against him regarding it (Dean Strong stated that this was not necessary, despite

that Dartmouth's policies clearly stipulate otherwise)

32. By arbitrarily and capriciously imposing a sanction of expulsion upon Doe for these

actions 177 days after this initial investigation, and as the result of disciplinary rulings

and procedures that are inconsistent with or violate Dartmouth's policies, Dartmouth

breached its contractual obligation to the plaintiff.

33. Based on Dartmouth's investigation of the March 29th report and subsequent decision that

it was not appropriate to potentially impose a disciplinary sanction upon Doe based on

the information within the report, John Doe reasonably expected that Dartmouth would

not arbitrarily and capriciously expel him based on a subsequent review of this report at

some indeterminate point-in-time later on, leading Doe not to apply to other

undergraduate institutions during the 2017 application season, and to continue paying

tuition costs and investing countless hours of his time towards earning his degree at

Dartmouth – investments rendered worthless as a result of Doe's wrongful expulsion, and

which he would not have made if Dartmouth had not made decisions and rulings that

would make any reasonable person in Doe's situation believe they wouldn't be arbitrarily denied the fruits of these sacrifices and labor based on the contents of the March 29th report at some point after Dartmouth initially investigated it.

34. The finding report explaining the basis for the COS's decision was written by Daniel Nelson, who served as COS chair at Doe's hearing.

35. In the finding report, Nelson cited more than 11 different messages from the March 29th report which Dartmouth's decision was based upon.

36. In finding report written by Daniel Nelson, Chair of the Committee on Standards ("COS"), Nelson stated it was appropriate to impose the harshest sanction possible against Doe, because he and the other committee members felt Doe had exhibited an "inability to take responsibility for his actions and his lack of awareness of the significance of his actions and their impact on others," in relation to the statements he'd made which were contained in the March 29th report.

37. Dartmouth's decision to sanction Doe based on how much remorse it perceived Doe felt for committing actions which he had not received allegations about in advance of his hearing, and in violation of the rules and regulation of Dartmouth's disciplinary hearing system was arbitrary, capricious, unjust, and unlawful.

38. In said finding report, Nelson also cited information and evidence which had not been shared with Doe, and which Doe was not notified would be considered by the COS at his hearing on September 21st, such as that Sally's mother had contacted Dartmouth on several occasions and suggested it take action against Doe, a breach of Dartmouth's policies which undermined the fairness of Doe's disciplinary proceedings.

39. The terms or concepts "expulsion" and "separation" were never uttered, mentioned, or suggested to Doe by any Dartmouth employee or affiliate, in any official or unofficial capacity, before the very instant when he was notified that this was the sanction that had been imposed on him on September 22nd, the day after Doe's first hearing, a violation of Dartmouth's obligation to inform students if expulsion is a potential outcome in advance of their disciplinary hearings.

40. Upon information and belief, Dartmouth has never imposed a disciplinary sanction, let alone expulsion upon a student for actions, behaviors, and/or information that Dartmouth's JAO had previously reviewed and determined were not appropriate and/or necessary grounds to raise formal disciplinary allegations against the student.

41. When Dartmouth Undergraduate Dean Kristi Clemens called Doe's parents to tell them John had been expelled from Dartmouth, Doe's parents asked why Dartmouth was now punishing him so harshly based on information Dartmouth received the previous academic year and determined it wasn't appropriate to punish Doe for at that time. In response Clemens told Doe's parents the COS felt he wasn't remorseful enough for sending the messages in the March 29th report, and that this justified imposing such a harsh sanction upon Doe.

42. Dartmouth's decision to impose a sanction of expulsion upon Doe for the statements contained in the March 29th report was arbitrary, capricious and made in violation with the institution's own policies, as shown by the fact Dartmouth decided not to impose a sanction or raise disciplinary allegations against Doe after investigating this report 177 days prior to John Doe's expulsion at the time Dartmouth received the complaint.

9

43. On the day of John Doe's hearing on September 21ˢᵗ, 2017, Director of the JAO
Katharine Strong exhibited a remarkable lack of familiarity with Dartmouth's own rules
and policies when she told Doe the COS could impose sanctions upon him for actions
Dartmouth had not raised allegations against him about in advance of his hearing, citing
that students had previously been sanctioned for underage drinking in this manner
(although Strong would later deny saying this and come to support other, differing
narratives to justify the action taken against Doe at the hearing she herself was
responsible for overseeing and ensuring was performed in accordance with Dartmouth's
policies).

44. Plaintiff had not read, and did not attempt to contextualize the messages which
Dartmouth had previously declined to raise allegation about, but would expel Doe for at
his hearing. Amongst other things, plaintiff did not tell the committee that he was
domestically abused by a parent at the time he sent the messages contained in the report
which Dartmouth initially decided it wasn't appropriate to sanction doe regarding, but
then later expelled Doe for.

45. Though Kevin O'Leary of Dartmouth General Counsel would eventually concede Doe
had, in fact, been found guilty of an allegation which hadn't been raised against him in
advance of his hearing on September 21ˢᵗ, and that this was indeed a violation of
Dartmouth's policies, Katharine Strong, Director of the Judicial Affairs Office (JAO),
and the Dartmouth administrator who bears the greatest level of authority in, and
participates in most, if not all of the College's disciplinary hearing processes, would
insist her department somehow actually had raised the allegations Doe was found guilty

10

of prior to his hearing – an unambiguously false narrative which Dartmouth's other employees vehemently supported.

46. Upon information and belief, Dartmouth has never subjected another student to a disciplinary hearing process marked by the other characteristics of the disciplinary hearing Doe was subjected to and has raised issue with herein.

47. Doe would not have been sanctioned or expelled from Dartmouth as a result of his disciplinary hearing on September 21st if this hearing had been conducted in accordance with Dartmouth's own rules, policies, and John Doe's promised rights as a member of the institution.

48. Katharine Strong's and Daniel Nelson's (the Dartmouth employees tasked with ensuring Doe's disciplinary hearing was performed in accordance with Dartmouth's policies) negligent behaviors and/or failures to perform their assigned duties in Doe's disciplinary hearing on September 21st is the fact-in-cause of the plaintiff's suffering and loss described herein.

## **The Appeal**

49. The letter notifying John that he was separated from the school stated that he had the right to appeal the decision on either or both of the following grounds: "(1) Procedural error which has materially prejudiced the student's case; (2) Newly discovered information which, had it been available at the time of the hearing, would likely have affected the outcome either with regard to a finding of responsibility or with regard to the sanction imposed".

50. In early October, John Doe submitted an appeal of the Committee on Standards' sanction.

51. As grounds for appeal of the sanction John Doe raised that Dartmouth had already investigated the March 29th report and decided not to raise allegations against him based on this investigation, that Dartmouth had not given him notice that a sanction might be imposed on him based on the March 29th report in advance of his hearing on September 21st, the disproportionate and unprecedented nature of the sentence compared to Dartmouth's past sentences for similar violations, and the other procedural errors that occurred in his case described herein.

52. The appeal was heard by Rebecca Biron, Dean of the College at Dartmouth.

53. Dean Biron had previously expressed biased views against men and was not a neutral decision maker in John Doe's case.

54. In 2014, Dean Biron published an article titled "BEHIND CLOSED DOORS: RAPE, MURDER, AND THE MISPLACED CONFIDENCE OF MEN."

55. The article expressed an assumption that men are violent, stating: "[w]hat makes it so hard for some men to question their own assumptions and so easy for them to act boldly and brutally when faced with closed doors?"

56. In that article, Dean Biron equated a Dartmouth undergraduate student who was acquitted by a jury of allegations of non-consensual sex with a classmate to Oscar Pistorius, the South African athlete who admitted to shooting and killing his girlfriend.

57. Dean Biron concluded her article by stating: "We must demand of men, whether in college or not, a bit more self-doubt and a bit less self-confidence when they are faced with closed doors, whether they be physical, verbal, or figurative. The legal system values epistemological humility in order to protect the innocent; individuals should too."

58. These biases were highly inappropriate for an adjudicator of a case involving allegations of misconduct raised against a male individual by a female, and upon information and belief influenced her decision to uphold the Committee on Standards' decision, and refusal to acknowledge the inappropriate and unjust actions undertaken by the Dartmouth employees who managed Doe's disciplinary hearing procedures or provide appropriate remedy or relief for these employees' wrongdoing.

