**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MARK ANDERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:19-cv-109-SM |
| | ) |
| TRUSTEES OF DARTMOUTH COLLEGE | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT TRUSTEES OF DARTMOUTH COLLEGE'S MOTION FOR SUMMARY JUDGMENT**

Defendant Trustees of Dartmouth College ("Dartmouth" or the "College") moves pursuant to Fed. R. Civ. P. 56 and Local R. 56.1 for summary judgment on all of Plaintiff Mark Anderson's claims. There is no genuine dispute as to any material fact. Dartmouth complied with its Student Handbook and fairly and appropriately separated Plaintiff from the College. Accordingly, Dartmouth requests that the Court grant its motion and enter judgment in its favor on all of Plaintiff's claims.[1]

**MEMORANDUM OF LAW**

During Plaintiff's junior year at Dartmouth, his girlfriend ended their relationship. Distraught, Plaintiff sent multiple harassing and threatening communications to her and her family members over several months. To stop Plaintiff's campaign of harassment and threats, his former girlfriend sought and obtained a protective order from a state court close to where she

---

[1] Dartmouth files this Motion in order to comply with the current discovery order. *See* Endorsed Order, Sept. 17, 2019; Discovery Plan, ECF No. 26. There are several motions related to depositions and discovery, however, that are currently pending. If the Court grants any of Plaintiff's motions and orders additional discovery, Dartmouth reserves the right to file a supplemental memorandum in support of its Motion for Summary Judgment.

was attending a different university.  The order directed Plaintiff to have no further contact with her.  Less than six weeks later, Plaintiff violated the order by contacting his ex-girlfriend, and the Hanover Police arrested him.  After Plaintiff's arrest, Dartmouth initiated its disciplinary process and, ultimately, Plaintiff was permanently separated from the College.

The essence of Plaintiff's Complaint is that Dartmouth did not comply with its Student Handbook, but the facts tell another story.  They establish that Dartmouth complied with the requirements set forth in the Handbook.  In fact, when Plaintiff challenged the results of his first disciplinary hearing, arguing that he had not understood the scope of the allegations against him, a reviewing officer granted him a new hearing.  That new hearing panel, with no overlapping membership, again determined that Plaintiff violated its conduct standards and should be separated from the College.

The Court must assess whether the undisputed material facts demonstrate that Dartmouth complied with the Student Handbook and fairly and appropriately separated Plaintiff.  As set forth below, there can be no question that Dartmouth did so, and the College is therefore entitled to judgment in its favor on all claims.

## I.   Statement of Undisputed Facts

### A.  Dartmouth's Disciplinary Process for Student Misconduct

Dartmouth's undergraduate student discipline policies and procedures are contained in the Student Handbook.[2]  Exhibit 1; *see also* Exhibit 40, Strong Dep. Tr. 14:2-5; Exhibit 43,

---

[2] Plaintiff had two hearings before the Committee on Standards.  Different Student Handbooks governed each hearing.  The relevant portion of the 2016-2017 Handbook is attached as Exhibit 1 and referenced throughout this Memorandum of Law.  The 2017-2018 Handbook in effect during Plaintiff's second hearing was not materially different with respect to the relevant provisions.

Nelson Dep. Tr. 52:17-53:5.[3]  The Handbook defines nine Standards of Conduct for the Dartmouth community and describes the structure and operation of the undergraduate disciplinary system, including the Committee on Standards.  Exhibit 1 at 7964-68, 7971-86.  One of the Committee's purposes is "to hear cases involving undergraduates concerning violations of . . . the Standards of Conduct . . . ."  *Id.* at 7972.

The Judicial Affairs Office is "responsible for receiving all complaints and issuing allegations."  *Id.* at 7973.  "Any student, faculty member, or employee may file a complaint regarding an undergraduate with the JAO," but it can consider "any source" in deciding whether to conduct an investigation.  *Id.*  The Judicial Affairs Office has exclusive discretion to "determine whether complaints or other information concerning a student shall result in formal disciplinary allegations."  *Id.*  In other words, it alone is empowered to determine when to initiate the formal disciplinary process described in the Handbook.

If allegations are to be issued, the Director of Judicial Affairs must "determine whether information available in support of an allegation could result in suspension or separation if the student were found responsible."  *Id.* at 7974.  "If suspension or separation is a possible outcome" then the Director must "inform the student in writing and provide the student with copies of the available information related to the allegations," which the student then has the opportunity to admit or deny within five days of the written notice.  *Id.*

Katharine Strong is the current Director of Community Standards and Accountability in the Judicial Affairs Office.  Exhibit 40, Strong Dep. Tr. 5:10-21.  She and her staff manage all

---

[3] At the time Plaintiff matriculated, he understood that if he violated any provision of the Student Handbook, he could be subject to the disciplinary procedure set forth therein.  Exhibit 39, Anderson Dep. Tr. 34:15-20.  He further understood that hearings before the Committee on Standards were controlled by the process set forth in the Handbook.  *Id.* 47:10-13.

responses to undergraduate student misconduct.  *Id.*  On a daily basis, Ms. Strong and her team review reports that concern behavior by undergraduate students.  Then they decide whether there has been a possible or alleged violation of the Standards of Conduct.  If so, they determine whether a similar violation has resulted in a student's suspension or separation from the College previously and, if so, begin the serious misconduct process before the Committee on Standards. *Id.* 6:2-19.  After the initial decision to move forward with a judicial process is reached, it is initiated by sending the student a letter stating that the Judicial Affairs Office received a report concerning him or her and describing the next steps.  *Id.* 7:20-8:4, 9:1-8.

Responding students are entitled to reasonable written notice of the substance of the allegations against them.  Exhibit 1 at 7977.  That notice is provided to a student through an allegation packet from the Judicial Affairs Office.  Exhibit 40, Strong Dep. Tr. 9:9-10:7, 12:5-8; Exhibit 44, Knowlton-Young Dep. Tr. 11:9-12:11.  The packet includes, among other things, the allegation letter and a document used to allow the student accused of a policy violation to admit or deny the allegations called the Statement of Understanding.  *Id.*  The Statement of Understanding also includes a request that the student acknowledge that they have been notified where information about the process can be found (i.e. in the Student Handbook).  Exhibit 40, Strong Dep. Tr. 14:15-23.  If the student denies the allegations, the case is referred to the Committee on Standards for a hearing.  Exhibit 1 at 7974.

The hearing panel includes two members of the faculty, one administrator or staff member, two students, and a hearing Chair, who is a non-voting member.  *Id.* at 7972; Exhibit 40, Strong Dep. Tr. 15:10-14.  A member of the Judicial Affairs Office provides logistical and procedural support during the hearing.  The Judicial Affairs Office representative does not vote.

*Id.* 17:8-19:2; Exhibit 41, Burke Dep. Tr. 27:17-28:5; Exhibit 43, Nelson Dep. Tr. 11:12-23;

Exhibit 44, Knowlton-Young Dep. Tr. 9:9-10:9.

Committee on Standards hearing rules are set forth in the Student Handbook.  Exhibit 1

at 7975 ("In all . . . Standards of Conduct cases referred to the COS, the COS will conduct a

hearing in accordance with the procedures set forth under 'Rights, Rules, and

Responsibilities.'"); Exhibit 40, Strong Dep. Tr. 14:2-5.  The Student Handbook explicitly states

that the proceedings "are administrative in nature and [] not governed by rights and rules that

apply in a court of law."  Exhibit 1 at 7976.  Students are entitled to have a single advisor

present, but are individually responsible for responding to allegations and questions at the

hearing.  *Id.*  Students are free to choose their own advisor.  Exhibit 40, Strong Dep. Tr. 11:20-

12:4.

Hearings are to be scheduled "as soon as possible" after an incident.  Exhibit 1 at 7977.

The possibility that a student may face criminal charges does not limit the Judicial Affairs

Office's ability to proceed with disciplinary procedures.  *Id.*

Working with the Chair and the student, the Judicial Affairs Office prepares materials for

the Committee on Standards in a set of documents referred to as the case packet.  Exhibit 1 at

7975; Exhibit 40, Strong Dep. Tr. 13:6-14:1.  The hearing Chair, who has the discretion to

determine what is relevant to the proceeding, "makes the ultimate decision about what does or

doesn't get included in the packet."  *Id.*  The final approved case packet is sent to the hearing

panel and the responding student before the hearing.  *Id.*; Exhibit 41, Burke Dep. Tr. 9:1-11:17.