59. On October 27th, 2017, Dean Biron upheld the Committee on Standards' decision and dismissed Doe's assertion that a procedural error had occurred in his disciplinary hearing case, falsely asserting that Dartmouth had raised the allegation Doe had been found guilty of in advance of his hearing, provided him notice of the allegation, and that no procedural error had occurred in his case.

   a. Although Counsel for Dartmouth has falsely asserted that Dean Biron recognized that the plaintiff's hearing was not performed in accordance with Dartmouth policies, in her ruling on the plaintiff's appeal, Dean Biron explicitly denied that Dartmouth had found Doe guilty of an allegation which had not been raised against him, or that any procedural error has occurred in Doe's, stating the issues Doe raised in his appeal did "not by itself constitute a procedural error."

60. There is no evidence to support Dean Biron's false assertion that the JAO raised the allegation that John Doe was found guilty of against him in advance of his hearing on September 21st.

61. On or about October 27th, 2017 Katharine Strong compelled John Doe to meet with her so that she could personally deliver Dean Biron's response to Doe's appeal to him in

person. Anne Hudak, Doe's Dartmouth-appointed advisor was also present at this meeting.

62. Though Hudak and Strong had both affirmed that the College had not raised any allegations against Doe regarding the March 29th report at all points prior to this meeting, at the meeting on or about October 27th, 2017, both would insist (on the contrary, but as Dean Biron had at the time in her response to Doe's appeal) that Dartmouth actually had raised allegations regarding the report, and consequently, that Doe's hearing on September 21st, 2017 had been performed in accordance with Dartmouth's policies, and that he had been appropriately and fairly dealt a sanction of expulsion.

63. Although Dartmouth's general counsel would later concede  that this narrative was fictitious, that Doe had, in fact, been found guilty of an allegation which hadn't been raised against him in advance of his hearing on September 21st, and that this was indeed a violation of Dartmouth's policies, Dartmouth would refuse to acknowledge or provide remedy for the decisions and rulings that were based upon or derived from these material misrepresentations over the months Dartmouth's treated them as factual truths.

64. While upholding Doe's expulsion on these false grounds, Dean Biron told Doe he could attend a new COS hearing where he would face a new set of allegations which encompassed both of the allegations Dartmouth raised against Doe in advance of his September 21st hearing, as well as the different allegation Dartmouth had found Doe guilty of but not raised against him or given him notice of in advance of this hearing, but noted, "As it appears that there is sufficient evidence to support the sanction that was imposed, you will remain not enrolled and are not allowed on campus."

65. Dean Biron's ruling that a procedural error did not occur in Doe's case is not supported by evidence, logic, or facts, and is arbitrary and capricious.

66. By failing to identify and provide appropriate remedy for the procedural errors that'd occurred in Doe's hearing on September 21st, Dean Biron negligently failed to perform her designated role and responsibilities in Doe's judicial hearing process, violating Dartmouth's contractual and good faith obligations to the plaintiff, directly and indirectly subjecting plaintiff to the suffering and loss described herein.

## October 28th – January 7th 2017; From the Day After Biron Responded to Doe's "Request for Review", Through the Day Before His Second Disciplinary Hearing

67. In the days after he'd been given Dean Biron's response to his request for review, Doe sent Dean Biron a letter explaining that the JAO clearly had not raised the allegation he'd been found guilty of in advance of his COS hearing (Biron had asserted otherwise) and requesting that she reexamine the facts and circumstances of his case more closely and reconsider her decision and ruling.

68. In response, Biron stated she would not reconsider her ruling or assertions about his case which plaintiff had attempted to notify her were unambiguously false and instructed Doe to raise any concerns he had about Dartmouth's management of his case to the COS at his second hearing.

69. During the period of time when Katharine Strong was claiming Dartmouth had raised the allegations Doe had been found guilty of in advance of his hearing, Katharine told plaintiff that if Doe was actually correct and Dartmouth had already reviewed the March 29th report long before Doe's September 21st hearing, decided it wasn't appropriate to

initiate disciplinary allegations regarding the report, and then refrained from ever raising allegations regarding the report in advance of Doe's hearing, then Dartmouth's decisions to expel Doe and Dean Biron's ruling in response to Doe's request for review would both indeed have been made in violation of Dartmouth's policies and Doe's promised rights as a member of the institution, and it would not be appropriate to sanction Doe based on the contents of this report.

     a. Later on, when Dartmouth would come to acknowledge that these elements of Doe's (as opposed to Dean Strong's) understanding of the situation were true, it would refuse to acknowledge that this meant Doe's case had been proceeded upon and managed in violation of Dartmouth's policies (as Dean Strong previously had to the plaintiff).

70. About November 15th, Katharine Strong erroneously claimed Doe had failed to comply with a deadline she'd imposed, and that this justified imposing an immediate temporary suspension upon Doe, in violation of Dartmouth's own policies, the law, common sense, and reason.

71. The Dartmouth College student handbook reads: "Immediate, Temporary Suspension. The Dean of the College, or a designee, has sole discretion to take immediate action to preserve and protect the safety and/or welfare of specific individuals on campus and/or the College community as a whole during an investigation and pending a hearing in a disciplinary case."

72. The Supreme Court explicitly stated that due process only allows immediate temporary suspension without a hearing if the student poses an immediate danger to people or property (*Goss v. Lopez*, 419 U.S. 565 (1975)). When emergency circumstances do not

exist, the temporary suspension hearing must be held before the temporary suspension is put into effect.

73. After vehemently defending her decision to impose this immediate temporary suspension against Doe for aforementioned reasons, Katharine would later admit (to the contrary) that she had actually imposed this sanction upon Doe to help remedy billing and grade-related issues that had arisen from ambiguities surrounding his enrollment status at the institution.

74. Neither Katharine's ostensive or actual justifications for imposing this immediate temporary suspension upon Doe were those required for such a sanction to be imposed by Dartmouth's own policies, demonstrating her cavalier disregard for and/or lack of familiarity with Dartmouth's policies and public law regarding her profession, and the defendant's failure to adequately train or supervise even the most senior personnel entrusted with overseeing and performing its disciplinary hearing procedures.

75. This is not the only lawsuit open in this court at the present time in which Dartmouth's employees, including its Director of Judicial Affairs, Katharine Strong, and Dean of Dartmouth College Rebecca Biron, are accused of having flagrantly violated the College's own policies and both unlawfully and unjustly expelling a male undergraduate student.

76. Plaintiff wrote every employee of Dartmouth's Judicial Affairs Office informing them of Katharine's actions and asking them to intervene or provide plaintiff the opportunity to appeal Dean Strong's "ruling." None of these employees responded, other to say that plaintiff would not be given an opportunity to appeal Strong's decision.

77. In a recorded in-person conversation between Doe and Dean Strong from about November 16th, Doe presented Dean Strong copies of every single letter and piece of information the JAO had provided him in advance of his September 21st hearing which described the allegations that had been raised against him, and asked Strong to simply review these materials with him and indicate which parts she believed conveyed notice of the allegation Doe had been found guilty of at his September 21st hearing.

   a. Although Dean Strong claimed her office had raised the disciplinary allegation Doe had been found guilty of in advance of in advance of his judicial hearing on September 21st, she refused to go over the (approximately) 8-pages of material Doe sought to discuss with her in person during their (approximately) 1-hour meeting, but promised Doe she would go through the allegation materials he'd been given and indicate which parts had provided him such notice by the end of Thanksgiving break.

78. Katharine Strong would later refuse to provide the plaintiff this promised information or explain why she would no longer make due on her promise to provide said information.

79. Dartmouth's Student Handbook clearly stipulates that the JAO is responsible for answering students' questions and providing them information about the rules of the College's disciplinary hearing process, as well as their own specific cases. Dean Strong violated Dartmouth's policies by inexplicably refusing to provide him aforementioned promised information or fulfill other informational inquiries Doe made over the course of his hearing process.

80. In a therapy session, Mark Reed, Director of Dartmouth's Counselling and Health Department (CHD) told plaintiff that no reasonable person in his situation could move

18

along with and participate in the upcoming judicial hearing he was being asked to attend with any sort of soundness of mind without first being provided the information about Dartmouth's policies and his previous disciplinary hearing which John had repeatedly asked Dartmouth to provide him. Doe reported this assessment to Katharine Strong, who replied by stating she did not care and this would not affect her decision to not provide Doe this information, and that she felt it was inappropriate for CHD employees to make such comments about the JAO's operating procedures.