Generally, the "hearing procedure is informal.  The purpose is to provide the student an

opportunity to be heard and to provide the COS relevant information on which to base a

decision."  Exhibit 1 at 7980.  The Chair is empowered to make all procedural rulings, including

rulings on relevance and admissibility of materials and information.  *Id.* at 7978; Exhibit 41, Burke Dep. Tr. 7:12-8:11.  Subject to the Chair's discretion, the student is entitled to request witnesses, present information and argument, and to hear and question the information presented during a hearing, as well as to make opening and closing statements.  Exibit1 at 7978; Exhibit 41, Burke Dep. Tr. 12:2-13:20. While students may suggest questions for any witness, "[a]ll questions are posed by the Chair and members of the committee."  Exhibit 1 at 7978.  The Chair is responsible for ensuring the Committee hearing follows the standard procedures, participates in questioning, and facilitates deliberation, but does not vote.  Exhibit 40, Strong Dep. Tr. 16:20-17:7; Exhibit 41, Burke Dep. Tr. 24:12-26:3 (describing general hearing process); Exhibit 43, Nelson Dep. Tr. 8:8-10:4, 13:14-14:9 (describing general hearing process).  Once presentations are complete, the Committee enters executive session, considers the information it has been provided, determines whether a violation has occurred, and then, if a violation is found, determines the appropriate sanction.  *Id.*  The Judicial Affairs Office representative provides relevant precedent to assist the Committee in evaluating the appropriate sanction.  Exhibit 40, Strong Dep. Tr. 41:23-42:10; Exhibit 44, Knowlton-Young Dep. Tr. 9:21-10:3.  A finding that there is a violation must be supported by a preponderance of the evidence.  Exhibit 1 at 7981.  Both the responsibility determination and the sanction require a majority vote of the Committee.  *Id.*  After the final decision is reached, the Chair drafts a document called a case note, which summarizes the Committee's rationale.  Exhibit 40, Strong Dep. Tr. 21:20-23; Exhibit 41, Burke Dep Tr. 158:2-6; Exhibit 43, Nelson Dep. Tr. 16:14-17; 19:2-21.

The Office of Judicial Affairs promptly notifies students of outcomes of individual hearings.  Exhibit 1 at 7981.  The in-person meeting with the student usually takes place within twenty-four hours of the hearing, and the student's advisor and undergraduate dean (if different

from their advisor) are present.  Exhibit 40, Strong Dep. Tr. 21:23-22:17; Exhibit 41, Burke Dep.

Tr. 34:9-35:12.  The student also receives a letter reflecting the outcome of their hearing in

writing.

Students may submit a written request for review of the Committee's decision.  There are

only two bases for reversal of the decision:

1. Procedural error which has materially prejudiced the student's case;
2. Newly discovered information which, had it been available at the time of the hearing,
   would likely have affected the outcome either with regard to a finding of
   responsibility or with regard to the sanction imposed (if the information was not
   reasonably available to the student at the time of the proceeding).

Exhibit 1 at 7982; Exhibit 40, Strong Dep. Tr. 23:10-24:7.  "The reviewing officer has the sole

discretion to determine whether the grounds for review have been met."  Exhibit 1 at 7982.

"Following review, the original decision may be upheld, the imposed sanction adjusted as

the reviewing officer deems appropriate, or referred back to the hearing officer or the COS panel

that originally heard the case for further consideration."  *Id.*; Exhibit 45, Biron Dep. Tr. 8:8-9:13.

The Judicial Affairs Office does not have any involvement in the reviewing officer's review or

decision.  *See id.*  If a request for review is granted, the Judicial Affairs Office implements

whatever the review officer has requested as the next step.  Exhibit 40, Strong Dep. Tr. 25:2-10.

### B.  Plaintiff's Protective Order and Arrest

Plaintiff's former girlfriend ended their relationship around January 2017.  *See* Complaint

¶ 10.  Thereafter, Plaintiff began a campaign of harassment and threats against both his former

girlfriend and members of her family.  As a result, she obtained a protective order against him.

Complaint ¶ 12.  Plaintiff was served with a copy of that order by a Dartmouth security officer.

Exhibit 39, Anderson Dep. Tr. 10:1-4, 51:5-9.

The Judicial Affairs Office received a report regarding the protective order in March 2017, but decided not to initiate a formal disciplinary process at that time.  Exhibit 40, Strong Dep. Tr. 31:8-20 ("[W]e determined at that time that we did not have enough information to move forward with allegations at that time. . . . [S]hould more information become available, we would review again."), 92:15-93:9.  The Judicial Affairs Office did not consider its decision an adjudication.  *Id.* 28:6-11.  Plaintiff did not speak to anybody at the Judicial Affairs Office or receive anything in writing in April 2017.  Exhibit 39, Anderson Dep. Tr. 58:12-19.

Kristi Clemens, at that time the Assistant Dean of Student Affairs and Director of Case Management, also received a report concerning the protective order against Plaintiff.  Exhibit 42, Clemens Dep. Tr. 5:1-5, 9:11-10:4.  Ms. Clemens served as a point of contact for struggling students who might need assistance across multiple areas.  *Id.* 7:10-8:21.  She did not have any role in the disciplinary process, nor did she have any authority to make any adjudication regarding any report of troubling behavior she received.  *Id.* 8:5-7, 42:5-9

Ms. Clemens contacted Plaintiff to set up a meeting to talk to him.  *Id.* 12:5-10.  He initially declined, but they ultimately met on April 4, 2017 after Ms. Clemens clarified that their meeting was not optional.  Exhibit 2.  During that meeting, Ms. Clemens told Plaintiff the Judicial Affairs Office had reviewed the protective order and decided not to raise disciplinary allegations at that time.  Exhibit 39, Anderson Dep. Tr. 53:2-14, 55:3-13; Exhibit 42, Clemens Dep. Tr. 16:2-21 ("I let him know the college would not be taking any action on this report in terms of a judicial approach at this point, but wanted to let him know that should this behavior continue we may need to reconsider that."), 62:6-22.  Ms. Clemens also told Plaintiff that if he violated the protective order, then allegations could be raised against him and other materials

might be viewed at a future hearing.  Exhibit 39, Anderson Dep. Tr. 59:3-12, 191:2-8; *see also* Exhibit 3.

On May 4, 2017, a month after Plaintiff's meeting with Ms. Clemens, he was charged with violating the protective order and was arrested on Dartmouth's campus.  Exhibit 39, Anderson Dep. Tr. 10:10-12, 60:19-61:6; Exhibit 42, Clemens Dep. Tr. 19:15-21.  The Judicial Affairs Office became aware of these events.  Exhibit 40, Strong Dep. Tr. 31:21-32:5.  Ms. Strong and her colleagues reviewed all of the available information and determined that it was appropriate at that point to move forward with allegations "based on the totality of the information."  *Id.* 32:10-33:1, 108:4-19 ("There was additional new information that was brought to the attention of the College.  And that new information made the previously reviewed information appear to be more of a pattern of conduct rather than one interaction."), 160:7-161:3 (describing a "grouping of conduct" and "new conduct . . . of the same vein, continued harassment of the same non-Dartmouth community members"), 261:11-25 ("the Standard II [allegation] is about the entire pattern, not just the report from March").

### C.  Judicial Affairs Office's Initiation of Disciplinary Proceedings

On May 10, 2017, Adam Knowlton-Young, a Hearing Officer in the Office of Judicial Affairs, sent Plaintiff a letter.  It stated he was "writing to follow up on a report [his] office received from Safety and Security, regarding an incident on or about May 4, 2017 as well as behavior from spring term that had resulted in a restraining order being put in place on you." Exhibit 4.  Mr. Knowlton-Young offered to share materials electronically before he and Plaintiff met.  Shortly after receiving Mr. Knowlton-Young's letter, Plaintiff requested an electronic copy in advance of their meeting, which Mr. Knowlton-Young sent him later that day.  Exhibit 5; Exhibit 6.

Enclosed with Mr. Knowlton-Young's cover letter was a letter explaining the allegations, a Statement of Understanding through which Plaintiff was to respond to the allegations, a redacted copy of the Safety and Security report and other reports detailing Plaintiff's behavior, a copy of a letter to Plaintiff's parents, and an explanation of resources for navigating the Committee on Standards conduct process.  Exhibit 6; Exhibit 39, Anderson Dep. Tr. 63:9-12. The Statement of Understanding contained two allegations: (1) "I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term" and (2) "I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017."  Exhibit 6 at 111.