81. In conversation with Doe sometime after he was expelled, Dean Strong expressed she had not been aware the JAO had investigated the March 29th report in March and April of 2017, and decided it was not appropriate to raise allegations against him about it at that time.

82. In conversation with Doe, Katharine expressed resentment towards Doe for sending other Dartmouth employees his concerns about her management of his case and suggested that he had been misrepresenting her actions.

83. Based on advice he had received from Mark Reed, Doe contacted President Phillip Hanlon's office providing information and evidence of what'd happened in his judicial hearing case, and asked if Hanlon or any other employee of Dartmouth would evaluate this information to see if the College's employees had acted in accordance with Dartmouth's policies while managing his judicial hearing case in November.

84. On November 17th, 2017, after Doe contacted the President's office, Dartmouth's Associate Director of Safety & Security, Keiselim Montas, issued a cease and desist notice against Doe, which stated Doe was not allowed to contact anyone at Dartmouth College by any means (aside from three specified points of contact). Montas threatened to

file a criminal harassment complaint against Doe with the local police if he made contact with anyone else at the College.

85. In the voicemail through which Montas issued the cease & desist notice to the plaintiff, Montas told plaintiff to contact him if he had questions about the cease & desist notice.

86. Doe repeatedly contacted Montas in the following weeks asking why he'd threatened to take such action against Doe for having made permissible contact with the President's office, but Montas would not respond to Doe's calls, emails, or voicemails.

87. Doe raised that it was wildly inappropriate, and in violations of Dartmouth's own advertised policies regarding freedom of expression and dissent, for Dartmouth to threatened to file a criminal harassment complaint against Doe for simply trying to bring violations of the College's rules and regulations that'd been committed in his judicial hearing case to the attention of the relevant administrators. Shortly afterwards, Counsel for Dartmouth College granted Doe permission to speak with members of Dartmouth whom Montas previously stated he could not.

88. In a phone conversation Doe requested permission to record but Dartmouth employee Kristi Clemens would not allow him to, Clemens told the Plaintiff that even if his allegations against the Dartmouth were true, that according to her experience with Dartmouth's undergraduate disciplinary hearing system, the institution would not acknowledge this or provide remedy unless compelled to by a court of law according to her previous experiences with Dartmouth's undergraduate disciplinary hearing system, demonstrating the need for judicial intervention in this case.

89. Clemens also lamented about how costly and burdensome Doe's disciplinary hearing case had become for Dartmouth and its employees, and told John that she and the

employees working in Dartmouth's Judicial Affairs Office felt John had been raising concerns about their management of his case because he was unwilling to take accountability for his own actions, and not because his concerns were legitimate, and very specifically, that they felt Doe was raising concerns about their management of his case to shift focus away from his own behavior, demonstrating Dartmouth's apparent inability to fairly adjudicate John Doe's case after the time he started raising concerns about its employees' management of his disciplinary case.

90. Several weeks after Dean Biron responded to Doe's appeal on October 27th, Kevin O'Leary of Dartmouth's General Counsel denied John's claims that Dartmouth had failed to follow its own rules and procedures in his disciplinary hearing case, and told Doe that Dartmouth would not amend its adjudication of his case or engage in settlement discussions with him under any circumstances.

91.  In conversation shortly afterwards, Kevin demonstrated that he had not actually reviewed the information necessary to adjudicate whether or not Doe's claims about Dartmouth's employees were true before denying them by (through emails and phone conversations) making statements about decisions Dartmouth's employees had made over the duration of Doe's case, the justifications these employees had provided to support their respective decisions in Doe's case, and the nature of the decision-making process and conclusion which the COS reached at Doe's hearing on September 21st, amongst other things.

   a.  In an email to the plaintiff, Kevin wrote "In your request for review, you asserted a procedural error.  In other words you said that the College had not followed its procedures correctly.  As I mentioned above, Dean Biron agreed with you". There

21

is virtually no evidence to support Kevin's false assertion that Dean Biron had
reconciled or acknowledged the fact Dartmouth had failed to follow its own
procedures and committed procedural errors over the course of Doe's disciplinary
procedures.

92. In April, 2017, Brett A. Sokolow, President and CEO of The NCHERM Group, LLC
(formerly the National Center for Higher Education Risk Management) attested under
oath on a sworn affidavit that after an undergraduate student hired a member of
Sokolow's firm (Daniel Swinton) to serve as an expert witness in a lawsuit against
Dartmouth and do a report on the fairness and competence of Dartmouth's adjudicatory
procedures, that Kevin O'Leary personally called Sokolow to request NCHERM and
Swinton promptly remove themselves from the litigation, and stated that Dartmouth
would seek invasive discovery of NCHERM if they did not comply, but would not seek
such discovery if NCHERM fulfilled O'Leary's request. See

(http://www.dartblog.com/data/2017/05/013256.php).

   a. Upon information and belief, as general counsel for Dartmouth College, Kevin
      O'Leary does not attempt to fairly or unbiasedly review allegations made by those
      who claim they've been wrongfully sanction or punished by the College, but
      rather, strives solely to quell such complaints, and is willing to pursue this goal by
      morally and even legally dubious means.

93. In spite of what he had previously stated, Kevin O'Leary eventually conceded a
procedural error had occurred in John's case, but erroneously claimed Dean Biron had
already acknowledged this (Dean Biron explicitly told Doe no procedural error had

22

occurred at his hearing on September 21st 2017, and that this justified her decision and ruling in response to Doe's appeal).

    a.  No Dartmouth employee other than Kevin O'Leary was able to recognize that any procedural error or violation of Dartmouth's policies had been committed over the course of Doe's disciplinary proceedings in any capacity whatsoever. On the contrary, Dean Biron explicitly stated that no procedural error has occurred in Doe's disciplinary hearing process through the time of his September 21st hearing.

94. Both Kevin O'Leary and Elizabeth Biron stepped down, or were removed from their positions as Dartmouth's General Counsel and College Dean within the months following the plaintiff's expulsion.

95. After having previously told Doe that Dartmouth would not potentially settle with him under any circumstances, in a phone call about December 23rd, Kevin O'Leary told plaintiff that Dartmouth would engage in settlement discussions with plaintiff if Dartmouth did not impose a sanction upon him as the result of his second disciplinary hearing on January 8th, 2018. In response, Doe raised concerns to O'Leary that Dartmouth now had a clear incentive to subjectively enforces its rules and discretion to sanction and expel Doe at this hearing, since the Chair would most likely end up imposing financial, legal, and/or reputational burdens on their coworkers and employer if they were not to impose a sanction of expulsion upon him; amongst other things, imposing a lesser sanction or none at all would effectively serve to undermine these other employees' previous decisions and rulings, whereas subjectively imposing the same sanction of expulsion would do the opposite and support the veracity of their decisions and judgement exercised in the management of Doe's disciplinary process.

96. Doe also pointed out that the adjudicator in his second trial would face these incentives, ultimately, because of decisions other Dartmouth employees had already made in violation of the instructions own written rules and procedures in his case.

97. In response, Kevin O'Leary told Doe he was free to present these concerns to the COS at his second hearing (as Dean Biron and Dean Strong had also told Doe), but that Dartmouth and its employees would not answer any questions or concerns Doe had about Dartmouth's management of his first hearing in any capacity other than this opportunity to present them before the COS. After this point, Dartmouth's other employees became unwilling to answer the vast majority of his basic, reasonable questions about the rules and regulations of the College's hearing process, as well as his individual case.

98. By refusing to make due on its promises and contractual obligation to provide John Doe important information regarding Dartmouth's policies and his previous disciplinary hearing case, Kevin O'Leary, Katharine Strong, and Dartmouth's other employees unfairly, inappropriately, and severely impeded his ability to prepare for and participate in his second disciplinary hearing, and violated the terms of Dartmouth's contractual obligations unto the plaintiff.

99. By instruction from Kevin O'Leary, the Chair of Doe's second hearing would prevent him from presenting any information whatsoever to the COS on subjects which Kevin O'Leary, Dean Biron, and Dean Strong had all promised him he'd be given an opportunity to speak before the committee about without even evaluating the information herself, and in violation of Dartmouth's policies, basic reason, and fairness.