Plaintiff requested a delay of his disciplinary proceeding while he attempted to resolve the parallel criminal proceeding concerning his violation of the protective order.  Ms. Strong responded that he could finish the current term, but would need to resolve the judicial case before returning to Dartmouth.  Exhibit 7; Exhibit 40, Strong Dep. Tr. 34:12-17.  Plaintiff understood that in order to remain enrolled at Dartmouth, he would have to participate in a hearing, and he would not be able to register for classes until his disciplinary process was complete.[4]  Exhibit 39, Anderson Dep. Tr. 74:20-75:11, 75:21-76:3; Exhibit 40, Strong Dep. Tr. 35:16-36:9.

Despite this understanding, on September 4, 2017, Plaintiff emailed Mr. Knowlton-Young and Ms. Clemens stating he was coming back to Dartmouth and asking whether he still needed to participate in a hearing.  Exhibit 8.  Mr. Knowlton-Young informed Plaintiff his case

---

[4] When a hearing cannot be scheduled during the term of an incident, a temporary hold is imposed until the case can be heard or the deadline for administrative withdrawals passes. Exhibit 1 at 7978; Exhibit 40, Strong Dep. Tr. 25:11-23.

needed to be resolved before he returned to campus, and the process could not move forward until he completed the Statement of Understanding.  Exhibit 9; Exhibit 40, Strong Dep. Tr. 37:11-38:6.  On September 10, 2017, Plaintiff partially completed and returned the Statement of Understanding.  Exhibit 10.  He denied both allegations.  *Id*; Exhibit 39, Anderson Dep. Tr. 69:14-70:7.

On September 11, 2017, Adam Knowlton-Young notified Plaintiff of the date of his hearing, September 21, 2017, and identified the individual members of the panel.  Exhibit 11; Exhibit 39, Anderson Dep. Tr. 76:7-22.  Plaintiff had the right to, but did not, object to any of the panel members.  *Id.* 78:8-79:11.  Mr. Knowlton-Young's notice invited Plaintiff to submit written materials for potential inclusion in the case packet.  Exhibit 11.

The deadline for Plaintiff to submit a written statement passed without Plaintiff submitting materials or requesting an extension.  Exhibit 12.  The case packet was prepared and transmitted to Plaintiff and others on September 19, 2017, and he was informed it would be used with the Committee on Standards.  Exhibit 13.  Plaintiff was also provided an updated list of panel members.  Exhibit 14.

### D.  First Committee on Standards Hearing

The first hearing took place on September 21, 2017.  Plaintiff was given the opportunity to respond to the allegations that had been raised, and he attempted to answer questions about the emails to his ex-girlfriend.  Exhibit 39, Anderson Dep. Tr. 84:20-85:12.  Plaintiff gave a final statement after the question period.  *Id.* 88:6-12.

The Committee on Standards deliberated and found Plaintiff responsible for violating Standard of Conduct II, Exhibit 1 at 7964-65, and concluded the appropriate sanction was separation.  Exhibit 15; Exhibit 39, Anderson Dep. Tr. 93:8-94:8.  The Chair, Daniel Nelson, met

with Plaintiff the following day, September 22, 2017, and verbally communicated the

Committee's decision.  *Id.* 86:12-25.  Ms. Strong sent Plaintiff written notification the same day.

Exhibit 15.[5]

### E.  First Request for Review

Before Plaintiff submitted his request for review, he asked for more information

regarding the panel's decision, and on September 25, 2017, Ms. Strong sent him the case note

authored by the Chair, Daniel Nelson.  Exhibit 17.

After several extension requests, Plaintiff submitted his request for review on October 4,

2017.  Exhibit 39, Anderson Dep. Tr. 96:1-6; Exhibit 18; Exhibit 19.  In it he stated, among other

things, "I was not given such ***reasonable*** notice of the substance of my allegations from the

school, because my advisors and I were able to come to the conclusion . . . that the COS

committee put me on trial for a specific set of actions I'd committed during the Spring term,

which did not encompass the things I'd done during the Winter term while I was home . . ." and

consequently "I didn't get an opportunity to 'admit' or 'deny' the allegations I was found guilty

of, & it wasn't possible for me to know exactly what information it was important for me to

provide to the committee."  Exhibit 19 at 1301.

---

[5] Dartmouth paid for Plaintiff's parents to fly from Washington state to Dartmouth to take
Plaintiff home after he received the decision, but Plaintiff "elected not to return home" with them
after they arrived on campus.  Exhibit 39, Anderson Dep. Tr. 95:12-19; Exhibit 42, Clemens
Dep. Tr. 35:7-12; Exhibit 16.  Plaintiff understood that he had the right to request a review and
that he was not permitted to remain on campus during the time period that he was seeking
review.  Exhibit 39, Anderson Dep. Tr. 95:20-25; *see also* Exhibit 15 ("As you know, you have
the right to request review of the panel's decision . . .  Please note: separated students who
request review are expected to leave campus while their review is pending . . . .").  While
Plaintiff understood that until the proceedings were resolved he was not permitted to enroll in
classes or live on campus, he violated that directive by living at his fraternity.  Exhibit 39,
Anderson Dep. Tr. 104:18-105:8, 105:15-106:24.

Rebecca Biron, then Dean of the College, served as the reviewing officer.  She considered all of the materials submitted to the Committee on Standards panel and Plaintiff's written request for review.  Dr. Biron concluded that, while there was no new information or procedural error in the first hearing, because Plaintiff "was claiming that he would have responded differently" if the dates in the allegation letter had been more specific, "the issue of his ability to respond to the allegations [did] potentially have a material effect on the outcome of the hearing . . . ."  Exhibit 45, Biron Dep. Tr. 14:1-15:6.  She decided a new "hearing in which the allegation letter would more clearly state that the hearing was going to cover events from the first communications all the way through would allow him to respond in a more wholesome way as he indicated in the appeal letter he would like to."  *Id.*; Exhibit 20 at 2106 ("This statement demonstrates that the discrepancy you perceived between the allegation letter and the committee's focus did significantly affect your response to the allegations, both in your denial of responsibility and in the way you answered questions during the hearing.").  Plaintiff was granted a new hearing.   However, while the matter remained pending, he could not enroll and was not permitted to be on campus.  *Id.*

On October 26, 2017, Ms. Strong communicated the result of the request for review in person to Plaintiff, and then followed up with a new allegation letter the following day.  Exhibit 21; Exhibit 22; Exhibit 39, Anderson Dep. Tr. 99:13-19, 102:8-21; Exhibit 40, Strong Dep. Tr. 46:16-23, 47:1-4.  The revised allegation letter stated "it is alleged that you engaged in harassing behavior or conduct targeted at an individual in January, February, and March of 2017. Additionally, it is alleged that you violated a restraining order on or about May 4, 2017."  Exhibit 22 at 2012.  The first allegation in the Statement of Understanding was also revised: "I violated

the Dartmouth Standard of Conduct II by engaging in harassing behavior or conduct targeted at an individual in January, February, March, and/or May of 2017." *Id.* at 2013.

### F.  Interim Between First Request for Review and Second Committee on Standards Hearing

On November 1, 2017 Plaintiff sent an email to Katharine Strong requesting to delay his second hearing.  Exhibit 23 at 2782-83.  Worried that Plaintiff was in distress, Ms. Strong responded the following day that she had "significant concerns about [his] ability to engage in the judicial process at [that] time" and asked that he meet with a counselor for an evaluation.  *Id.* at 2782.  Until he completed the evaluation and Judicial Affairs was notified of his ability to participate, the hearing would "not move forward."  *Id.*  Plaintiff responded that he understood Ms. Strong's expectations.  *Id.*

 On November 9, 2017, Ms. Strong emailed Plaintiff and restated that she had asked him to provide her office with a waiver so that she could speak to his counselor and confirm his availability to participate in the hearing process.  Exhibit 24 at 3628-29.  Plaintiff signed a waiver, and in Ms. Strong's conversation with Counseling and Human Development, "they recommended that the hearing be delayed while [Plaintiff] pursue[d] recommended treatment options."  *Id.*  Ms. Strong gave Plaintiff until November 14, 2017 to confirm that he would pursue treatment or, in the alternative, refuse treatment, complete the Statement of Understanding, and move forward with the hearing.  She also noted that failure to respond would result in Immediate Temporary Suspension from the College.  *Id.*; Exhibit 40, Strong Dep. Tr. 49:7-17, 51:18-52:5.