100. While Dartmouth had already presented several different narratives regarding subjects such as whether or not Doe had been given notice of the allegation he'd been found guilty

24

of prior to his hearing, and whether or not he had fairly and appropriately been expelled as a result of his disciplinary hearing on September 21st, 2017, in a recorded conversation with the plaintiff, Adam Knowlton-Young presented an entirely new fictitious narrative which justified Doe's expulsion, claiming that the JAO had intended to raise the allegation Doe was found guilty of in advance of his hearing, but failed to as the result of a "typo."

101. When Doe pointed out that this narrative could not be reconciled with the facts and circumstances of his case and other, different narratives Dartmouth had already provided him on these topics, Adam refused to clarify the apparent contradictions, or answer any other questions on the subject.

102. Over these months between Doe's first and second hearings on September 21st and January 8th, Doe would incur substantial out of pocket expenses as the result of Dartmouth wrongfully continuing to subject him to disciplinary procedures that violated its own policies, while also unexpectedly denying Doe benefits to his food and meal plan and other daily living expenses that would've otherwise been covered by his full-ride scholarship, causing Doe and his family to incur substantial debts over this period as a direct and proximate result of Dartmouth's failure to uphold its contractual obligations to the plaintiff.

### The Second Hearing

103. John Doe submitted a 166-page report containing his response to the allegations against him, and other information which Kevin O'Leary, Katharine Strong, and Dean Biron all told John he could present to the COS in written messages or recorded conversations in advance of his second hearing.

25

104. Every portion of Doe's report that addressed a variety of subjects which Kevin O'Leary, Katharine Strong, and Dean Biron had all explicitly instructed him to raise to the COS before his hearing, and reassured Doe that he'd be given an opportunity testify about to the COS about was removed from the report. No member of the COS which heard his case evaluated this information, including the Chair, a violation of Dartmouth's policies and its contractual obligation to uphold these policies over the duration of John Doe's disciplinary case.

105. While Dartmouth prevented John Doe from presenting information, argument, or raise these subjects and events to the COS's attention during his disciplinary hearing, when it eventually upheld Doe's expulsion as a result of his January 8th hearing, Dartmouth would cite the same specific subjects in support of its decision to sanction Doe, a plain violation of Dartmouth's own policies and any reasonable person's interpretation of basic reasonability and fairness.

   a. In another lawsuit currently open against Dartmouth, defendant has admitted to promising another student that he would be given an opportunity to share information on specific subjects with the COS, and then subsequently denying the student an opportunity to share that same information at their hearing (*Doe v. Trustees of Dartmouth College,* Case 1:18-cv-00040-LM).

106. The vast majority of the information John submitted was omitted from the report Dartmouth eventually gave the COS.

107. Upon arriving at his hearing on January 8th, 2017, Dartmouth-employed attorney Katharine P. Burke notified John she would be serving as chair at his hearing instead of the person who'd previously been designated to (who was allegedly ill). In doing this,

26

Dartmouth violated its promise and obligation to provide the names of the individuals who'd adjudicate his case in advance of his hearing.

    a. Doe would have urgently exercised his right to request Burke not serve as chair at his hearing if Dartmouth had given him notice she'd be serving on the committee as its own policies require.

108. In May 2013, Dartmouth alumni from the class of '79, Joseph Asch published an article titled "COS STORIES: BURKQUEMADA."

109. In that article, Katharine Burke is described as being an abusive COS adjudicator with little regard for the Colleges rules, or the fairness and integrity of the disciplinary hearings she oversees, and who routinely threatens students and acts capriciously while performing her duties as COS chair – a description that characterized Burke's management of Doe's hearing on January 8th.

    a. The disparate treatment offered to students accused of disciplinary misconduct based on the specific Dartmouth employee designated to serve as COS Chair at a particular student's hearing further demonstrates Dartmouth's failure to retain employees who are adequately trained and supervised to treat and discipline student's accused or found guilty or accused of committing similar acts of misconduct.

110. Burke was a biased adjudicator in John Doe's case who demonstrated a lack of disregard for Dartmouth's policies and violated Doe's promised rights as a member of the College and a participant in its disciplinary processes on the date of his hearing.

111. Upon information and belief, Katharine Burke systematically abuses the power she is given as COS Chair to determine, amongst other things, whether or not specific segments

of her dialogue with accused students are made before recording equipment and witnesses, and which are delivered in the secrecy of a private room where the student is legally prohibited from recording, or creating any sort of evidence of their interaction, to abuse and infringe upon the rights accused students at their hearings in ways described herein, and in aforementioned article.

112. Prior to the start of his hearing Doe asked Burke if she had read any of the information omitted from his original report, and she openly admitted she had not, and did not intend to.

113. Dartmouth's policies provide that in a COS hearing, it is the duty of the Chair to review information submitted by the accused student, and by failing to perform this obligation in Doe's case, Burke failed to conduct her role in his disciplinary hearing fairly or according to Dartmouth's policies.

114. John Doe repeatedly begged Burke to acknowledge it was the duty of the COS chair at his hearing to review all the information he'd submitted, and in response, Burke refused to do so.

115. Before his hearing, John notified Burke that Dartmouth's General Counsel, director of Judicial Affairs, and College Dean had all told him he would be allowed to share the information that'd been omitted from his original report (and she had prevented him from sharing without reading).

116. Upon Burke's request, Doe forwarded her an email Dartmouth's General Counsel had sent him weeks prior, in which Doe had been told he'd be able to share the omitted information with the COS.

28

117. After reviewing said email and speaking on the phone with Kevin O'Leary privately, Burke threatened to cancel Doe's hearing, send him on the next flight home, and draw out his College hearing process for weeks or months longer if he mentioned any of this information he'd previously been told he could share with the COS by Dartmouth employees including Kevin O'Leary, but which O'Leary himself inexplicably instructed Burke to prevent Doe from sharing with the COS on the date of his hearing.

118. Burke placed several other restrictions on what Doe could disclose which were severely detrimental to his ability to participate in the hearing and prevented him from being able to testify before the COS on subjects and events related to the allegations against him, and which were clearly relevant to the COS's decision of what sanction ought to be imposed upon Doe.

119. Dartmouth was abundantly aware Doe sought, and had been promised he'd be given the opportunity to present evidence about subjects which Burke inexplicably prevented him from speaking about to the COS.

120. Based on its review of the March 29th report Dartmouth imposed a sanction of permanent separation from the College upon Doe as the result of his second disciplinary hearing on January 8th 2018.

121. The finding report from Doe's hearing was written by Assistant Director of Dartmouth's Judicial Affairs Office, Adam Knowlton-Young.

122. In the finding report, Adam wrote that "Despite his assertion that he accepted responsibility and described his behavior as the "worst thing" he'd ever done, the student's other statements led the Committee to believe that he felt his actions during this period were justified, and that [Sally], her family, and Dartmouth were to blame. Under

the circumstances, the panel expressed concern for the safety and security of the Dartmouth community if the student were to continue his education here."

    a. Adam made no attempt to identify what "other statements led the Committee to believe that he felt his actions during this period were justified, and that [Sally], her family, and Dartmouth were to blame."

    b. Such judgement is in conflict with the verdict Dartmouth reached based on its initial investigation of this report in March & April of 2017, and is both arbitrary and capricious.

123. In his report on Doe's second hearing, Adam claimed that the COS had considered Doe's decision to present information alleging Dartmouth's employees had mismanaged his case, despite that in reality, Doe had been wrongfully prevented from sharing these concerns with the COS, and that Dartmouth's policies clearly stipulate these are not grounds upon which a student may be sanctioned for.

124. Adam cited a number of other subjects and events in his report which Burke had specifically barred Doe from sharing with the COS at his hearing in any way, such as that Dartmouth had failed to perform his disciplinary hearing procedures fairly or appropriately.

125. Doe had previously raised concerns about Dartmouth's Billing and Financial Aid departments, which has charged Doe for services he had not requested and were not rendered to him, promised to remove these charges for months, and then after repeatedly failing to remove the charges as they had promised to, eventually went back to Doe and persistently tried to make him pay for the charges and interest. These departments also misappropriated funds from the plaintiff's scholarship-funded tuition credits, and both

have, and continue to insist Doe pay out-of-pocket to cover the debt which arose on his

account as a result of their processing errors, even after having admitted in writing that

the charges were made in error, and that the appropriate offices would remove them.

   a. Doe asks the court order Dartmouth to remove charges it has inappropriately

   made to his student account, such as charges made for food and housing during

   terms which Doe was not even on campus or enrolled for classes.