On November 15, 2017, Plaintiff emailed Ms. Strong.  He did not confirm pursuit of recommended treatment options and did not return a completed Statement of Understanding.  Exhibit 24 at 3628.  Ms. Strong replied that since she had not received a direct response—or a

request for an extension—she would move forward with scheduling his hearing, likely at the start of the winter term. *Id.* She also stated Dartmouth would enact an Immediate Temporary Suspension. *Id.* The next day, Brian Reed, Associate Dean for Student Academic Support Services and Dean of Undergraduate Students sent Plaintiff notice of the Immediate Temporary Suspension, which would remain in force until the formal disciplinary proceedings concluded. Exhibit 25.[6]

On November 17, 2017, Plaintiff's counselor, Mark Reed, recommended to Ms. Strong and to Plaintiff that he take a medical leave from the College. Exhibit 26. Plaintiff understood that if he did so, he would be granted an extension of time for the disciplinary proceeding, but if he did not take a medical leave, the disciplinary process would move forward. Plaintiff decided not to take a medical leave. Exhibit 39, Anderson Dep. Tr. 109:8-110:7. Ms. Strong inquired on November 20, 2017 about an update on the topic. Exhibit 26. She sent a follow-up email on November 21, 2017 explaining Plaintiff's status at the time and reiterating that if he believed he would benefit from taking a leave before his hearing, he could request one and there was no deadline to do so. Exhibit 28.

Plaintiff requested a delay in the proceeding so that he could file a lawsuit. Exhibit 29. Ms. Strong responded that Dartmouth would consider a request if a lawsuit was filed, but the hearing might proceed even if he did so. In the meantime, she stated they would proceed with scheduling the hearing. *Id.*

---

[6] After Dean Biron issued her decision giving Plaintiff another hearing, he initiated a campaign of harassment against a variety of Dartmouth officials—including the Judicial Affairs Office, the President of the College, and the Provost—seeking intervention in his disciplinary proceeding through repeated phone calls and written submissions. Exhibit 27. Plaintiff was told that the Committee on Standards hearing was the only proper venue for proceeding. *Id.*

On December 8, 2017, Plaintiff was notified that he would be required to attend the Committee on Standards hearing on January 8, 2018, and was provided the names of the individuals who would sit on the panel.  Exhibit 30; Exhibit 39, Anderson Dep. Tr. 110:21-111:2.[7]  None of the voting members of the panel in Plaintiff's second hearing participated in or had any awareness of the first hearing.  Exhibit 40, Strong Dep. Tr. 47:10-22, 158:7-9 (Plaintiff was "granted an entirely fresh and clean new hearing"); Exhibit 41, Burke Dep. Tr. 29:1-16 (the second hearing panel was not aware of the first hearing, rather it was "a fresh hearing, not related to any previous proceedings").  The scheduling letter informed Plaintiff he could submit a written statement or other materials for inclusion in the packet provided to the Committee on Standards, but he should do so no later than December 15, 2017.  Exhibit 30. The letter also specifically stated the "COS Chair is empowered to determine the relevance and admissibility of all submitted materials."  *Id.*

Because Plaintiff had returned to his home in Washington State, Plaintiff requested, and Kristi Clemens approved his request for, financial assistance and travel arrangements to attend his second hearing.  Exhibit 31.  Ms. Clemens was clear that Plaintiff would have to depart Hanover if he were found responsible a second time, even if he decided to pursue a request for review.  *Id.*  Plaintiff ultimately accepted the terms Ms. Clemens outlined.  *Id.*

On December 22, 2017, Adam Knowlton-Young told Plaintiff again that materials are included in the case packet in the discretion of the Chair.  Furthermore, the Chair would "only be allowing materials or discussion related to the allegations and associated behavior" and the

---

[7] Katharine Strong had no involvement with the second Committee on Standards hearing and removed herself from the process in December 2018.  Exhibit 40, Strong Dep. Tr. 54:21-55:1, 55:19-22, 56:4-18.  Adam Knowlton-Young sat in on Plaintiff's second hearing in order to have "someone fresh" from the Judicial Affairs Office as the representative.  Exhibit 44, Knowlton-Young Dep. Tr. 17:15-18:10.

hearing would not be a "venue for discussing [his] concerns about the previous hearing or concerns with College procedures."  Exhibit 32.

On January 2, 2018, Plaintiff submitted materials he hoped would be included in the case packet.  Exhibit 33.  He also completed the Statement of Understanding, and named Ms. Clemens, among others, as a witness.  *Id.* at 8748.  The Chair, Liz Agosto, in her discretion, and consistent with the authority given to the Chair in the Student Handbook, reviewed Plaintiff's submission and selected a portion for inclusion in the case packet.  *Compare* Exhibit 33 *with* Exhibit 34; Exhibit 39, Anderson Dep. Tr. 116:16-24, 119:22-120:2, 120:9-13.[8]  Plaintiff received the final case packet on January 4, 2018.  Exhibit 34; Exhibit 39, Anderson Dep. Tr. 112:13-19.

### G.  Second Committee on Standards Hearing

The scheduled Chair, Liz Agosto, became ill at the last minute and could not attend Plaintiff's second hearing.  Katherine Burke substituted as the Chair.  The members of the Committee on Standards who actually made the decisions did not change.  Exhibit 39, Anderson Dep. Tr. 111:23-112:11.

Ms. Burke, an experienced chair, immediately familiarized herself with the case packet. Exhibit 41, Burke Dep. Tr. 15:2-21.  She met with Plaintiff in advance of the hearing to explain the process.  They discussed the materials he had proposed to be included in the case packet.  *Id.* 19:20-22:2.  She made it clear to him before the hearing started that the Committee's responsibility was limited to reviewing the case packet, and that she would maintain the focus of the hearing on his behavior as alleged in the materials, determining whether he violated Standard

---

[8] It is unclear how the information that Ms. Agosto decided should be removed would have improved Plaintiff's position before the Committee on Standards.

of Conduct II, and, if so, what the appropriate sanction would be. *Id.* 87:17-88:20. She stood by Dean Agosto's decision to allow consideration of only a portion of Plaintiff's written materials.

At his hearing, Plaintiff admitted the first allegation and acknowledged the messages he sent to his ex-girlfriend were "inappropriate" and, at some points, constituted "harassing behavior targeted at an individual." Exhibit 39, Anderson Dep. Tr. 113:5-114:2. The Committee on Standards reviewed Plaintiff's admission of a violation and concurred that he was responsible. Exhibit 41, Burke Dep. Tr. 30:16-31:5. The Committee then concluded that "given the nature of the behavior, it was behavior that should lead to permanent separation from the college." *Id.* 31:23-32:6. The basis for the conclusion was described in the case note but, briefly, the Committee "did not believe that during the hearing [Plaintiff] displayed an understanding of what [Dartmouth's] community expectations are or a capacity to conform his behavior to those expectations going forward." *Id.* 32:7-21; 100:12-101:3 (describing the purpose and content of a case note). A member of the second panel of the Committee, Michelle Clarke, testified that "the primary reason" she recalled "supporting that sanction was for the safety of the community" because there was a "pattern of threatening behavior and an unresponsiveness to various level of authority" and that "there didn't seem to be much in the way of an awareness of how frightening and inappropriate the behavior was." Exhibit 46, Clarke Dep. Tr. 16:21-17:10, 21:17-23. Plaintiff's focus was "exclusively or almost exclusively on the repercussions that the events and the" Committee on Standards Hearing "was having on [him] as opposed to the victim in the case." *Id.* 22:1-8.

On January 9, 2018, Plaintiff was informed of the Committee on Standards' decision that he had violated a standard of conduct and would be separated effective immediately. Exhibit 39,

Anderson Dep. Tr. 120:17-24.  He received written confirmation on January 11, 2018.  Exhibit 35.

### H.  Second Request for Review

Adam Knowlton-Young sent Plaintiff the case note for his second hearing on January 17, 2018.  Exhibit 36.  Plaintiff requested review of his second hearing on January 23, 2018.  Exhibit 37; Exhibit 39, Anderson Dep. Tr. 123:4-11.  He also attached the documents he requested to submit at the hearing.