126. The COS was not made aware of Doe's concerns regarding Dartmouth's Financial Aid

and Billing Departments in any way, and yet, Adam cited them in his report summarizing

the Committee's decision.

127. Upon information and belief, the case report Adam provided John does not accurately

represent the COS's consideration or adjudication of his case.

128. However, if Adam's finding report actually does accurately depict the COS's judgement

in Doe's case, this would necessarily mean that Chair Burke prevented Doe from

testifying and presenting evidence to the COS on the subject matters which it later based

its decision upon in his case, and thus, violated Dartmouth's policies and denied him the

opportunity to a fair hearing.

129. Dartmouth's decision to impose a sanction of expulsion upon Doe on January 9th was

motivated by the fact that Doe had raised allegations that the College failed to treat him

fairly or abide by its own rules and regulations, a grave violation of the institution's own

advertised policies supporting its members' rights to expression and dissent.

130. Said information which Doe had presented in the segments of the report he'd written for

the COS, but which Dartmouth omitted from the report before passing along to the

committee, contained allegations Dartmouth had discriminated against him on account of

his gender. Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.

131. Kristi Clemens provided an erroneous narrative of what transpired during their meeting at the start of April, which Doe was effectively denied the ability to protest and correct for the committee because of the restrictions Burke had imposed on what subjects he was allowed to testify about.

132. Adam's report contains conjectures such as "the student's description of his pain, anger and motivations did not appear to have diminished over time and did not convey genuine remorse or growth," which are entirely unsupported by, and in contradiction with Doe's testimony.

133. It is inappropriate for Dartmouth to have sanctioned Doe based on the contents of the March 29th report in spite of its previous decision not to, because of such subjective and arbitrary perceptions as these that its employees reached later on, and as the result of disciplinary procedures and processes Doe was wrongfully subjected to, or which were carried out in violation of Dartmouth's policies.

134. On January 9th, the day after Doe's hearing, he met with Katharine Burke (and several other employees who were present but did not participate in the meeting) who informed him his expulsion had been upheld.

135. These employees then compelled Doe to submit himself to the emergency room at Dartmouth Hitchcock Medical Center against his will, and despite that he did not pose a threat to himself or anyone else at the time or done anything to demonstrate he did.

a.  At this meeting, Doe expressed that it was not necessary or appropriate for him to
be submitted to the emergency room, and that he also would not be capable of
paying the costs associated with such a visit, and in response Dartmouth's
employees told Doe that Dartmouth would cover any medical expenses associated
with his stay at the hospital, but that if Doe did not immediately comply with their
demands to go, that they would call the police and that he would be "forced to go
in handcuffs." Doe, who felt he had no other choice, complied with their demands
and submitted himself to the hospital.

b.  Several months later, Doe received a bill for the ambulance ride, as well as a bill
for the cost of services he was provided at Dartmouth Hitchcock Medical Center
which were not covered by plaintiff's insurance for a sum of $715.14.

c.  When plaintiff wrote asking Dartmouth to cover these costs months later, one of
its employees (who was not at the meeting where plaintiff had been promised
Dartmouth would cover these medical costs) replied to Doe falsely claiming
Dartmouth's employees had actually only promised to pay for the costs associated
with his ambulance ride, and that it would not repay any of the other expenses
from the unnecessary medical treatment Dartmouth's employees had compelled
Doe to undergo against his expressed will. In response, Doe asked for a recording
of the meeting so he could "set the facts straight," and Dartmouth informed him it
had not recorded the meeting. Doe then asked if he could at least speak with the
individuals who had been present at this meeting to determine if any of them were
able to remember what'd actually happened, and in response, Dartmouth told Doe
that he could not, and that its decision was final. In doing so, Dartmouth unjustly

33

violated its earlier promise to pay the costs associated with the medical visit Doe it compelled Doe to undergo.

    d.  In his own notes from the day of the event, Dr. Mark Hiatt wrote "[Doe] said he could not afford the hospital and I told him that we have options for financial assistance."

136. About January 22nd, John Doe submitted an appeal of the Committee on Standards' sanction.

137. As grounds for appeal of the sanction John Doe raised the various irregularities, procedural errors, and violations of Dartmouth rules and regulations which transpired over the course of his judicial hearing process.

138. On February 5th 2018, Dartmouth Interim Provost David Kotz upheld the COS's decision and denied that any procedural error had occurred in Doe's judicial hearing case.

139. Other than reciting the standards by which Dartmouth's policies designate these decisions must be made, David Kotz provided no other information in his response to Doe's appeal and did not provide a word responding to or acknowledging the substance of the information and concerns Doe raised to him.

140. Doe had reached out to Provost Kotz's office asking if he would be willing to review information regarding his disciplinary hearing case to determine if Dartmouth's employees had acted according to its rules and procedures months prior to when Kotz evaluated Doe's request for review, by suggestion of the secretary of Dartmouth's Board of Trustees.

141. In response, Kevin O'Leary of Dartmouth's General Counsel responded to Doe speaking on Kotz's behalf, expressing Kotz's apparent willingness to defer to O'Leary's judgement

on how to respond to said concerns and complaints prior to the time Kotz eventually reviewed Doe's appeal.

142. Kevin O'Leary is one of the individuals whose actions Doe brought into question in his appeal to Provost Kotz.

143. Upon information and belief, Kotz's professional relationships with the individuals Doe had alleged failed to fairly and appropriately conduct his judicial hearing process motivated his wrongful decision not to acknowledge, identify, or try to provide remedy for what'd happened over the course of Doe's case.

144. In making said ruling in Doe's case, Provost Kotz was negligent in performing his duty to fairly and appropriately investigate allegations of administrative and/or employee misconduct at Dartmouth.

145. Furthermore, Dartmouth failed to fulfill its obligation to provide an unbiased arbitrator who would make a good faith effort to review the facts and circumstances of appealing students' cases and ensure the College's policies are upheld.

146. Shortly after submitting his appeal, John Doe wrote an email to the COS panel members who adjudicated his case containing a copy of the report Dartmouth's employees had prevented him from sharing with them before or during his hearing.

147. In response, Dartmouth's General Counsel and Safety and Security Department issued a cease and desist notice against and accused the plaintiff of violating a College policy that prohibits such contact with members of the COS (Dartmouth would later concede that no such rule exists).

Case 1:19-cv-00109 Document 1 Filed 01/30/19 Page 36 of 57

148.John Doe asked Dartmouth's General Counsel, an Undergraduate Dean, and Safety and
Security where this policy he'd allegedly broken could be found, but none would provide
him the information desired.

149.In a phone conversation about February 3rd 2018, Adam Knowlton-Young eventually
confessed to Doe that no such policy barring contact with the COS like the one
Dartmouth's General Counsel and Safety and Security had accused him of violating
actually exists.

150.On February 4th 2018, Doe wrote an email to Dartmouth's general counsel and other
employees involved in his disciplinary hearing procedures asking why they had issued a
cease and desist notice against him for allegedly violating a policy which did not actually
exist. Plaintiff did not receive a response to this inquiry, and on the day after he sent it,
Provost Kotz upheld the plaintiff's expulsion.


**Concerning Actions & Patterns of Behavior Undertaken by Dartmouth Employees**

151.The Dartmouth administrators and employees who're responsible for the vast majority of
wrongdoing described in the Plaintiff's complaint are, and have been the subject of a
myriad of lawsuits and articles containing allegations similar to those the Plaintiff has
made for years prior to the submission of the Plaintiff's suit.

   o  For instance, see **http://www.dartreview.com/the-state-of-judicial-affairs/**
   o  **https://www.powerlineblog.com/archives/2014/02/dartmouths-embarrassing-lack-of-regard-for-due-process.php**
   o  **http://www.dartblog.com/data/2013/05/010826.php**
   o  **http://www.thedartmouth.com/article/2018/01/expelled-student-sues-college-for-reinstatement**

- o   https://www.thecollegefix.com/dartmouth-expelled-male-victim-sextortion-attempt-female-raped-lawsuit/
- a.   http://www.dartblog.com/data/2017/05/013256.php

152. Dartmouth's policies stipulate that at various points over the course of the events described herein, that Doe ought to have been allowed the opportunity to have the actions of those employees of acted inappropriately or unfairly while managing his case fairly and unbiasedly reviewed by at least the following Dartmouth employees: the Dean of the College, the Provost of the College, the President of the College, the COS Chair, and various members of Dartmouth's Judicial Affairs Department, and Dartmouth's General Counsel (or at least member Kevin O'Leary, who represented to the plaintiff while performing his role in an official capacity that his job is to see that Dartmouth is compliant with its own policies).