David Kotz reviewed Plaintiff's request.[9]  Dr. Kotz denied the request, upholding the Committee on Standards' decision.  Exhibit 38; Exhibit 39, Anderson Dep. Tr. 124:10-17.

### I.  Procedural Background

Plaintiff filed his Complaint on January 30, 2019.  ECF No. 1.  It contains twelve alleged claims: breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), violation of Title IX (Count III), negligence (Count IV), negligent infliction of emotional distress (Count V), intentional infliction of emotional distress (Count VI), estoppel and reliance (Count VII), unfair and deceptive trade practices (Count VIII), equitable relief in the form of a declaratory judgment (Count IX), negligent training and supervision of employees (Count X), fraudulent misrepresentation  (Count XI), and fraudulent concealment (Count XII).

Plaintiff's expert disclosure deadline passed on December 31, 2019 without Plaintiff disclosing experts.  *See* Endorsed Order, Sept. 17, 2019; Discovery Plan, ECF No. 26 at 2.  Additionally, Plaintiff did not produce *any* documents or electronically stored information in response to Dartmouth's requests for production.

---

[9] Rebecca Biron discussed the general parameters of the role of a review officer with Dr. Kotz but did not discuss any other details or provide him any information or advice, including any of her own opinions or any information about the first review.  Exhibit 45, Biron Dep. Tr. 21:14-22:1.

II.     **Argument**

A.  **Choice of Law**

Almost all of Plaintiff's claims are based on state common law.  "In determining what

state law is relevant, a federal court must apply the choice-of-law framework of the forum state."

*Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am.*, 338 F.3d 42, 46 (1st Cir. 2003).  "Under New

Hampshire choice-of-law principles, when more than one state may have an interest in the suit

and the choice involves substantive law, the court must first decide whether relevant New

Hampshire law actually conflicts with the laws of the other interested states."  *SIG Arms Inc. v.*

*Emp'rs Ins. of Wausau*, 122 F. Supp. 2d 255, 258-59 (D.N.H. 2000).  "An actual conflict exists

only when application of the laws of an interested state other than the forum would change the

outcome . . . . When no actual conflict is shown, the court will apply the law of the forum state

. . . ."  *Vollmar v. Atrium Med. Corp.*, No. 17-CV-704-LM, 2019 WL 3935364, at *2 (D.N.H.

Aug. 20, 2019).

Dartmouth submits that the Court should apply the law of New Hampshire.  All of the

acts at issue in Plaintiff's Complaint occurred on Dartmouth's campus.  There are no facts in the

record that demonstrate any state other than New Hampshire has an interest in his suit, nor has

Plaintiff identified any substantive conflict between New Hampshire law and any other state's

law.

B.  **Count I - Breach of Contract**

"A student's relationship to his university is based in contract."  *Havlik v. Johnson &*

*Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007).[10]  "The relevant terms of the contractual language

between a student and a university typically include language found in the university's student

---

[10] Although the *Havlik* court applied Rhode Island law, there is no material difference between
Rhode Island and New Hampshire law that would prevent the Court from applying it here.

handbook." *Id.* Courts "interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should expect the student to take from them." *Id.*; *see also Nierenberg v. Trustees of Dartmouth College*, No. 2152016CV00259, 2017 WL 10259668, at *4 (N.H. Super. Ct. July 07, 2017) ("[T]he relationship between the parties is contractual in nature and is based on the terms of the Handbook as the parties should have reasonably interpreted them in light of their unique student-college relationship . . . ."). In "order to survive summary judgment the plaintiff must demonstrate genuine issues as to procedural errors resulting in material prejudice to his case or actions of Dartmouth that deprived him of basic fairness." *Id.*; *see also Van Ness v. Dartmouth Coll.*, No. 04-E-288, at 7 (N.H. Super. Ct. Mar. 28, 2006) [attached hereto as Exhibit 47] (reasoning a plaintiff "is entitled only to those procedural safeguards which the school specifically provides" and "Dartmouth has broad discretion in determining appropriate sanctions for violations of its policies, but [its] rules and disciplinary proceedings must comport with basic notions of due process and fundamental fairness").

### i. Plaintiff Cannot Demonstrate that Dartmouth Failed to Meet its Obligations Under the Student Handbook.

There was no breach of the contract embodied in Dartmouth's adherence to the provisions of the Student Handbook as a matter of law. The undisputed facts demonstrate that Dartmouth followed its own rules and procedures, and Plaintiff was not deprived of basic fairness. Dartmouth anticipates that Plaintiff may raise four arguments regarding his potential entitlement to relief. None have any merit.

First, Plaintiff may allege that his meeting with Kristi Clemens on April 4, 2017 was an adjudication that prevented the Judicial Affairs Office from later issuing disciplinary allegations against him in connection with the underlying conduct (i.e. the threatening and harassing

communications to his ex-girlfriend and her family) that resulted in the protective order.  Such an allegation confuses her role at the College, as well as misinterprets her statements.  The Student Handbook vests the authority to determine when and whether to issue disciplinary allegations in the Judicial Affairs Office.  No other person or office is given such authority.  Exhibit 1 at 7973. While not a perfect analogy, members of the Judicial Affairs Office are like prosecutors who decide if and when to bring charges, the Committee on Standards is like a jury, and the Chair is like a judge.  Ms. Clemens was none of the above.  Since she was not a member of the Judicial Affairs Office, she had no authority to initiate or decline to initiate allegations.

There is no dispute that she communicated the Judicial Affairs Office's initial decision not to issue allegations to Plaintiff at that time, but there was nothing in the Student Handbook that prevented Judicial Affairs from revisiting the issue at a later time.  Returning to the admittedly imperfect analogy of prosecutors and judges above, the Judicial Affairs Office's decision, as communicated by Ms. Clemens, was nothing more than the exercise of prosecutorial discretion.  Dartmouth did not believe it had enough information to move forward at that time and determined to do nothing unless more information became available.  *See* Exhibit 40, Strong Dep. Tr. 31:8-20.  When Plaintiff violated the protective order and was arrested in May 2017, the Judicial Affairs Office reconsidered Plaintiff's case because the arrest provided new information. A pattern of inappropriate contact had continued, and Plaintiff had not been able to let go of his animosity.  The continuing nature of the behavior and involvement of the police put Plaintiff's conduct in a more serious light.  It was entirely appropriate for Judicial Affairs to issue allegations at that time, and nothing in the Handbook limited their discretion.[11]

---

[11] The section of the Handbook titled "Rights, Rules and Responsibilities" applies only "if a student is alleged to have violated the . . . Standards of Conduct and must appear before the COS for a hearing . . . ." Exhibit 1 at 7976.  In other words, these procedural requirements regarding

Second, Plaintiff may allege that Dr. Biron should have concluded that he was not responsible or decided that no or only a minimal sanction should be imposed on him instead of deciding that a new hearing was an appropriate remedy.  The review officer "has sole discretion" to determine whether "grounds for review have been met" and may refer a matter back for further consideration.  Exhibit 1 at 7982.  Dr. Biron thought there was no procedural error because a reasonable person in Plaintiff's position should have understood the scope of the allegations.  If there was no procedural error, technically, Dr. Biron should not have granted Plaintiff's request for review, and his initial separation should have stood.  Nonetheless, Dr. Biron recognized that Plaintiff's subjective perception of the allegations may have prevented him from participating fully, even though there was enough evidence to support his separation at that time.  As a result, she ordered a new hearing.  Dr. Biron erred on the side of caution because the effect of Plaintiff's perception could have been a procedural error.  Her decision was fundamentally fair to Plaintiff, and ultimately gave him a second bite at the apple with an entirely new panel of the Committee on Standards.

Third, Plaintiff may allege that he should have been able to present more information regarding his disciplinary process during his second Committee on Standards hearing but he was prevented from doing so by the Chair.  Specifically, he may argue that he should have been allowed to present information about how the Judicial Affairs Office and Dean Biron had treated him unfairly throughout the Committee on Standards Process.

 The Student Handbook is clear: "the Chair is empowered to make all procedural rulings, including rulings on relevance and admissibility of information."  Exhibit 1 at 7980.  Plaintiff concedes that he was aware that the Chair had such discretion.  Exhibit 39, Anderson Dep. Tr.

---

hearings are only relevant once the formal disciplinary process has been initiated.  There is obviously no need to schedule a hearing if no allegation letter has been issued.