153. Upon information and belief, most, if not all of these supervisors work closely with one another, and with the employees who they were designated to supervise and scrutinize the conduct of in Doe's case.

154. John Doe persistently tried to present evidence showing Dartmouth's employees had failed to conduct their duties appropriate to each of these Dartmouth "supervisors" at the relevant times during his disciplinary hearing procedures and on each occasion (regardless of how severe, unambiguous, and well-evidenced the infraction which Doe was attempting to bring to their attention might be) that supervisor would either (1) present an erroneous, imaginary narrative that justified whatever inappropriate decisions or behaviors Doe raised concerns about, but which also starkly contrasted with all available evidence on the misconstrued subject matters, or (2) communicate they were

37

either uninterested or unwilling to evaluate the information and concerns Doe had presented them.

155. Over the course of his entire disciplinary process, not a single Dartmouth employee was able to reconcile an understanding of what transpired during his disciplinary proceedings that is consistent with the pertinent facts and evidence, or the reality of what happened.

156. While these false narratives were often based on differing accounts of the very same events and information, one thing they held in common was that the falsified portions of each narrative conveniently served to justify wrongful actions undertaken by Dartmouth's employees, and consequently, what Doe had been subjected to as a consequence of these wrongful actions.

157. After one Dartmouth employee would present one false narrative to the plaintiff, Dartmouth's other employees would then support it, even when presented information that incontrovertibly demonstrated the falsified portions of these accounts could not be true.

158. The evidence will show that Dartmouth's employees and "supervisors" were playing a game of Whack-a-Mole with Doe — they would fabricate one narrative that justified his expulsion and the inappropriate decisions and rulings that'd been made by the individuals managing his case, and when he would try to dispel it, they would then come up with another reason.

159. Over the course of these events, Dartmouth's employees refused to answer dozens of John Doe's basic inquiries about the rules and regulations of the College's disciplinary procedures, as well as the plaintiff's specific case, in spite of these employees' clear obligation to provide such information based on their employer's contractual obligations

to the plaintiff, and often, even these employees' own promises to provide Doe the information he'd requested and assurances that Dartmouth did, in fact, have a duty to provide plaintiff the information in question. As a result, Dartmouth failed to uphold its contractual obligations unto the plaintiff and compelled him to attend fundamentally unfair hearings.

160. On many occasions, Dartmouth's employees would inexplicably make this excuse to refrain from answering questions which Dartmouth's employees had already answered for Doe on multiple occasions (affirming his inquiries were, in fact, reasonable, and that Dartmouth would answer such questions for a student in normal circumstances), but which Dartmouth had already provided Doe contradictory or otherwise differing and unreconcilable responses to on separate occasions, making it impossible for Doe to discern which of the statements were, in fact, true, and necessitating further inquiry to Dartmouth for clarification on his behalf.

161. Plaintiff reasonably infers that Dartmouth's employees refrained from responding to his information inquiries, and from upholding their obligations to do so in these circumstances because doing so would necessarily require refuting at least one of the differing, unreconcilable facts and narratives Dartmouth had provided Doe when he'd previously made the same inquiries, such as "did Dartmouth provide me notice of the allegation I was found guilty of and expelled for at my hearing on September 21st," which Dartmouth had responded to by saying both "yes" and "no" on different occasions.

162. Given the facts and circumstances, plaintiff reasonably infers that the paralleled behaviors and silent acquiescence of Dartmouth's employees were not simply the result of independent errors of judgement in fact and acts of negligence, but rather, part of a

collaborative, conscious effort to refrain from fairly or accurately examining or

adjudicating John Doe's case, or what this would necessarily require – identifying the

violations of Dartmouth's rules and procedures their coworkers and peers committed over

the duration of his proceedings.

163. Over the course of these events and the plaintiff's life, he has never done anything that

could conceivably make another member of the Dartmouth community have justifiable

reason to fear harm of feel threatened. Despite this, Dartmouth cited that "Doe made

members of the Dartmouth community feel threatened and/or fear harm" to support its

treatment and sanctioning of Doe throughout his case, while refusing to provide any

evidence that might support such a claim or justify such feelings, even when asked to on

numerous occasions.

164. On July 23, 2018, Mark Reed of Dartmouth's Counselling and Health Department

emailed Dana Scaduto of Dartmouth's General Counsel photocopies of the plaintiff's

private and protected health information. Plaintiff has explicitly instructed Reed not to

share any of his medical information with Dartmouth's General Counsel one day prior on

July 22, 2018 via email.

165. This is not the only case open in this court in which Dartmouth is alleged to have shared

students' private medical information with its own general counsel (see complaint from

*case 1:18-cv-01070*, paragraphs 57 and 150). Upon information and belief, Dartmouth

regularly violates its students' right to medical privacy.

   a. This court ought to impose punitive penalties against Dartmouth to put an end to

      this insidious practice, which has destroyed plaintiff's ability to fully trust the

      confidentiality promises of medical professionals.

**Defendant's Actions Have Severely Damaged Plaintiff Doe's Entire Future**

166. Plaintiff expected to graduate from Dartmouth in the spring of 2018

167. As a result of Dartmouth's actions, the plaintiff's academic career is ruined, and without a Dartmouth degree his education and earnings capacity will be forever diminished.

168. Plaintiff's academic and disciplinary record has been destroyed, and there is an incredibly remote chance that he will be able to complete his undergraduate degree at any school in the United States of remotely similar quality to Dartmouth.

169. If he can complete his bachelor's degree, plaintiff will have endured substantial delay because of Dartmouth's actions. In the status quo, Doe will almost certainly be unable to complete his undergraduate degree at another institution until the year 2021; until he was first wrongfully expelled on September 21st, 2017, Doe's projected graduation date was in June 2018.

170. If Dartmouth had not specifically told Doe it had determined that it was not appropriate to potentially impose a disciplinary sanction against him based on its investigation of the March 29th report, it would've been possible for him to make arrangements in time to attain his degree at another institution much earlier. This additional delay in Doe's attainment of an undergraduate degree and ascension to the workforce will cause plaintiff further reductions in his employability and earning capacity, and other likely permanent harms.

171. John Doe invested hundreds of thousands of hours over the first 18 years of his life in order to gain acceptance to a college of similar quality as Dartmouth. In high school, he led, managed, and founded various student groups; he earned various honors and awards

for his efforts in serving the community; he spent years studying for the SATs until he was able to attain perfect scores on multiple sections; and through incredible sacrifice, Doe managed all his responsibilities while taking the most difficult courses possible, and earning the grades necessary to gain acceptance to a school of similar quality as Dartmouth.

172. As the result of Dartmouth's unjust and unlawful actions described herein, these investments and sacrifices will have been rendered worthless, as it is inconceivable plaintiff will ever be granted acceptance or the ability to earn a degree at a school of similar quality as Dartmouth.

173. John had worked hard at Dartmouth to have a strong GPA to get into law school and to make his applications for the jobs he planned to apply for after graduating from Dartmouth as competitive as possible and was deeply active in academic and extracurricular programs as a student at Dartmouth.

174. John will now have to disclose, and defend himself against, his deeply blemished university record and reputation to every law school and professional graduate school to which he applies, and to prospective employers.

175. Because of the expulsion on his record, the possibility that plaintiff will gain entry into graduate school is remote.

176. Plaintiff will forever have to explain why his record shows he did not graduate from Dartmouth College which will negatively impact his lifetime earnings.

177. Dartmouth's Student Handbook states "Examples of conduct that have led to suspension, and in some instances separation from the College, include arson, bomb threats, driving under the influence, sexual assault, other forms of physical assault, and drug dealing."

42

178. As a consequence of what Dartmouth has done to John, every person, company, institution, or association in his life that learns he attended, but did not graduate Dartmouth, will have reason to suspect he was expelled for committing some action which represented comparable levels of harm to others as the aforementioned crimes – a stigma that will haunt plaintiff for the remainder of his life.