45:15-23.  The revised allegations under consideration at the second hearing concerned Plaintiff's conduct towards his ex-girlfriend up to and including his arrest for violation of a protective order.  The materials Plaintiff sought to include in the case packet went far afield from the core question of Plaintiff's behavior leading up to his arrest and were not relevant to the issues before the panel.  Plaintiff's concerns about the first hearing had nothing to do with the second hearing, and Ms. Agosto appropriately removed irrelevant materials from the case packet. Likewise, Ms. Burke appropriately directed Plaintiff to focus on the specific allegations in the Statement of Understanding, which were the only issue the Committee was being asked to—and had the power to—consider and decide.  Her only goal was to guide the panel towards evaluating whether Plaintiff was responsible for violating the Standard of Conduct as alleged and, if so, what the appropriate sanction should be.  The Committee on Standards does not and cannot make rulings about whether any Dartmouth employees, including members of the Judicial Affairs Office, did their jobs appropriately.  Their sole focus is on the responding student's conduct. The Chair's decision to restrict the materials provided for the Committee's consideration was within the discretion afforded her by the Student Handbook, and did not constitute a breach of contract.

Fourth, Plaintiff may argue the ultimate outcome was simply wrong.  Plaintiff's first hearing is essentially moot since he was given a brand new hearing with a new panel.  In advance of the second hearing, he *admitted* that he had violated Standard of Conduct II and engaged in harassing behavior or conduct targeted at his ex-girlfriend.  He did not dispute that he sent messages including the following to her:

- Calling her "a stupid fucking pathetic bitch;"
- Calling her "a crooked fucking whore;"
- Telling her to "kill yourself you fucking sociopath;"
- Calling her a "heartless cunt;"

- Telling her he would "probably post your nudes on reddit every day until they finally reach the front page (cause with your gross flabby tits, it'll probably take some work!);"
- Telling her would do "whatever I can do to hurt you as [sic] at least a fraction as much as you've hurt me;"
- Stating he hoped "life brings you nothing but pain and suffering;"
- "This is only going to be worse if you try and have your mom deal with it.  Kill yourself you spineless fuck;"
- Calling her a "fucking pathetic disgraceful piece of shit;"
- "If you take your time I'll make sure you regret it;"
- "You will know the same pain and suffering that you caused me now;"
- Stating "the thought of you crying excites me;"
- Hearing she failed a test was "truly exhilarating;"
- Once he "let [his] feelings out publicly…. the pain you'll feel might resemble mine."

Exhibit 36 at 5401-5402.  Throughout his many written explications to various Dartmouth employees about the termination of his relationship, he consistently failed to take responsibility for the damage he may have done to his ex-girlfriend or the fear or pain he may have caused her and her family.  The materials he asked to be included in the case packet were no different.  *See, e.g.*, Exhibit 33.  Panel members were "deeply concerned by" Plaintiff's "impulsive, unwanted, harassing and threatening pattern of behavior" and further concerned that "nine months later, [his] description of his pain, anger and motivations did not appear to have diminished over time and did not convey genuine remorse or growth."  Exhibit 36 at 5403.  The panel "expressed concern for the safety and security of the Dartmouth community if [Plaintiff] were to continue his education" at Dartmouth and "did not believe a long period of suspension would be appropriate given the severity of the behavior, or that it would be effective in protecting the community."  *Id.*  While the Court need only decide whether Dartmouth complied with its policies and notions of basic fairness, the Committee's decision was justified.

### ii.  The Student Handbook is the Only Contract.

The only relevant contractual source is the Student Handbook.  To the extent Plaintiff has alleged "a contractual relationship existed between Dartmouth and the Plaintiff through . . . oral

statements" by Dartmouth employees, his claim must fail as a matter of law because he has

offered insufficient evidence in the record to demonstrate any enforceable oral contract.

Complaint ¶ 185.[12]  *See, e.g.*, *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir. 1993)

("Where, as here, the moving party does not have the burden of proof at trial, that party must

make a showing that the evidence is insufficient to support the nonmoving party's case.").

### C.  Count II - Breach of the Covenant of Good Faith and Fair Dealing

"In every agreement there exists an implied covenant that each of the parties will act in

good faith and deal fairly with the other."  *Seaward Constr. Co. v. City of Rochester*, 118 N.H.

128, 129, 383 A.2d 707 (1978).  The covenant of good faith and fair dealing generally does not

give rise to an independent action in tort.  *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133,

137, 562 A.2d 187, 189 (1989); *see also Bennett v. ITT Hartford Grp. Inc.*, 150 N.H. 753, 757,

846 A.2d 560, 564 (2004).  A separate claim will lie only where the facts make out a breach of a

duty owed to the plaintiff independent from the contract.  *Id.*  Plaintiff's claim rests on a general

duty by Dartmouth to act fairly and in good faith in administering the disciplinary proceedings

described in its Student Handbook.  *Cf.* Complaint ¶ 192.  It does not implicate a separate,

independent duty owed to Plaintiff, and therefore cannot be asserted as a standalone claim.

Even if Dartmouth were not entitled to summary judgment on that basis, Plaintiff cannot

establish any conduct by Dartmouth that could constitute a breach of the covenant.  "[T]he

obligation of good faith performance" demands behavior consistent "with common standards of

decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and

justified expectations."  *Centronics*, 132 N.H. at 140.  "Good faith and fair dealing cannot be

---

[12] Likewise, Plaintiff has not and will not be able to identify any "matriculation contract" or other written document that has any bearing on his disciplinary process apart from the Student Handbook.  Complaint ¶ 185.

separated from context, however—and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline." *Havlik*, 509 F.3d at 35.  There is no genuine dispute that Dartmouth acted reasonably and complied with its Handbook, as described above.  The Court should give Dartmouth appropriate deference and find in its favor on Count II.

### D.  Count III - Title IX

Federal law prohibits excluding any person "on the basis of sex" from "participation in," denial of "the benefits of," and subjection to "discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  "[A]ttacks against a university disciplinary process on grounds of gender bias generally fall within" an "erroneous outcome" or "selective enforcement" theory of liability.  *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019).  The outcome of Plaintiff's disciplinary proceedings was not erroneous, Plaintiff has offered no evidence whatsoever to support a claim of gender-based decision-making, nor did Dartmouth engage in selective enforcement.

#### i.  Selective Enforcement

In order to succeed on a claim for selective enforcement under Title IX, a plaintiff must prove "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Haidak*, 933 F.3d at 74 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  "For a statistical disparity to support an inference of sex discrimination, the evidence must tend to show that there was a causal connection between the outcome of [the] disciplinary proceedings and gender bias."  *Id.* at 75 (internal quotation and citation omitted).

There is no evidence in the record that Plaintiff's gender affected the decision to initiate a formal disciplinary process or the outcome of that process in any way.  Plaintiff alleges in the

Complaint that "Dartmouth employees selectively enforced their policies so as to find the male student ([Plaintiff]) responsible for a policy violation while declining to initiate formal disciplinary proceedings or impose similar sanctions on female students accused and/or found guilty of committing the same behavior."  Complaint ¶ 201.  At his deposition, Plaintiff identified two female students whom he believed were comparable to him.[13]  He did not know, however, whether either student's alleged conduct was reported to Judicial Affairs; the content of any report about them to Judicial Affairs; how the report, if any, was handled; or whether the situations were factually similar enough to his own to create meaningful comparisons.  *See* Exhibit 39, Anderson Dep. Tr. 138:10-140:12 ("[I]t is impossible for me to know such specifics of other people's dealings, you know, private protected dealings with the college."), 141:10-142:22 ("I do not know with certainty the details of other people's disciplinary processes with the college or lack thereof."), 144:5-146:3 ("I don't know if they decided it was worthy or appropriate to raise an investigation.  I don't know what conclusion the JAO came to.").  For example, Plaintiff did not testify that either female student made threats similar to those Plaintiff made to his ex-girlfriend (such as threatening physical harm or to post nude photos on the Internet), or involved the issuance—let alone violation—of a state court issued protective order.  Plaintiff's allegations regarding these two other students are based on rank speculation and hearsay, and are insufficient to create a material dispute of fact regarding any allegation of selective enforcement.