179. Even if Dartmouth were somehow able to prevail on the claim that they had the right to expel Doe, by failing to do so until 6-months after Dartmouth's Judicial Affairs Office initially investigated and received the March Report, Dartmouth enticed Doe to continue making payments and working towards completion of his degree at Dartmouth. All of the credits Doe earned during this time are virtually worthless at the vast majority of undergraduate institutions in the United States due to residency requirements.

    a. Residency requirements are graduation requirements which students must complete 2-3 years of courses on campus to fulfil and earn their undergraduate degree.

180. The time when Doe will be able to attain his undergraduate degree from another institution has also been delayed as a result of Dartmouth expelling him 6 and 9-months after the time it received the March Report, instead of at the time it received the report as Dartmouth's own rules require.

181. Without appropriate redress the unfair outcome of Dartmouth's flawed disciplinary process will cause irreparable harm to plaintiff by not permitting him to complete his education at Dartmouth, impairing his ability to continue his education elsewhere, and impacting his ability to work in his chosen field should he complete his bachelor's degree – professional consequences which will affect him for the remainder of his life.

43

182. As a result of Dartmouth's actions, plaintiff has been put through excruciating suffering, required extensive psychiatric and medical support, and been diagnosed with debilitating depression – problems Doe had never experienced before this incident, and subjected to this preposterous, torturous treatment and process. John has nightmares and flashbacks of the events described here and suffers other symptoms of post-traumatic stress disorder associated with them. At least three of Doe's different family members have sought psychological therapy or counselling because of the intense pain and trauma they have experienced alongside Doe over these events.

183. Today, in this courthouse, Plaintiff seeks to hold Dartmouth College liable for these catastrophic injuries and asks for a jury verdict to revendicate his life.


## CAUSES OF ACTION

### I. Breach of Contract

184. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

185. At all times relevant hereto, a contractual relationship existed between Dartmouth and the Plaintiff through, inter alia, Dartmouth's Student Handbook, matriculation contracts, and oral statements yielded by Dartmouth's administrators, trustees, and employees.

186. Dartmouth was required to act in accordance with that contract.

187. Dartmouth breached its contract with Plaintiff by failing to substantially comply with its own policies, violating Doe's promised rights as a member of the institution, and by making irrational, arbitrary, capricious, and fundamentally unfair determinations and rulings over the course of his disciplinary proceedings.

44

188. As a direct and proximate result of that breach plaintiff suffered the harms described herein.

189. Plaintiff is entitled to recover damages for Dartmouth's breach of its contractual obligations and duties including specific performance of the contract.

## II. Breach of Covenant of Good Faith and Fair Dealing

190. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

191. The student-university contract contains, as do all contracts, an implied covenant of good faith and fair dealing.

192. Dartmouth breached and violated the covenants of good faith and fair dealing implied in its agreement with Plaintiff by mishandling the investigative, evaluative, and adjudicative elements of his judicial proceedings, by failing to provide Plaintiff with the information and assistance he requested, by threatening him during adjudication, by meting out a disproportionate sanction of expulsion, by failing to fairly and consistently adjudicate his disciplinary hearing process, by refusing to be honest or forthcoming with Doe, by repeatedly insisting upon obvious falsehoods, by subjecting him to disciplinary proceedings other than and in addition to those described in Dartmouth's policies, by using the broad discretionary powers which Dartmouth has granted itself in its own policies in ways, or for purposes explicitly prohibited by, or antithetical to said contracts and policies, and by ignoring the many reasons why Plaintiff's appeal should have been granted and/or appropriately responded to, as averred in this complaint.

193. As a direct and proximate result of that breach Plaintiff suffered the harms described above.

## III. Title IX

194. Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

195. Title IX Of The Education Amendments Of 1972, 20 U.S.C. § 1981 et seq. (Title IX"

provides that in relevant part that "[n]o person in the United States shall, on the basis of

sex, be excluded from participation in, be denied benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance."

196. Dartmouth receives extensive federal funding.

197. Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is prohibited

from subjecting plaintiff to a disciplinary proceeding where the severity of the penalty

and/or the decision to initiate the proceeding was affected by his gender.

198. Pursuant to Title IX of the Education Amendments of 1972 Dartmouth is further

prohibited from providing a disciplinary proceeding that is not prompt or equitable.

199. Dartmouth initiated and conducted the investigation and subsequent hearing of Sally

Smith's March 29th report in a manner that was biased against plaintiff due to his sex.

200. Compared with its treatment of Doe, Dartmouth has treated two female students (which

plaintiff will name) accused of committing the same conduct violations highly favorably,

demonstrating how gender impacted the College's investigation and adjudication of his

judicial proceedings.

201. Dartmouth's employees selectively enforced their policies so as to find the male student

(John) responsible for a policy violation while declining to initiate formal disciplinary

proceedings or impose similar sanctions on female students accused and/or found guilty

of committing the same behavior.

202. Dartmouth violated plaintiff's right to be free from discrimination on the basis of sex by subjecting him to a disciplinary proceeding marked by the aforementioned procedural flaws and gender bias, that resulted in the plaintiff being inappropriately sanctioned.

203. Upon information and belief, at least one Dartmouth administrator who played an integral role in the adjudication of John Doe's case held the belief that men are inherently violent.

204. Dartmouth violated plaintiff's right to be free from discrimination on the basis of sex by subjecting him to a disciplinary proceeding marked by the aforementioned procedural flaws and gender bias, that resulted in the plaintiff suffering the harms described herein.

205. As a direct and proximate consequence of Dartmouth's Title IX violations, Plaintiff has sustained significant damages including expulsion from Dartmouth and profound emotional suffering and distress.

## IV. Negligence

206. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

207. Dartmouth had a duty of care, imposed on it by its policies and voluntarily undertaken, to conduct its disciplinary hearing procedures fairly, consistently, and in accordance with Dartmouth's own rules and regulations.

208. Dartmouth's employees breached that duty by pursuing their investigation and adjudication in a manner that violated or deviated from its policies, and was arbitrary, capricious, unfair and biased.

209. Furthermore, Dartmouth was negligent in performing its duty to adequately train and supervise with overseeing its undergraduate disciplinary hearing processes.

210. As a direct and proximate result of that breach plaintiff suffered the harms described above.

## V. Negligent Infliction of Emotional Distress

211. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

212. Defendant Dartmouth owed duties of care to plaintiff as averred in the sixth cause of action.

213. Defendant Dartmouth breached its duties owed to plaintiff.

214. As a direct and proximate result of this breach, plaintiff sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of reputation, loss of education opportunities, economic injuries and other direct and consequential damages.

## VI. Intentional Infliction of Emotional Distress

215. The foregoing allegations are incorporated herein by reference.

216. The actions of Dartmouth were willful and intentional.

217. Dartmouth knew of should have known that its actions in finding John responsible of a violation as the result of a fundamentally flawed disciplinary process, labeling him as a serious miscreant that posed a substantial harm to the Dartmouth community, and the other inappropriate treatments he was subjected to described herein, would cause John severe emotional distress.

218. Dartmouth's conduct was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

219. Dartmouth's conduct was the direct and proximate cause of John's severe emotional distress. He is deeply depressed and anxious; he is no longer able to sleep through the night; and he has had suicidal ideation.

220. As a direct, proximate, and foreseeable consequence of Dartmouth's aforementioned conduct, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

221. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and the reasonable costs of this action.

## VII. Estoppel and Reliance

222. Plaintiff Doe incorporates each of the above paragraphs as if fully set forth herein.

223. In the event the Court were to find that no contracts exist between Plaintiff and Defendant, Dartmouth, through but not limited to its regulations, standards, procedures, and policies, made representations to Plaintiff, independent of any express contractual promises, that Dartmouth expected or should have expected would induce Plaintiff to apply to and continue to enroll at the College.

224. Similarly, Plaintiff gave up competing offers from other prestigious schools because he believed on and acted based on the belief he obtained from Dartmouth's representations.

225. Plaintiff relied on Dartmouth's expressed and implied promises that he would not arbitrarily be sanctioned, much less expelled based on the contents of the March 29th report after Dartmouth had investigated the report pursuant to its own policies and determined it wasn't appropriate to raise disciplinary allegations against him based on the information it contained; that he would be treated reasonably, fairly, and according to its

49

written and stated policies and procedures; and that he would not be discriminated against based on his sex by the College while enrolled in it.