Plaintiff also likely will allege that an article Dr. Biron authored before she became Dean of the College reflects bias against men.  Exhibit 45, Biron Dep. Tr. 5:10-12.  Dartmouth denies

---

[13] Although Plaintiff's allegations are meritless, Dartmouth has obligations, including but not limited to those stemming from the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, to protect the privacy of its students, so it has redacted the names of the individuals about whom Plaintiff testified.

that this conclusion reflects a reasonable inference based on the content of the article, or that the article, standing alone, would be sufficient to permit a selective enforcement claim to move forward since Dr. Biron had no involvement in deciding to initiate the allegations or determine the sanction.  In fact, there can be no dispute that Dr. Biron *granted* Plaintiff's request for review and gave him a fresh start, even though she did not believe there actually was a procedural error in his first hearing.  Plaintiff's claim cannot survive based on Dr. Biron's alleged bias alone.

### ii.  Erroneous Outcome

To demonstrate the outcome of a disciplinary proceeding was erroneous, a plaintiff must offer evidence "cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and indicating that "gender bias was a motivating factor."  *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  Plaintiff cannot do so here.  There can be no dispute that the second hearing panel's decision to find Plaintiff responsible for a violation that Plaintiff himself *admitted* was not erroneous.  Even so, there is no evidence in the record that any member of the Committee on Standards was motivated by Plaintiff's gender in any way.

### E.  Count IV - Negligence

The hornbook elements of Plaintiff's fourth claim—duty, breach, causation, and damages—are no doubt familiar to this Court.  *See, e.g.*, *Macie v. Helms*, 156 N.H. 222, 224, 934 A.2d 562, 565 (2007).  The only duty alleged by Plaintiff in Count IV is a "duty of care, imposed on [Dartmouth] by its policies and voluntarily undertaken, to conduct its disciplinary hearing procedures fairly, consistently, and in accordance with Dartmouth's own rules and regulations."  Complaint ¶ 207.  In essence, Plaintiff alleges that Dartmouth was negligent because it breached a duty to follow its own policies and procedures.  This is not a claim for negligence.  Rather, it

duplicates Plaintiff's claim for breach of contract, which is meritless as set forth in Section II.B above.

Courts throughout this Circuit have held that when it comes to college and university disciplinary hearings, there is no independent duty of care outside of the contractual relationship between school and student as a matter of law.  *See, e.g.*, *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 93-95 (1st Cir. 2018); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 196 (D.R.I. 2016); *Doe v. Brown Univ.*, 209 F. Supp. 3d 460, 477 (D.R.I. 2016); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 43 (D. Me. 2005). These and other precedents preclude Plaintiff's claim of negligence.

### F.  Count V - Negligent Infliction of Emotional Distress

The elements of a claim for negligent infliction of emotional distress include "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms."  *Wenzel v. Nat'l Creditors Connection, Inc.*, No. 16-CV-481-LM, 2018 WL 1902699, at *15 (D.N.H. Apr. 20, 2018) (quoting *Tessier v. Rockefeller*, 162 N.H. 324, 342 (2011)).  Like "any other negligence claim," a claim for negligent infliction of emotional distress "demands the existence of a duty from the defendant to the plaintiff."  *Id.* (citation omitted).

The duty identified by Plaintiff in connection with his claim for negligent infliction of emotional distress is somewhat confusing.  Plaintiff asserts "Defendant Dartmouth owed duties of care to Plaintiff as averred in the sixth cause of action."  Complaint ¶ 212.  Plaintiff's sixth cause of action is intentional infliction of emotional distress, which requires a higher standard for liability than breach of a duty.  The sixth cause of action does not identify a legal duty. Dartmouth will assume *arguendo* that Plaintiff meant to refer to the duty alleged in the fourth

cause of action for ordinary negligence, but there is no such duty as a matter of law as set forth in Section II.E above.  Plaintiff's claim for negligent infliction of emotional distress fails as a matter of law for the same reason his claim for negligence fails.

Regardless, the Court must also dismiss Plaintiff's claim for negligent infliction of emotional distress for another reason: Plaintiff has failed to disclose any expert witness and expert testimony is necessary to prove the objective physical symptoms required.  *O'Donnell v. HCA Health Servs.of New Hampshire, Inc.*, 152 N.H. 608, 612, 883 A.2d 319, 324 (2005).

### G.  Count VI - Intentional Infliction of Emotional Distress

The standard for a claim of intentional infliction of emotional distress is "very high." *Moss v. Camp Pemigewassett, Inc.*, 312 F.3d 503, 511 (1st Cir. 2002).  A "plaintiff must allege that a defendant by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to another."  *Tessier*, 162 N.H. at 341 (internal quotation, citation, and alteration omitted).  To demonstrate extreme and outrageous conduct, "it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice."  *Id.* Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*

The undisputed material facts demonstrate that Dartmouth's treatment of Plaintiff could not be characterized as "beyond all possible bounds of decency" "atrocious" or "utterly intolerable in a civilized community" as a matter of law.  *Id.*  To the contrary, Dartmouth appropriately adhered to the Student Handbook and fairly separated Plaintiff from the College. While Plaintiff may subjectively feel his separation was unfair, that subjective belief is not

sufficient to create a material dispute of fact requiring a jury trial.  *Compare Mikell v. Sch. Admin. Unit No. 33*, 158 N.H. 723, 730, 972 A.2d 1050, 1056 (2009) (upholding dismissal of claim for intentional infliction of emotional distress where teacher falsely reported misconduct by a student who later committed suicide allegedly as a result) *and Posteraro v. RBS Citizens, N.A.*, 159 F. Supp. 3d 277, 293 (D.N.H. 2016) (conduct that was "retaliatory" and "deplorable" was insufficient to state a claim for intentional infliction of emotional distress") *with Yale v. Town of Allenstown*, 969 F. Supp. 798, 801 (D.N.H. 1997) (denying motion to dismiss intentional infliction of emotional distress claim where plaintiff alleged her field training officer harassed her, made sexual advances, touched her without her consent, made her afraid he would shoot her, and made disparaging remarks to others to prevent her from advancing or forcing her to resign); *see also Rand v. Town of Exeter*, 976 F. Supp. 2d 65, 76 (D.N.H. 2013) (explaining co-worker who sexually assaulted plaintiff could be liable for intentional infliction of emotional distress but her employer could not be held liable for emotional distress caused by an employee acting outside his employment).

Furthermore, the New Hampshire courts have not settled whether expert testimony is needed to support a claim for intentional infliction of emotional distress, but other cases from this Circuit suggest such a requirement is sound.  *See Horstkotte v. Comm'r, New Hampshire Dep't of Corr.*, No. 08-CV-61-JL, 2009 WL 4907025, at *7 (D.N.H. Dec. 11, 2009); *Francisco v. U.S. Marshalls Serv.*, No. CA 11-231L, 2014 WL 652147, at *11 (D.R.I. Feb. 19, 2014) ("In the ordinary case, proof of physical symptomatology requires expert medical testimony on the existence of a causal relationship between the defendant's wrongful conduct and the plaintiff's claimed emotional distress."); *Morin v. E. Maine Med. Ctr.*, 779 F. Supp. 2d 166, 189 (D. Me. 2011) (explaining Maine courts held that the possibility of proving a claim for intentional

infliction of emotional distress without testimony of an expert is remote possibility).  Lack of expert testimony should preclude this claim as well.

### H.  Count VII - Estoppel and Reliance

The Complaint states Count VII is asserted "[i]n the event the Court were to find that no contracts exist between Plaintiff and Defendant . . . ."  Complaint ¶ 223.  In other words, this claim appears to be pled in the alternative to a breach of contract claim.  Promissory estoppel is not available where there is an agreement between the parties covering the same subject matter. *See Rockwood v. SKF USA Inc.*, 758 F. Supp. 2d 44, 58 (D.N.H. 2010); *Great Lakes Aircraft Co., Inc. v. City of Claremont*, 135 N.H. 270, 290, 608 A.2d 840, 853 (1992).  Assuming the Court accepts that a contract existed between Plaintiff and Dartmouth embodied in its Student Handbook, there is no need to reach this claim.