226. Plaintiff justifiably relied on Dartmouth's expressed and implied promises to his detriment, as Dartmouth failed to adhere to them.

227. As a direct, proximate and foreseeable consequence of Dartmouth's conduct, Plaintiff sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that includes a notation he was expelled from the College, further substantial delays in his eventual attainment of a degree, and substantial costs and debts accrued while participating in the disciplinary hearing procedures he was wrongfully subjected to.

228. Plaintiff has also suffered monetary damages, debilitating emotional distress and suffering, loss of education opportunities, and other direct and consequential damages.

## VIII. Unfair and Deceptive Trade Practices

229. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

230. The state of New Hampshire's Regulation of Business Practices for Consumer Protection laws create a private right of action for consumers of New Hampshire-based services, such as Plaintiff's consumption of Dartmouth's education, food and housing services, whose characteristics have been misrepresented, including "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce (Section 358-A:2 - *Acts Unlawful of Title XXXI – Trade and Commerce*).

231. Defendant Dartmouth has engaged in acts and practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation of omission likely to mislead a

reasonable consumer acting reasonably under the circumstances because they create the likelihood of confusion and misunderstanding, and are otherwise unfair and deceptive in the context of the situation, by causing Plaintiff and other consumers of Dartmouth's education and other consumer goods and services to believe that Dartmouth would follow its policies both as they were provided to plaintiff as stated in Dartmouth's policies.

232. Defendant had no intention of following and in fact did not follow its own policies and procedures, or the various terms of its contractual agreements with the plaintiff.

233. While Dartmouth's advertises that students who join the College will be treated in accordance with its rules, policies, and the Student Handbook (and thus, that it will retain the necessary and appropriately trained staff to ensure compliance with these policies), and that student's will be granted opportunities to have allegations they have not been treated in accordance with said policies fairly and unbiasedly reviewed, but in reality, Dartmouth is indifferent towards such allegations regardless of their veracity, and either knowingly refrains from acknowledging them, or is reckless in its examination of such complaints, falling far short of Dartmouth's own depiction of what it offers undergraduate members of the institution.

234. Based on the foregoing defendant Dartmouth engaged in deceptive or unfair trade practices in violation of the New Hampshire's Regulation of Business Practices for Consumer Protection laws.

235. As a direct, proximate and readily foreseeable consequences of Dartmouth's unjust and unlawful conduct Plaintiff has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that includes a notation he was expelled from Dartmouth.

236. Plaintiff has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

## IX. Equitable Relief in the Form of a Declaratory Judgement

237. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

238. Defendant has violated its contract with Plaintiff, federal, and state law.

239. Due to those violations plaintiff's education, career and life have been damaged.

240. Without appropriate redress, the discrimination plaintiff endured which is described throughout this complaint will continue to cause irreversible damages to plaintiff's reputation, emotions, sense of worth, academic, and professional development for the rest of his life.

241. As a result of the foregoing there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handlings of plaintiff's formal academic and disciplinary student record at Dartmouth and his alumni status.

## X. Negligent Training and Supervision of Employees

242. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

243. Dartmouth had a duty to exercise reasonable care in seeing that the employees and administrators tasked with overseeing and performing its disciplinary procedures were adequately trained, supervised, and familiarized with Dartmouth's own rules and procedures as necessary for them to effectively abide by and uphold these policies.

244. Furthermore, Dartmouth had a duty to adequately supervise its employees to ensure they act and behave appropriately and according to Dartmouth's rules and policies.

245. Dartmouth failed to exercise reasonable care in training or supervising its employees, as demonstrated by the myriad of negligent behaviors and misconduct they committed over the course of Doe's disciplinary hearing, and that the supervisors in charge of these employees failed to recognize even the most unambiguous instances of wrongdoing which Doe presented them.

246. As a result, the Dartmouth employees tasked with overseeing Doe's disciplinary proceedings committed the negligent behaviors, misconduct, and other actions which precipitated the injury and suffering John Doe has been subjected to described herein.

## XI. Fraudulent Misrepresentation

247. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

248. Agents of Dartmouth College (including but not limited to Kevin O'Leary, Katharine Strong, Anne Hudak, and Rebecca Biron) made false representations of material fact to and about the plaintiff over the course of his disciplinary hearing procedures, including but not limited to representations regarding the terms and scope of Dartmouth's rules and policies, and individual events or circumstances from the plaintiff's specific case.

249. Dartmouth knew these representations of material facts were false or was reckless as to whether or not they were true.

250. Dartmouth intended plaintiff to act in reliance on, and in accordance with these false representations (regarding both Dartmouth's own policies, and the facts and circumstances regarding Doe's disciplinary hearings) and all decisions and rulings made over the course of his disciplinary proceedings which were derived from or based upon these false pretenses.

251. Even when Doe did try to dispel or defy these false representations of fact and derivative rulings, Dartmouth's employees acted so that he effectively had no other choice but to accept or "go along with" their false misrepresentations and that they would be treated as facts by the Dartmouth personnel managing his disciplinary case.

252. John Doe acted in reliance on Dartmouth's false representations about, inter alia, the rules and regulations of its own disciplinary hearing process, how they would, and had been applied in his own disciplinary hearings, as he attempted to navigate, participate in, and prepare for his own COS hearings.

253. As a consequence of John Doe's reliance on falsehoods Dartmouth represented as material facts regarding how his COS hearings would and had been performed, Doe was unable to appropriately navigate, plan and participate in his hearings, have his case and decisions made over its duration fairly reviewed, and suffered other consequences, effects, and damages described herein.

## XII. Fraudulent Concealment

254. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

255. Dartmouth rules, policies, and verbal statements yielded by its employees and representatives, inter alia, stipulate that Dartmouth has an obligation to provide students with information regarding the rules and regulations of its disciplinary procedures, as well as their own individual cases, and to provide reasonable, accurate responses to informational inquiries on these topics.

256. Dartmouth's employees and representatives intentionally concealed and/or selectively withheld material information about its own rules and regulations, as well as the facts and

54

circumstances pertaining to John Doe's disciplinary hearings in response to his reasonable inquiries on these topics.

257. Dartmouth knew these representations of material facts were false or was reckless as to whether or not they were true.

258. Dartmouth knew or should have known that it had a duty and obligation to provide Doe information regarding the rules and regulations of Dartmouth's judicial hearing process and his own specific cases which it knowingly, consciously decided to withhold from John Doe in spite of his requests Dartmouth provide it to him.

259. On at least one occasion over the course of the events described herein, Katharine Strong repeatedly promised Doe that she would provide him information regarding his disciplinary hearing which occurred on September 21st, 2017, that he had a right to ask for the information he desired, and that her office had a duty to provide Doe the information, only to inexplicably refuse to provide Doe this information after weeks of promising she would give it to him.

260. Plaintiff John Doe justifiably relied on information Dartmouth's employees provided him, and has, and continues to suffer incredibly as a consequence of Dartmouth's successful and attempted efforts to withhold and/or selectively acknowledge facts and information on aforementioned topics.

## **Prayer for Relief**

1. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against defendant on all counts of this complaint. Plaintiff further prays this court will:

2.  Order the defendant to revert to the decision it reached (in accordance with the institution's policies) about April 4th, 2017 to not impose a sanction upon or raise disciplinary allegations against him based on its investigation of the March 29th report, and overturn all subsequent decisions Dartmouth made to sanction Doe based on these same materials, and in violation of Dartmouth's policies;

3.  Order defendant to refrain from attempting to take further disciplinary actions against the plaintiff based on the materials in the March 29th report, and revert to the original decision it reached in April 2017 (in accordance with Dartmouth's policies and procedures) not to raise formal disciplinary allegations against John Doe based on the contents of the March 29th report;

4.  Order defendant to reverse its finding that plaintiff violated its policies, and expunge his record;

5.  Order defendant to reinstate plaintiff as a student in good standing;

6.  Award plaintiff damages and enhanced compensatory damages in an amount to be determined at trial, including but not limited to economic damages, damages to physical well-being, emotional damages, damages to reputation, loss of career prospects as well as prejudgment interests and;

7.  Grant such other and further relief as this Court deems equitable and just.


**PLAINTIFF DEMANDS A TRIAL BY JURY**

Date:____1/25/2019____

Signature:_____John Doe_____

Name:_____John Doe_____

Email Address:_____jd2018265@gmail.com_____