But even if this claim were properly pled in the alternative, any claim for estoppel must fail.  The elements of estoppel are (1) a false representation or concealment of material facts made with knowledge of those facts, (2) the party to whom the representation was made must have been ignorant of the truth of the matter, (3) the representation must have been made with the intention of inducing the other party to rely on it, and (4) the other party must have been induced to reply upon the representation to his or her injury.  *Thomas v. Town of Hooksett*, 153 N.H. 717, 721, 903 A.2d 963, 967 (2006).  Reliance by the party bringing the estoppel claim must be reasonable, and reliance "is unreasonable when the party asserting estoppel, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was improper, materially incorrect, or misleading."  *Id.*

Plaintiff cannot demonstrate that there is a genuine dispute as to whether he detrimentally changed his behavior based on any representation by Dartmouth, or that he relied on any

particular representation by Dartmouth to his injury. He alleges he "gave up competing offers from other prestigious schools" but also conceded in his deposition that he knew at the time he matriculated that he would be bound by the Student Handbook, and if he violated a Standard of Conduct, he could be subject to discipline. Complaint ¶ 224; Exhibit 39, Anderson Dep. Tr. 34:10-20. As set forth above, Dartmouth adhered to the Handbook and appropriately and fairly separated Plaintiff.

### I. Count VIII - Unfair and Deceptive Trade Practices

Plaintiff alleges that Dartmouth has violated the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 (the "CPA"). To succeed in such a claim, a plaintiff must prove (1) the defendant is a person, (2) the defendant used an unfair method of competition or a deceptive act or practice, (3) the act occurred in trade or commerce, and (4) the defendant's conduct rose to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.*, 158 N.H. 363, 369, 965 A.2d 1032, 1038 (2009) (internal quotation and citation omitted).

"Although the general provision of the CPA is broadly worded, not all conduct in the course of trade or commerce falls within its scope." *State v. Sideris*, 157 N.H. 258, 262, 951 A.2d 164, 168 (2008) "An ordinary breach of contract claim, for example, is not a violation of the CPA." *Turner v. Shared Towers VA , LLC*, 167 N.H. 196, 209, 107 A.3d 1236, 1248 (2014) (internal quotation and citation omitted). Plaintiff's claim should be treated as an ordinary contract claim, which is not subject to the statute. The essence of the dispute between the parties is private, and did not occur "in trade or commerce" as a matter of law.

Even if that were not the case, this claim is also based on Dartmouth's alleged failure to follow its own policies in the Student Handbook. *See* Complaint ¶¶ 231-233. There is no

genuine dispute that Dartmouth complied with its policies and fairly and appropriately separated

Plaintiff.

### J.   Count IX - Equitable Relief in the Form of a Declaratory Judgment

Count IX is styled as a claim for equitable relief in the form of a declaratory judgment.  A

New Hampshire statute permits:

> Any person claiming a present legal or equitable right or title may maintain a petition
> against any person claiming adversely to such right or title to determine the question as
> between the parties, and the court's judgment or decree thereon shall be conclusive.

N.H. Rev. Stat. Ann. § 491:22; *see also* 28 U.S.C. § 2201.  "To establish standing to bring a

declaratory judgment proceeding under RSA 491:22 . . . a party must show that some right of the

party has been impaired or prejudiced by the application of a rule or statute."  *Duncan v. State*,

166 N.H. 630, 645, 102 A.3d 913, 925 (2014).

The nature of the declaratory judgment or equitable relief Plaintiff is seeking is unclear

based on the contents of Count IX.  However, Plaintiff's prayer for relief asks the Court to

reverse the outcome of his disciplinary proceeding and reinstate him as a student in good

standing, among other things.  Complaint at 56.  Because plaintiff is not entitled to any relief as

set forth herein, this claim must also fail.

Although Dartmouth submits all of Plaintiff's claims are meritless, the only appropriate

remedy for a procedural error would be another hearing before the Committee on Standards—not

reinstatement, a reduced sanction, or any other relief.  *See Nierenberg v. Trustees of Dartmouth

Coll.*, No. 16-CV-259, at 7 n.2 (N.H. Super. Ct. Oct. 26, 2016) [attached hereto as Exhibit 48]

("[T]he court anticipates that if the plaintiff prevails at trial on this matter, the COS should be

ordered to conduct a new hearing with the necessary procedural protections."); *Ramaiah v.

Trustees of Dartmouth Coll.*, No. 215- 2015-CV-00351, at 4-5 n.2 (N.H. Super. Ct. Jan. 22,

2016) [attached hereto as Exhibit 49] ("Although the Court is not making any rulings at this time as to the proper remedy, the Court notes that it would appear the College is correct that if the plaintiff prevails at trial, the Court should order the COS to conduct a new hearing with the necessary procedural protections.").  At a minimum, the Court should rule that the only injunctive remedy potentially available to Plaintiff is a third hearing.

### K.  Count X - Negligent Training and Supervision of Employees

"[A] claim of negligent hiring, training and supervision can encompass direct liability as a result of the misconduct of the employee."  *Cutter v. Town of Farmington*, 126 N.H. 836, 840, 498 A.2d 316, 320 (1985).  However, Plaintiff must establish as an element "an underlying tort or other wrongful act committed by [Dartmouth's] employees." *Town of Londonderry v. Mesiti Dev., Inc.*, 168 N.H. 377, 385, 129 A.3d 1012, 1019 (2015).

Plaintiff cannot demonstrate that any of Dartmouth's employees committed an underlying tort or other wrongful act for which Dartmouth could be liable for negligent training or supervision.  In other words, because all of Plaintiff's other claims are meritless, he cannot succeed in this claim, nor is there any evidence in the record that any employee's training was deficient.

### L.  Count XI - Fraudulent Misrepresentation

"One who fraudulently makes a misrepresentation for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."  *Tessier*, 162 N.H. at 331-32 (internal quotations, citations, and alterations omitted).  "The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was

made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." *Id.*

Although Fed. R. Civ. P. 9(b) is most often applied in the context of a motion to dismiss, Plaintiff cannot meet its requirements even after the benefit of discovery. *See e.g.*, *Micronics Filtration Holdings, Inc. v. Miller*, No. 18-CV-303-JL, 2018 WL 4845749, at *3 (D.N.H. Oct. 4, 2018), *reconsideration denied*, No. 18-CV-303-JL, 2018 WL 6529081 (D.N.H. Dec. 12, 2018). ("To meet this standard, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (internal citation and quotation omitted)). This claim is essentially duplicative of plaintiff's estoppel claim and is meritless for the same reasons. There is no evidence in the record that any particular misrepresentation alleged by Plaintiff induced his justifiable reliance to his detriment, or that any particular agent of Dartmouth intended for him to rely on his or her representation with knowledge of its falsity or conscious indifference to its truth. Likewise, there is no evidence that any representation materially affected the outcome of his disciplinary process in any way.

**M. Count XII - Fraudulent Concealment**

Count XII is styled as a claim for "fraudulent concealment." However, the "doctrine of fraudulent concealment is an equitable ground to justify the tolling of the statute of limitations based on the wrongful conduct of the defendant," not a freestanding cause of action. *Conrad v. Hazen*, 140 N.H. 249, 253, 665 A.2d 372 (1995). As described above, Plaintiff has failed to demonstrate a material dispute of fact exists with respect to any type of fraud.

**CONCLUSION**

No student's right to remain enrolled at a private college is absolute, and Dartmouth is entitled to some discretion in its disciplinary process. The undisputed factual record before the Court demonstrates that Plaintiff admitted he engaged in misconduct in violation of Dartmouth's Standard of Conduct II, and the second hearing panel of the Committee on Standards imposed a reasonable sanction based on the totality of the information available. Dartmouth complied with the Student Handbook and appropriately separated Plaintiff. For all the reasons set forth above, Dartmouth respectfully requests that the Court enter judgment in its favor on all twelve claims.

Dated at Burlington, Vermont, this 18th day of May 2020.

By:    /s/ Shapleigh Smith, Jr.
       Shapleigh Smith, Jr., Esq.*
       Kendall Hoechst, Esq.*
       DINSE
       209 Battery Street
       Burlington, VT  05401
       802-864-5751
       ssmith@dinse.com
       khoechst@dinse.com

Dated at Manchester, New Hampshire, this 18th day of May 2020.

By:    /s/ Elizabeth E. Ewing
       Christopher P. McGown, Esq.
       Elizabeth E. Ewing, Esq.
       WADLEIGH, STARR & PETERS, P.L.L.C.
       95 Market Street
       Manchester, NH 03101
       603-669-4140
       cmcgown@wadleighlaw.com

       *Admitted pro hac vice*

       Attorneys for Defendant Trustees of
       Dartmouth College

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has this day been sent to Plaintiff Mark

Anderson, via ECF.

/s/ Elizabeth E. Ewing
Elizabeth E. Ewing