# Exhibit 33

This is an explanation of how Katharine Strong made it impossible for me (or any reasonable person in my situation) to turn in my "Statement of Understanding" by the deadline she set, and the Katharine's actions which I describe here exemplify the type of ludicrous, abusive behavior the Judicial Affairs Office and Dartmouth College have tried to perpetrate at my expense over this now three-month long judicial hearing process. The perpetrators and accomplices to these well-evidenced, morally, and legally wrong violations of the rules and procedures of the judicial hearing process, and my rights as a member of the College may tell you that this information somehow isn't related to this hearing, and that you shouldn't allow me to present it to the Committee; however, I assure you that it all clearly is, and if you simply review it all, it will be obvious this is true. In my "Statement of Understanding" I list all of the main individuals whose actions I discuss in this letter, so that they are free to attend this hearing and refute any of what I'm saying is true.

- Some in early November, about the 2nd, I asked Katharine Strong if I could have the date of my COS hearing moved back for two reasons: (1) because I had yet to be provided information from the College which Katharine Strong confirmed in a recorded conversation on November 16th that I have a right to ask for, and be provided as a member of the College, and which I also needed to fill out my statement of understanding, and (2) so that there'd be adequate time for the claims I describe in this letter – that the College had not treated me fairly or appropriately in this process since September 21st, and that this is the sole reason that I've been asked to participate in this hearing in the manner I have been – to simply be evaluated by some unbiased arbitrator.

- In her email reply to my request to have this deadline extended, Katharine Strong did not respond to or acknowledge my request. Instead, she said I'd need to undergo a psychological evaluation with the CHD, and that she would delay the deadline for me to submit my statement of understand by until the evaluating was performed, and if the case that the CHD determined I was mentally able/capable of participating in the hearing.

- A few days later, around the 6th of November, I attended a counselling session with Mark Reed form the CHD – part of the mandatory therapy (which I was willing, but forced and had to attend). At this session, Mark Reed said that he thought it might be beneficial for me to attend a trauma rehabilitation program to recover from what I've been put through since this first hearing. He asked, and I said I might potentially be interested in attending such a program, and I replied that I might without knowing any of the details about them. Then, Mark Reed said that he'd like to get more information for me about the treatment programs he'd recommended for me. Since this would require time and effort on his part, Mark Reed asked if I'd give him permission to speak with other individuals at the College to make sure I'd be able to attain financial assistance from the school to cover the cost attending such a program, since, as I told Mark Reed, I would certainly not be reasonable for me to ask my family to pay for such a thing, so this was a prerequisite for me being able to attend. Although I did genuinely want Mr. Reed to be able to check-in on this before getting information about the program for me, the JAO and College had thoroughly demonstrated they had no intention of treating me reasonably or fairly by this time, I was very hesitant to sign the waiver form he asked me to, which would give him authorization to speak with other people at the College about our counselling sessions. I remember specifically saying to Mark Reed (approximately) "I know this is probably a paranoid thought, but at this point I legitimately feel like these people are out to get me and might try to leverage me signing this waiver in some way" even though I could not imagine how they might at the time, and only after Mark Reed specifically promised me that *nothing could conceivably happen as a result of me signing the waiver other than that he would be allowed to check and see if I'd be able to get financial assistance from the College to help cover the cost of attending the program he'd suggested for me.* This concern turned out not to be a paranoid thought, but rather, an intelligent expectation of how Katharine Strong and the College's attorneys would try to handle this case in the subsequent stages in this process.

- Very shortly (I believe it was only a couple hours) after I signed this waiver for Mark Reed, I got an email from Katharine Strong in which she said her office had spoken with Mr. Reed, and based on that conversation, decided to require that I either submit my statement of understanding, or sign a form agreeing to enroll with whatever treatment program the CHD recommended to me. Since Mark Reed had explicitly told me nothing other than what he'd specified would happen as a consequence of me signing the waiver, because I was not told that the therapy session and treatment recommendation constituted the "evaluation" Katharine Strong said she delay the deadline until a date after it'd been performed, and because I still had not been provided the information which I needed to fill out my statement of understanding, and also been promised, told I had a right to ask for and receive from the College, and which Mark Reed said in a counselling session that no person in

DARTMOUTH008729

my situation could be reasonably expected to participate in this COS hearing without being provided (this information has still yet to be provided to me despite that Katharine Strong promised she would provide it to me by the end of Thanksgiving break in a recoded conversation I beg you to review from November 16th, and I will explain exactly what they have been refusing to provide me, and why this is not appropriate for them to be doing.

- Knowing that Katharine Strong would not relent in her ridiculous, and clearly improper procedural rulings and behavior from me presenting my concerns to her, I asked to speak with Mark Reed the next day, explained the situation to him, and asked that he write Katharine and say it was not appropriate to impose such a deadline as a result of the contact her office had with the CHD because of me signing the waiver he'd asked me to the previous day. Mark Reed wrote an email asking Katharine to delay the deadline, and she agreed to in writing via email to Mark Reed, and this is objectively true and clearly evidenced.

- About November 15th, the day after the initial deadline Katharine imposed, I emailed her asked if she could clarify the terms of her extension, because she had not given me any details about it personally other than the one-sentence email she sent to Mark Reed (and he CC'd to me) saying that she would give me more time to respond to the questions she had (dubiously) said I had to respond to earlier in the month. In response the next day, Katharine Strong emailed me saying that she'd not extended the deadline (objectively, a lie), and had decided to suspend me for (allegedly) failing to comply with the deadline she'd imposed. Now, about December 21st, Adam has told me something along the lines of that I cannot submit a statement of understanding for this COS hearing now because I missed this November 14th deadline Katharine imposed upon me. Please do not allow this ludicrous, systematic abuse affect my ability to participate in this hearing. I can only put out this information, tell you it is objectively true, and beg you to read it and act upon it. Please do.

- In a recorded conversation on November 16th when I presented these concerns to Katharine Strong, she told me that she had actually imposed this suspension on me a few days earlier in order to remedy or resolve logistical problems that had arisen from me not having been allowed to participate in classes for the last eight weeks of the fall term, suggested I should just "let it happen," and that aside from these issues being resolved, her suspending me would have no negative consequences on me in the future. This was also, objectively, a lie. As you can see, it has clearly affected me in other ways, such as influencing my ability to submit my statement of understanding for this hearing. I will fill one out for you anyways, in hopes that you will evaluate it as if you had not received it late.

DARTMOUTH008730

These people have total, unchecked power over the lives of students at this College who they ask to undergo these disciplinary hearings, and I promise you that in my case, they have not used their power and discretion to make any attempt to treat me fairly throughout this process. Instead, they have used it to try and cover up what they've put me through by failing to perform the duties of their offices appropriately since September 21st; it is an abusive conspiracy they're perpetrating to try and cover up their past wrongs. They've gone to such great lengths to try and prevent me from sharing this information with you and the relevant supervisors and authorities at the College; please do not let them

The Nazi's, and all other regimes given authoritarian control over the population they oversee, and what information their constituents have access to, will more often than not, eventually use the powers of their office deprive a minority of its basic human, and civil rights, to attain or protect the regime's own status, wealth or power, but under the guise they were acting in the best interests of the community. This is how American slavery, segregation, and Japanese internment all survived for as long as they did. History has shown that when authoritarians promise they will do one thing while holding office, but once in power, encounter situations where they have clear and obvious personal incentives not to, they are doomed to act to serve their own interests, rather than those of the people they claim to serve. This is what is happening here in this case. Though known to few, the Dartmouth Community is overseen by administrators who have total power and control over institutional and operational policies and procedures, fettered only by their own commitment to carry out their duties fairly and appropriately. However, at least in this case, the administrators of this College have shown these commitments are superficial, and that they go to great lengths, and do everything to ensure the victims of their abuse and mistreatment are the only people that ever learn of their true intentions.

Hitler and Himmler exemplify the kind of atrocities that can be committed by people who're given total power and control over other people's lives, and eventually find themselves in a situation where they can promote their own interests by committing violence against a small segment of the population it oversees which, seemingly, will not be able to stop the abuse, but the Nazis are certainly not alone in having committed these behaviors; men we remember today as kind benevolent rulers have also done this during their times in power, and under the guise they were really acting in the national interest. If you've heard about the door-to-door police raids that Obama authorized the police to perform in Chicago, or the drone strikes in the middle east, you'd probably agree he used the powers of his office to commit violence against these minorities to somehow bolster his own political power, or advance some other agenda, not because he thinks they are justifiable. There is a reason that some are prosecuted and others are not -- no president would try to overthrow democratically elected leaders in Russia and China for alleged human rights abuses, because of their ability to retaliate, but their peers in nations abroad with fewer resources and power.

In Nazi Germany, the individuals who were democratically chosen to oversee German society, and given authoritarian power, wielded this power in order to advance their own personal agendas, and disguised their violence and aggression as morally-justified and necessary acts of self-defense. The Nazi regime said the Jews were an imminent threat to German society that needed to be purged, and because of the German people's willingness to accept and believe anything their superiors told them without independent thought, and the Nazi's ability to control what information their people had access to. With this power and control over information, the Nazi's weren't just able to line their own pockets and bolster the regime by liquidating six million Jews across Europe; they also managed to convince the German people to carry out Himmler and Hitler's plot by doing whatever to it to prevent them from knowing what kinds of systems and processes they were participating in; if the soldiers who rounded up the Jewish people, or civilians knew what happened at the concentration camps built and operated abroad, they certainly would have been less complicit in helping perpetrate the genocide, or less willing to stand-aside and allow it to happen. The Dartmouth Administration has not committed the holocaust, but this is not required to act in the spirit of the Nazi's, as they have by using their total, unchecked power over the decision made in this special court/hearing system, by preventing the people who're unwittingly helping them perpetrate their plots (or who have the power to stop their inappropriate use of the power they've been entrusted with) from being able to learn what they're taking part in, and by abusing the rights of a minority of their constituents while claiming to act in the interest of the community they've been entrusted to oversee, but in truth, only acting to serve their own financial and political interests. What they are doing is clearly not fair or appropriate, and they do not want you to know this hearing is a part of their attempt to cover up this mistreatment, because they are worried that if you are made cognizant of the system of abuse you're being asked to participate in, it

DARTMOUTH008731

might affect your willingness to help perpetrate it, or stand aside and allow it to happen. Many of the individuals who ultimately helped bring the Holocaust to fruition were not fully aware of what they were participating in, and the Nazi's had a clear incentive and purpose for selectively publishing information in the way they did. They are not covering up genocide, but the Dartmouth Administration is covering up systematic, calculated, and intentional abuse and mistreatment they've committed to serve their own purposes. I promise you this is the case, and please, I beg you, do not simply believe that the people you've been tricked (or at least had me convinced of before this) into thinking are too accredited or must hold themselves to standards of accountability and integrity too high to commit such actions in order to hold the positions in office they hold, without evaluating the information I'm trying to present to you here. After these violations of the rules and regulations of the judicial hearing process, and my rights as a member of the College were first committed on September 21st, I was repeatedly told by multiple employees of the College the subsequent retrial (this hearing) Dean Biron eventually granted me five weeks after my initial trial was the only place where I could raise my concerns. As of the past few weeks though, they've suddenly started to try and tell me I shouldn't, or won't be allowed to share this with the committee, and they have a clear reason and incentive to want this information withheld; no authoritarian desires the victims of their abuse to make known what has been done to them. I do not know your intentions, or level of allegiance to the College, or people in the Judicial Affairs Office, but wherever you may stand, please do not help them perpetrate this abuse by preventing me from sharing all the information that is relevant to this case to the COS. Like Hitler and Himmler, Katharine Strong and Kevin O'Leary are pathological liars and serial manipulators. Please do not allow them to trick you into collaborating in their plot. This is nothing more than an attempt to cover up what they have done to me, and they have clear reputational, personal, and financial incentives for doing this. They also have an incentive to try and prevent you from knowing that you are taking part in this – please do not allow them to succeed at this. If I could afford an attorney, I would almost certainly not have been asked to attend this hearing, and the College would have come forward and made some attempt to treat me fairly, rather than try every option available to it to cover this up as it has since September 21st. Like the Jews, I have been selected for this persecution because it serves the financial and political interests of our community's leaders, and they do not believe I have the resources available to stop or resist them, no matter how well documented their abuse may be. Please just read all of this with any sort of an open mind, and I promise you that you'll come to understand how I have been asked to participate in this hearing, not because the JAO evaluated the actions which they're having me participate in this hearing over today and decided it was appropriate for me to attend a COS hearing because of them, but because by doing so, they might be able to absolve themselves of blame for what they've done to me over the past 3 months.

If I were to reproduce every single plain-faced lie and contradiction Katharine Strong and Kevin O'Leary have told me throughout this judicial hearing process, and the consequences this has had on me, would require me to literally produce a short novel, and since they've made so clear that they now intend to try and stop me from sharing this information with you at my hearing, I will not go through the trouble of trying to produce it for you like this in full. I promise you though that everything I'm saying to you is objectively true, and that there is a great deal of evidence that inextricably demonstrates that this is the case. If you are tempted by the urge to default to some theory of what has happened here, rather than examine all the available evidence to ensure you know what has really happened, my entire life is on the line in this case, and please, please, I beg you not to. If you are truly fair and unbiased arbitrators, and you resist this urge, I promise that you will come to realize that what I'm saying here (and have been saying for months) is objectively true, and that I have been plainly, and systematically abused by Katharine, Kevin, and various other employees of the College who oversee it's judicial hearing system, but they are not. These are unnecessary evils which have resulted in everything that is precious and dear to me in life being destroyed, and that the perpetrators of this abuse have committed solely in order to benefit themselves. No reasonable interpretation of the rules and regulations of the College's judicial hearing process, or my rights as a member of the Dartmouth Community, has been followed throughout this. Instead, they have set the rule-books aside, to engage in full-on, unfettered abuse. A man who beats his wife, and then commits further violence against her if she cries out to others for help operates under the same kind of logic and reasoning as Katharine Strong has here; when the victims of her abuse cry out for help, her first response is to commit further violence to try and silence them.

These people have no consideration for the type of power they bear over other people's lives, and the type of harm they cause others when they fail to perform the responsibilities of their offices appropriately. I asked all my relatives for money this Christmas so I could use it to help cover the attorney's fees and other expenses I've accumulated for the

DARTMOUTH008732

sole reason they have repeatedly and flagrantly violated my rights as a member of the College since September 21st. Like I did on Thanksgiving, I'm pretending to be sick today on Christmas as I write this so that I don't have to go see my family who I still can't bear to speak to while this goes on. Katharine Strong and Kevin O'Leary don't care about these things; they only care about covering this up to protect and serve the interests of the people who have helped needlessly destroy my entire life and do this to me

Case 1:18-cv-00109-SM   Document 48-33   Filed 05/18/20   Page 6 of 156

Please do not let these people inflict this violence upon me for the sole reason that it will serve their own personal agendas, and they believe I will be powerless to stop them. Please do not help them get away with doing this to me. It is so sick and cruel, and I cannot tell you how much it feels like continuing to go through this begging to simply be treated fairly, and as the College has a contractual obligation to treat all of its students for so long really is slowly killing me. If I could've been offered the choice, I would have accepted any sort of torture or suffering short of death rather than be put through this. It is so hard to describe what it has been like to go through this. All that would've been required for none of this to happen, and for me to have been able to apply to jobs, and finish my classes last term, and be able to talk to my grandparents, or anyone else that's been asking me about these two things for the past two months without crying, is for my previous COS hearing to have been performed in accordance with the rules and regulations of the College's judicial hearing process, and for Katharine Strong, who was responsible for making sure the hearing was performed appropriately, to have done her job appropriately and ensured that the few, meager procedural rights and protections I have in this process were upheld. Now, in order to absolve herself, the JAO, and the College of blame for what they have done to me, they are trying to string together a ludicrous, false narrative about what happened. If you simply look at the available facts and evidence, and the false, contradictory explanations as to how it might possibly be appropriate for them to have treated me like this, and you will see how plainly true this is, and what these people are really trying to do; destroy evidence of their abusive behavior and misconduct.

I cannot tell you how many times I've described and rewritten all of this in emails and phone calls to various employees of the College over the past three months, but I can assure you it is well into the hundreds. Rather than try and rewrite it all again, I am going to piece together some of the letters that I have written in the past that, combined, should communicate what has happened in this case as well as I can to you in writing at this point; at this point, it makes my mind numb to try and go back through and describe it all again. There are so many details about what this has been like that I cannot share with you. For the sole reason that the College has tried so hard not to treat me fairly, I have suffered the most depraved, torturous experiences that I have witnessed anyone go through in my entire life. I've pretended I've been sick all break to avoid going to Thanksgiving and Christmas with my extended family, because I cannot bear to see them and be asked about graduating and getting a job. I never had a real, genuine suicidal thought until September 22nd, but in the weeks between my first hearing and when Dean Biron responded to my request for review, when I didn't think there was any way for me to possibly attain justice for this in the public court system, I knew I could not survive my life, or bear to try if I simply had everything I've ever worked for or cared about taken away from me at the age of 22, and for these reasons. I cannot tell you what that was like to truly know that would be the only option left to me, and what it was like to have to promise myself that I would be strong enough to do it. I cannot understand how anyone could think they might be able to survive this life after being kicked out of College in their senior year for these reasons, have to explain to every College I apply to afterwards why Dartmouth says it expelled me for harassing my ex-girlfriend; these are so few of the implications this would have on me, and ultimately, I'd have to live my whole life knowing that the ultimate reason this was all taken away from me was that the College refused to try and treat me fairly in this hearing process, and I was powerless to stop them. I do not even know what will become of my scholarship now, but I do not know how I could live through paying thousands of dollars of student loans eventually finishing my last year or College at whatever school might accept me, and remembering this every time. I'm reminded of this by so many things in my daily life, I cannot express how debilitating it is, and I do not understand how anyone could think they might be able to survive having literally everything I've worked for my entire life taken away like this. The only thing that truly made me scared was that I might not fully succeed, and would wake up again, still in this life, but too disfigured or damaged to be able to remove myself again. I remember crying every day and just wondering if they'd still send out an email to the community about me after if it happened, or if they'd hold back on that too to try and remove themselves from what they'd done, and I'd just vanish without most of my friends even knowing what'd happened. I cannot tell you what kind of a sick, deranged, torturous experience it has been to be put through things like this so these people can try and absolve themselves of blame of what they've done. Waiting this long to see if your College gets away with expelling you for actions it didn't raise allegations against you about, but then accidentally

DARTMOUTH008733

expelled you for later without even providing you a hearing, so that it can cover-up that it committed such an egregious procedural error for this long, and having no choice but to fight it like I have is not something anyone in the world should have to go through. It is not a purposeful productive punishment, but a torturous process I was chosen to participate in by chance, and with no power to end it no matter what I do.

DARTMOUTH008734

This is an explanation of all the events that have occurred that are related to this COS hearing. It contains a response, and information about the actions which the JAO has raised allegations against me in this hearing for; it also contains an explanation of how these allegations came to be raised against me, what the College is making a systematic effort to do to me right now, their incentives for doing it, how asking me to attending this hearing as they have is nothing more than an attempt to achieve their own ends by ruining my life, and why it is unquestionably illegal, immoral, and wrong for them to have done what they have. I guarantee that everything I'm telling you is true, and if you doubt a word of it, please put the time and effort into making this decision, which will literally, permanently change the course of my life more dramatically than it would for the defendant in any other COS hearing, and exercise your right to ask for and examine any evidence you'd like to see if what I'm saying is true. I promise you that my rights as a member of the College, livelihood, and the rules and regulations of the College's judicial hearing process have not been their primary considerations. They have collectively been behaving and treating me in whatever way they think will provide the outcome that is most preferable for themselves throughout this process.

- About January/February of last year, my ex-girlfriend ended our relationship of 4.5 years, and in the weeks following we had a dispute which escalated over a sum of money owed, and I sent the emails which the allegations against me in this case are pertaining to. I think I described these to the best of my ability, and better than I can now in my "Request for Review" (which is included in this letter). I think I explained exactly what happened as well as I can there, so I don't really know what else to say about it other than to reference you there.

- At the end of this dispute, my ex-girlfriend and her mom said they were going to get revenge for what I'd said in these emails. I have a full-ride scholarship from a source outside the college, and they specifically said they would try and have this taken away from me. This was the last time we spoke until a month later about March 27th, the first day of Spring term, when they made unsolicited contact with my parents.

- A month later, on the first day of Spring term, the REDACTED family contacted my parents, and told them a series of lies, including that I had contacted them since roughly a month prior when we exchanged requests that either of our families contact the other in any way via the police.

- My parents started calling me for hours on end after this begging me to do something I had not been, and which I could not prove I had not been doing to them. Thus, I reached out to the REDACTED 's and told them that, as the police officer had told me prior, if they made continued unsolicited contact with me or my family, it would be sufficient cause for either of us to attain a restraining order against the other, and asked for them to provide verbal confirmation they would not continue to, or I would have no choice but to do this (last time I had asked REDACTED not to contact my mom again she said something along the lines of "fuck you, I'll do whatever I want").

- They agreed to do this and called me while I was in the library before the time they said they were going to, and then blocked my number after I left to return it. Then the next day, I wrote them to clarify the situation, and they submitted a complaint to the REDACTED Police Department, containing the emails I had sent during January/February, and a false narrative that I had been the one making unsolicited contact with them. This was about March 28th.

- When the REDACTED 's submitted this complaint, the police issued a restraining order against me, and the College/JAO were provided this information by the police. Based on the College's review of this information, my undergraduate dean, Kristi Clemens, made me attend a mandatory disciplinary hearing, and at this meeting, told me that based on the College/JAO's review of the materials in this complaint, it had decided that it was not appropriate to initiate allegations about the information contained in this complaint. Further suggesting this is (1) the fact that the College (seemingly, although Dean Biron, Katharine Strong, and every other College official I've gotten a response from about this has denied this aside from yourself and Kevin O'Leary) and JAO did not indicate in any way that based on its review of the materials it received in the complaint against me in advance of my hearing on September 21st, and (2) that no allegations were raised against me until months later, when I committed the actions which the JAO *did* initiate allegations against me about. Additionally, this meeting I was asked to attend perfectly meets the description of an "administrative hearing" as described in the student handbook, and although it happened almost a year ago now, the one thing I remember from it was that Kristi Clemens said that I'd have a college reprimand/warning issued as a result of the information, because I thought it was peculiar the two punishments were interchangeable. Kevin O'Leary has repeatedly reminded me I have no evidence to prove this was an administrative hearing, but I hope that you can understand that regardless of what my meeting with Dean Clemens would be appropriately characterized as, the one thing that is inextricably true, and well-evidenced, is that the College and JAO received, reviewed, and processed the materials contained in the complaint sent to the College by REDACTED Police Department about March 28th,

and at that time, determined those materials did not contain allegations which, if true, would warrant imposing an above-probation-level sanction upon me, and thus, did not warrant initiating allegations, or having me attend a COS hearing where the committee would consider imposing a sanction upon me for them. This is an imaginary threshold determined by the JAO based on nothing other than its own discretion, the precedents that've been established in this hearing system (which is a derivative of the former item), and the JAO's interpretation of the Student Handbook which they've been given to follow and act according to, but I promised you that based on these criterion unbeknown to anyone but the four people who run the JAO, they did not initiate allegations against me for these actions which I committed prior to March 28th, or the Spring term.

- A month or so later, the REDACTE 's had contacted my family again after the incident at the start of the term, so I called the police to ask what I needed to do in order to attain a restraining order, as Dean Clemens had suggested I should at our previous meeting. The police told me that in order to attain a restraining order, I would need to submit evidence that I had explicitly told the REDACTE 's not to contact my family, as well as evidence they subsequently failed to honor this request. I had no record of me asking this in writing at this point, and legitimately traumatized by this sick lady toying with me months after a breakup I just wanted to forget, I sent a 1 sentence email saying they were not allowed to contact me or anyone in my family, so that if they did again, I could get a restraining order, and at least be able to sleep at night knowing these people would leave me alone.

- I'm not even sure why I didn't think it would be at the time, but this was in violation of the restraining order that had been issued against me before, and so REDA submitted it to the police, who arrested me. In the end, this was nothing more than a mentally ill woman's successful play in a sick, sadistic game I had only been trying to escape for months at this point.

- About May 4th, when the College/JAO received notice I'd been arrested for allegedly violating the law, it initiated allegations that specifically stated this alleged violation of the restraining order on May 4th was a potential violation of Standards II and VI which, if true, could warrant imposing an above probation-level sanction upon me, and thus, warranted having me attend a COS hearing.

- At this COS hearing, which occurred on September 21st, the COS did not find that either of the two allegations which the JAO had raised against me were, in fact, true. You can read through the report where the COS chair Daniel Nelson describes the basis of the committee's finding if you need confirmation of this. It did, however, rule that the actions I'd committed prior to the Spring term, which the JAO had not raised allegations about in advance of my hearing, were severe enough to impose the harshest sanction possible against me; separation from the College.

- Since, as my College advisor Anne Hudak, and public defendant George Oslter both told me in advance of my hearing, the JAO had not given me any notice whatsoever that my actions from prior to the spring term were allegedly violations of the standards which, if true, would warrant imposing a sanction upon me, this was the most fucked up surprise I've gotten in my entire life. Given that Anne Hudak said the day before my hearing that I should think about what I might do if the COS suspended me for a term because it was always good to "hope for the best, but prepare for the worst" with these hearings. Little did I know that the committee, without giving me any chance to "admit" "deny" or explain these actions in a hearing, would rule my actions which the JAO had specifically examined and determined not to be appropriate to initiate allegations regarding, were such egregious violations of the Standards to warrant imposing what's normally dealt to students who commit *the more severe instances* of the following crimes: "arson, bomb threats, driving under the influence, sexual assault, other forms of physical assault"

- I am not asking to be given any sort of special treatment; I am simply asking to be treated fairly, and according to the rules and procedures set forth in the Handbook, and with respect to the rights that I, and all other members of the College are promised they'll be provided if asked to participate in the undergraduate disciplinary hearing process. After begging the College for any explanation as to how I might've been treated fairly in this hearing process for months I hope you understand that I at least have a very legitimate reason to believe these things have not been respected by the people who've been entrusted with making sure they are, and that it is not appropriate for the College to simply refuse to evaluate this claim to see if it is true for the past few months the way it has. The actions which you are reviewing have been examined by the College twice already, and at one point the JAO decided it would not be appropriate to initiate allegations about them, and then at another point a COS committee decided it'd be appropriate to expel me for them after a quick glance at the emails I sent without giving me an opportunity to explain them or take into consideration the things I did say about them, so I know that these decisions are made on a whim at this point, with almost virtually no consideration for how they affect people's lives, and have virtually no idea how sanction-worthy you'll determine they are. Please just recognize the circumstances in which I've been forced to attend this hearing,

and what this decision really represents. I have been punished so many times over for these actions. Without any sort of intervention from the College, these would have literally been the actions I regret committing most in my entire life. REDACTED and I were together for 4.5 years, and every time I see someone I haven't in the last year, one of the first things they ask is always if we're still together, and then how it ended after I tell them we aren't. The two other things everyone asks about are school and where I'm thinking about working next year, and I cannot tell you how torturous it has been to try and maintain fake smiles and lies through all of this, while this is my actual reality. She and I were really best friends, and closer than we'd been with anyone else, and I still can't believe what she did in the end even now, it is so hard for me to live with how I reacted. I cannot tell you the kinds of social and emotional consequences this has had on me, and I know you probably don't care, but I don't understand how anyone could think imposing a sanction here would serve any productive purpose other than to indirectly serve the probable intentions of Kevin O'Leary and the College. I have been dealing with this for a year, and even once it is over, will not ever be able to forget how much I regret acting like that, and even more now, the extraneous consequences that behaving that way has had on my life. I cannot understand that after all this, and considering the reasons why the College was ultimately given the information I'm having this hearing for in the first place, how anyone could think it is humane, productive, or healthy to make me sit at home watching my life pass by as I continue to try to have this situation and the information I've presented to you fairly evaluated by whomever I can find at the College that might be willing to, and has the power to act upon it, against the best efforts of the JAO and Kevin O'Leary. I am not suggesting that the JAO should or should have not initiated allegations about the actions which I have been asked to attend this hearing to respond to today, but I am stating that it is a matter of fact it did not, and that the fact none of the people who're responsible for recognizing and acting according to this have done so, and this has caused me incredible financial, personal, and emotional suffering than any other thing I have gone through, or seen anyone be put through in my entire life.

- I wrote Dean Biron about this, and she only responded to say she would not evaluate it, and encouraged me to move forward with the hearing process as I'd been instructed to.
- After this happened, I wrote my "request for review" to Rebecca Biron, the Dean of the College, explaining how my hearing had not been conducted fairly or appropriately, and that was the sole reason a sanction had been imposed upon me. Again, this is not a defense of my actions; it is the simple truth that I was not guilty of either of the two allegation the JAO had raised against me in advance of my first hearing, and that if my hearing had been conduct according to the rules and regulations of the judicial hearing process, or with respect to my rights as a member of the College, and Katharine Strong and Daniel Nelson had not failed to perform their duties and ensure the COS only imposed sanctions for actions I had been given notice would be considered as sanctionable violations of the Standards at the hearing, did not have a chance to admit or deny, and was specifically told would be superfluous to describe or explain to the committee by my advisor Anne Hudak, because no allegations had been raised against me about these actions in advance of the hearing. I met with several counsellors at the CHD now to explain this situation to them and try to make sense of why the College is doing this, and the only response any of them have been able to provide me is that it also did not seem like the College could possibly be treating me fairly or appropriately. I think four of the five I've spoken with have suggested I get an attorney, but my family does not have the money to afford one, and this is almost certainly the sole reason that I've ultimately been treated this way.
- Dean Biron responded to my request for review on October 27th, and stated that the JAO had given me notice of the allegations against me in advance of my hearing, and that no procedural error occurred, meaning it would be appropriate to maintain the sanctions which I claimed had been imposed as a result of Katharine Strong/Daniel Nelson's negligent behaviors/misconduct at my previous hearing. She however, did say that she believed I didn't know that the JAO had initiated allegations against me for the actions I committed prior to the start of the Spring term, and which were entirely the basis of the COS's decision to expel me from the College,
- I wrote a response a few days after I received Dean Biron's response to my request for review, which is contained in this letter. In response, Dean Biron said that it was not appropriate for her to hear or respond to my concerns that I had not been treated fairly, or according to the rules and regulations of the College's judicial hearing process in any way, and basically, told me to just accept what'd happened and move on. "Dean Biron's response to my *Letter to Dean Biron"* is also contained in this letter.
- Although the JAO, Student Affairs Office, and Kevin O'Leary conspired to try and prevent me from learning of this for the past few months, and I only learned of it around December 20th or so when the Board of Trustees Office revealed it was not true,
- If you have read these materials, you will see that my own interpretation of the allegation materials which the JAO presented to me in advance of my COS hearing on September 21st is substantially different that that of

DARTMOUTH008737

Dean Biron and Katharine Strong. I have provided these allegation materials in full for you to read in my "Letter to President Hanlon;" please review these materials for yourself to determine which of our two perspectives is true when you arrive at this portion of my letter. If it is not clear to you already, I promise you it will be abundantly so by the time you have read this entire letter. Their entire justification for effectively having separated me from the College for the past three months without first giving me a fair and appropriate hearing where I'd be given a chance to respond to is that I really had been provided one on September 21st. In a recorded conversation on November 16th, Katharine Strong said that the basis for them believing what they do, and accordingly, imposing the sanctions and treating me as they have since the date of my hearing on September 21st, is that the 6 pages of allegation materials which the JAO presented to me in advance of this hearing (the same ones I have provided you to look at), *clearly* state the JAO had, in fact, initiated allegation against me regarding the actions which I committed during January/February of last year, prior to the start of the Spring term, which were entirely the basis of the COS's decision to separate me from the College. When I sat down next to her during this conversation on November 16th, provided her a copy of all 6-pages of this material, and asked her to point, underline, highlight, or indicate in any way what part of these allegation materials her office provided me in advance of my hearing could conceivably be interpreted to support her own opinion in favor of her own, she told me that she would do this for me after our meeting and send it to me by the end of Thanksgiving break because, despite that I'd been asking for this information for months by this point, she said she was very busy with other JAO related work which she needed to complete before she'd have time to look through these 6 pages and provide me a response. Katharine Strong also confirmed that as a member of the College, I have a right to ask for such information, and it is the duty of the JAO to respond to such informational inquiries.

- A few days after the end of thanksgiving break, Katharine hadn't yet sent me the information which she'd promised to provide me by then in our recorded conversation about November 16th, so I asked to have a conversation with her so I could ask about it again. Katharine refused to allow me to record this conversation, but in it, said she was no longer willing to provide me this information, despite that she'd previously promised to: she also said that she was not willing to answer any questions about why I was no longer being provided this information which *I'd been promised, and told I had a right to ask for and be provided by the Director of the Judicial Affairs Department of Dartmouth College in a recorded conversation.* Since this time, all other individuals I have tried to contact at the College aside from the office's of the Board of Trustees and Provost have told me the College is no longer willing to answer any questions, or review any information about the allegations of negligence and misconduct that I've presented in this letter. After three months of begging every individual at the College that I've been given reason to believe might attempt to review this information to determine if I've been treated fairly (Dean Biron, President Hanlon, every member of the JAO, and Chris Sununu) the only response they've provided me is to say they will not evaluate what I've written, and refer me back to the judgement of the JAO – who have repeatedly stated they will not evaluate/act upon this information, and are the very perpetrators of the negligence and misconduct I'd written to inform them.

- The only employee of the College who has responded to what I've written is Kevin O'Leary of the Associate General Counsel, and his responses to what I've written have very clearly affirmed what the attorney I spoke with for an hour said is the case, and what Kristi Clemens said was the case (to the best of her knowledge) in a conversation she refused to allow me to record; that regardless of how much needless suffering and loss a student experiences as a result of the type of inappropriate behavior I'm alleging has been committed at my expense here, the College will not acknowledge what has happened in the situation, or try and provide relief or remedy to the student for what has been done to them, unless compelled to by a court of law. There are so many people who might've just submitted to this abuse like they've been hoping I will over the past few months if they found themselves in the same situation, and this cannot continue to be the way this community is run, with no way for people to know the true nature of this institutions operational policies, other than to find themselves victim to it like I have.

- Specifically, Kevin O'Leary has demonstrated that he rejected the allegations I'd presented to him without actually reviewing the evidence or materials related to them, and by doing this, he has shown that he has not had any intention of reviewing this information to determine if I've actually been treated fairly or appropriately throughout this hearing process; again, this is the only person aside from the people in the JAO who perpetrated the behaviors I've said must be reviewed who has even claimed to have read the information after these months, and he verifiably had not (other than to perhaps hear Katharine's rendition of what'd happened). Kevin demonstrated this by insisting several times that events had occurred which, clearly and objectively, had not. Some examples include that; (1) Kevin stated Dean Biron and Katharine Strong had recognized that the JAO had not initiated allegations regarding the actions which the COS imposed sanctions upon me for, and treated

DARTMOUTH008738

me accordingly since September 21ˢᵗ; (2) Kevin suggested that the COS's decision to impose the sanction it did upon was based (at least in part) on a finding that the allegations which *had* been imposed upon me in advance of my hearing were, in fact, true, despite that (as you can see from comparing the reasoning for the letter I was provided explaining the basis of the committee's finding with the allegation materials which were presented to me in advance of my hearing – both of which are provided in this letter for you to review) this is objectively not true, and the committee did not determine either of the allegation which had been made against me were true; (3) in emails and phone conversations, Kevin said a series of things about what rights and information I'm entitled to in this process as a member of the College which directly contradicted what Katharine Strong had told me in a recorded conversation on November 16ᵗʰ, which again, I beg you to review, as it is an important piece of information that is necessary for you to look at to understand this case to the best of your ability. This conversation was literally not available for Kevin to review at the time he'd contradicted what she'd said, and since I brought to his attention that he'd contradicted Katharine as I've described, they few people which he and the JAO have been trying to convince me I'm allowed to contact about this have only responded to what I've said by telling me they won't review or respond to the information, because they don't believe it is related to this COS hearing. I know

- Kevin told me I was allowed to contact the Board of Trustee's Office at some point, so I did this, and they suggested it would be more appropriate for me to contact the Office of the Provost before presenting this information to the Trustees, despite that everyone else at the College (including Kevin) had been trying to convince me my only option was to simply submit and allow the JAO to ruin my life like this, for these reasons, or file a lawsuit against the College.
- After I wrote the Provost's Office to simply ask if I could schedule an appointment to speak with the Provost about information and concerns which the Trustee's office had told me was appropriate to direct to them, I received a reply saying that I should direct my concerns to the JAO and Student Affairs Offices – both of which had participated in the misconduct I was going to present the Provost information and evidence of. However, I had not yet described what I wanted to discuss with the Provost at this time, suggesting they have been presented instructions to try and avoid responding to my request from Mr. O'Leary, since there is no other way they'd know. I wrote Kevin and the Provost's Office once again pointing this out, and how morally wrong it was for them to try and systematically conspire to prevent me from being able to have these concerns and information to be fairly evaluated, and after this point, the Provost's Office replied saying they'd talk with the Provost about scheduling an appoint with me when they get into office at the start of January, but as I write this on December 30ᵗʰ, I have so little faith I won't eventually be prevented from attending this meeting or having it fairly evaluated by the Provost after how determined the employees of the College tasks with handling this case have demonstrated they are to prevent me from having this case heard. These people are like criminals, and will only relent when they know their crimes are too well evidenced for them to hope they'll be able to conceal what they've done.
- While I've contacted every person I've been told I should try and present this information to over the past three months, only for none of them to even read the information I'd sent them, or do anything other than tell me I should blindly comply with the judgement of the people I'd told them were not acting reasonably or appropriately, Katharine Strong and Kevin O'Leary have also orchestrated and perpetrated a number of other clearly inappropriate actions in violation of my rights such as those described at the very start of this letter which Katharine Strong committed in the first few weeks of November. They are trying to tell me I should not try and raise this information to anyone's attention, but I hope you understand how these sort of actions not only must be brought to the attention of the relevant supervisors or authorities, not just for my sake in this case, but for the sake of all the people in this community whose security is affected by how competently and accountably these people perform the duties of their offices. I have personally learned that, at least from time to time, they do not perform these duties appropriately. I have also learned that when they do not, they will do anything in their power to prevent what they've done from becoming known.
- I cannot even begin to describe all the unnecessary pain and hardship I've been put through for the sole reason I haven't been treated fairly throughout this. I cannot bear to tell my grandparents on both sides of my family that they bought flights and hotel reservations to come see my graduation for nothing, if the reason why I won't be graduating on time is because this happened, and relevant authorities do not review this in time to even let me have that. I did not get to apply for any jobs during the most important round of recruiting last fall because of this. I am sure that it has been exhausting to read, review, and make sense of this information, but please, try and imagine how painful and frustrating it has been for me to actually write out, explain, and provide this to you and everyone else that might read it over and over through the past three months, only to receive the responses that I have. I am doing this all because I have no choice.

DARTMOUTH008739

- **Please try to understand how the College has not asked me to participate in this hearing today because it decided to initiate allegations regarding these actions at the time they were brought to it's attention. The College has made me attend this hearing because by doing so, it gives itself an opportunity to potentially absolve itself for some of the harm it has caused me throughout this process. As Kevin O'Leary explained to me in a conversation he would not allow me to record about December 21st, if you do not impose a sanction upon me at this hearing, the College will so clearly be responsible for causing me needless harm by failing to uphold its contractual obligation to perform its judicial hearing processes according to the rules and regulation's set forth in the College's operating policies and student handbook that it will probably acknowledge this, and provide relief and/or settlement for what has been done to me. However, if you do impose a sanction, it will help them argue that they're responsible for less of what they've put me through in this process. This is because, although it is not procedurally correct for them to have asked me to participate in this hearing, by making me do so anyways, they get to see if a COS which HAD been given the allegations which they're claiming were made against me at my first hearing, but which were objectively not, would've imposed a sanction upon me. If this COS (yourselves) then impose a sanction at this hearing, they will get to make up whatever explanation for how this process would've been conducted ex post facto, and they will certainly use their power to selectively enforce the precedents and procedures of this hearing process to come up with some narrative of how this would have gone over if I'd been treated fairly that absolves them of as much responsibility as possible for what they've done. Since I've been provided multiple, contradictory explanations for why I've been treated this way, it is hard to imagine this is not the true reason for why they're doing all this. Katharine Strong said in multiple recorded conversations that the reason it is justified for me to be asked to participate in this hearing in the way I have been, for me to have been expelled for the College for the past three months, and for me and my family to have suffered through all these unparalleled financial, personal, and emotional hardships over the past three months. Their intention is to cover up these crimes without doing anything that'd expose them to additional liabilities, and for that reason it is difficult to extrapolate or articulate how and why they might possibly be behaving in the way they have, but please, do not allow them to succeed at their goal. Please do not allow them to exercise their total, unchecked, authoritarian control over this system and these procedural rulings to give themselves a chance to put together a case for why they shouldn't be held accountable for the legal and moral wrongs they've committed at my expense throughout this.**

Please do not help them get away with doing this to me in order to serve their own means, and please do not allow these people to continue performing their jobs and duties as they currently do. I do not know these people's intentions, or why my rights were initially violated on September 21st, but I do know, and can prove to you that they clearly and objectively were not, and that since the College has realized this, it has done everything in its power to cover up what it has done.

This College has literally destroyed my life by failing to uphold its contractual obligation to ensure my (and all other) judicial hearing(s) are performed according to the rules and procedures of the College's disciplinary process, and adequately train and supervise its staff to ensure they're able to perform these duties appropriately. It is both morally, and legally wrong for the College to have done this, and rather than try and own-up to what it has done and attempt to remedy the situation for me, it has conjured and stood behind lies and false narratives in an attempt to justify what it has done. The College's employee's, led by Katharine Strong and Kevin O'Leary, have made a systematic effort to accomplish this.

Did you know that (as Dean Kristi Clemens said in a conversation she refused to record) at Dartmouth College, if you are asked to participate in the undergraduate disciplinary hearing system, and then abused or mistreated by whichever one of the handful of employees the College has entrusted with overseeing it's judicial hearing process, the College's unofficial policy is to try and cover-up and refuse to acknowledge what it has done to you unless compelled to by a court of law – no matter how clear and well-evidenced the College's mistreatment is, or how severely it has harmed the student? Apparently, these people judge crimes and impose sanctions based on how much they feel the defendant is remorseful for what they've done, and yet, here they've shown that they themselves are incapable of feeling such remorse. Their vision of justice is self-serving, and their commitment to fairness nothing more than a marketing line.

DARTMOUTH008740

TABLE OF CONTENTS

- STATEMENT OF UNDERSTANDING
- APPENDIX B
- APPENDIX C
- APPENDIX D
- APPENDIX E
- APPENDIX F
- APPENDIX G
- 
- ARTICLE 1 – "LETTER TO PRESIDENT HANLON"
- ARTICLE 2 – "LETTER TO DEAN BIRON"
- ARTICLE 3 – "REQUEST TO REVIEW"
- ARTICLE 4 – "EMAIL RESPONSE SENT BY DEAN BIRON ON OCTOBER 27TH"
- ARTICLE 5 – DEAN BIRON'S EMAIL RESPONSE TO MY "LETTER TO DEAN BIRON,"
- ARTICLE 6 – EMAILS I SENT TO PRESIDENT HANLON ON NOVEMBER 7TH
- COURT COMPLAINT

DARTMOUTH008741

It appears this document may have been affected when I converted it to a PDF to fill out, but it contains all the additional information I'm asked for.

Case 1:18-cv-00040-SM Document 49-23 Filed 05/18/20 Page 15 of 156

# Dartmouth

Office of Judicial Affairs

5 Rope Ferry Road, Room 204

Hanover, New Hampshire 03755

October 27, 2017

Mark Anderson

Sent electronically to Mark.I.Anderson.18@Dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Dear Mark,

Enclosed you will find the information that I shared with you yesterday afternoon:

A letter explaining the allegations

A Statement of Understanding of Student Rights in Disciplinary Matters, on which you respond to the allegations. This form also reviews your rights and options during the process. This document is time sensitive and needs to be returned to our office by Noon, November 2, 2017. You may return this document via email to the Judicial.Affairs@Dartmouth.edu account.

A redacted copy of the related reports

A letter to your parents informing them that we have provided these materials to you

Additionally, please review these Resources for navigating the COS conduct process

DARTMOUTH008742

I know it can be stressful to be alleged to have violated the Standards of Conduct and to anticipate a COS Hearing. Please don't hesitate to ask questions if you have them or if I can otherwise be of assistance. My role in this process is to make sure that you and the COS members or Chair have the information you all need to resolve this matter fairly and in as timely a manner as possible. Our Office number is 603-646-3482 or you may reach out directly via email .


Sincerely,


Katharine R. Strong

Director, Judicial Affairs


CC:   Office of the Deans of Undergraduate Students
      Anne B. Hudak, Assistant Dean of Undergraduate Students

# Dartmouth

Office of Judicial Affairs
5 Rope Ferry Road, Room 204
Hanover, New Hampshire 03755

October 26, 2017

Mark I. Anderson '18
Hand Delivered

**PERSONAL AND CONFIDENTIAL**

Dear Mark:

I am writing regarding your possible violation of Dartmouth's Standards of Conduct. Specifically, it is alleged that you engaged in harassing behavior or conduct targeted at an individual in January, February, and March of 2017. Additionally, is it alleged that you violated a restraining order on or about May 4, 2017. If true, these behaviors would be in violation of Standards II and VI.

Copies of the materials supporting this allegation are enclosed. Any additional materials to be considered in the adjudication of your case will be provided to you as we receive them.

Before deciding how to respond to the above allegations, you should review the material set forth in the current *Student Handbook*. You should also contact Dean Hudak or one of the other undergraduate deans as soon as possible for advice and support. Please note, if found responsible for these violations a likely outcome would be Suspension, or in some circumstances Separation, from the College.

I am enclosing a "Statement of Understanding of Students' Rights in Disciplinary Matters." You must complete this form and return it to my attention in the Office of Judicial Affairs (5 Rope Ferry Road, Room 204) no later than **noon on November 2, 2017.**

You should know that any change in your student status (including a Suspension) could impact your housing, financial aid, or other commitments. I strongly recommend that you speak to staff listed in the enclosed resource list about your options and the possible financial consequences of a Suspension.

I welcome the opportunity to speak with you now, or at any time in the future, about the hearing process or these allegations. You can reach me at (603) 646-3482.

Sincerely,

Katharine Strong
Director of Judicial Affairs

Enc.: Supporting materials, Statement of Understanding, Family Letter

cc: Student file
    Anne Hudak, Undergraduate Dean

DARTMOUTH008744

## STATEMENT OF UNDERSTANDING OF STUDENTS' RIGHTS IN DISCIPLINARY MATTERS

**Mark I. Anderson '18**

*This form must be completed and returned to the Judicial Affairs Office (JAO) at 5 Rope Ferry Road, Room 204, no later than* **noon on November 2, 2017**. *Please contact JAO at 603-646-3482 or your advisor if you have questions about completing this form.*

## Rights

I understand that my rights in College disciplinary proceedings are set forth in the current *Dartmouth College Student Handbook.*

## Allegations

I have received a letter from the Judicial Affairs Office, dated October 26, 2017, setting forth the allegations against me and providing me with copies of currently available materials pertaining to the case.

I violated the Dartmouth Standard of Conduct II by engaging in harassing behavior or conduct targeted at an individual in January, February, March, and/or May of 2017.

☐     (X) I admit the allegation.

☐     ( ) I deny the allegation.

DARTMOUTH008745

I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

☐   ( ) I admit the allegation.

☐   (X) I deny the allegation.

## Type of Hearing

I understand that I have been charged with an offense that (if I am found responsible) could merit a suspension or separation from the College and that my case will therefore be referred to the Committee on Standards (COS) or an individual hearing officer for adjudication and imposition of a penalty.

I understand that the hearing will be recorded and that I can request access to this recording.

I recognize that, if I have admitted to the allegation(s) listed above, I may provide a statement and request to have an individual hear my case and impose the penalty. If my request is granted, I understand that the hearing officer's decision on a penalty shall be final except for my right to request a review in accordance with the procedures set forth in the current *Dartmouth College Student Handbook*.

☐ *(X) I request to be heard and have the penalty imposed by the Committee on Standards.*

☐ *( ) I request to be heard and have the penalty imposed by an individual hearing officer. I understand that this option is only available if I admit responsibility and provide a written statement with this form.*

## *Attendees (COS Hearings Only)*

*I understand that my case will be heard by the COS and that the hearing will be open to current Dartmouth students, faculty, and staff (in accordance with the procedures set forth in the current Dartmouth College Student Handbook) unless I request that it be closed.*

☐ *( ) I request that my hearing be open.*

☐ *(X) I request that my hearing be closed.*

*If you have requested a closed hearing, you may request one current student, faculty member or administrator to observe the hearing as a source of support. Observers do not participate in the hearing and are subject to approval of the Chair.*

*I request that _____ attend the hearing as an observer.*

*I am aware that I am entitled to have a single advisor present at my disciplinary hearing, and that this advisor must be a currently enrolled Dartmouth student, a member of the faculty or a member of the College administration.*

*My advisor will be _____Anne Hudak_____.*

☐ *I do not wish to have an advisor.*

## *Witnesses and Additional Materials*

DARTMOUTH008747

*Please indicate below whom you wish to request as a witness and to what each witness will testify . Witnesses may be asked to submit a written statement to the COS and may be asked to appear before the committee. You may also attach any printed material you wish to present. The deadline for the submission of printed materials shall be set forth in a scheduling letter.*

### **Witnesses**

Katharine
Strong

Kristi Clemens

Kevin O'Leary

Rebecca Biron

2

DARTMOUTH008748

_____     _____

_____     _____

## Accessibility

The COS conference room is wheelchair accessible.  All printed materials for this hearing are available in alternative media.  If you wish to request disability-related accommodations including sign-language interpreters, please do so below or contact the Judicial Affairs office at 603-646-3482 or by e-mail at Judicial.Affairs@Dartmouth.edu. Requests can be made at any time, but some types of accommodations take several weeks to arrange. The College can usually provide accommodations requested two weeks prior to a hearing.

____1/2/2018                                 _____

**Date**

_____

**Signature**

DARTMOUTH008749

_____ **Mark Anderson** _____

**Name (please print)**

_____

**Preferred Mailing   Address**

: Mark.i.anderson.18@dartmouth.edu

_____

**PreferredPhone**

206 949 9250

3
3   Statement of Understanding of Students' Rights in Disciplinary Matters

DARTMOUTH008750



**REDACTED**

**Incident Report**                                                                      03/30/2017

---

### Incident #: 17▮RED▮-181-OF

### Call #: **17-11530**



Date/Time Reported: 03/29/2017 1842

Report Date/Time: 03/29/2017 1849

Occurred Between: 02/22/2017 0800-03/29/2017 1800

Status: No Crime Involved


Reporting Officer: Officer Christopher Fielding

Approving Officer: Sergeant Anthony Regan


Signature: _____


Signature: _____







1   ANDERSON, MARK

_____**[CONTACT INFORMATION]**_____

Home Phone          (Primary)

LOCATION TYPE:  Residence/Home/Apt./Condo      Zone:

**1    EMERGENCY RESTRAINING ORDER**

DARTMOUTH008752

Case 1:19-cv-00109-SM   Document 48-33   Filed 05/18/20   Page 26 of 156

**Incident Report**

03/30/2017

**Incident #: 17▮RED▮-181-OF**

**Call #: 17-11530**

| # | VICTIM(S) | | | | SEX | RACE | AGE | SSN | | PHONE |
|---|-----------|---|---|---|-----|------|-----|-----|---|-------|
| 1 | W | , H | | | | | | | | |

RESIDENT STATUS: Non Resident

VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

RELATION TO: ANDERSON MARK                    Boy/Girl Friend

CONTACT INFORMATION:

DARTMOUTH008753

REDA
NARRATIVE FOR OFFICER CHRISTOPHER E FIELDING

Ref: 17RRE-181-OF

On March 29, 2017 at 1800 hours I, Officer Christopher E. Fielding, responded to the lobby of the REDACTED

Police Station to take a report from REDACTED student H W in relation to harassing and threatening communication from her ex-boyfriend. W stated that she broke up with her ex-boyfriend,

Mark ANDERSON (Dartmouth College Hanover, New Hampshire), on February 22, 2017 and ANDERSON has

been texting her and her family members harassing and threatening communication. W stated that on the first day they were broken up that ANDERSON texted her over 600 times.

W stated that ANDERSON threatened to post nude photos of her online in retaliation for her making him suffer. She also stated that ANDERSON was threatening her because he believed W owed him $800.00 for a trip they took over break. W provided REDACTED Sgt. Anthony Regan and I with numerous copies of communication from ANDERSON that were harassing and threatening in manner. W was

most alarmed over a communication in which ANDERSON stated to her that, "The only thing he wanted to

do more than end his own life was to end the life of you and your mom." ANDERSON repeatedly asked

W to contact him and if she decided not to he stated he would, "make her regret it." W was also concerned because ANDERSON was contacting her family members as well.

W                stated that ANDERSON did not abuse her physically but she was in fear for her safety due to

ANDERSON's constant threatening behavior and the fact that ANDERSON has a friend at RED ACT and knows where

she lives. W did state that she has asked ANDERSON not to contact her many times since they have broken up and that she did block ANDERSON from various social media communication methods. W

did talk to counseling services at █RED ACT█ and they recommended that she come to █REDA CTED█ to file for an emergency

restraining order. ANDERSON did report this behavior to the police department and provided 2 CAD entries from her contact with did not pursue any emergency order.

Sgt. Anthony Regan and I contacted the emergency on call Judge, The Honorable Kenneth KING, and relayed the

information that W had provided us to him. KING then asked to speak with W and asked W a set of questions while she was under oath. Judge KING issued an emergency restraining order based on the facts W provided that expires 1600 hours on 3/30/2017. W was advised to

go to Somerville District Court at 0900 hours on 3/30/2017 to pursue an active restraining order against ANDERSON.

At the time of this report Sgt. Anthony Regan is in the process of contacting the Hanover, NH police department in an attempt to get the emergency restraining order served to ANDERSON. It has been faxed over and awaiting

confirmation that it has been served. W was offered additional counseling services (in which she declined), alternative housing (declined), given a safe ride home by Officer Jose Colon, and advised of the Tap Ride service. She was also advised to contact █REDA CTED█ at anytime for any reason if she felt the need to do so.

All pertinent documented correspondence that                    provided to █REDA CTED█ was scanned and added to the W report.

Sgt. Regan also contacted the Dartmouth College Public Safety Department to advise them that ANDERSON could

be a danger to himself as he did make comments to W about the possibility of hurting himself and ending his life.

REDA

NARRATIVE FOR OFFICER CHRISTOPHER E FIELDING

Ref: 17 RED -181-OF

**THIS IS A COPY OF A WRITTEN STATEMENT FOR INCIDENT 17TUM-181-OF PROVIDED BY**

**W                 , H            ON WEDNESDAY, MARCH 29th, 2017**

I broke up with Mark Andersonbruaryon Fe 22, 2017. He was in Washington state and I was in Massachuse After we broke up, he sent me hundredstext,ofwhich have bedeletedn because of their mean nature (callin a bitch, etc.) and he also threatened to killtoldhimselftostop.I contactingandmethen blocked him on all forms of communications. He startedndingmeseemails, and initially I was responsive though I kept repe needed space. Two or three weeks after the breakntme-up,amuchhesecalmer email asking that we meet up whil I was home for spring break sod hegetcoultheclosure he needed, and after a few back-and-forth emails, I that if he continuedontactto me, I would no longmeetr with him. He respondethreatening to release nude pictures of me online unlesstarilyImonecompensated him ($800 ousfor thingsvari he spent on me during our relationship), and said if I took my time respondingmake surehewoulIwould regrHet alsoit. said that the only thing he wanted to do more than sendownhilife was to end my life or that of my mother's. We called the police about his attempt to extort me and they talked to him, and he asked them about what was legal (by this point, he had said multiple times he wanted to make me suffer and told my mom he would mak legally). After the meeting with the cop, he sent me a goodbye emailsnapchatted.Thenextamy, brother a picture of an emotionally distressingssagehe mesent to my cousin. His father was in contact with my paren entire time, as he was afraidandofMarkdidn't know what to do. He had us write Mark a check for $700 (as demand had lowered by that point)hepaidand us $500 (we decided to payand$200)have it to him to make it

seem like we met his demands (alongflashdrivewith with all picturesonit ofandusall of his stuff - his other demands). Then, this past Monday,aunt myreceived a mean andonallyemoti distressing Facebook message fro him, so my mom called his parentshe sentand an email to my mom andme,cc'saying the only reason he did it

was to make me feel even a fraction of the painhim,I andcausaided that "For every time H was so weak s has babs contact my parents becausecannotsh bear to speak with merwhaafteshe's done, I promise I will do my best to ensure being weak like this for her own sake cause her to fell so much more pain than if s respect..." He then sent a follow-up email scallyinghimIhadwithinto two hoursand tated: "As always, I'm asking nicely first because the alternative is worse for everyone." I called him and he didn't had 5 minutes and after that I wouldbusybe.He called me 10 minutesandlater,Itold him I was in class and he told me to leave, and that I would regret it if I stayed. I am really scared for my safety and the saf after all these threats. He knows whereandI'mlinve,constant distress and fear.

DARTMOUTH008756

REDACTED

REDACTED

**Page: 1**

Case 1:19-cv-00109-SM   Document 48-33   Filed 05/18/20   Page 30 of 156

**Order Report**

03/30/2017

**Order #: 17**RED**-2-RO**

**Call #: 17-11530**

**Incident #: 17**RED**-181-OF**

Order Type: Restraining Order

Effective: 03/30/2017 @ 1020

Expires: 04/10/2017

Order Status: Open

Responsible Officer: Officer Timothy Philbrook

Orders Issued: NOT TO ABUSE PLAINTIFF

NOT TO CONTACT PLAINTIFF

OTHER ORDERS

**1   ANDERSON, MARK I**

_____[CONTACT INFORMATION]_____

| # | PLAINTIFF(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|

RESIDENT STATUS: Non Resident

VICTIM CONNECTED TO OFFENSE NUMBER(S): 1

RELATION TO: ANDERSON MARK                    Boy/Girl Friend

DARTMOUTH008758

On Thursday, March 30th, 2017, Detective Sergeant Tilton and I met REDACTED student W          ,
H          at the Somerville District Court House at 0900 hours to file for an Abuse Prevention Order (209A
Order). W          (Plaintiff) was issued an emergency restraining order (refer to: 17 RED ACTE -181-OF) on March
29th, 2017 that expired at 0900 hours to her ex-boyfriend (Defendant) ANDERSON, MARK.

W          filled out the proper paperwork adding three specific incidents regarding the reason for the order.
Judge Paul Yee issued the Abuse Prevention Order (**Docket No. 1710-RO-138**) at 1020 hours advising
W          that the order expires on April 10th, 2017 at 0900 hours. Judge Yee advised W          to
return on April 10th, 2017 at 0900 hours to request an extension for the Abuse Prevention Order. The Prevention
Order will be placed in the REDACTED Police Communication Center under active restraining orders.

Detective Sergeant Tilton contacted Dartmouth Police Department regarding this incident. A copy of the
Police report and Prevention order will be sent to Dartmouth Police via fax for documentation purposes.

Specifics orders by Judge Paul Yee.

2.) Defendant is ordered to stay at least 100 yards from the Plaintiff even if the Plaintiff seems to allow or
request contact.

3.) Defendant is ordered to immediately leave and stay away from the Plaintiffs residence
.

4b.) Defendant is ordered to stay away from the Plaintiffs School located at REDACTED ,

14.) Defendant is ordered not to communicate electronically or disseminate, send or post any images of the plaintiff to any person or any website without obtaining written permission by the plaintiff.

DARTMOUTH008760

# Incident Report



DARTMOUTH008761

## CAD Narrative

DARTMOUTH008762

# Incident Report



DARTMOUTH008763

DARTMOUTH008764

DARTMOUTH008765

**2016085101**

Open - Active

Management

 Case Management

# Mark Irwin Anderson

**DEMOGRAPHICS**

**Academic Advisor**

Anne B. Hudak

DARTMOUTH008766

Page 1 of 4

DARTMOUTH008767

**Incident Description**

I received a call from Safety and Security at 8:41 pm informing that a parent of a ███REDACTED███ student called because her daughters ex-boyfriend a Dartmouth student was harassing her and her daughter. The mother would not share the students name at that time. The original call was received at 4:01 pm.

At 8:10 pm S&S received a call from ██RED██ S&S to inform them that they were faxing a restraining order over to the Hanover PD. The ██RE██s officers shared the name of the Dartmouth student (Mark Anderson 18). The ██RE██s officer also shared with our officer that in text messages Mark Threatened to harm himself. The officer notified Dicks house that they might be bring Mark in after they do a welfare check and deliver the restraining order with HP. The S&S communication office is waiting for the restraining order and the text messages from ██RED██

## NOTES

**Individual Notes**

DARTMOUTH008769

**3.29.17 from dean on call**                                          *Thursday March 30, 2017 at 10:35am*

*Kristi L. Clemens*


*Follow up report:*

*Hello All,*


*S&S updated me at 9:45 that they delivered the restraining order to Mark with HPD. Mark was surprised and said that they (Mom and Ex-girlfriend) were the aggressors and not him. He was asked to write a statement that will be added to the case notes.*


*The officers mentioned that mark seemed to be a little sad given the restraining order, but not anything alarming. The officer offered counseling services and the student refused. I pressed the officer again to ensure the student was not in any danger and the officer assured me that the student seemed to be in an ok space given the news that had just been delivered.*


*I also asked if they had received the text messages from* ▮RE▮ *stating that Mark wanted to harm himself and they had not.* ▮RE▮ *needed a higher authorization to release the messages and they were still waiting for clearance. Dartmouth S&S has a recording of the* ▮RED▮ *officer reading the text and has marked the recording, but no physical messages have been received.*


**3.30.17 from K. Clemens**                                          *Thursday March 30, 2017 at 10:37am*

*Kristi L. Clemens*


*Talked with CHD who had requested a draft report from DOSS. The text messages that Mark allegedly sent seemed to directly threaten himself, as well as the ex and her mom. DOSS has reached out to* ▮RE▮ *for screenshots of those texts. We may require a CHD assessment today.*


**3.31.17 from K. Clemens**                                          *Friday March 31, 2017 at 12:48pm*

*Kristi L. Clemens*


*Mark responded to my outreach and said that we don't need to meet. I shared that we did.*


**4.3.17 from K. Clemens**                                          *Monday April 3, 2017 at 1:12pm*

*Kristi L. Clemens*


*I have scheduled a meeting with Mark for tomorrow at 9am.*


**4.4.17 from K. Clemens**                                          *Tuesday April 4, 2017 at 3:09pm*

*Kristi L. Clemens*

DARTMOUTH008770

*Met with Mark today. Advised on behavioral expectations and spoke at length about his state of mind. Declined counseling, but knows that is an option.*

**5.4.17 from Dean on Call**                                                   *Friday May 5, 2017 at 11:48am*

*Kristi L. Clemens*

*Received a call at 10:45pm tonight from DSS informing me that Mark Anderson '18 had been taken into custody by*

*Hanover Police for violation of a protective order for H          W          , a student at* REDACTED *.*

*DSS received a call at 6:15pm from* RE *PD officer Mark Roach stating that Mark had violated a restraining order by*

*emailing Ms. W . After extensive efforts to contact Mark to let him know DSS & HPD wanted to talk to him, DSS was able to arrange a meeting at 10:40pm in the Maynard Lot outside DSS. Mark was arrested without incident by Hanover PD, and taken to Grafton County Jail.*

*Custodial contact # in ABC does not connect. Mark's father (also named Mark), was reached at . Shared basic information regarding the arrest and the process of returning to campus when he is released. I let Mr. Anderson know that Kristi Clemens would be a point of contact for Mark when he was released, and also offered that she could be a point of contact for the family. Shared Kristi's office number. Father took the news relatively well and said he would call the jail.*

*Export of File ID 2016085101 generated by Kristi L. Clemens on May 9, 2017 at 2:52:12pm EDT*                *Page 3 of 4*

5/8/2017

Department of Safety and Security

# Incident Report

---

*Date Reported:* 05/04/2017 07:51 P          *Day of the Week:* **Thursday**

*Occurred (From):* 05/04/2017

*Location:*

*Area:* **Academic Building**          *Jurisdiction:* Dartmouth College

*Site:*          *Site Type:* **On Campus Property**

*Comment:* On May 4, 2017 at 7:51pm, DoSS Communications received a call from a Sergeant of the ▮RED▮ ▮▮▮ REDACTE ▮ Police Department reporting that Mark Anderson '18 had violated a restraining order

that was issued by the Hanover Police Department (HPD) for the ▮REDACTED▮ Police on March

29, 2017.

---

| Name, ID: | Role: | Date/Time Involved: |
|---|---|---|
| *Officer Involved:* William Bean (26) | Dispatched Officer | 05/04/2017 07:55 P |

---

*Reviewed By:* Keiselim Montás          *Date Reviewed:* 05/05/2017

*Cleared By:* Arrest          *Date Cleared:* 05/05/2017

*Current Status:* Reviewed and Proofread

---

**HW**

---

1)      **Mark I. Anderson**

---

---

*Informant CS*

5/8/2017                     Department of Safety and Security                          Page 2 of 4

# Incident Report

<div style="background:#555;height:30px;"></div>

1)      *Mark Roche*

## Narratives

1)      *Initial Report*

**Prepared By:**  William Bean                               **Date Reported:**05/04/2017

On May 4, 2017 at 7:51pm, I received a call from Sergeant Mark Roche of the ▮REDACTED▮ Police Department reporting that Mark Anderson '18 had violated a restraining order that was issued by the Hanover Police Department (HPD) for the ▮REDACTED▮ Police on March 29, 2017. The restraining order stipulated

that Anderson was to have no contact with H W            or her family at all. Anderson violated this order

by sending W            an email today at 6:14pm.


At 8:06pm, I requested to meet with an HPD Officer so I could pass along the information that I had received.


At 8:36pm, Officers Ryan Kennett and Tyler Reidy came to Safety and Security. I briefed them on the situation and they informed me that they would be looking into the restraining order paperwork and then get back to me.


At 9:28pm, I met with HPD Officers Kennett and Reidy at Anderson's residence Hall. We went to Anderson's room and found that he was not there. Officer Reidy tried to call Anderson and with no response I requested that DoSS Communications send Anderson an email requesting to meet with him. See attached email correspondence.

DARTMOUTH008774

It wasn't until 10:36pm, that Anderson finally arrived at the Maynard parking lot to meet with me and the Officers from HPD. HPD Officers Kennett and Reidy informed Anderson why they wanted to meet with him. Officer Joseph Landry then informed Anderson that he was under arrest.

At 10:53pm, notifications were made to the Dean on call and Director Harry Kinne.

The HPD report number is 17-HAN-68-AR

---

2)  *Supplement #1 Email Correspondence*

**Prepared By:**  William Bean                                **Date Reported:**05/05/2017

**Reviewed By:**  William Bean                                **Date Reviewed:**05/05/2017

---

From: Mark I. Anderson

Sent: Thursday, May 4, 2017 10:04 PM

To: Safety and Security <Safety.and.Security@dartmouth.edu>

Subject: Re: meet

Could you perhaps give me his phone number so I could call him?

_____

---

**Informant CS**

Case 1:19-cv-00109-SM    Document 48-33    Filed 05/18/20    Page 49 of 156

# Incident Report

## Narratives

From: Safety and Security

Sent: Thursday, May 4, 2017 7:00:54 PM

To: Mark I. Anderson

Subject: RE: meet

Hi Mark,

All I can tell you is that Sgt Bean asked me to contact you and that it was imperative to meet him asap.

R.Schemmel

Communications

Safety and Security

5 Rope Ferry Road

Hanover, NH 03755

Business: 603-646-4000

Fax: 603-646-1603

From: Mark I. Anderson

Sent: Thursday, May 4, 2017 9:58 PM

To: Safety and Security <Safety.and.Security@dartmouth.edu>

Subject: Re: meet

DARTMOUTH008776

Could you confirm that I'm required to go if you don't know what it's about though?

_____  _

From: Safety and Security

Sent: Thursday, May 4, 2017 6:57:56 PM

To: Mark I. Anderson

Subject: RE: meet

Ok,  thank you.

Safety and Security

5 Rope Ferry Road

Hanover, NH 03755

Business: 603-646-4000

Fax: 603-646-1603

From: Mark I. Anderson

Sent: Thursday, May 4, 2017 9:57 PM

To: Safety and Security <Safety.and.Security@dartmouth.edu>

Subject: Re: meet

_____

Informant CS

Department of Safet y and Securit y

# Incident Report

## Narratives

Ok, I will be at the Dicks house parking lot at 10:30

From: Safety and Security

Sent: Thursday, May 4, 2017 6:56:28 PM

To: Mark I. Anderson

Subject: meet

Hi Mark,

  Sgt Bean asked me to reach out to you again,          it is imperative that you meet him immediately.

Thank you,

R.Schemmel

Communications

From: Mark I. Anderson

Sent: Thursday, May 4, 2017 9:40 PM

To: Safety and Security <Safety.and.Security@dartmouth.edu>

Subject: Re: contact

Also, could you perhaps let me know what this is regarding and if I am required to come speak with you about it (no offence, I'm just kind of busy at the moment).

From: Mark I. Anderson

Sent: Thursday, May 4, 2017 6:37:35 PM

To: Safety and Security

Subject: Re: contact

Would you like to meet me today? If so could we go somewhere private where there will not be other students, or could we perhaps just speak on the phone? It's incredibly embarrassing and annoying to have officers walk up to my dorm and I appreciate you reaching out.

_____   _

From: Safety and Security

Sent: Thursday, May 4, 2017 6:31:49 PM

To: Mark I. Anderson

Subject: contact

Hi Mark,

   Sgt. Bean asked me to reach out to you as he would like to meet up with you to discuss something. Where are you so he can chat with you?

Thanks,

R.Schemmel

Communications

Informant CS

DARTMOUTH008779

# Dartmouth

Office of Judicial Affairs
5 Rope Ferry Road, Room 204
Hanover, New Hampshire 03755

October 26, 2017

Elizabeth and Mark Anderson
3204 West Concord Way Apt 481
Mercer Island, WA 98040-6229

**PERSONAL AND CONFIDENTIAL**

Dear Ms. and Mr. Anderson:

I am writing to let you know about a possible serious violation of Dartmouth's Community Standards of Conduct concerning your son. I have shared information with Mark that alleges he has harassed an individual and violated local, state, or federal law by violating the terms of a restraining order.

Although no determination has yet been made about whether Mark is responsible for the violation, it has been determined that there is sufficient reason to conduct a hearing. If the hearing determined that your son was responsible, the reported violation is considered serious enough that possible sanctions might include Suspension or, in rare circumstances, Separation from the College.

I am sending you this letter because the College believes it is important for parents to know about serious disciplinary cases. We encourage students responding to such allegations to speak with their parents about such matters, and we hope that you will raise the issue yourself if your son has not already done so. Please also encourage him to speak with his undergraduate dean. The deans regularly assist students involved in disciplinary proceedings, serve as advisors, and provide support to students working to fulfill academic and other responsibilities while a conduct case is pending.

Mark has received all the relevant information concerning the allegation and should be able to share copies with you, if you wish. The College's practice is to encourage direct communication between students and parents about the substance of these matters, but do not hesitate to contact us at (603)646-3482, if we can respond to specific concerns you have for your student.

Sincerely,

Katharine Strong
Director of Judicial Affairs

cc:     Student/Student file
        Anne Hudak, Undergraduate Dean

DARTMOUTH008780

In this letter, I describe actions which members and employees of Dartmouth College have performed in violation of the rules and regulations described in Dartmouth College's Student Handbook, and in such a way that has, and continues to me to needlessly suffer to this day. I provide a good deal of the evidence available to me that proves this point, and explain how members and employees of the College have failed to abide by its rules and regulations, and how these actions have violated my rights as a member of the college, and caused me severe harm. I sincerely hope that you are able to understand how this negligent behavior I've described is (and has been) the direct and proximate cause of the personal, financial, and emotional suffering and losses, once you have read all I have written here. I did not contribute in any manner to the actions committed by the College officials and representatives who have caused my suffering, and there are no intervening factors which might relieve these individuals, and by extension, Dartmouth College, of liability for these damages.

On or about March 28th, the Dartmouth College received a student complaint about me from sources outside of the College. Shortly after it received the complaint, the College's Judicial Affairs department issued a disciplinary "warning" or "college reprimand" against me, but did not decide that it was appropriate to initiate allegations that I had violated the Standards, or have me undergo a Committee On Standards hearing based on the information in this report, and the actions I had committed which were described within it. Also important to note is that this report was sent to the College by the REDACTED REDACTED Police Department, who had issued a restraining order against me based on the emails and information within the report, on or about March 28th.

On or about May 4th, I was arrested for allegedly violating the restraining order which had been issued against me on or about March 28th. On or about May 4th, the College received a report from the police stating that I had committed action which may have been in violation or a restraining order and the law. Shortly afterwards, the JAO processed this report, and based on the information within it, initiated two allegations against me, and stated it had decided I would have to undergo a disciplinary hearing in which the COS would evaluate the actions I'd allegedly committed in violation of a restraining order, and determine if these actions were in violation of the Dartmouth College Community Standards of Conduct, and if a sanction ought to be imposed on me for having committed them.

During June 2017, I had a public court hearing where the New Hampshire District Court evaluated the actions I'd allegedly performed in violation of the restraining order, and I was not found guilty of the alleged violation at this hearing.

My COS hearing occurred on or about September 21st. At this hearing, the COS was designated to determine if I deserved to have a sanction imposed upon me for actions I committed during the spring term which had, allegedly, been made in violation of a restraining order. The denied these actions were in violation of Standards II and IV, and the COS made virtually no indication that they believed these actions were, in fact, violations of the Standards.

Sadly however, the COS failed to conduct my hearing in accordance with the Handbook. This is because it performed actions and responsibilities which the COS is not enumerated the right to perform in the Handbook. Specifically, the COS reviewed the materials which the College received on or about March 28th, and which the JAO had already imposed a punishment against me for committing, and made the procedural ruling that the materials included in the complaint did not constitute issuing misconduct allegations against me, or me being forced to undergo a COS hearing for committing them. While the Handbook states that the COS is authorized to consider past "college reprimands" and "warnings," in does not indicate or imply that the COS can impose sanctions based on their review of these previous

sanctions (and the actions which justified them being imposed upon me) when the JAO has not initiated allegations against the student for these actions in advance of the COS hearing which they are reviewed. On or about September 22nd, I received notification that the COS had ruled the information included in the report which the College had received on or about March 28th contained sufficient evidence to warrant me being separated from the College. This action was taken in violation of the rules and regulations in the Handbook, and since it was made, I have undergone incredible harm and suffering because of it, and subsequent acts of negligence that officials of the College have performed since that time also unfortunately seem to be in violation of the Handbook.

## CHRONOLOGICAL DESCRIPTION & EXPLANATION OF THE EVENTS THAT OCCURRED IN VIOLATION OF MY RIGHTS AS A MEMBER OF THE COLLEGE, THE HANDBOOK, AND WHICH ARE THE PROXIMATE AND SOLE CAUSE OF THE SUFFERING I'VE EXPERIENCED

1. On or about September 21st, the school required me to attend a judicial hearing regarding actions I'd committed during the spring term, which the Judicial Affairs Department had alleged were in violation of Dartmouth College's Community Standards of Conduct. At this hearing, the Committee on Standards was told to hear my case and determine if I ought to have sanctions imposed for actions I'd committed during the spring term.

2. During this hearing, on or about September 21st, the committee which performed my hearing did not find that the actions which the JAO had alleged I'd committed in violation of the Standards were, in fact, violations of the community standards which warranted a sanction being implemented against me. They did, however, use the evidence from my hearing to convict me of a Standards violation for actions which the College did not allege were in violation of the Standards, or present allegations to me regarding in advance of my hearing. For evidence, and in-depth explanations of the fact that the College did allege I had committed actions during the spring term may've been in violation of Dartmouth College's Standards of Conduct, but did not allege that actions I'd committed during the winter (which I was expelled for) were in violation of the standards of conduct in advance of my hearing, see the commentary and information I've provided in my ***"Letter to President Hanlon," "Letter to Dean Biron," and (also, although it is less the focus of what I've written in) "Request for Review."***

3. The Judicial Affairs Office (JAO) is responsible for receiving and processing all complaints sent to the College according to the Student Handbook, and is also the sole entity enumerated with the power to initiate an allegation against a member of the College based on the information within such a complaint (see ***Appendix A*** for relevant excerpts of the Dartmouth College Student Handbook which describe this process). By imposing a sanction upon me for actions which the JAO had not presented an allegation to me about in advance of my hearing, and which I did not perform during the very specific, and clearly defined period of time which the JAO alleged I'd committed a Standard violation during, the COS sanctioned me for an alleged violation of the Standards of Conduct without allowing me to attend a hearing, explain, defend, admit, or deny these actions. For a detailed explanation of how the COS acted in violation to the rules and procedures in the Student Handbook, and without respect with the rights that the College is contractually obligated to provide all members of the institution, see ***Appendix A & B***.

4. Since the time I was expelled, I have repeatedly tried to communicate this information with the two individuals who are responsible for evaluating complaints about procedural errors at the school – Katharine Strong and Rebecca Biron. The first attempt I made to communicate this was on or about October 4th when I submitted my ***"Request for Review."*** Since then, I have made persistent efforts to acquire answers to the questions I pose in this letter, as well as others which I subsequently sent the College (in various capacities: phone calls, emails, and face-to-face conversations with Katharine

DARTMOUTH008782

Strong [who the Student Handbook designates is responsible for providing such information, as shown in ***Appendix C***]), and on each occasion, it's representatives either neglected to respond my inquiries entirely, only responded to a small minority of my urgent and substantive requests for information about the College's disciplinary processes and procedures.

5.  In response to my ***"Request for Review"***, Dean Rebecca Biron sent me a letter on October 27th (provided in ***Article 4***). saying that the way the Committee of Standards proceeded in my hearing did "not by itself constitute a procedural error" because the allegations which the JAO presented to me in advance of my hearing did indeed state that the actions I was expelled for would be in consideration at the hearing, and that although a procedural error had not occurred, she believed I genuinely did not know this before the hearing, and thought I should have another where this information was communicated more clearly to me beforehand. Though Biron decided I must attend another hearing (which requires I be in the Hanover area), she also decided there was good reasons to uphold the decisions which caused me to lose the right to live in the dorm room, or use the meal plan I was billed for, forcing me to live in my friends' rooms in areas I'm permitted to be, and pay for food and other living costs at my parent's expense, imposing great, unanticipated financial distress upon my entire family. While she has full power to make procedural rulings like these at her own discretion, I do not think it is reasonable, just, or according to the principals the Handbook implies such rulings should be made according to, for her to exercise this power to (unwittingly or not) put a student in a situation where they're (1) required to be on the College's premises to undergo a judicial hearing several weeks in the future, but also (2) not provided food or shelter during this time, while in the meantime she, (3) refrains from responding to my inquiries regarding the procedural basis of this ruling (amongst others).

6.  The understanding of the events which occurring during, and leading up to my hearing which Dean Biron described in her letter was at-odds with my own on several accounts: (1) I did not believe the materials which the JAO gave me describing the allegations I would be on hearing for at my COS hearing could conceivably be interpreted to say that Judicial Affairs had decided to raise allegations of misconduct against me based on the materials which were submitted to their office in a complaint about me, on or about March 28th, and thus, consequently, (2) the COS had in fact committed a procedural error. I sent Dean Biron a letter explaining my concerns, there seemed to be very good reason to believe that the people whom the College tasked with overseeing my case had committed negligent behaviors that caused me to experience destitute suffering and extreme harm (or at least, this was the message it was intended to communicate when coupled with what she'd already read in my Request to Review), and this letter is provided in **Article 2** ***titled "Letter to Dean Biron"***. Dean Biron replied to my letter with an email response included in **Article 6**. In this email, she states that that she understood what I'd said but "disagreed" with it, and affirmed the decisions I'd expressed concern she'd made based on an incomplete understanding of what'd happened during (and since) my COS hearing (and to my own peril and demise). Furthermore, Biron did not respond to my information inquiries about the rules and procedures in the Student Handbook or the College's judicial review process, but rather, neglected to respond to them in her response, explicitly saying it would not be appropriate for her to provide such information for procedural reasons.

7.  After this, I asked an employee of the College if there was any other measure I could take to get the responses to the questions which Biron and Strong has neglected to respond to when I wrote them or have these issues resolved, and which I had already tried to resolve using the methods provided in the Handbook. This employee told me I could try to write a letter to the President of Dartmouth College, Phil Hanlon, and I've provided this letter titled ***"Letter to Preisdent Hanlon"*** in the articles attached with this letter. In my letter to Hanlon, I present all allegation materials the College provided me in advance of my hearing, and explain how these allegations materials did not seem to contain evidence that supported Dean Biron and Katharine Strong's shared perspective – that the JAO had presented

allegations stating I'd committed actions prior to the spring term that were potentially in violation of the Standards in advance of my COS hearing, and that I only thought otherwise before the hearing because I had misinterpreted the written letters the JAO sent describing the allegations against me. As Dean Biron and Katharine Strong had when I'd written them prior, Hanlon stated that he stood by the decision Dean Biron described in her response to my ***"Request to Review,"*** and encouraged me to go along with newly scheduled disciplinary hearing.

8.    In response to Hanlon's email, I sent another email asking for an opportunity to communicate with anyone that would be willing to (1) listen to and consider my concerns about procedural errors that seem to have occurred in my disciplinary proceedings, or (2) respond to my urgent, well-reasoned, and clearly articulated requests for information I had an obvious need for, and right to be provided according to the Handbook. These emails, which I sent on or about November 7th, are provided in **Article 6**. President Hanlon has not responded to those emails as of November 13th when I am currently writing this.

# DAMAGES

I have done nothing to deserve to suffer the way I have through all of this. I have suffered these consequences for the sole reason that employees of Dartmouth College who oversee its judicial review process were negligent, and failed to perform their duties in such a way that caused me to needlessly suffer, and violated my rights as a member of the College, the rules and regulations of the Student Handbook, and the principles and values it professes to uphold, and which any person – whether an affiliated member of the institution or not – would see the apparent reasons why it is important for the College to operate according to. I hope that the evidence I have presented to you here will bring you to the conclusion that these negligent behavior were the direct and proximate cause of the personal, financial, and emotional suffering and losses I've incurred and will describe here, and that the options I've been provided to resolve these issues or receive fair treatment within the College's jurisdiction have not only been inadequate, but below the standard of treatment which the College and its representatives and contractually obliged to provide all its members. I did not contribute in any manner to the actions committed by the College officials and representatives who have caused my suffering, and there are no intervening factors which might relieve these individuals, and by extension, Dartmouth College, of liability for these damages.

I have not been able to get legal advice from an attorney through all of this (because my parents cannot afford to pay for one), and so I have no idea how to perform a valuation how much I should be owed for everything I've lost and been put through during this affair. Thus, I am more than willing to discuss the quantity of money owed to make sure all parties feel they've been treated equitably, and that this is resolved in the fairest manner possible, and have refrained from trying to provide my own speculative estimates here to try and help show that. I do strongly believe each of these qualitative claims I've made are fair and reasoned, but I am also more than willing to engage in a dialogue with any representative of the College that might be willing about their content as well, as I have, and continue to be willing to discuss any part of what I've described in this letter. I would also like to point out that I brought up all these issues starting the day of my hearing, and these damages have amounted as a consequence of the College's collective failure to provide me treatment according to the standards described in the Handbook from that point, until now. If the individuals who oversee its disciplinary processes had responded to the initial procedural error that occurred during my hearing on or about September 21st according to the

Handbook when I first reported what'd happened, these are the things they could've prevented me from losing, or being put through.

- **<u>Forgone experiences</u>** – I have been barred from participating in any undergraduate activities for most of the fall term, which has prevented me from meeting the new members of my fraternity this term, or having any memories to show for a third of my senior year in college other than this atrocious suffering. I have not gotten to participate in any club activities, or do anything other than leave a dark cramped room to get food, talk to my counsellor, or speak with my advisor.
- **<u>Pain and Suffering:</u>**
  - **<u>Emotional suffering due to:</u>**
  - Losing the opportunity to pursue jobs at any of the companies I wanted to work at next year, which I worked so incredibly hard to get throughout my life and which I will never get back in the same capacity.
  - Furthermore, the investments that I made to prepare for the recruitment process, as well as the things that I came to enjoy as I prepared myself to capitalize on this employment opportunity, and also be well-equipped for the job I received (such as reading academic literature, newspapers, and other texts, and attending occupational and professional training sessions where I spent hundreds of hours preparing for the interviews I anticipated I'd be invited to partake in this fall, and also learning accounting skills which are not taught at this College, specifically to bolster my performance in these interviews) have all been marginalized as a consequence of the JAO's misconduct.
  - The emotional toll this affair has had on people I care about and my family.
  - I'm sure any of the counsellors I've met with throughout this affair would gladly attest to the nature and severity of the emotional suffering I've endured throughout this affair because of the school's failure to comply with its own rules and regulations.
  - Being prevented from participating in any social events for most of the past term – I have been disallowed from meeting any of the new members of my fraternity, participating in social events, or hanging out with most of my friends for a third of my senior year at this college.
  - Damage done to my personal relationships – as my family has told me, they do not believe what I've said in this letter, for the reason that the College has so persistently argued that I am not right, and that they do not believe such a highly acclaimed institution wouldn't be standing in support of its actions if it had done as I've described. I have perpetual, severe anxiety which I've never experienced before, that makes it impossible for me to have a conversation with my friends without just starting to vent about these experiences, which has made me exponentially more taxing to be around and difficult to support as this has been drawn out for an unnecessarily long duration of time. When an institution wrongly imposes a sanction upon an individual, that persons entire public and private reputation becomes tarnished by this outstanding claim they'd performed misconduct that justifies the sanction imposed. I speak from person experience when I tell you that this will deteriorate even your closest, most cherished relationships faster than anything.
  - Constantly being haunted by the fact that I may never be able to attain a fair or reasonable outcome in this affair, as I'm forced to fight a large, powerful institution that has proven that it is devoted to not giving me one, and which I have no way to stop other than trying to describe what is happening to someone that will intervene, as I have been trying to for more than a month now with nothing to show for it. I have not been treated appropriately, and have suffered incredibly because of this mistreatment. The longer this goes on, the more of my life

DARTMOUTH008785

is painfully liquidated into this settlement request that I've been told I'd need at least $100,000 and a legal team to have acknowledged.

- **Professional and educational losses incurred.**
  - **Educational**
    - I have been prevented from attending classes for an entire term, and expect to be compensated for the academic experiences I paid for, and deserved to have.
    - I am also requesting that the school make accommodations so that I will be able to graduate on time, despite having been wrongly prevented from taking classes or earning credits this term. I truly enjoy learning, and would be more than willing to do extra academic work during winter break and the Summer after my class graduates, but it is not right for my entire family to have purchased expensive tickets and hotel rooms to watch me walk at graduation, only for them to have spent this money for nothing now because I was wrongly abused like this for no reason.
  - **Professional**
    - Inability to apply to the vast majority of jobs in the investment banking, consulting, and private equity industries, which opened for application on or about September 25th, and ended sometime around the start of November. In the same way a medical student who had been denied the ability to apply to medical school during their senior year because the JAO had treated them inappropriately as they've treated me would deserve to be compensated for these damages, I am also asking to be compensated for them.

- **Out of pocket expenses:**
  - Since on or about September 22nd when I was expelled from the college, I have been forced to cover my living expenses out-of-pocket while I've been required to stay in Hanover, and the school has simultaneously denied me access to the dorm room and dining facilities that it billed me for. While my family was not able to afford a place for me to stay in the area during this time, the two friends of mine who have so graciously sacrificed their own privacy and resources by having me stay in their rooms and getting me meals on their own DBA accounts deserve to be compensated for ways they've indirectly suffered due to the negligence of the JAO. Katharine Strong has explicitly stated that she does not believe it was necessary for me to stay in Hanover during this time, so I want to reiterate that (1) it would not have been rational self-interest to have left hanover since I was wrongly expelled, and (2) that the sole reason I'm in this situation is because of negligent behaviors perpetrated by members of the JAO, and (3) that I have done everything possible to minimize the duration of time this has gone on for. In an email she sent me on November 3rd, Strong wrote that I am responsible for incurring these costs because I pursued help from other people in the college after it became clear that she would not perform her designated responsibilities by providing the information I'd asked of her (or in a reasonable manner that would not clearly incur me harm or suffering), writing:

"That you disagree with the decisions that have been made is understood. However, the length of time of the process and its impacts on you are, in part, due to your own actions and decisions. When the original decision was made, you were offered an opportunity to return home at the College's expense. That you have chosen to stay in Hanover and have requested interventions outside the process are decisions that have had impacts on you and on the College moving forward in its own process."

- Coupled with their (implicit) persistent refusal to answer the questions I've sent various representatives of the College, statements like these reflect a deafness towards my concerns

DARTMOUTH008786

that makes it hard to believe that my concerns and questions have really been carefully examined, understood, and responded to appropriately.

- **Legal costs** – I met with a lawyer for an hour to have him review this letter before I sent it to you. $250

- Finally, although it is not "compensation" per say, I am also requesting that simple changes be made to the student handbook in order to make sure that another student does not suffer through the same experience I have. Katharine Strong, and the sole individual who oversees her actions and could conceivably hold any member of the College's JAO and COS accountable for negligence or misconduct, Dean Biron, have both repeatedly insisted that under their interpretation of the rules and regulations that are currently in place that I not only have been treated appropriately and fairly throughout this Judicial Hearing process, but also that my own actions have been the proximate cause of any financial, emotional, and personal suffering I've needlessly incurred through its course. To prevent my fellow students, present and future, from ever being treated so wrongfully as I have here, only to discover that the College has no systems in place to prevent, or make-right for administrative misconduct of the variety I've described here, I am requesting that simple, minor changes be made to the College's Standards of Conduct to ensure the specific type of inappropriate behavior that I've suffered as a result of here, will not be repeated again in the future at another students expense. I can't even begin to describe what this has been like for me, but I promise you that if you knew what it has been like to be put through this experience, you would be disturbed. I've watched so many more precious experiences, opportunities, and precious things vanish from my life as this has taken weeks longer than I anticipated to be resolved. It would be superfluous for me to try and fully explain here, but each unexpected refusal to respond to the questions and concerns I've written about here that I've received from the school over the past weeks has only been exponentially more detrimental to my livelihood and the last. They just make this more traumatic, but also increase the amount I have to lose if the wrongdoing I've alleged occurred simply goes unchecked, forcing me work even harder in an already so worn and compromised so I can represent myself in a system that seems determined to act accountably if I do not, and perhaps even if I do. See Appendix F for a segment of the Handbook that describes the procedure by which such changes as the ones I'm requesting be made are put into place

- Even if you do compensate me for these things, regardless of what you decide all my pain and suffering has been worth through this, I would cry of happiness if I could have a chance to trade it all (and even half my income for the first three years I work on top of that) to just go back and live another version of my life where the COS and JAO hadn't performed the acts of negligence and misconduct I've described, and which have put me through all this. I was the happiest I've been in my entire life for months up until the date of my hearing. Now, I have to use sedatives to fall asleep, take antidepressants to function enough to take the action necessary to defend my own interests throughout this process, and wake up in the middle of the night having panic attacks, thinking about this, and how much more I'll probably have to go through before I'm able to get the attention of anyone who will, quite frankly, give enough of a shit about what I have written here to explain how I could've possibly been treated appropriately here, or concede that I have not, and conjure some sort of justice for me.

DARTMOUTH008787

**Appendix A**

Table Of Contents

**Contains:**

- **Text from student handbook that explains how allegations are derived from incoming information about members of the college.**
- **Explanation of how members of the COS and JAO caused me extraordinary harm, pain, and suffering by failing to perform their duties according to the Handbook.**
- **Excerpts of the Handbook which these members of the COS and JAO failed to abide by when they committed the negligent behaviors that are the proximate cause of my pain and suffering.**
- **Excerpts from the Handbook which describe rights which I was clearly deprived of during my COS hearing process.**
- 

According to the Dartmouth College Student Handbook:

*"The Judicial Affairs Office (JAO) shall be responsible for receiving all complaints and issuing allegations. Any student, faculty member, or employee may file a complaint regarding an undergraduate with the JAO. In addition, the JAO may conduct an investigation and initiate an allegation on the basis of information coming to its attention from any source. The JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations.*

*"The Director of Judicial Affairs shall determine whether information available in support of an allegation could result in suspension or separation if the student were found responsible. If suspension or separation is a possible outcome of a disciplinary hearing, the Director shall inform the student in writing and provide the student with copies of the available information related to the allegations. The student will have an opportunity to admit or deny the allegation within five days of the written notice of the allegations."*

These are the only parts of the Handbook which describes how the College derives misconduct allegations from complains about student behavior which it receives. Thus, if the College receives any complaint about a student, the JAO is tasked with reviewing the complaint and determining (1) if any disciplinary procedures ought to be initiated based on their review of the complaint. If the JAO decides the student ought to undergo a disciplinary hearing based on their review of the complaint, the department also becomes responsible for (2) describing what actions it believes the student committed in violation of the Standards, and which Standards it decided these actions may be in violation of. Thus, when a complaint about a student is submitted to the school, the sole basis by which the College determines whether the student should attend a disciplinary hearing because of it is to have the JAO review the materials and make this decision. Furthermore, if the JAO tells a student a certain set of actions are being considered as potential acts of misconduct in advance of their hearing, then by the rules ordained in the Dartmouth College Student Handbook, this discretion is the sole, unwavering criterion which the College derives and raises misconduct allegations by. And thus, if the JAO raises certain allegations against a student after reviewing a complaint about them, it is not procedurally correct for the Committee on Standards to review the complaint again when the committee received them in a hearing where they were told to investigate other actions (excluding those mentioned in said complaint), and then based on their review, for the COS to find that student guilty of a violation of the Standards for actions the JAO had not initiated allegations against the student for committing in advance of their hearing. Here is the section of the Student Handbook which describes the purpose of the COS, and what role the committee is designated to perform in the College's disciplinary process:

DARTMOUTH008788

> *"**Committee on Standards (COS) Purpose:** The purpose of the COS is to hear cases involving undergraduates concerning violations of the Academic Honor Principle and the Standards of Conduct, cases involving academic standing and requirements, and cases involving appeals of certain registrarial actions."*

My COS hearing was not performed in accordance with the rules and procedures described in the Student Handbook because the committee convicted me of actions which the JAO had not presented me allegations for having potentially committed in violation of the Dartmouth College Standards of Conduct in advance of my hearing. I was told that the COS would not consider imposing a sanction for the actions I was expelled for in advance of my hearing repeatedly by both my College advisor, Dean Anne Hudak (although she refused to admit this after the day of my hearing), was not given a chance to "admit," "deny," or explain the actions I was expelled for committing to the jury, and was not found guilty of either of the allegations which the JAO had raised against me before the start of my hearing. By neglecting to perform my hearing according to the rules and regulations they're required to follow, the COS and JAO not only deprived me of rights and protections it is contractually obliged to uphold for me, and caused me to suffer through the most depraved misery I've ever experienced in my life since the time of my hearing by failing to acknowledge what happened, or act according to the College's rules and procedures. Consider the following excerpt from the Student Handbook:

> *"**Notice**
>
> Students are entitled to reasonable written notice of the substance of the allegation(s) against them. Students are also entitled to a reasonable period of time in which to prepare for a hearing. A reasonable period of time is, at a minimum, as five calendar days from the date of delivery of the allegation letter. Hearings will be scheduled as soon as possible after an incident. A student who needs additional time to prepare for a hearing may request, in writing, an extension of time from the Chair. A student's D-plan or the availability of an advisor are not normally grounds for postponing a hearing.*"

I was not given the "reasonable written notice of the substance of the allegation(s) against" me in advance of my hearing, by virtue of the fact that the COS found me guilty of standard violations the JAO had not initiated allegations to me of in advance of my hearing.

Furthermore, it is the duty and responsibility of the Chair in a COS hearing to ensure that this this right is upheld, as is written in the Student Handbook:

> *"At the beginning of the student's hearing, the Chair shall determine that students have received a copy of the allegation(s) against them and notification of their rights in the COS proceeding."*

In my disciplinary hearing, Dean Dan Nelson failed to perform this task appropriately, and this was the initial action that precipitated this series of events and the most excruciating, prolonged period of suffering I've been put through in my entire life. I first raised this concern – that I had been put on hearing for actions which I did not know I'd have to explain, and which I was only made aware I might be found guilty of a violation for at the end of my hearing – during the actual hearing, when I expressed the concerns, and ask Katharine Strong if the COS was considering a sanction for action other than those which the JAO had initiated allegations regarding. Nobody has addressed or responded to the concern to this day.

**Appendix B**

[Table Of Contents](#)

Here, I:

- **Provide additional excerpts from the Handbook which the COS neglected to performed their duties according to when it conducted my hearing, in addition to the ones I already provided in** <u>Appendix A.</u>
- **Provide an in-depth explanation of why the COS was given the student complaint (received on or about March 28th by the College and JAO) to review during my hearing, how it failed to act in accordance with the Handbook during my hearing, and how this compliance failure has caused me to suffer personally.**

This part of the Student Handbook describes *why* the COS was given the student complaint (which it expelled me because of), and what purpose it was designated to utilize this information for at my hearing:

> ***Consideration of Prior Record***
>
> In all Academic Honor Principle and Standards of Conduct cases, if a student is found responsible, the student's conduct history may be considered for purposes of imposing an appropriate sanction. Additionally, the COS or the hearing officer, in imposing a sanction, may consider sanctions imposed in other cases at the College. Where the COS recommends a sanction, the Chair shall have discretion to determine the appropriate form and manner of presentation of information to the COS concerning both the individual student's record and the disposition of other behavior cases that may be helpful in formulating a sanction recommendation.

This indicates why it could have been procedurally correct for the COS to <u>consider</u> the actions which I had committed outside of the timeframe which the JAO had alleged I'd violated the Standards during, if they were to have imposed a sanction for my alleged violation. It is not procedurally correct, however, for the COS to impose a sanction for actions which the JAO had not alleged were in violation of the standards in advance of my hearing, after it decided that I was not guilty of the violations I had actually been accused of committing.

In review, the College initially received the "student complaint" the COS panel expelled me because of on or about March 28th as part of a police report it received when a restraining order was issued against me by ▮RE▮ and/or ▮REDAC▮ Police Department. Around the time which the complaint was sent to the college, and then (in accordance with the Student Handbook) the JAO reviewed the materials within the complaint, and subsequently, decided to imposed one of the two following disciplinary sanctions. It is impossible to tell which of the two they proceeded with given that they call for the same disciplinary action to be undertaken, but given that my Dean, Kristi Clemens, wrote me an email on or about March 29th asking to meet and discuss the information in the complaint, and stated it was some sort of procedural, disciplinary meeting I was required to attend (the emails that Dean Clemens and I exchanged in advance of this meeting are included in my "Letter to President Hanlon").

> ***"Warning***
>
> A Warning is a written notice that a student has been found in violation of the Community Standards of Conduct. The student is advised to review the applicable College policies and to exercise better judgment. The letter is shared with the student's Undergraduate Dean but is not recorded on the transcript. Warnings may be considered in any future disciplinary proceedings.

***College Reprimand***

A Reprimand is a written notice to a student for a second or more serious violation of the Community Standards of Conduct. Like a warning, the letter is shared with the student's Undergraduate Dean but is not recorded on the transcript. A Reprimand may be considered in any future disciplinary proceedings. "

Later, on or about May 4th, the College was given a report stating that I had been arrested for committing actions that were allegedly in violation of a restraining order – the very restraining order the College & JAO received notice about (and included the materials and information that the police said justified the order being issued against me), and which they had previously issued a "warning" or "college reprimand". When the College received this information, and again, according to the Student Handbook, the JAO processed this information and decided that based on the fact that the State of New Hampshire had alleged I'd violated a restraining order, that it was appropriate for me to be forced to undergo a COS hearing where a committee would evaluate my actions to determine if they were in violation of the Standards, and subsequently, if I deserved to have a disciplinary sanction imposed upon me for committing them. Thus, the JAO initiated two allegations against me, and these are shown in **Appendix D**. As you can see there, these allegations clearly state that the purpose of my COS hearing was to determine if the actions I committed during the spring term, (on or about May 4th, and which the College had been notified by the police were potentially in violation of a restraining order) were in violation of the Dartmouth College Standards of Conduct II and VI. Thus, the committee did not have the right or power to impose sanctions based on its review of materials which the JAO had already reviewed on or about March 28th, proceeded with some sort of disciplinary procedure based on its review of, and decided it was not necessary or appropriate to issue allegation against me based on this review, as demonstrated by the fact the materials which the JAO provided me in advance of my hearing unambiguously, and repeatedly stated that the department had initiated allegations that I'd performed actions that were potentially in violation of the Standards during the spring term. Furthermore, by doing so, the individuals who conducted my COS neglected to perform their duties and ensure that my hearing was conducted according to the Handbook, and with respect to my rights as a member of the college, and this negligent behavior is the sole & proximate cause of the suffering I've endured. While every single piece of information that the JAO provided me describing the allegations they'd initiated against me in advance of my COS clearly affirms my contention that the JAO had only alleged that actions I'd performed during the spring term might've been in violation of the Standards, and that the JAO did not intend to raise allegations against me regarding the information in the complaint it'd received, on or about March 28th, which it had reviewed at that time and issued a "warning" or "college reprimand because of. I have not been able to locate a single word, sentence, innuendo, intention, poorly/ambiguously worded statement, or pictographic symbol that could conceivably be interpreted to validate the claim Dean Biron and Katharine Strong have so persistently affirmed (but refused to justify or explain the procedural basis for) – and trust me, I have done my reading. A copy of every piece of information the JAO gave me describing the substance of the allegations they'd raised against me before my hearing is included in my "***Letter to President Hanlon.***" Please, take a look.

Here is an additional section of the student handbook which describes the Director of JA's role in the College's judicial hearing process:

"The Director of Judicial Affairs shall determine whether information available in support of an allegation could result in suspension or separation if the student were found responsible. If suspension or separation is a possible outcome of a disciplinary hearing, the Director shall inform the student in writing and provide the student with copies of the available information related to the allegations. The student will have an opportunity to admit or deny the allegation within five days of the written notice of the allegations."

Here is a letter from the allegation materials I was provided where the JAO describes the sanctions which could be imposed on me, **if I was found guilty of the violation of state and/or federal law which the JAO had been told I**

**may have committed, and been arrested for on March 4th.**


**may have committed, and been arrested for on March 4th.**



Emailed: Mark.J.Anderson.18@dartmouth.edu

PERSONAL AND CONFIDENTIAL

Dear Mark:

I am writing regarding your possible violation of Dartmouth's Standards of Conduct. Specifically, it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and VI.

Copies of the materials supporting this allegation are enclosed. Any additional materials to be considered in the adjudication of your case will be provided to you as we receive them.

Before deciding how to respond to the above allegations, you should review the material set forth in the current *Student Handbook*. You should also contact Dean Anne Hudak or one of the other undergraduate deans as soon as possible for advice and support. Please note, if you are found responsible for this violation, a likely outcome would be Suspension.

I am enclosing a "Statement of Understanding of Students' Rights in Disciplinary Matters." You must complete this form and return it to my attention in the Office of Judicial Affairs (5 Rope Ferry Road, Room 204) no later than **noon on May 17, 2017.**

You should know that any change in your student status (including a Suspension) could impact your housing, financial aid, or other commitments. I strongly recommend that you speak to staff listed in the enclosed resource list about your options and the possible financial consequences of a Suspension.

I welcome the opportunity to speak with you now, or at any time in the future, about the hearing process or these allegations. You can reach me at (603) 646-3482.

Sincerely,

Furthermore, while it would require too much space and attention to try and articulate to representatives of the College once again here, I was not found guilty of doing anything malicious or with the intention of violating the order issued against me on this date, and was not found guilty of violating the law in a public court where I was brought to hearing for committing them, or found guilty of violating the Standards by the COS panel that evaluated the actions which I'd been accused of violating the restraining order for performing. I hope you can understand how it feels wrong, on principle, for the College's COS panel to not find me guilty of committing any of the Standard violation's which the JAO had raised against me before the hearing it was conducting, but then go on to expel me because it acted in violation of the Handbook and the judgement of the JAO (which the COS' procedural duties are determined by, and must be performed in accordance with) by taking it upon itself to (1) rule that the materials in the complaint submitted to the College around March 28th were sufficient information and evidence support of a misconduct allegation to weight imposing a sanction upon me for, and then proceed to (2) impose a sanction for the allegations it decided ought to be raised against me, but which it is not given the right or responsibility to in the handbook. To be expelled under these circumstances, and refused an explanation for as long as I have – left wondering if I'll even be able to attain the attention that will make this right for me, or be left to beg at the knees of every authority figure I can imagine might, until the anxiety or depression I'd never experienced before this, but which grows so much more severe with each passing day, consumes me so much that my mind isn't clear enough, or I'm left without the energy to continue trying.

DARTMOUTH008792

**Appendix C**

Table Of Contents


**Excerpts from the Student Handbook that state the JAO is responsible for addressing and responding to informational inquiries which member of the College present to the department about the rules and procedures of the College's disciplinary hearing processes', as well as information regarding developments in their own case:**


I have asked well reasoned, thoughtful questions about how this court operates, and the JAO has not responded to the questions I have asked. According to the student handbook:

> "Students alleged to have violated the Academic Honor Principle or one or more Standards of Conduct are expected to become familiar with the rules and regulations governing COS hearings and to keep themselves informed of developments in their case through frequent contact with the JAO and a trained advisor. Students are strongly encouraged to take advantage of the support and guidance the JAO and a trained COS advisor can provide."

Since I have not been provided information about the development of my case which I have asked for so persistently, it is not appropriate for me to be asked to move along with another hearing until my right to be provided this information has been satisfied. Furthermore, even if it does (for some reason) turn out that it really is procedurally correct for me to be asked to attend this second hearing, the JAO has still forced me to remain in Hanover to resolve these issues with them at my own expense, and they are responsible for costs I have incurred during this period. Had they responded to my inquiries for information starting on or about October 4th, I would have been able to proceed with this hearing (if it should happen) at that time, and forgone an incredible amount of pain and suffering.

Furthermore, if I were made to participate in this hearing which I have wrongly been asked to attend, it would cause me further emotional distress and harm for a few reasons. (As my counsellor said would be true for any rational in my situation) Even in the case that all I've said here is wrong, it is impossible for me to participate in the hearing I've been asked to attend with a sound mind unless the College makes some effort to explain how it is proceeding with respect to my rights, and its own rules, as it has made these decisions. How can a student be expected to participate in a court system that they've come to believe does not abide by its own written rules (for good reason), and which nobody will explain to that student no matter how many times they ask? Additionally, as I've repeatedly stated to Dean Biron and Katharine Strong, so long as I have a sincere, rational belief that the College's rules and regulations, and my rights as a member of it, had not been respected or upheld, I cannot move on and participate in this process with a sound mind. Students are certainly owed a chance to learn the basis for procedural rulings like these, especially if they have concerns of a similar variety to the ones I've raised here.

DARTMOUTH008793

**Appendix D**

Table Of Contents

These are the allegations which the JAO initiated against me on or about May 4th when the Police informed them that I had been arrested and allegedly acted in violation of a restraining order issued earlier in the spring term (on or about March 28th). The actions described in these allegations are the only ones which the JAO and my advisor have I should make an attempt to explain or defend to the COS, and which I was given an opportunity to "admit" or "deny" I'd performed prior to my hearing:

---

**Allegations**

I have received a letter from the Judicial Affairs Office, dated May 10, 2017, setting forth the allegations against me and providing me with copies of currently available materials pertaining to the case.

I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term.

☐ I admit the allegation.
☐ I deny the allegation.

I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

☐ I admit the allegation.
☐ I deny the allegation.

---

Again, the College representatives whom I've been directed to share these concerns with have unyieldingly affirmed that they believe the most obvious interpretation of these allegations would be that they say actions I'd committed during the Winter term, in February and March, that were potentially Standard violations. This is a curious conclusion to say the very least. Do you believe I deserve to understand the basis they've made rulings ruling of this procedural nature on, considering that every person at the College who has the power to make a ruling on this decision (Katharine Strong, Dean Biron, and President Hanlon) has heard my concerns, and thought it moral, just, or responsible to act as bystanders, doing nothing as the departments, institutions, and committees which it is their responsibility to oversee and ensure function according to the rules and regulation set forth by the College fail to do so, and at great personal expense to a student.

This is the new set of allegations which the College had decided it is procedurally correct for me to attend a hearing for at this time:

DARTMOUTH008794

## Allegations

I have received a letter from the Judicial Affairs Office, dated October 26, 2017, setting forth the allegations against me and providing me with copies of currently available materials pertaining to the case.

I violated the Dartmouth Standard of Conduct II by engaging in harassing behavior or conduct targeted at an individual in January, February, March, and/or May of 2017.

☐ I admit the allegation.
☐ I deny the allegation.

I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

☐ I admit the allegation.
☐ I deny the allegation.

As you can see, this new set of allegations differs in form and substances from the one that was presented to me on or about March 28th, and used in my COS hearing on or about September 21st.

DARTMOUTH008795

**Appendix E**

Table Of Contents

**Why it is not only procedurally incorrect, but also cruel, and unusual for the College to ask me to attend another hearing in the manner it has:**

There are several reasons it would not be procedurally correct, or according to the rules and regulations set forth by the College for me to be asked to undergo the second judicial hearing I've told I must attend (in the manner and circumstances I have at the very least). I will explain what evidence supports this contention here now, in an effort to convey why these concerns are certainly substantive enough to, (clearly and at the very least), deserve a response. Furthermore, I hope this will help you understand why it would actually be logistically impossible for me to defend and represent myself as effectively in my scheduled second hearing without this information, and that when the JAO decided to make me attend this second hearing (as mine was scheduled for November 9th) but also failed to fulfill my informational requests, the department's actions put me in yet another position where my well-being was put at stake, ultimately, for no reason other than that the individuals in charge of the College's judicial review process failed to perform their duties according to the rules and regulations set forth by the College over the past weeks in the instances I've described in this letter (in addition to others I haven't taken the time to describe), have not been acknowledged, or adequately investigated and responded to, and those decisions have continued to serve as precedent for subsequent actions undertaken by the College, which have only grown more detrimental with each passing day from when they were first made, to the time I am writing this.

At this hearing I will be tried for a new set of allegations which are different in substance from the two allegations the JAO initiated against me in advance of my initial COS hearing (which transpired on or about September 21st). These new allegations (provided along with the allegations which the JAO had initiated before my original hearing in **Appendix D**).  The COS will determine if the actions which the JAO initiated allegations against me prior to my first hearing for these actions (on or about September 21st), in addition to the actions which the COS expelled me for as a result of my first hearing, but which the JAO did not presented allegations stating they'd be considered as potential violations of the Standards during my hearing. First, it is not appropriate for officials at the College to knowingly and willingly put me in a situation where I'd necessarily suffer so incredibly by having to remain in the area to attend this hearing, or work with people at the college to postpone it (originally scheduled for November 9th), considering that I have raised legitimate, written concerns that these disciplinary sanctions were imposed as a result of a COS hearing which was not conducted appropriately, and these concerns have yet to be addressed in the manner which the Student Handbook says they ought to be.

Second, it is not appropriate for the JAO to review a student complaint and raise what they deem to be the appropriate allegations accordingly, for the COS to then find the student guilty of some other actions which the JAO had not issued Standards allegations regarding, based on the COS's own review of the materials in the student complaint on the later date of their hearing, and then for the JAO to retroactively pretend it had charged the student with these new allegations in advance of the hearing, in order to justify the COS's actions and argue they are "procedurally correct." While I am not accusing the individuals and entities whose inappropriate behaviors have resulted in my own peril from perpetrating the actions I've described in a conscious effort to achieve that purpose, I do believe it is not without merit to say that if what I'm saying is true, that the misconduct I've described, in sum, has effectively served this purpose.

DARTMOUTH008796

**Appendix F**

Table Of Contents

**This is a component of student handbook that shows that my call for action can be fulfilled within the rules and procedures described in the Handbook.**

*"Structure and Operation of the Undergraduate Disciplinary System*

*Responsibility for Disciplinary Matters*

The Trustees of Dartmouth College have ultimate authority for the structure and operation of the undergraduate disciplinary system at the College. The Trustees have delegated to the Dean of the College and the Committee on Standards (COS) authority for promulgation, revision, and enforcement of rules concerning the disciplinary system as it relates to undergraduates, and to the Dean of the College and the Organizational Adjudication Committee (OAC) as it relates to recognized undergraduate organizations. Regularly matriculated undergraduates and all special and exchange undergraduate students are subject to this authority. Students are subject to disciplinary action in accordance with this Handbook as soon as they arrive on campus to begin orientation activities (including DOC trips, pre-season athletic practices, and related programs)."

**Appendix G**

Table Of Contents

**General Concerns about the College's Disciplinary Processes and Procedures**

Many parts of the student handbook allow members of the College's Judicial departments and committee's to make procedural rulings (such as whether or not a student complaint shall result in formal disciplinary actions – "The JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations") solely on the basis of their own discretion. For example, this section of the Handbook states that the panel for a given hearing is entirely responsible for determining if the evidence available to them is sufficient proof that it is more than likely that the student committed the alleged violations, and it is allowed to make this decision entirely at its own discretion:

> "In order for the COS to conclude that a student has violated a College rule, the COS must be persuaded that a preponderance of the evidence supports such a finding. To find a violation under this standard, the COS must conclude that it is more likely than not that the student committed the alleged violation."

Thus, in order for the College to provide fair treatment to all of its students in these disciplinary rulings, the individuals who are tasked with making these decisions must make them according to some set of standards or procedural framework to ensure they are determined by the content of students' behavior. If these decisions are not made according to such a set of standards, then by necessity, they can only be made according to the whimsical, subjective musings the person making them has at the time they're made. Without a specific, defined methodology which these decisions are made according to, an individual not only can, but necessarily will reach very different conclusions about the permissibility of a student's alleged misconduct based on their own emotional state, the time of the day when they make their decision, etc. and this variance in treatment grows exponentially when we account for judgmental discrepancies that exist between all the potential adjudicators that might review information about students' behavior within the JAO. The American public court system epitomizes these features, yet even the people who're considered to understand its rules best, like Supreme Court Justices who stand on different ends of the political spectrum, can come to very well-reasoned, yet, wildly different, or even opposing conclusions based on their reviews of the same information. In a system of judicial review without such rules, decisions end up being made, and punishments wind up being dealt based on the whimsical, subjective musings of the people tasks with making them, not on the severity of nature of the defendant's actions.

I have learned firsthand, at great personal expense, and in a way that affirms this with near absolute certainty, that this College's systems for investigating alleged student misconduct are set-up and/or run in such a way that procedural rulings are made and sanctions are imposed on students, not based on the kinds of well-defined evaluative frameworks which preclude the possibility of such decisions being made fairly and consistently, but rather, based on the whimsical, subjective musings of the individual tasked with making them, and the disposition of the individual which the student complaint is randomly given to review. This is by virtue of the fact that:

- On or about March 28th, the College received a report of information from the Police, and the JAO, who is tasked with reviewing this incoming information, decided what it contained was not severe enough, or sufficient evidence in support of the finding that I'd performed a violation of the Standards to warrant initiating allegations against me for committing.

- On or about September 21st, the Committee on Standards expelled me based on its review of the information, and with no additional evidence to support the finding that I had violated the Standards.

I think that it is very clear that different JAO officials and COS chairs are able to evaluate the same actions, and come to very different conclusions about how permissible they are according to the Standards. As I mentioned before, well-minded and reasonable judiciaries can come to such starkly contrasting conclusions. But what holds these people accountable, as they wield this incredible authority over the lives of these people who'd have almost no power to defend themselves if they were mistreated the court's jurisdiction, is these judiciaries' obligation to explain the reasoning behind, and procedural basis of the decisions they arrive at, and also defend that they make these decisions based on a consistent framework to ensure all individuals who fall under their scrutiny are treated as equitably as possible. The Handbook implies that the individuals who oversee the College's judicial are bound by such an obligation (because it encourages students to correspond with the JAO for any information they'd like to become as informed about the disciplinary hearing process, rules, and procedures as they can, implying that when a student makes such informational requests, they will be adequately responded to, not ignored like they have been). However, I have learned first-hand that in this system, that is not the case. Rules can be broken, and then concealed with lies that absolve the wrongdoers of blame and make the victim's suffering more severe, and the only options the wronged are left with are to submit to the abuse, or desperately try the few, painful options available to you to pursue fair treatment, as I am here by writing this letter to you.

DARTMOUTH008799

# ARTICLE 1 – *"LETTER TO PRESIDENT HANLON"*

Table Of Contents

Hello President Hanlon,

We talked once before when we were walking the same direction across campus, and you probably don't remember me, but I'm so sorry, and it makes me so deeply sad that this is what you and everyone else who works at this school will know me for now, but I've been told you're the only person with greater administrative authority at this school than Dean Biron, and this is my last chance to try and resolve this matter within the college's jurisdiction. I am not threatening to present a lawsuit against the school in this letter; I am begging you to read it and understand how I've been put in a position where I will have no other choice available to me, and to be merciful enough to resolve this affair, which there is no reason should not be resolved internally by the school, privately. It's obvious how terrible and painful a 22nd year on this earth I will be put through if this really does come to that, but I promise you that if you read this and truly try to understand what I've written, it will be clear that I will lose far too much more than I'm capable of if I relent and submit to this abuse, for conceding to even be an option for me anymore. Here is a timeline of what the school's judicial affairs department has done to me over the past 7 months since March 28th. All of the page numbers refer to the "Compiled list of all official letters of correspondence from the school" which I will send along with this letter. Any articles presented here without a page reference and not contained in this compiled list, but are reproduced here in full.

---

1. On March 28th, the school received a complaint from my ex-girlfriend and her mother, who I had a really terrible breakup with the month before, and had vowed they'd make me pay for what I'd done the last time we spoke. They also issued a complaint to the police at this time, and obtained a restraining order against me, which the school was also notified of at this time.
2. **The materials which the JAO received from the** REDACTE **family and police at this time included a series of emails I had sent in the month before during the Winter term while I was off from school (which I will refer to as "The Winter Emails"), and made me attend a mandatory disciplinary meeting with Dean Kristi Clemens to discuss them. Please take note of this very important point – that the JAO saw, processed, and took action against me at the time they were shown The Winter Emails, but did not decide they were severe enough that I should have to attend a judicial hearing over them. You can easily confirm this is true by looking at the chain of emails Dean Kristi Clemens and I sent each other between March 30th and April 3rd, provided below:**

Kristi L. Clemens|
Thu 3/30, 11:52 AM
Hello Mark,

I would like to speak with you about last night and the information we received from RED.  Are you free before 5pm today, or some time tomorrow?  Please let me know.

Best,
Kristi

---------------------------------------------------------------------------------------

Kristi <mark>Clemens</mark>
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907

Thu 3/30, 6:47 PM
Hey Kristi,

I already spoke with the officers about this and would prefer to not spend more time on this matter if that is ok. I hadn't spoken the with people in question for a month, and was told that if they contacted me or my family it would be considered harassment. They then waited a month (presumably until I had left home for school) and decided to contact my parents a couple days ago. The only contact I had with them was to communicate they were in fact harassing me, and to see if I could get them to agree to stop contacting my family to say bad things about me before I filed a harassment complaint.

If you know them and the situation, this is very clearly just a final "fuck you" and not a safety concern. Again, I only contacted them after they contacted my parents after having been told it would be illegal to do so, and because I wanted to ensure they weren't willing to just promise me and my family would not have to hear from them again before I filed some sort of legal complaint. I've been told the only way I can ensure they don't contact me again now is by filing a harassment suit. I'm not sure if I will yet, but I think I'd prefer to just continue not thinking about this like I was until they contacted my family again while I'm in school.


Sincerely,
Mark Anderson

Fri 3/31, 9:00 AM
Hi Mark,

I completely understand.  However, I have an obligation to talk with you just to get a little more information.  I'm not trying to jam up your day, I just want to make sure we understand what happened.  Do you have any time this afternoon or Monday?

Best,
Kristi

---------------------------------------------------------------------------------------

Kristi <mark>Clemens</mark>
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College

DARTMOUTH008801

132 Carson Hall
(603) 646-3907

Kristi L. Clemens

|

Mon 4/3, 9:08 AM

Hi Mark,

We need to meet to check in about this incident.  I see from your schedule that you are free tomorrow at 9am.  I would like to speak briefly with you at that time.  My office is located in Carson Hall, in the same suite as the Undergraduate Deans and OPAL.

Best,
Kristi

--------------------------------------------------------------------------------------
Kristi Clemens
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907
Kristi L. Clemens

|

Mon 4/3, 11:38 AM

Hey Kristi,

Sounds good, is there any chance we could meet later in the day though?

Best,
Mark
Kristi L. Clemens

| MA |

Mark I. Anderson

|

Mon 4/3, 11:45 AM

Of course.  I am free tomorrow from 11:30-4pm.  When is best for you?

Kristi

--------------------------------------------------------------------------------------
Kristi Clemens

Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907

| MA |
|---|

Mark I. Anderson

|

Mon 4/3, 2:38 PM
Hey, I'll come by after my class ends at 12:00

- ➤ These emails capture AND DEMONSTRATE THE FACT THAT THE SCHOOL AND ITS JUDICIAL AFFAIRS ORGANIZATION, UNAMBIGUIOUSLY AND WITHOUT CONCEIBABLE CAUSE FOR DOUBT OR REASON, KNEW ABOUT "THE WINTER EMAILS" FROM THE DATE OF MAY 30TH WHEN THEY INITIALLY TOOK ACTIONS UPON THEM, BUT DID NOT DECIDE I WOULD HAVE TO ATTEND A JUDICIAL HEARING FOR HAVING SENT THEM.
- ➤ On May 4th, I was arrested for having allegedly violated the restraining order which had been issued against me on March 28th for actions I committed on the same day. The authorities notified the college of my alleged violation of the restraining order, and in response, JAO sent me a letter stating the alleged violation of the restraining order, if true, could be a violation of Standards of Conduct II and IV, and that I would have to undergo a hearing for having committed these actions. They provided me with four letters which describe the allegations that'd be made against me.

Now, I will review all of the official letters of correspondence and show you how every single one of them contains evidence that proves that I'm saying is true, and what administrators at the school are arguing cannot be. I have provided the parts that describe the allegations which the JAO had raised against me here, but I will also send a full copy of all these letters with this letter.

- ➤ **(Page 1)** - This is the first official letter of correspondence the school sent to notify me that I would need to attend a judicial affairs hearing for alleged violations of standards of conduct II and IV. In

DARTMOUTH008803

this letter, Adam Knowlton-Young clearly states that he is following up on a report about incidents that occurred during the *Spring term (*March 27th-June 5th).



**Dartmouth**

Office of Judicial Affairs
5 Rope Ferry Road, Room 204
Hanover, New Hampshire 03755

May 10, 2017

Mark Anderson
Sent electronically to Mark.I.Anderson.18@Dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Good Morning Mark:

I hope this message finds you well. I'm writing to follow up on a report our office received from Safety and Security, regarding an incident on or about May 4, 2017 as well as behavior from spring term that had resulted in a restraining order being put in place on you.

I have reviewed the report from Safety and Security and prepared materials regarding our concerns. I would like to share them with you. My preference would be for us to schedule a time to discuss the steps going forward and answer any questions you might have. However, if you'd prefer I send the materials electronically before speaking with me that would be fine. Your Undergraduate Dean is another great resource you can utilize while reviewing and responding to these materials.

If I have not heard from you by tomorrow morning at 9:00 am I will proceed with sending this information electronically and make a hard copy available in our office.

Please let me know your preference. If you would like to speak with me, please call the Office, 603-646-3482 or email me directly Adam.J.Knowlton-Young@dartmouth.edu. If I am not available you can speak with another member of our office.

Sincerely,

Adam Knowlton-Young
Hearing Officer

CC:   Anne B. Hudak, Assistant Dean of Undergraduate Students

➤ **(Page 2) –** This is the second letter the JAO sent to notify me that I would have to attend a Judicial Affairs hearing for alleged misconduct. Here, we see once again that "specifically, it [had been] alleged that on or about May 4, 2017 [I] communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing."



Office of Judicial Affairs
5 Rope Ferry Road, Room 204
Hanover, New Hampshire 03755

May 10, 2017

Mark Anderson
Sent electronically to Mark.I.Anderson.18@Dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Dear Mark,

As you now know from me previous message, our office received a report from Safety and Security detailing events you were involved with on or about May 4, 2017 and during the spring term 2017. Specifically, it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. I have reviewed the information in this report, and based on the nature of the incident described I have determined that this should be referred to the Committee on Standards. Enclosed you will find the information that is currently available including:

- A letter explaining the allegations
- A Statement of Understanding of Student Rights in Disciplinary Matters, on which you respond to the allegations. This form also reviews your rights and options during the process. This document is time sensitive and needs to be returned to our office by **Noon on May 17, 2017**. You may return this document via email to the Judicial.Affairs@Dartmouth.edu account.
  - Please note that even though we are meeting to go over this material in person on Monday May 15 as per your request, the deadline for the return of the Statement of Understanding is still May 17.
- A redacted copy of the Safety and Security report and reports detailing behavior from the spring term.
- A letter to your parents informing them that we have provided these materials to you
- Resources for navigating the COS conduct process (available online, and hard copies of these and all the materials listed here will be available in hard copy in our office)

If you have not yet contacted your Dean, Anne Hudak, I would encourage you to do so. They are copied on this message.

I know it can be stressful to be alleged to have violated the Standards of Conduct and to anticipate a COS hearing. Please don't hesitate to ask questions if you have them or if I can otherwise be of assistance. My role in this process is to make sure that you and the COS members or Chair have the information you all need to resolve this matter fairly and in as timely a manner as possible. Our Office number is 603-646-3482 or you may reach out directly via email Adam.J.Knowlton-Young@dartmouth.edu.

Sincerely,

➢
➢ **(Page 4)** – The text in this 3rd letter which the school provided to describe the allegations that had raised against me, once again, affirms that JAO asked me to (1) attend a hearing in which they would determine if the actions I'd allegedly committed in violation of the law and a restraining order during the spring were violations of standards II and IV, and not (2) attend a trial where they would examine The Winter Emails, which they had already confirmed I would not have to attend a COS hearing because of when I attended mandatory meetings with employees of the school for having

committed them.



Dartmouth

<span style="float:right">Office of Judicial Affairs<br>5 Rope Ferry Road, Room 204<br>Hanover, New Hampshire 03755</span>

May 10, 2017

Mark L Anderson '18
Emailed: Mark.L.Anderson.18@dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Dear Mark:

I am writing regarding your possible violation of Dartmouth's Standards of Conduct. Specifically, it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and VI.

Copies of the materials supporting this allegation are enclosed. Any additional materials to be considered in the adjudication of your case will be provided to you as we receive them.

Before deciding how to respond to the above allegations, you should review the material set forth in the current *Student Handbook*. You should also contact Dean Anne Hudak or one of the other undergraduate deans as soon as possible for advice and support. Please note, if you are found responsible for this violation, a likely outcome would be Suspension.

I am enclosing a "Statement of Understanding of Students' Rights in Disciplinary Matters." You must complete this form and return it to my attention in the Office of Judicial Affairs (5 Rope Ferry Road, Room 204) no later than **noon on May 17, 2017.**

You should know that any change in your student status (including a Suspension) could impact your housing, financial aid, or other commitments. I strongly recommend that you speak to staff listed in the enclosed resource list about your options and the possible financial consequences of a Suspension.

I welcome the opportunity to speak with you now, or at any time in the future, about the hearing process or these allegations. You can reach me at (603) 646-3482.

Sincerely,

Adam Knowlton Young
Hearing Officer, Judicial Affairs

Enc:    Supporting materials, Statement of Understanding, Family Letter

cc:    Student file
       Anne Hudak, Undergraduate Dean

➢
➢ **(Page 5)** – This is the 4th and final official description of the allegations which were being made against me at my COS hearing. Once again, you will see that the text of the allegations very clearly state that I was accused of (1) violating Standard of Conduct II during the Spring term, and violating Standard of Conduct VI on or about May 4, 2017, not (2) violating either standard for behavior I did not commit during the Spring term, or on or about May 4, 2017, despite the fantasies enjoyed by

DARTMOUTH008806

Katharine Strong and Dean Biron.

## STATEMENT OF UNDERSTANDING OF STUDENTS' RIGHTS IN DISCIPLINARY MATTERS

### Mark I. Anderson '18

*This form must be completed and returned to the Judicial Affairs Office (JAO) at 5 Rope Ferry Road, Room 204, no later than noon on May 17, 2017. Please contact JAO at 603-646-3482 or your advisor if you have questions about completing this form.*

#### Rights

I understand that my rights in College disciplinary proceedings are set forth in the current *Dartmouth College Student Handbook.*

#### Allegations

I have received a letter from the Judicial Affairs Office, dated May 10, 2017, setting forth the allegations against me and providing me with copies of currently available materials pertaining to the case.

I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term.

☐ I admit the allegation.
☐ I deny the allegation.

I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

☐ I admit the allegation.
☐ I deny the allegation.

#### Type of Hearing

I understand that I have been charged with an offense that (if I am found responsible) could merit a suspension or separation from the College and that my case will therefore be referred to the Committee on Standards (COS) or an individual hearing officer for adjudication and imposition of a penalty.

I understand that the hearing will be recorded and that I can request access to this recording.

I recognize that, if I have admitted to the allegation(s) listed above, I may provide a statement and request to have an individual hear my case and impose the penalty. If my request is granted, I understand that the hearing officer's decision on a penalty shall be final except for my right to request a review in accordance with the procedures set forth in the current *Dartmouth College Student Handbook.*

---

- (Page 75) – This is the letter I received on September 22nd, which states that the committee had come to the decision to expel me form the college for violating Standard of Conduct II. As you

can see, the allegation they did not find me guilty of is recreated here exactly as it was in the packet I was provided. The allegation they did find me of is not one they presented to me during the hearing. To be totally clear, here is the allegation that I was given a chance to respond to during the trial:

> **"I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term**."

And here is the allegation which I was found guilty of during the trial:

> **"I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual."**

I really do pray to god that with all the other information I have provided here, you will understand how severely I have been punished for no reason other than the committee made this **procedural error.**

DARTMOUTH008808

 **Dartmouth**

Office of Judicial Affairs
5 Rope Ferry Road, Room 204
Hanover, New Hampshire 03755

September 22, 2017

Mark Anderson
Sent electronically to Mark.I.Anderson.18@Dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Dear Mark:

This is official notification that, following your hearing on September 21, 2017, a panel of the Committee on Standards has found that you violated the College Standard of Conduct II when you had repeated contact targeted at an individual. The Committee made no finding regarding the allegation that you had violated Standard VI on or about May 4, 2017. Based on these findings, you have been separated from the College, effective immediately.

Separation is permanent removal from the College community. And, as you are probably aware, a student for whom Separation has been voted is not normally eligible for consideration for readmission to Dartmouth. Information on separations is set forth in the current *Dartmouth College Student Handbook.*

Students separated from the College must leave campus housing within 48 hours of notification. Please consult the *Student Handbook* for further information.

This sanction will be noted in your record in the Dean's Office and a copy of this letter will be placed in your file. As a result of this action, you must answer any question as to whether you have been subject to disciplinary action here at Dartmouth in the affirmative.

As you know, you have the right to request review of the panel's decision. If you wish to do so, your request must be in writing and must set forth the specific grounds for reconsideration in accordance with the standards and requirements set forth in the current *Student Handbook.* The request must be submitted within seven days of today's date, no later than September 29, 2017. Please note: separated students who request review are expected to leave campus while their review is pending, unless they are granted permission to remain.

If you have questions about this letter, please feel free to contact me at 603-646-3482.

Sincerely,

Katharine R. Strong
Director, Judicial Affairs

•
• Here is the "Case Note" form my hearing, in which the college's representatives explain the basis for their decision to expel me from the school. As you will see, they do not cite a single piece of evidence to support that I was guilty of either of the two allegations that were made against me, but rather, stipulate that I violated Standard of conduct II during the winter term (implicitly, but also unambiguously, by only citing actions I committed during that period in support of their finding).
• **Thus, this "Case Note" makes very clear that the school did not find me guilty of doing any of the things they'd alleged were in violation of the standards of conduct, but instead, decided I should be expelled for sending The Winter Emails, which were not what I was being accused of violating the standards of conduct for at this trial.**

COS 17F#3 - September 21, 2017 Casenote

Student: Mark I. Anderson '18
Finding: Responsible for violating Standard II; no finding regarding violation of Standard VI
Sanction: Separation, effective immediately

The student was charged with violating Standard of Conduct VI when he reportedly "violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017." He was also charged with violating "Standard of Conduct II through repeated behavior or conduct targeted at an individual." The student denied both allegations, and his case was heard by the Committee on Standards.

This student's former girlfriend, a student at REDACTED obtained a restraining order in late March, 2017 following her report to REDACTED Police about the Dartmouth student's behavior following the breakup of their relationship earlier in the year. At about the same time, Dartmouth Security received a call from the woman's mother detailing the family's concerns about the Dartmouth student's behavior and asking for assistance. Shortly thereafter, Dartmouth Security and Hanover Police met with the charged student to deliver a restraining order issued by RED police. In early May, Dartmouth Security and Hanover Police were informed that this student had violated the terms of the restraining order by sending the woman an email. The student was arrested by Hanover Police.

The RED student reported that the Dartmouth student had "said that the only thing he wanted to do more than end his own life was to end my life or that of my mother's." She provided a series of emails from the charged student, replete with obscenities and slurs, sent after she had told him to stop contacting her. The Dartmouth student wrote he would do "whatever I can to hurt you as least a fraction as much as you hurt me." He wrote things like, "I hope life brings you nothing but pain and suffering," and "This is only going to be worse if you try and have your mom deal with it. Kill yourself you spineless fuck." He insisted on repayment for expenditures during their relationship and stated that "if you take your time I'll make sure you regret it."

He called her a "fucking pathetic disgraceful piece of shit." He threatened to post on social media things that would be "just too fucked up and hurtful for you to believe…" He insisted the woman comply with his demands "because the alternative is worse for everyone." He called her a "heartless cunt" and threatened to "post your nudes on reddit every day until they finally reach the front page." The charged student also sent distressing messages to the woman's family members (mother, brother, cousin, aunt). He wrote to his former girlfriend's mother, stating that if she contacted his mother he would "do something equally immature to make you regret it." He also wrote to her mother that "it's clear to me why some many people in your family kill themselves now."

The charged student did not provide a written statement or any other materials in advance of the hearing. At the hearing, he said that his former girlfriend had created a "misleading narrative" that was presented "in retaliation" following a bad break-up, and that his messages

should be construed as a justified response to her harassment of him and his family. He said that the messages from him in the packet were out of chronological order and without context. He acknowledged that some actions on his part could be interpreted as malicious, but he stated his view that they were "protected by free speech." The charged student brought to the hearing a copy of the text he sent, in violation of the restraining order, telling the woman to have no contact with him. He also provided a letter he had received from his lawyer about the status of his case in N.H.

The charged student insisted that it was not true that he threatened to kill his former girlfriend or her mother, as the REDA tudent reported in her complaint, although he acknowledged he might have written something to the effect that he wished she were dead. He said the committee should view his communications to the woman as justified responses to the hurtful dynamics of their relationship. He also acknowledged, in his closing statement, that some of his behavior was "super fucked up" and that he deeply regretted some of the messages he sent. He denied, however, that any of the threats were real, and he argued that some of the apparently threatening statements were being misconstrued.

During deliberations, committee members observed that although the student eventually expressed some regret, they did not find his explanations or justifications for his behavior to be reasonable. They viewed the written threats as credible, and they noted that the woman had reason to feel threatened and afraid, especially after she had been clear in her request for no further contact from him. They noted that he continued to harass her and that his explicit and implied threats, which seemed real and frightening, escalated. Committee members noted that his behavior violated Standard II in "multiple ways." One committee member described the behavior as "a textbook example of coercion."

The Committee found the student responsible for violating Standard II. The reached no finding concerning the violation of Standard VI in the absence of a court finding.

In reaching its decision to separate the student, Committee members acknowledged that he appeared to be experiencing a great deal of distress, but they were especially concerned about his apparent inability to take responsibility for his actions and his lack of awareness of the significance of his actions and their impact on others. They concluded that the student's well-documented and repeated behavior was a clear and egregious violation of Standard II and incompatible with his continued status as a Dartmouth student.

Daniel M. Nelson, Director
Dartmouth Outdoor Programs

- 
- In this letter, Daniel Nelson does not acknowledge that I showed the committee the emails I sent during the Spring term that resulting in me getting a restraining order issued against me, and in me being arrested later. I provided these to the committee, and after reviewing all of them, they did not come to the decision that I had done anything during the spring term that would constitute a violation of standards of conduct II or IV. Pretty much all of what he says is wrong and a reflection of how little effort they put into carefully analyzing this case before they expelled me.

DARTMOUTH008811

- After my whole life was permanently made worse because of what the school did to me during my trial, I began my desperate attempt to convince someone at this school who might help me, just how incompetent Katharine Strong and the other members of her department are, and how much I have suffered because they failed to conduct my hearing appropriately.
- I sent a 30,000 word letter to Dean Biron asking her to review the JAO's decision . 23 days later, she notified me that my interpretation of the allegations the school raised against me ((1) that they could only conceivably be interpreted to mean one thing – that I had been accused of committing actions during the spring term that were in violation of the standards of conduct) was wrong, and that instead, that (2) the allegations stated that I'd been accused of performing actions in the Spring and Winter terms which were in violation of the standards of conduct. Here is a copy of what she wrote:

DARTMOUTH008812

 **Dartmouth College**    HANOVER • NEW HAMPSHIRE • 03755-3529

*Dean of the College, 6004 Parkhurst Hall*              • Tel. (603) 646-3113

Rebecca E. Biron
*Dean of the College*

October 25, 2017

Mark I. Anderson
Sent electronically to: Mark.I.Anderson@dartmouth.edu

**PERSONAL AND CONFIDENTIAL**

Dear Mark,

I write to notify you of the determination I have made after carefully considering your request for review of your separation from the College for violating Standard II. For the reasons set forth below, I am granting your request and directing that a new hearing be held.  While this matter is pending, you will remain not enrolled and are not allowed on campus. However, you may be on campus to access services at Dick's House and/or to meet with advisors related to your COS case.

As stated in the Student Handbook, Requests for Review may be granted on one of the following grounds:

1. Procedural error that has materially prejudiced the student's case.
2. Newly discovered information which, had it been available at the time of the hearing, would likely have affected the outcome either with regard to a finding of responsibility or with regard to the sanction imposed (if the information was not reasonably available to the student at the time of the proceeding).

You have asserted that a discrepancy between the allegation letter you received on May 10, 2017 and the hearing committee's focus during their process constitutes a procedural error that materially prejudiced your case. The allegation letter states that "it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and VI." The materials in the case packet and the recording of the hearing indicate that the Committee on Standards did not limit their consideration to your actions on or about May 4. In finding you responsible for violating Standard II, the hearing committee focused on the connection between your May 4 communication in violation of the restraining order and "previous behavior that was threatening or harassing" over time between February 28 and May 4, 2017. This focus does not by itself constitute a procedural error. Rather, it is a reasonable interpretation of the phrase "continued contact" to consider the violation of the restraining order in the context of the entire course of the communications from February to May.

DARTMOUTH008813

However, you assert that your own understanding was that the allegation letter and statement of understanding concerned only behavior on May 4. You write in your request for the review (page 2) that "if this error had not occurred and the substance of the allegations against me were communicated with the care and attention to detail that students hope and assume this school will put into things like these, I would have admitted to the allegation of having committed a violation of Standard of Conduct II during the Winter term." This statement demonstrates that the discrepancy you perceived between the allegation letter and the committee's focus did significantly affect your response to the allegations, both in your denial of responsibility and in the way you answered questions during the hearing.

For this reason, your request for review is granted. I am instructing the Office of Judicial Affairs to issue a revised allegation letter and to conduct an entirely new hearing. Please note that there is no guarantee that a new hearing will result in a different outcome. As it appears that there is sufficient evidence to support the sanction that was imposed, you will remain not enrolled and are not allowed on campus. However, you may be on campus to access services at Dick's House and/or to meet with advisors related to your COS case.

Mark, your appeal letter makes a number of concerning references to your emotional distress throughout this entire matter. I encourage you to seek out all the counseling and advising resources available to you for support during this difficult time. I wish you well as you learn and grow from these experiences.

Sincerely,

Rebecca E. Biron
Dean of the College

Cc:
Anne Hudak, Undergraduate Dean
Katharine Strong, Assistant Director of Undergraduate Judicial Affairs

- As you can see, Dean Biron came to the decision that, contingent on her argument about how the allegations raised against me at the first trial could be interpreted, I should undergo another hearing with a new set of allegations that more explicitly communicate what the JAO allegedly meant to say before.
- **(Page 79)** – These are the new allegations which the school has asked me to respond to for this second Judicial Affairs hearing. As you can see, the substance of these allegations is clearly different from those I was presented at my first trial.

## STATEMENT OF UNDERSTANDING OF STUDENTS' RIGHTS IN DISCIPLINARY MATTERS

### Mark I. Anderson '18

*This form must be completed and returned to the Judicial Affairs Office (JAO) at 5 Rope Ferry Road, Room 204, no later than noon on November 2, 2017.  Please contact JAO at 603-646-3482 or your advisor if you have questions about completing this form.*

### Rights

I understand that my rights in College disciplinary proceedings are set forth in the current *Dartmouth College Student Handbook.*

### Allegations

I have received a letter from the Judicial Affairs Office, dated October 26, 2017, setting forth the allegations against me and providing me with copies of currently available materials pertaining to the case.

I violated the Dartmouth Standard of Conduct II by engaging in harassing behavior or conduct targeted at an individual in January, February, March, and/or May of 2017.

- ☐ I admit the allegation.
- ☐ I deny the allegation.

I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

- ☐ I admit the allegation.
- ☐ I deny the allegation.

### Type of Hearing

I understand that I have been charged with an offense that (if I am found responsible) could merit a suspension or separation from the College and that my case will therefore be referred to the Committee on Standards (COS) or an individual hearing officer for adjudication and imposition of a penalty.

I understand that the hearing will be recorded and that I can request access to this recording.

I recognize that, if I have admitted to the allegation(s) listed above, I may provide a statement and request to have an individual hear my case and impose the penalty. If my request is granted, I understand that the hearing officer's decision on a penalty shall be final except for my right to request a review in accordance with the procedures set forth in the current *Dartmouth College Student Handbook.*

- After I received this decision, I started to realize there may be no actual system of accountability or oversight at this college,. I wrote Dean Biron one more letter trying to explain why what she

had asserted – that the allegations that'd been raised against me in my first trial could reasonably (or even possibly) – hoping someone at the school (she) might finally acknowledge what has been done to me, or even simply explain how what the school was doing to me could be in-line with the rules in the student handbook. Here, I try to communicate the single, irrefutable point which the school has refused to accept thus far, and which this entire disagreement is decided by, and simply ask her to at least write or meet with me and explain how this could possibly be so**. This letter is attached in this email and titled "letter to Dean Biron."**

**This is the email Dean Biron sent in response to my letter:**

Dear Mark,

**I received and read your letter this morning.**

**I am concerned about the reference in your letter to your being "scared for your life" in relation to your COS case. Please call Dean Hudak and/or seek support through counseling.**

**As for the case itself, I understand your view that remaining separated pending the next hearing is unfair to you. I disagree.**

**I have granted your request for review and directed a new hearing. A new hearing with a revised allegation letter is the appropriate remedy for the issue you raised in your request.**

**As I may be called upon to consider a request for review for your second hearing, it would be inappropriate for us to meet to discuss my decision in this case.**

**I encourage you to participate fully in the new hearing granted to you. You will have the opportunity to explain to the committee how you view the pending allegations.**

**Sincerely,**

**Dean Biron**

Dean Biron's response did not acknowledge any of the very serious concerns I expressed in the letter, although it did affirm she'd read it. I do not understand how this college, which claims itself one of the finest in the world, can so flagrantly cause me to suffer by failing to provide me the rights it promises to provide me, and then conduct itself like this afterwards. And if they truly believe that they have acted

DARTMOUTH008816

appropriately in spite of all I've written here, don't I deserve to at least understand why? I am by no means demanding that what I've written here be accepted without question. I am only explaining what seems to be happening from my perspective as clearly as I can, in hopes that it will help you understand why I actually cannot move forward with this hearing until this problem is resolved in one way or another.  I promise you, I am a man of reason, and I would very readily move along with the hearing if I were simply given a fair and reasonable explanation that justifies the college's behaviors which I have brought into question. I am doing nothing more than desperately begging to be provided the rights and protections this organization promised it would provide me, and I've so painfully come to learn it will not.

Now, I will explain how much I'd stand to lose if I simply accepted what Dean Biron and Katharine Strong have repeatedly insisted is true, but refuse to explain or justify how, and seemingly stands in stark contrast with reality, to try and make you understand that the only option this cruel system will've left available to me is to sue the school if nobody is willing to reason with me after I've sent this letter, or explain how this is right so I can go onto the trial with something of a sound mind.

If the college did not mean to charge me with allegations for actions I performed during the Winter term during my initial trial – a perspective I've clearly explained, and begged the school for a reasonable alternative to no avail – then they performed a **procedural error** during my initial trial, and I do not deserve to be put through another one

Let me explain to you how going to this COS hearing will literally be the equivalent of attending a death panel where the decision will be decided on a coin flip for me. I use the term "literally" here with the upmost sincerity.

In this new trial, the JAO is putting together a new committee which will determine if I was guilty of violating Standard of Conduct II for having sent "The Winter Emails" – a set of emails I sent to my ex-girlfriend on February 28th and March 11th-13th. JAO received these emails on March 28th, reviewed and took actions upon them, but decided they did not constitute I needed to attend a hearing for them at this time. Then, later at my trial, JAO reviewed them again (despite that they were not the actions which were alleged to have been in violation of the Standards of Conduct at this hearing), and decided they were so such severe standard violations that they'd expel me for them without even giving me a hearing for them. As you can see, JAO has reviewed "The Winter Emails" twice so far, and at one point determined I did not need to attend a COS hearing over them, only to expel me for them at another. Thus, if I were to allow the school to deliberate if I should be punished for these actions a third time, it would be tantamount to allowing this college to bully me into attending a trial where everything I have worked for in life will be played with and gambled on by a committee that has inextricably proven that it bestows the harshest punishments it can with no more discretion than the two sides of a coin. People who play God with other people's lives like this cannot continue to act so unaccountably, and while the people who're victimized by their actions are provided no better ways of trying to get their lives back than the ones which have been available to me.

# CONCLUSION:

Here is a summary of this letter:

At my original COS hearing, I was expelled for actions I committed during the Winter term while I was at home, and which the school had not alleged were in violation of the Standards of Conduct. The school knew about these actions (which I was expelled for) a month before the trial, acted upon them immediately, and did not decide to move forth with a COS hearing having known I'd committed them over this time. The allegations I was provided by the school explicitly state that the actions I committed in February were not the subject of the trial, and my school advisor repeatedly affirmed that this was the case to me, and that I should explain parts of those events that might help the committee understand the actions I committed between March 28th and May 4th which were the subject of the trial.

Thus, I was expelled for the actions I committed during the winter which the school hadn't alleged were in violation of the standards of conduct, which the trial was not an investigation of, and which my "denials" to the two allegations against me were not a response to, were now somehow worthy of me being expelled for. By these actions, the school flagrantly failed to abide by the following rules and procedures during my COS hearing:

**Here is the section of the Student Handbook titled *Rules, Rights, and Responsibilities.***

### Guidelines for COS Hearings

Committee on Standards (COS) proceedings are administrative in nature and are not governed by the rights and rules that apply in a court of law. However, if a student is alleged to have violated the Academic Honor Principle or Standards of Conduct and must appear before the COS for a hearing, the disciplinary system does provide that student with certain rights and obligations. These, as well as the rules and responsibilities that govern COS hearing procedures, are described in this section.

**Here is the second right which the Student Handbook says students must be provided in COS hearings:**

Notice

Students are entitled to reasonable written notice of the substance of the allegation(s) against them. Students are also entitled to a reasonable period of time in which to prepare for a hearing. A reasonable period of time is, at a minimum, as five calendar days from the date of delivery of the allegation letter. Hearings will be scheduled as soon as possible after an incident. A student who needs additional time to prepare for a hearing may request, in writing, an extension of time from the Chair. A student's D-plan or

DARTMOUTH008818

*the availability of an advisor are not normally grounds for postponing a hearing.*

I was not given the "reasonable written notice of the substance of the allegation(s) against" me, but rather, put on trial for doing one thing, but then found guilty of doing something else I'd received multiple explicit, unambiguous reassurances from people at the school that the trial was not an investigation of. Nobody at the school has been willing to acknowledge that this right was violated during my first hearing, when the Judicial Affairs committee found me guilty of actions which it had not given me notice would be considered as potential violations. Instead, they have persistently stood by "alternative facts" that nicely absolve them of blame, and even posit this second hearing to be something of an act of charity for a student who was too stupid to understand what everyone else allegedly did at the time.

Going through this ludicrous, unfair, and aimless judicial hearing process has been the most emotionally, fiscally, and cognitively damaging and taxing experience of my entire life. My counsellor revealed to me that this Judicial Affairs process is designed to "teach students life lessons" and "be a learning experience." I urge you to understand that it cannot serve these purposes so long as students believe it is as unprincipled, and incompetent an organization as my experiences over the past seven months have proven it is. While it is usually able to hide behind shallow, unfounded explanations to justify how it bestows different punishments to individuals who performed the same actions in most cases, my situation is a rare one that puts the inconsistency of their judgements on full display, and demonstrates they do not determine punishments based on a students actions, but rather, for extraneous reasons were only left to wonder and speculate about. The JAO saw "The Winter Emails" in March and did not decide I needed to attend a hearing because of them. Then, in September, after finding I had not done anything in violation of the Standards of Conduct since March 28th when they received "The Winter Emails," they decided they were sufficient to expel me over. I've asked Katharine Strong how this could be, and as in every conversation we've had, she has only insisted falsehoods to be reality, and refused to explain how any of these things are being proceeded on according to the courts rules and procedures, and how I am not being denied my rights, no matter how many times I've earnestly begged her to. I am a human being, and I do not deserve to be treated like this. Someone tried to make me go through this school's judicial affairs system solely because they intended me harm, and thought that by merely putting me under the scrutiny of such a prolifically whimsical and trigger-happy court system, they might be able to do so, even if they weren't able to succeed as they wished on the first attempt. I hope you can understand that when the school affirms these public perceptions, it undermines every other thing this institution stands for, in addition to every member of its community, both past and present. I'd only ever watched Fox News for amusement, or to get insights on how mainstream conservative America really thinks. Thank you for making me see reason in the likes of Betsy DeVos from my experiences here. This committee is all about teaching "life lessons," and I've learned a couple of the most important ones of my life from this. The first is to never believe in something simply because it is supported by people I've come to believe are reasonable, and opposed by other who are usually not. The second is to never believe in any institution or organization, no matter how other people might be stupid enough to regard them, because it will only ever treat you as well as the individuals whom its made of decide to, and these people will only treat you as well as they must, and will slight you at every chance they get if they can benefit themselves by doing so, unless you take it upon yourself to stop them from doing so.

DARTMOUTH008819

Think about this from my perspective. I sent those emails in February, and then the school came to know about them in March and spoke with me about them, but did not make me attend a Judicial Affairs hearing because of them. Then, I had a hearing for different actions I committed later, which I knew I could easily defend and demonstrate were not in violation of the standards of conduct, and which the committee did not decide were in violation. They did, however, find that the actions I'd committed during the winter, which the school hadn't alleged were in violation of the standards of conduct, which the trial was not an investigation of, and which my "denials" to the two allegations against me were not a response to, were now somehow worthy of me being expelled for. Would you not be "scared for your life" if you or your own child were put at the scrutiny of a system you had so painfully witnessed has so little consistency, accountability, and care for its own rules and procedures? Its so insulting when people like Dean Biron reply to my letters by responding to little snippets like this so she can send me a condescending response that serves to justify the very wrongdoing I'd written her about, without giving an actual explanation to justify it, or addressing any of the concerns I'd raised about it. I cannot imagine how to express in words, what a special kind of torture it has been to go back and forth between people who the school has decided have the discretion and credibility to merit them having the power to take away everything I have in life if they see it fit to do so, and who my life will forever be changed for the worse in proportion to how poorly they perform their duties, only to be so violently confronted with the fact it was all a ruse, and with brochures, and expensive libraries, and everything else that got me to believe this place was so much greater than it is until now, they'd simply tricked me into believing in it until it was too late for knowing the truth to even matter. Please, for the sake of every student this school has ruined the life of, and other student that will fall tribute to it if it remains this way, don't allow things like this to happen to people.

I am begging you, in the final capacity available to my very being, to acknowledge what I've said here is true and make it right accordingly, or simply give me an explanation for the school's actions so I can understand what is actually going on here, put my concerns to rest, and move on with this second judicial hearing in good conscious, rather than spend most of the 22nd year of my life in a courtroom fighting. I'm not sure, and honestly doubt you'll really read this now that I think about it, but please Mr. Hanlon, don't make me suffer like this to get simple answers and treatment this school promises students. I don't know how everyone else has stood by and watch it happen to me while I've begged them to help me and stop it so many times, and for so long, but please don't let it happen again one last final time, and introduce this whole new needless period of suffering into my life. This has really made me question whether I might really just be a bad person, or might even lack the soundness of mind to really understand what was going on here. But when I eventually felt such a need to know if I really might be wrong that I brought myself to not only show this to several of my friends, but also ask them to take the time out of their busy schedules to really look at it all and candidly tell me if I was really wrong here, so that I could give up ahead of time and try to move on with this if I really was the delusional, psychopathic child trying to weasel my way out of being expelled for things he should like my counsellor said they probably feel I am, and they responded by telling me everything I said was correct and true, and that they'd help me hold this school accountable for what it's done to me, no matter what it takes. I have done nothing to be put in this position, where I'm fighting for my life, and the only option anyone else will give me is to file a lawsuit, and everyone outside the school (including several counsellors) that I've spoken to about this is telling me I need to if they will not stop abusing me like this. I'm begging you to show me mercy, and have the civility to give me the answers I've

DARTMOUTH008820

begged to be given for so long without doing this to get them. Please understand at least that I will not do this if I'm given an explanation for this, that I cannot proceed with my life and this hearing until the matter is resolved, and so the only decision left to make is how much more you'll put me through before it's given to me.

DARTMOUTH008821

# ARTICLE 2 – *"LETTER TO DEAN BIRON"*

Table Of Contents

**Here is a copy of the email I sent with this letter attached:**

Hello Dean Biron,

I have written you a letter which is attached to this email. For reasons I explain in the letter, I need you to respond to what I've written in it by the start of the day on November 1st. I'm sorry if some of what I've written is unduly cross, but after having spent so many countless hours fruitlessly trying to get administrators to accept basic facts or conduct their jobs appropriately by now, it is hard to withhold my frustration when I address people who represent this organization. I really do hope and pray you'll be willing to have the meeting I've requested once you've read it, and just want this to be made right.

Best regards,
Mark Anderson

---

Dear Dean Biron,

It has come to my attention that the college staff in charge of the Judicial Affairs department, and the sole individual tasked with supervising this department, ensuring it follows the rules, regulations, and procedures it's required to abide by (yourself, the Dean of the College), have not been able to understand how the school failed to conduct my disciplinary hearing fairly or appropriately. It is pointless for me to try and communicate what this fact implies to people who don't understand it, so in this letter, I am simply trying to articulate what our fundamental point of disagreement is, before articulating my own perspective one more time as clearly as I can in hopes you'll understand it. Then, finally, I will review the school's perspective on this point, deconstruct it, and explain how it is indefensible, and unfettered by such limiting factors as logic and reason.

Now, I will explain why it is a matter of fact that the allegations presented against me by the school stated I had been accused of performing actions that violated the school's standards of conduct between the dates of March 28th when I was issued a restraining order, and May 4th when I was arrested for allegedly acting in violation of this restraining order, and that it is virtually impossible to reasonably interpret this text to mean anything else. This is to say, that the interpretation of this text which the court erroneously endorsed, which you've supported in your letter, and which the legality and justification for the school's actions resides upon the validity of, is not one that could reasonably, or even conceivably be derived from the text of the allegations provided to me by an individual with a strong, functional understanding of the English language. Here is why.

This is a copy of the text from the allegation letter I received on May 10, 2017:

==It is alleged that on or about May 4, 2017, you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and IV.==

I will now break-down these two sentences into smaller constituent parts, explain what each of these segments mean, and then finally, the single, very clear meaning that could be derived from the text. This is the interpretation of the text which my advisor told me was accurate until after the hearing when she began to deny it, and which every person I have shown the allegations to who doesn't work for the school is able to understand as easily as I am.

- ==It is alleged that on or about May 4, 2017, you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing.==
    - ==*"It is alleged that on or about May 4, 2017, you communicated with parties in violation of a restraining order"*==

- This summarizes the allegations being made against me in short, and does not require further explanation.
    - **"which had been issued for previous behavior that was threatening or harassing."**
        - This part of the sentence describes why I had been issued the restraining order that: "**It is alleged that on or about May 4, 2017, you communicated with parties in violation of."**
- **This continued contact in violation of the restraining order, if true, would be in violation of Standards II and IV.**
    - **"This continued contact in violation of the restraining order"** This part of the sentence references to a very specific set of actions described in the previous one (as there were two – the communication with parties in violation of a restraining order which I'd been accused of committing on or about May 4, 2017, and the "previous behavior which was threatening or harassing" and constituted the restraining order being issued in the first place, making it important to do so if they were not both in question) using the adjective "continued" and the phrase "in violation of the restraining order" to qualify which set of actions are referenced to later in the sentence. The phrase "in violation of the restraining order" means that the set of actions in reference are those which I committed after the restraining order had been issued – March 28th – and the adjective "continued" reaffirms that the actions I'd committed after this time were the ones in question. Thus, this first part of the sentence unambiguously states that the actions it was alleged I'd committed after March 28th "in violation of the restraining order" were the ones that it was alleged were in violation of Standards II & IV, and there is no other interpretation of this that could be made by someone with a strong, functional understanding of the English language, unless you aren't aware of the date when the restraining order was issued, which I understand is possible. The allegations provide a timeframe which it was alleged I'd committed a Standard violation during, and it is a simple matter of fact that the actions I was expelled for, and am still suffering the worst punishment this school can bestow upon a student, were not committed during this period.
    - **"if true, would be in violation of Standards II and IV."** This then, means that the very specific set of actions referred to in the first part of this sentence are the ones which the school had decided it ought to investigate to determine if they were in violation of the community standards of conduct. In addition to the explicit statement in the first part of this sentence, the "if true" at the start of the second part implicitly affirms this as well. This is because in the first sentence, it is alleged that I may have committed actions in violation of a restraining order, but merely stated as fact that I **had been issued [the restraining order] for previous behavior that was threatening or harassing.**

<u>Lets take one last look…</u>

In review, here is the full statement from the allegation letter:

> It is alleged that on or about May 4, 2017, you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and IV.

And my interpretation of what this means: that it was alleged that I'd violated a restraining order, and that if this were true, the actions I'd committed in violation of this restraining order would be in violation of Standards II and IV.

There are a number of other facts and circumstances I can describe that affirm it is impossible the school meant to present accusations against me for misconduct during the Winter term (such as the fact that the school had the emails I was expelled for producing for over a month, they did not decide that I should undergo a COS hearing for having written them [this decision was only reached in the middle of my hearing], and that Kathrine Strong has previously given me an entirely different justification for why the hearing proceeded this way (but which is equally or exceedingly unfounded, and inadequately explained), and that other iterations of the allegations raised against me only affirm my point more clearly), but I will not describe them here to ensure I do not distract from this line of reasoning which I hope will be the easiest to understand.

<u>**What the school has repeatedly argued these two sentences (which have a very clear, unambiguous meaning that does not provide any room for interpretation, as I've described) mean:**</u>

Here is what was said in your response to my appeal:

> **The COS did not limit their consideration to your actions on or about May 4, 2017. In finding you responsible for a violation of Standard II, the committee focused on your May 4 communication in violation of the restraining order and "previous behavior that was threatening or harassing" over time between February 28 and May 4, 2017. This focus does not by itself constitute a procedural error. Rather, it is a reasonable interpretation of the phrase "continued contact" to consider the violation of the restraining order in the context of the entire course of the communications from February to May.**

The following claim – that "it is a reasonable interpretation of the phrase "continued contact" to consider the violation of the restraining order in the context of the entire course of the communications from February to May" – is objectively false, and unless you're able to understand why, it'll be impossible for you to appreciate the severity and nature of the situation at hand . Let me explain.

In isolation, the phrase "continued contact" could mean many different things, so we need to look at the context of the sentence it is in to understand what meaning it imparts in any unique case. In this case, the phrase is used in the following sentence: "this continued contact in violation of the restraining order, if true, would be in violation of Standards II and IV." As I'm sure is clear, "continued contact in violation of the restraining order," the entire phrase which "continued contact" is a part of here, has a very different meaning than the phrase "continued contact" would have in isolation here. Let me articulate with an example to help make this clear:

Consider the following two sentences:

> "This continued contact, if true, would be in violation of Standards II and IV."

> "This continued contact in violation of the restraining order, if true, would be in violation of Standards II and IV."

As we can see, the sentences have very different meanings when the noun "contact" is described by the phrase "in violation of the restraining order." Had the allegations contained the first statement here instead of the second, the actions I committed during the Winter term could be in question (although other documents the school provided me also affirm that they were not intended to be). However, the allegations contained the second statement, which clearly states that the actions I'd committed in violation of a restraining order that'd been issued at the end of March were the ones in question, not the actions I committed before then, which cannot possibly be interpreted to have been "in violation of a restraining order" that did not exist at the time. And so, in this way, words impart meaning. I'm not sure where you're all finding the room for so much creative interpretation in these two sentences, but unless you're willing to explain and defend the integrity of your interpretation as I have here instead of simply insisting your perspective is true (as I have of my own in this letter), I hope you can understand why I won't be able to simply accept such a seemingly obvious departure from reality. I've run this argument by several people at this point, and the only individuals who do not think my perspective is perfectly sound and based in reason are those who work for the college, while the only people who have been able to see any reason in the college's perspective are the people it employs. Katharine Strong has communicated she is not interested or willing to communicate in a dialogue about this, and Anne Hudak has told me you are the highest ranking administrator barring the president, so the only options I will have after this are to contact him or try and resolve this in the jurisdiction of a different court.

I am happy you came to the decision that the result of my first trial should not be upheld, but I am emphatically disturbed that the school's representatives do not think their organization, very clearly and without a doubt, failed to conduct my hearing according to the guidelines described in the student handbook, and that they have decided the punishment I was assigned as a result of my earlier trial should be upheld between now and the time I'm given a fair one. I am not able to make sense of how these two separate conclusions could simultaneously be reached – that I deserve another trial because the original sanction imposed may be incorrect (for any reason), but that until they actually determine if it is, I should continue to live under that punishment. I don't know if you're aware of how expensive it is to eat in hanover while you don't have access to a kitchen or a student meal plan, but I do not understand what the school might be hoping to achieve by making me pay these costs while the meal plan and room I've already been billed for go unused, much less how it could be considered appropriate or moral to continue to deny me them.

While these statements are strong, it is only out of frustration, and I cannot tell you how sincerely I would appreciate, and how humbly I would accept any thorough, well-reasoned explanation that is presented to me for these things. The only reason I can believe that so many different people at the school could independently fail to understand the interpretation of the two sentences which I've detailed, is that you're all trying to attribute as little blame for what has happened here to your coworkers

DARTMOUTH008824

and employer. I thought this was an institution with principles and values, but instead, I'm left in the same position as someone trying to hold a police department accountable for undeniable wrongdoing in their local court system; the ostensibly "unbiased" arbitrators only willing to admit their buddies have done anything wrong when there's so much evidence it's impossible not to, and default to whatever line of reasoning absolves their peers as much as possible, regardless of how much pain and suffering they've needlessly caused others.

I'm scared for my life about having to participate in a judicial system that I've witnessed display such incompetence, and subsequently, an inability to understand why what they'd done was inappropriate and inconsistent with the rules and policies of this college which it is their profession to uphold. If they cannot understand such basic things that are so fundamental to performing their jobs and duties, how could they possibly ensure the college's courts have a modicum of legitimacy, come to fair reasonable conclusions, or even abide by the rules and regulations their very organization designed. This is the very reality I was afraid would be supported by such a "preponderance of evidence" in one way or another after this meeting that I wouldn't be able to hope it might not be true anymore after yesterday. I am writing this for the reason that nobody deserves to wait a month wondering if the school is going to fail them one more time and make their lives unlivable like I have, and continue to do, and I can't move on from this knowing that every student in this community is subject to the tyranny of a court system so systematically flawed, and at odds with the very rules and standards it supposedly abides by and acts to uphold, that it could put a student in this position, for these reasons, and consider this to be "sound practice."

I promise, and urge you to try and understand that the allegation letter provided to me could only intelligently be interpreted to mean what I've said it does. I would be more than willing to meet with you to explain why if it this is still unclear. If you still believe your interpretation – that the allegations did indicate the actions I'd committed before the restraining order was issued were the ones the school alleged were in violation of the standards of conduct – is one that could reasonably, or even conceivably be derived from the text in the allegation packet, I strongly encourage you to review the statements with a member of the English department and a legal professional before you say so with certainty.


If you see merit in the main point I have made in this letter – that the allegations provided to me by the school could only reasonably, intelligently be interpreted to say that I'd been accused of perpetrating actions that were in violation of a restraining order and standards of conduct II and IV between the dates of March 28th (when the restraining order was issued) and (on or about) May 4th – I would like to meet with you to engage in a dialogue about what this entails. I can send you a copy of everything I will want to explain and discuss in this meeting in advance to ensure it is as efficient a use of your time as possible, but I have spent too many months of my life going through this, and lost too many experiences and memories while desperately trying to receive fair treatment from an organization with almost virtually no administrative oversight, and that has so many clowns and jesters amongst its ranks, that I cannot bring myself to try and convince them of basic facts and information any longer. It is my birthday today, and as all my friends text me asking where I've been lately and why we haven't hung out this term, all I can do is pretend I'm busy and didn't see their messages. The school has no reason to do this to me, and if it does, then I damn well deserve more than a half-assed, non-sensical explanation as to why.

If you also find reason in what I've said here, I will explain the subsequent points of disagreement which need to be clarified. Once all of these points have been communicated to you, I would like to meet with you and/or whoever else might like to represent the college in this discussion, and I will explain the overall point these facts irrefutably prove, and the options that will be available to me moving forward, and what the school can do to help resolve this and make right for the needless harm it has caused me by failing to abide by its own rules and regulations.

If you do not believe my statement about these allegations is true, and would not like to meet with me to discuss what this fact (which the school has denied until this point) implies, I will need to file a lawsuit in federal district court by the start of the day on November 1st so that I'll be able to request an extension on my judicial affairs hearing while another authority investigates this matter. So unless Katharine Strong approves my request for one when I ask her in advance once I send this to you, I will actually have no choice but to file the complaint by then if I haven't heard back from you, because by simply not responding to the allegations by the deadline or attending the hearing without this in place, I will have actually given the school a reason to expel me that it might possibly be able to defend in a court of law, and given how this might go down at this point, and that I have no idea where this organization stands or what principles and values it really operates according to, I'm sure you can understand that's not something I can leave on the table anymore.

DARTMOUTH008825

Sincerely,

Mark Anderson

DARTMOUTH008826

# ARTICLE 3 – *"REQUEST FOR REVIEW"*

Table Of Contents

To whomever this makes its way to,

   I'm staying on a couch in my friend's room at an off-campus house right now, and as soon as I submit this appeal, the next step for me will be to determine what excuse I need to make up and tell everyone I know here so explain why I mysteriously haven't been seen for the past few weeks, and why I'm going to be gone for however long I am. Since the time I was informed of the committee's decision, through now, and until the time I learn what will become of me, or how long I'll be gone after this with absolute certainty, I'm just going to be stuck in this room rotting away because I'm too scared to go outside, run into someone I know, and then become forced to make-up a story to explain my irregular absence from classes and my extracurricular commitments these past few weeks, and that I might have to contradict later on when I've come to know how much time away from school I'll have to rationalize being gone for in whatever lie I invent and tell everyone to explain my time away if I'm every allowed back at this place. I don't think the school will let me meet with anyone to try and figure out plans for how I might graduate on time or minimize my student debt burden if I am every allowed back at this school, but that's honestly the first things I'll have to start doing after I submit this in a few minutes. My dean, Anne Hudak, warned me that it can take up to a few weeks before a decision is reached on an appeal because the Deans of the College often have very busy, unpredictable schedules that usually prevent them from reviewing appeals until a short while after they've been received. I totally understand this, and urge you to wait until you have the time and energy to read through this and remember, and understand it. In case you might be in a position where you have the freedom to elect when you'll look through this once you've received it, that you might be able to provide me an incredible amount of utility electing to look through this at one of the earlier times it'd be possible and convenient for you to do so.

   To preface this, I want to apologize for the variety of careless grammatical errors, incomplete sections, and incoherent statements that I'm sure are scattered throughout this letter. Despite my best efforts, I was not able to find a lawyer whose minimum retainer my parents could afford to look at this or help me in any way, and although my school advisor (who helped me with the Judicial Affairs process and met with me several times the week after I was expelled to help me understand how to write this appeal) said she would skim through it for me, she wouldn't mark-up mistakes she saw while going through. I do not have anyone else in my life that I could bring this to right now and seek help with that cares enough about me that they might want to, but are also capable of providing meaningful help and assistance, and have the time available in their own busy lives right now to help me with such a severe and difficult-to-handle situation as this one. Now that the deadline I must submit this letter by has nearly arrived, I've only been able to finish writing everything I've said here by the day of the deadline (I'm writing this having just finished now), so I have not had an opportunity to review any of it aside from the very first section, so you'll be the first person to have read all of it since I typed it, even taking myself into account. If there is anything you come across I might be able to clarify, feel free to call me or reach out to set up a time I could come meet you and answer any questions you might have in person.

<div align="center">***</div>

**Please read this, I know it's long, but this is everything you need to understand this case. You are the only person in the world that can save me now, and this is the only tool I have to communicate exactly what is happening to me; the only thing I can do is express it to the best of my capabilities here and pray you read it and try to understand. It might not be totally clear why I go into such detail at some points of this letter until I bring up whatever I was talking about again later on, but I promise you it's all necessary, and that every memory I can access about the events I was expelled for are described here. Overall, this letter contains:**

➢ **An explanation of the procedural error that occurred in this trial.**
➢ **The information I would have provided to the committee if all the allegations I'd been put on trial for were adequately described to me.**
➢ **The information I did provide during the COS hearing.**

DARTMOUTH008827

➢ **Line-by-line response to the judicial affairs committee's finding report**
➢ **Copy of my opening statement from the hearing**

I don't know what punishment I deserve here – maybe this is it. What I do know with incredible certainty is that the school didn't put in the care or effort to conduct this Judicial Affairs trial in such a way that they could be informed enough to know either.

# ➢The Procedural Error that Occurred in this Case

The Student Handbook reads:

> *"Students are entitled to **reasonable written notice of the substance of the allegation(s) against them**. Students are also entitled to a reasonable period of time in which to prepare for a hearing. A reasonable period of time is, at a minimum, as five calendar days from the date of delivery of the allegation letter. Hearings will be scheduled as soon as possible after an incident. A student who needs additional time to prepare for a hearing may request, in writing, an extension of time from the Chair. A student's D-plan or the availability of an advisor are not normally grounds for postponing a hearing."*

Since the phrase "reasonable written notice" isn't defined or further explained in the handbook, I am providing my own interpretation that I think any reasonable person would agree makes a great deal of sense here.

**_"Reasonable notice" entails:_** a written description of the allegations against the student that would make the substance of these allegations abundantly clear to anyone making a reasonable, intelligently derived interpretation of the text provided to them.

I was not given such **_reasonable_** notice of the substance of my allegations from the school, because my advisors and I were able to come to the conclusion (based on our reasonable interpretation of information the school had provided describing the allegations against me) that the COS committee put me on trial for a specific set of actions I'd committed during the Spring term, which did not encompass the things I'd done during the Winter term while I was home – these are the transgressions the committee focused on in the hearing, and which I was expelled for committing.

Consequently, I didn't get an opportunity to "admit" or "deny" the allegations I was found guilty of, & it wasn't possible for me to know exactly what information it was important for me to provide to the committee. If this error had not occurred and the substance of the allegations against me were communicated with the care and attention to detail that students hope and assume this school will put into things like these, I would have admitted to the allegation of having committed a violation of Standard of Conduct II during the Winter term. Here is a copy of the allegations I was given to respond to:



The events that I was expelled for did not occur within the timeframe described in the allegations that the committee had raised against me – the allegations clearly stated that I was being accused of committing a violation of conduct during the spring term. In other words, I was not given an opportunity to "admit" or "deny" the allegations I was found guilty of at the Judicial Affairs hearing by responding to all of the allegations which were presented to me. Here is the other information I was provided describing the allegations against me:



I don't think I can really articulate how seriously this may have affected the outcome of my Judicial Affairs hearing without just asking you to read everything I've written here. I'm not saying I did nothing wrong, I'm just begging you to understand that because of how this all went down, I was not provided all of the information students are guaranteed the right to in the student handbook, and which you couldn't possibly argue a student had been given a fair opportunity to prepare for, or represent themselves in a trial in which they hadn't been provided an unambiguous written description of beforehand.

I was specifically told to try and share as few details as possible about our relationship as were needed for the committee to understand the specific allegations against me. I took this as further prompting to spare the committee all the details necessary to understand all the events pertaining to what they eventually found me guilty for.

When I had such a hard time answering questions the panel asked about events I'd been told I wasn't being put on trial for, and I couldn't recall the things they asked me about for the entire questioning session, because to this day, the only way I've been able to ease the pain from the memories of what happened in the end is to try and forget them, I guess they interpreted my confusion and inability to coherently respond as me trying to make up some story that'd rationalize or excuse what I'd done. Please don't let my life end for this. You're the only person in the entire world that can save me from a fate so much more painful than losing your house, or job, or even randomly being kicked out of college one random day at the beginning of your senior year in college for no reason at all, which I don't know any way to really explain to you other than writing you this, and praying that you have the empathy to read it.  I was distracted, trying to understand what their questions were implying, and why they were asking so few related to what they were accusing me of, which culminated in me pausing to **express my confusion, and ask why they were focusing almost entirely on events unrelated to what I was on trial for during the middle of my questioning.**

# WHAT I DID TO PREPARE FOR THE CASE

I'm describing what I did to prepare for my Judicial Affairs hearing to articulate exactly how this procedural error – me being told, (as Adam told me in the first letter I received about the case) **"specifically, it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order,"** and very specifically that it was "*this* continued contact in violation of the restraining order [which], if true, would be in violation of Standards II and VI,"** when this description did not actually encompass all of the actions I'd be put on trial for – made it impossible for me to know what information I should've provided to the committee in the opening statement of my hearing.

DARTMOUTH008829

My family cannot afford a lawyer to help me with any of this, so the only people I've had to help me navigate this incredibly opaque and unforgiving judicial affairs system are my public defendant, George Oslter, and my college dean Anne Hudak. George's interpretation of the school's letter describing the allegations which the COS committee had raised against me, was that the accusation I'd violated standard of conduct VI would be the biggest issue for me, since a very strict reading of everything that transpired could cause the school to punish me for a technical violation of the law, even though the court hadn't found me guilty, and that I was quite clearly and provably not doing anything malicious during the period it was alleged that I had been. He told me my main concern should be that the committee might punish me for having technically violated the conditions of a restraining order when I sent the ▉REDACT▉'s the email which resulted in my arrest, despite that the court accepted my not-guilty plea. This is why I was not immediately available to have the hearing during the spring term – I still needed to undergo the New Hampshire court hearing where they'd determine my culpability for the alleged crimes. Several people at the school I went to for help throughout this process told me that George was very familiar with the school's Judicial Affairs process from his past experience representing students in them, so I had great respect for, and readily accepted his opinion on how things would go, and what I should do to prepare for the COS hearing.

Anne told me to consider things I might do if I was suspended and had to go home, because she said it was always important to "hope for the best, but prepare for the worst," which, at the least, affirms that she would've agreed with my lawyer that total separation from the college was not really something that would be considered here, even if she won't admit it to me now no matter how much I ask her to.

As a result, I wasn't even provided an opportunity to admit or deny the allegations I was eventually expelled for, or know what set of information I needed to provide so they'd understand all the circumstances surrounding my actions which'd come into question. Once you've read this entire thing, it'll be a lot easier to understand why this was especially misleading in the case of my Judicial Affairs trial.

I have provided photos of the opening statement I read to the Judicial Affairs committee at the end of this letter.

*** 

Although this information was available to me during the time of the hearing, and is absolutely necessary to make sense of the events I was expelled for, because of the procedural error that occurred, I was specifically mislead to believe it was not necessary to understand anything I was being accused of at the hearing, and that I should make an active effort to omit as much of it and "any other irrelevant information about our relationship that wouldn't contribute to the committee's understanding of the events surrounding the actions I was being accused of" (the man leading the hearing said something along those lines to me at the very start of the trial, at which point I decided they'd probably look more kindly upon me if I respected their time by listening to what he'd said, and decided to skip over a number of segments in the 6-page opening statement I'd written). This judicial affairs system is so beyond my understanding, and I have no idea what punishment I might really deserve for this; maybe this is it, and I'm just so fucked up I can't even see what's wrong with myself. I just urge you to understand that institutions like judicial affairs serve obvious, important purposes in places like our school and society, but even the individuals who create and manage them would profess there aren't instances where they occasionally come to invalid conclusions, and inadvertently cause more needless harm to people who don't fully deserve it than any other entity in the world might be capable of, or serve as a set of tools that some people will be able to utilize to defend the very same injustices these institutions are made to quell; a society wouldn't survive without means of holding people accountable for causing other people harm, but no one would argue its possible for the institutions that serve this purpose to do so without dealing some punishments to wrongdoers which are too harsh or undeserved. Please, please understand that because of the circumstances I've described, there is no doubt the chance that this happened to me is too large for you to not at least make certain it isn't before you affirm I'm the psychopath they could only protect society from by taking his life away from him. You know so much better than I do what punishment I deserve. The only thing in the world I regret more than having been weak enough to have perpetrate the actions I committed during the Winter term, is not being able to go back and do the trial again, just having any idea what I was being accused of, or what information I needed to provide. That way, I could at least know this wasn't a mistake, but a necessary measure and precaution that simply has to be made against people like me to protect others. To write this description of what happen during, and leading up to the events I was expelled for, I truthfully had to reach deeper into myself and try harder to understand my own mind, emotions, and what unconsciously motivates my actions and behavior than I ever have in my entire life, so that I'd be able to express them to you as clearly as possible. I guess there's never been another time in my life where that was my only choice, and this was the only thing that could possibly make me go back to dwell on all these memories I've tried so hard to forget. Once you've read this letter, I honestly think you'll be able to make better sense of it all better than I even can now. I

couldn't tell you what I deserve, but I do think that if you really read all of this, I'll at least be able to know your judgement is correct.

## ➤ THE INFORMATION I WOULD HAVE PROVIDED TO THE COMMITTEE IF ALL THE ALLEGATIONS I'D BEEN PUT ON TRIAL FOR WERE ADEQUATELY DESCRIBED TO ME.

REDA and I met each other during our sophomore year in high school. I guess must've been a lot more popular back then because we always talked about how we'd thought the other was super cool for a long time before we'd met. After we first became friends after meeting in pre-calculus class, we both started making as many excuses as we could to hang out with each other. We started dating a few months later, and after that, spent every last day of high school together, as well as every break from college/university either of us had. Literally every single one. In our sophomore year of college, her parents wanted to go on a vacation to Hawaii that I couldn't afford, and so she refused to go and came to stay with me in my dorm room and watch me study instead, because like she would always say to me when we loved each other "nothing was as fun as time spent with her Marky."

We were best friends, and closer with each other than we'd been with anyone else in the entire world until the very last day of the relationship. She knew and understood me better than anyone else has in my entire life, and cared about and related to me in such a special way; until the last day we were together, she'd always say she felt the same about me.

REDA was my first kiss, relationship, and the closest friend I've ever had. I was as close to her parents as I was to my own for a while, and spent countless times more waking hours at her house than I have at my own since we started dating in our junior year of high school. We were inseparable, and everyone that knew us would say they'd never seen two people with such an incredible relationship before. Almost every one of the best memories I have in life are from time we spent together, and now every one of them fills me with the deepest crushing sadness I'd ever felt before I was removed from the college and lost everything that matters to me in life, and the ability to do the things I loved, and that make me who I am.

After we'd dated for two years by the end of senior year in high school, we had to decide what should become of our relationship as we went to college. We loved each other so dearly, both said we felt our love for one another could never die away. She begged me to keep going, and I told her I wanted to, but that I couldn't ignore the objective reality we'd probably be making a terrible mistake if we did keep going.  This was my perspective: 95% of high schoolers who take their relationships long distance once they go to college end up breaking up before they graduate, and resenting they didn't just end it earlier and have stayed friends, and not lose out on the best opportunity to meet new people they'll ever get in their entire lives. Students who pursue long-distance relationships generally know this, but think that their love is special, and consequently, that they'll be the exception to this statistic. Even if we felt otherwise, we didn't really have reason to believe we wouldn't be making the same mistake.

She saw someone in the first few weeks of freshman year during the fall term while we were open, and called me the next day crying, saying she couldn't enjoy being with other people and needed to be with me again. I insisted we continue seeing other people for the rest of the term to get a better feeling for how we both felt, but she refused while I continued. By the end of the term though, I started to really agree with her that we would probably never find other people we were so compatible with, and that we were so good together that we probably were the exception to that daunting statistic. And so we started dating long distance after the end of fall term.

From this point until when we broke up, our relationship seemed to be as great as it had always been. Our only priorities we had while deciding where we'd work after graduation, or during internships, or what we'd do during our vacation times off from school was that we would be with one another. She always liked to make plans for when we would get married, and insisted I spend most of my vacation time away from home visiting her family on the East Coast.

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

This is so hard to admit to myself that I can barely write it here, but during the Winter of our freshman year (the first term where we did long distance) she got me to promise her I'd stop being friends with girls at school, because she said that even though she trusted me, she'd feel very insecure knowing I was hanging out with them. She'd struggled with severe body image related problems since she was in middle school, and while I wasn't ever able to fully understand them, I always did

DARTMOUTH008831

everything I could to help her with them. Throughout the relationship, I always thought she was so beautiful, and told her that every day. This helped her a lot in the first few years we were together, but eventually, her condition started to become more severe, yet different than it had been before. She would send me photos of her abs in the mirror every single day, multiple times a day, and legitimately start to feel insecure or hurt if I ever forgot to reply with a message telling her how impressed I was, or how hot she looked. Her weight would also fluctuate dramatically between months, never become so thin she seemed unhealthy, but losing weight incredibly fast at times, and then subsequently gaining it back over longer periods of time and starting to lose confidence in herself each time it happened. This went on for a very long time until I eventually told her I thought she might benefit from help, and should go see someone about it. She always agreed it was a good idea, and even let me help her set up an appointment for it once or twice, but she never actually saw anyone until right after we broke up. I guess maybe in the end, she probably realized I'd just become an object she'd come to rely on to cope with those insecurities, and that feeling of security I'd always provide her so reliably was the happiness she mistook for love.

Anyways, I agreed, and stopped bring friends with girls at school – for her, because her happiness mattered so much to me, and with how overly committed she was to the relationship until the last day, I was stupid enough to believe in that with such confidence I'd agree to what she'd ask. To this day, there isn't a single girl at Dartmouth I could call my friend. She on the other hand, was primarily friends with guys at school. She'd always been like that since high school, but I always thought it was because she was just a little bit of a tom boy, and I'm generally a very unjealous person and couldn't imagine asking something as ludicrous of her as distancing herself from her new closest friends. Their names were REDACTE REDACTED, and I came to know all but the last of them very well while REDA and I were dating, because one of the things she'd constantly remind me was important to her was that I become close with the people who were close to her. Ashton's parents are Dartmouth alumni, and they have a skiing cabin just off campus which they'd come up from Boston to visit all the time while they were in school. I vividly remember how easily she was able to convince me to agree, but can't understand how I could put myself in a situation that would made me so much more used when it ended.

## ➢ The Breakup & Events Preceding

I spent my Thanksgiving break seeing her family all around the East Coast; she'd always pressure me to come with her to when she was visiting them, saying it was super important to her that I meet them. If I said I didn't want to go on any particular trip, she'd guilt me into it by saying she couldn't believe I didn't want to go and meet her family given how important they were to her, and that I was implying I didn't like them if I was ever reluctant to make trips to the same people year after year, despite that she never wanted to come the few times I asked her to come and meet mine. When she was studying abroad in Denmark after that, she said she couldn't bear being apart from me for so long. While this always seemed like it'd be an extraordinary experience from when she first brought it up, I soon came to realize it would cost far too much for my family to afford, and told her it'd probably be better to wait a few years until after we'd graduated and I a job and income, and would be capable of doing so without putting financial stress on anyone. We'd always talked about how fun it'd be to study abroad in the same place at some point while we were in school. She'd done a ton of work to find the best Dartmouth and RE programs that took place at the same location and time. I'd come to believe it was relatively easy to get into study abroad programs here based on what I'd read and heard from other students, but ended up getting rejected from my program after she'd already been accepted and confirmed she'd be attending hers. I was already self-loathing when I got the news because I was already going through an unprecedented and unmanageable situation in one of my classes at the time that was driving me mad, and I hated myself even more after I was rejected from the program.

She kept insisting, until finally we told me she wanted to have a "serious talk" during the summer before she left. In the talk, she told me she couldn't deal with being away from me for 6 months while she was going to be abroad in the fall/winter, and basically cried saying she couldn't do it until I eventually conceded and "pinky swore" to her I'd figure out some way to make it happen – I shouldn't have, but I just felt responsible for the situation for not getting into my program, and like I owed it to her to do whatever I could to make the situation better. I know that sounds stupid, but throughout our relationship, it was the little secret ritual we used to promise one another we'd unconditionally stay true to whatever promise we'd made them. We probably made hundreds of these with each other, but in the end I guess the only one that wasn't kept was the one she made us do the most – that we'd always be best friends for our whole lives no matter what. I think they were sort of a testament to how much we trusted one another; it could be something as simple as bringing the other person a meal at the library, or asking them to convince their friends to come to the first meeting of a club you'd just started, but we never went back on one when we were together. She always told me how much she loved it.

She comes from an incredibly wealthy, well decorated family (she cried to me for months when she "only" got into RE for the reason that every other member of her immediate, and at least 80% of her 35+ large extended family went to Ivy League schools), while neither of my parents attended college or have ever really been able to provide me for financially since we lost everything in 2008, since when my parents have been living paycheck-to-paycheck and I've done everything in my power to minimize the financial burden I pose to them and help stop the incredible suffering I've watched them experience from not knowing if they'd be able to make our rent or car payments for months at a time. REDA and I were always so considerate to one another about things like these though; I feel like she always understood, and would never asked twice when I asked if we could try a cheaper restaurant, or pick the cheaper flight as we traveled between Seattle and Boston with each other for school, and I did all I could to minimize the number of things she had to miss out on for dating someone so much poorer than her, and buy her gifts the size of the ones she bought me. While we were together in school, I used more of my spare money on her than I did on myself. Other than my laptop computer, the two most expensive purchases I've made in my entire life were presents I got for her. I still wear most of the clothes she gave me as gifts because they're most of the nicest I own, even though I have to think of her every time I look at them as I put them on to wear or see them in my dresser.

And so going back to the commitment I'd made to see her in Denmark, this was the biggest instance of me going beyond my means to try and do this for her, and I wasn't even really sure how I was going to get together the money for it yet, especially since my parents had been especially tight on money in the months leading up to this. By total coincidence, I was given a much larger refund check than normal in the fall term – roughly $5,000 dollars, while checks I'd received in the past ranged from $600-1,500. I assumed this was because my parents' income had fallen substantially below what it was the previous year. Thus, I used the money to cover all of my expenses for the next 5 months, pay for the Denmark trip, and also do something really special for REDA to celebrate her birthday which was occurring during the trip, as well as our recent 4-year anniversary. And so I went ahead and did just this.

We'd started talking on the phone for at least 20 minutes every day starting in the fall of last term when she went abroad. REDA 's the type of person who needs a lot of emotional support from whoever she's in a relationship with compared to most people, and I'm just the opposite, which I only say now with such confidence because we'd always freely talk about and acknowledge it. This had been something she'd always wanted us to do since we'd started school, but that I had a really hard time to find the time and energy to do every day with all the other social, work, and academic obligations I had while at Dartmouth. Before she went abroad, she also got me to pinky swear I'd make time to talk with her on the phone every day it was possible, and we did from that point on.

When I arrived in Denmark, I noticed a few things had changed about her. Neither of us enjoyed drinking much before, but now she'd get blacked out a couple times a week, and seemed disappointed when I couldn't keep up. A few other things changed that were impossible for me not to notice after having known her for so long, but also too subtly for me to bring up, like she seemed less excited to show me her friends and hear about what I was doing, even though she described her feeling about the relationship in the same way she always had – she loved me more than anyone in the world and could never imagine being with someone else.

When I went back home during the winter, I started to have some pretty severe emotional issues of my own. After having gotten through to final round interviews at Bridgewater, Goldman Sachs, and Deutche Bank, which were the companies I wanted to work at most at the time, and a few others I would've been incredibly excited to get at companies like Amazon, HPE, and UBS, but not gotten any of them, or any of the other 200+ internships I applied for despite having many interviews. I'd been desperately trying to get any possible experience in the financial services industry since my freshman year, but had almost certainly failed to for the 3rd by this point, while there were already more kids that'd have three years of internship experience in the industry than firm's would even want to hire. I just felt really depressed and like I'd fallen too far off the track necessary to get any of the jobs I'd dreamed of. I don't know what makes me this way now that I think about it, but this type of failure has always haunted me in life more than anything.

We live in a pretty small 4-person apartment with 5 people in it, and don't have any desks for me to sit and do work at, so I usually walk a couple miles to Starbucks in the morning and spend a good part of my day there. It's a small community, and there's almost always someone from my high school class working there, so it's impossible for me to go there without running into a few friends from the past. I used to love catching up with people like this, but over the winter, I started to think of the interactions as nothing more than an instance where I'd inevitably have to explain that I was at home, doing nothing over break. It's not that I was embarrassed they'd now know about how I'd failed, just that the interactions would force me to confront my circumstances in my own mind, when my feeling of powerlessness to change them made it so the

DARTMOUTH008833

only thing I could do to cope with it all was try and somehow forget it all. No matter what I did – read the news, browse the internet, or participate in any of the career development or academic programs I'd done to prepare myself for the workforce in the past 3 years. Now all the market and industry reports I'd begun reading to prepare myself for interviews, and to be a good employee at first, but had grown genuinely interested and intrigued by over the years as it became part of my daily morning routine, I'd be overcome with the thought I was just accumulating knowledge that I'd only be able to use if I got a job that wasn't attainable for me anymore. When I participated in any of the leisurely activities that used to help me relax at the end of the day, like watching movies or playing video games, I'd instantly be overcome with hate for myself for being weak enough to waste any time I could be using to maybe save myself from the situation somehow. And so I'd just sit there scrunched up on a wooden stool and a makeshift desk I made out of a shelf in my room, unable to do anything recreational without starting to hate myself moments in being stupid enough to waste anymore time when I was already so far behind where I needed to be, but unable to do anything productive without being overcome by the feeling I'd already invested so much of myself and tried my hardest to achieve something, I needed to come to terms and let it go so that when my unrealistic dream became an impossible one.

This was the first time in the 4½ years or so we'd been dating at this point that I'd had an emotional problem I needed support from her with. I didn't need much – just someone who I felt like was still rooting for and believed in me – I guess because I probably needed someone in the world that actually understood what I was going through, but who'd told me they loved me unconditionally for so many years, and that I could actually believe had a reason to care other than that they had to, to help me believe that after having gone through so many trials and told I didn't have the right qualities in each one, there might be some place out there that'd come to believe I was qualified for any of the jobs that I dreamed of.

During break I'd go on walks in the woods behind my house around 8:00 every night and call her according to our promise. Up until the last week or so days we were together, she was always so excited for these calls where we'd share what we'd been up to that day like we always had, and where she'd comfort me about the problems I was going through. In the last week, she told me that she loved comforting me, but that my happiness mattered so much to her that she was becoming sad whenever we spoke because of how sad she could see I was. I said I thought it was kind of callous for her to ask me to stop being so sad because it was bumming her out, and how mad she'd have gotten if I'd ever said something like that to her in a similar situation. She agreed, and what she said hurt me, but I tried my best to hide all my pain when we spoke after that (we usually FaceTime'd).

The weekend before she broke up with me, █REDA█ went on a trip with her friends █REDACTE█ to Montreal. Her friendship with █RE█ had been a little bit of an uncomfortable situation in our relationship for a while by that point. Ever since the first time I'd met him, she'd always remark about how awkward and quiet he became if I was around. It couldn't help but notice it too, whenever he'd visibly tense up when I walked in the room, or seem to die a little inside when they'd very occasionally facetime and she'd put me on the camera for a moment to say "hi." She became his closest friend at school one point in sophomore year, until at one point she told me she was really worried █RE█ was in love with her, and I told her it'd always seemed that way to me, though I didn't want to say anything about it because he hadn't done anything that'd give me reason to believe he wasn't just shy around people he isn't super close with, and because I'd have never raised a concern like which would result in her having to marginalize a close friendship of hers, and as a consequence of what I was stupid enough to believe was male paranoia at the time: a feeling I was proud of being able to virtually ignore at the time, because I thought it was part of what made me a such a good partner to her, and our relationship such a healthy one. After she raised the concern though, she said it was pretty fucked up considering she had asked me to preemptively not pursue friendships with any girls so that she wouldn't have to feel paranoid that I might end up in a similar situation to the one she was in, and that she was going to start slowly creating distance from him over the next term until they were hanging out once a week or so, instead of most days as they had been. I said that sounded totally fine, and that ultimately, I always trusted her ability to evaluate her friendships with other guys better than my own, but obviously appreciated her telling me about it. After this, she told me she became less close with █RE█, and seemed to for a while, though I never payed attention to it (she'd just report on it to me without any prompting).

She'd spam me with snapchats and texts throughout the day to tell me about whatever she was up to on trips like these, but now, for the first time ever, I didn't hear anything from her. She didn't reply to any of my phone calls or texts either. I could see she'd read them, and so I assumed something must've gone wrong with her phone or something that made it so she couldn't reply.

That next Monday right after she got back from the trip, Hannah messaged me "we need to talk," on Facebook. At this point, she'd never raised a problem about the relationship that was serious, or that we didn't immediately talk through, and

DARTMOUTH008834

had only ever told me she wanted to be together for the rest of our lives. We had a trip to Canada we'd planned extensively to go on – she talked for months about how excited she was to go on the first of so many trips we'd go on to see the world with each other. I remember replying "Lololol ok but just fyi ur making it sound like you're gonna break up with me," and then only while I waited for minutes watching the bubbles on messenger go back up and down over and over again, letting me know she was typing and deleting her response over and over as she tried to figure out what to say, did I realize what was actually happening. When we talked at this point, she told me she wasn't sure she wanted us to be forever anymore, but wouldn't tell me why at first. I couldn't understand how she suddenly felt that way, and kept telling her I had to know why. Eventually, she told me that she didn't find me attractive anymore and secretly hadn't enjoyed the sex in the past 9 months. She said it'd almost become like a chore for her in the end, even though I'd always made sure she didn't feel pressured to be any more sexually active than she really wanted to, just so she could impress me, or make me happy. This was the only reason she ever provided me in the end. I can't remember, and still can't imagine her saying this to this day, but she told me it was because she didn't like my skin anymore, or find me attractive in general anymore, and told me she thought I'd become socially awkward since I got to college – I was a lot more cool in high school, and won homecoming prince and class president a couples times each. I guess she couldn't even be attracted to me once the respect and admiration she had from when I was those things faded away. She said that she still loved hanging out with me until the end, but that the sex was just a chore she pretended through to keep me happy, and hide that deep down inside, she felt the opposite of how she'd insisted she had to me every day we'd been together. Her favorite "pinky swear" was the "forever" promise and she made me do it so often. She'd ask me, "forever?" and hold her hand out, and then I'd lock my finger with hers and reply "forever." She would always break the biggest smile after that, and then jump up and grab on my shoulders. I'd pick her up and we'd just hug each other after that. It used to be such a sweet memory.

Just about 9 months or so before that, I'd gotten her a dildo as a present – she'd wanted one for a while, but was too embarrassed to actually go out and purchase one herself, and so asked me to do it for her as a gift, which is was more than happy to. She said she loved it and (though never with, or in front of me) told me she used it every day. We were always very sexually active and into each other before then, but she gradually became less and less interested in generally having sex after she got the dildo. I asked her if anything was the matter, and if she was still enjoying the sex as much as she had before; every time she'd reply that she thought I was as attractive as she always had, and that she was just naturally losing the desire to bang quite as much as we used to, as anyone would four years into a relationship. I understood this and felt the same, but the only. The difference was big enough where it was impossible for me to ignore, but I'd reassure myself her change in enthusiasm was just a natural consequence of her also having the dildo to provider her pleasure. I remember her saying she'd stop using it so the sex would be "especially good" when I saw her, and me insisting she not, because overall, she'd get more happiness from using it in the meantime than we'd get in combination from her being more excited for the first sexual encounter.

In this first conversation, she just expressed her dissatisfaction with the relationship for the first time, but said she still loved me and wanted to make the relationship work. She listed all the things she wanted to try, like starting to have skype sex sessions with each other while we were apart at school, or her taking her Uncle & Aunt's car to visit me on the weekends while we were in school (she had a lot more free time than me while we were in school). I said I couldn't believe that after so many years of me doing ridiculous things to help her with body issues, she couldn't be aware of how much that would hurt me to hear from her; that she wouldn't have cared enough about my feelings (if this was the real reason) to not wait until she'd already decided she wanted to end it for sure, and then come up with some other fake reason I'd believe, and tell me that instead. After a while, I said I was sort of in shock from all this, so I said we should sleep on it and have a longer, very serious talk about what to make of our relationship the next day, she agreed, and I went to bed.

Early in the morning the next day, I woke up and went out in the woods to talk to her, but right when I arrived at the little hilltop with a view that I always paced around at when we'd chat back in the day, she sent me a facebook message saying she didn't want to make it work or talk about any of the things she'd said the day before, and that she couldn't emotionally deal with talking to me for 6 months or so if I remember correctly, because she'd loved me so much and the breakup was going to be too hard for her to bear already, and that she was sorry for leading me on so hard for the past few years.

The fact that we broke up that day isn't what broke me. It was that the person I cared about most in the world, and who I thought, and had always reassure me she felt the same, didn't actually care enough about me once she'd decided she didn't want me as her partner anymore, to just simply not do this in the most hurtful way imaginable. I kept trying to see things from her perspective so I could make sense of it, but I couldn't imagine any thing or situation that could conceivably make me do these things to my **RED**. Looking back at things now, I guess she probably just wanted me to think that she felt the same love so I'd keep giving her the affection I'd always provided her up until the end.

DARTMOUTH008835

Since then, I haven't actually been able to look at my relationships with people the same way. If the person I'd been closest to in my entire life could've been faking her affection for so long, how could I ever believe that another person I'm less close to for the rest of my life really cares about me in the same way I do about them. I still don't really know or understand when or why she stopped thinking I was the cool impressive person that she cared about so deeply at one point, but at the very start, it broke me that she'd agreed with the opinions of every other person or group I'd tried to gain the approval of since I'd started school here. My closest friend at school, who's the closest person to me in the world now that I think about it, and I've never told him that before, even though we both know we're closer with each other than we even are with our own families. He's the  person who helped me find a place to stay here so I wouldn't have to write this appeal while dealing with all the anxieties of being home, and the only person that'd lay there and cry with me about this happening to me.

Now, I can remember parts like her hair, chin and ears, but I can't actually remember exactly what her face looks like. I can imagine the faces of all her friends and relatives who I saw once or twice, but for some reason the person whose face I've seen the most times in my life is the only one I can't remember.

She started blocking me on all contacts after that. I couldn't comprehend how she could care so little about exchanging last words, or trying to be friends afterwards, or just telling me what actually happened so I wouldn't just come to hate every part of myself and who I am that made it so I stopped being good enough, or worth caring about as a friend just because she wasn't sure she wanted to be with me forever anymore. I switched between my apps as fast as I could, trying to find ones she hadn't blocked me on yet so I could plead with her to talk to me one more time so that we could end it differently. In response to one of my messages, she told me I should go to her mom if I needed someone to talk to. This hurt me for reasons I'll have to explain.

**REDA**'s mom **RED** (I only ever called her by her nickname – "**RE**") is probably not like anyone you've ever met. She went to UPenn and worked some at some prestigious law firm in her earlier years, but her father in law was a super famous doctor with a street, and a whole bunch of other things named after him at UPenn, and they both retired decades ago and have been living off the money he left their father when he died at a young age. They lived very comfortably, spending most of the year on vacation seeing relatives, but, as is common in my hometown (where highly educated stay-at-home moms with Ivy League degrees are the norm), **RED** became increasingly troubled by her own sense of purposelessness. I remember one time right when we'd graduated from high school, she started telling everyone about how she was going to apply for a job at Trader Joe's because she wanted something to do that'd keep her busy, and then later when it was just us in the kitchen and she conferred with me about how sad and empty she felt, and then helping her and not being able to believe how well it worked. After **REDA** and her Brother had both left for college, this manifested in her effectively becoming **REDA**s personal servant. She did absolutely everything for her, and **REDA** loved it and would openly talk about how she could simply ask her mom is she wanted literally any task completed that she didn't want to do herself. **RE** even told **REDA** that if she was ever in a situation where she needed an excuse to rationalize her actions, she could say her mom made her do it, and then pass off the situation for her to handle, and **REDA** would brag to be about how awesome of an out it was to have and used it an incredible amount (more than you could imagine might be possible). So when **REDA** told me to talk with **RE**, I felt this was certainly what must've been going on at the time – that I was just an annoying obligation that she wanted to brush off instead of deal with.

Thinking back now, I still don't know if she couldn't speak to me because what she did immediately before the breakup was so bad she wasn't even capable of speaking to me about it, or because she secretly cared about me so much less than I somehow believed. These sorts of things from the end of the breakup still haunt me every day of my life.

I took the offer to talk to her mom, even though I felt **REDA** had direct me to her for this reason, because after being around the house every time **REDA** and I had hung out there over the years, she'd become the only person I was close enough to really understand how close **REDA** and I really were. After we left for college, **RE** started to become increasingly neurotic (she used to openly talk about it to me at length, but she suffered from bi-polar disorder, depression, anxiety, ADHD, and took enough psychoactive drugs each day to kill most people several times over) in a bunch of new ways, one of which was to try and control when **REDA** and I could be together when we were home to make sure they had adequate personal family time, which was especially insane because their family already spent more time together than any I've ever witnessed. The fighting happened between her and **REDA** while I wasn't there, but when **REDA** would tell her she was being overbearing and insist I be able to come over or spend the night while we were on break, she'd act super weird and uncomfortable when I was over after that, which eventually resulted in her starting to openly

DARTMOUTH008836

antagonize me from time to time. Things got complicated between ██ and I after me and ████ left home for college, in short. Still, in so many ways, she was like a second mother and close friend to me for all those years. We did chores together, and walked their dog Lucy when ████ was feeling too lazy to join, and sent each other funny videos and interesting articles we thought the other would like on facebook.

██ and I got Starbucks and went on a walk in the park where I told her most of what I've described here. She couldn't believe it. I asked her, "with how she ended it, how will I ever be able to forgive her so that we can ever even be friends again," and she told me she didn't know, because, what person could after the way she ended it? And she also said that I needed to promise myself I'd make sure to not ever allow myself to get in a position where someone could take advantage of me again like this in my life. There are so many things about this conversation I still don't know: if ██ was just there because ████ had asked her to have the difficult last words of this relationship with me so she could feel a little less bad about not being brave enough to have them with her herself. Another way of putting the dichotomy between these two versions of reality that could be true in my mind, but that there's no way for me to discern between: ██ could have talked to ████, and learned whatever really happened, and was saying whatever she thought would help resolve the situation easiest, not because she cared about me at all, but because she cared about ████. She could have also known whatever really happened, in which case my interpretations of what her words implied were probably accurate, especially if what happened is as bad as I can only assume. Regardless, I know without a doubt she would have been there if she didn't have another agenda to pursue back then – I'd forgotten how close we used to be until writing this now, but we really did love each other. We were like family. I remember us crying and hugging each other in the car, both unable to say goodbye until my parents eventually came by where we were parked (I hadn't told them what'd happened yet), and so I jumped out to leave before they'd see what was happening. Before I'd left at some point, ██ also said it was too fucked up that ████ could just end it without even giving me a final conversation after all these years, and that she'd tell her to give it to me later that day.

Later that day, we talked on the phone very briefly. There questions I remember asking her at the start were, "are you sure you don't want to try any of the solutions you tried before," "how could you convince me to find the money to make that trip to Denmark and all the things we did during it if you knew you hadn't been sure about the relationship for so long," and "what about the trip to Canada we'd planned to go on in two weeks that you were covering to get me back for stuff we did in Denmark?" She instantly replied admitting how wrong this was, and saying she'd pay me a few specific purchases she didn't really give me an option to not make on her behalf, even though I'd resisted in each case, or only made the purchase after she said that she'd compensate me by covering a short trip to Canada we'd arranged to go on with a mutual friend and her boyfriend from Germany. Originally, these included a dinner where she'd made me pay hundreds more than I'd repeatedly told her we could for weeks leading up to it, and a border fine I incurred while coming back from Denmark and got caught with an alchohol-based marijuana product she'd purchased for her friends at home, put in my bag with a bunch of other things she didn't have room for in her own bag, and so asked me to take back for her in my own.

*   *   *

This dispute over money is ultimately what caused this situation to proliferate, and what motivated me to write the emails that I was expelled for, and so I am going to go into all the details of the situation to try and make sure you'll at least be able to really understand everything.

When she called me on the Monday after she'd gone on her trip to Canada with ████████ and expressed dissatisfaction with our relationship for the first time, I asked her how she could've told me otherwise for so long if she really knew that she'd felt that way. I told her how used I felt after she'd gotten me to spend a ludicrous and unprecedented amount of money on her in the past 9 months if she'd really felt the way she'd described, and she responded something along the lines of: "you're right, I can't believe how fucked up of me that was, and I'll at least pay you for the expensive dinner and border fine you paid for in Denmark." This is what the $800 dollar debt that I kept insisting she had to repay me for, or at least explain why she didn't think it'd be appropriate for her to pay me anymore. The dinner was at a Michelin Star restaurant – we are both really into food, and I figured it'd be a really sweet and precious memory we'd enjoy from while we were young for the rest of our lives, so I found one that'd be ~$300 for both of us to go to eat at while we were there to celebrate our anniversary/her birthday. The wine menu was incredibly expensive, (~$200) and she was really into drinking at this point, so I told her we should go get drinks at a bar beforehand so we'd wouldn't have to pay for the ones on the menu. We did this, but after we got to the restaurant, she started saying she really wanted it, and talking about how much it increases the quality of the meal and places like that, and I thought it'd be better to just do whatever to make the

DARTMOUTH008837

experience perfect since I was already spending a couple weeks of spending money on this anyways, and that it might not be worth it to be stingy here if it might ruin or diminish the memories we'd have of what I'd already spent on, etc.

The border fine I'm describing is one I had to pay when I came back from Copenhagen and was randomly searched at border customs. They found two shot bottles of marijuana-infused alcohol in a bag inside my luggage that ████ had filled with things she wanted me to take back for her because she didn't have space inside of her own luggage to take them back. Thankfully, this merely resulted in me having to pay a $500 border fine. Although she was entirely responsible for me incurring this fee, she had been spending far beyond her allowance while abroad and was already strapped for cash, and paid for half of it to help relieve the burden she'd brought upon me without making her own situation more dire. If you look at the email to my parents ███ included in the police report (presumably just to taunt me since it doesn't contribute to the narrative that I posed a threat) you'll see they never even paid me back this amount.

In advance of all this though, ████ had generally been asking me to do a lot of things I'd told her were very hard for me to find the time and money for over the last year or so before our relationship ended. She'd convince me to do these things by saying it was too hard for her to be away from me so much, or because it'd be worth the time and money to see her relatives in the long-run if I was really as committed to the relationship as she was, so when she revealed that she'd actually been lying about how she really felt for all that time, my first initial reaction was to think that she'd been hiding her feelings (wittingly or unwittingly) so that she'd be able to milk me as hard as she could until she eventually came by a good opportunity to leave me. One way or another, it felt like she'd manipulated me, and her immediate and vehement promise she'd pay me for the two things when I just started to express this suspicion as it arose in my mind during our phone call, and refusal to just give me another explanation to believe in so these things would hurt a little less, or repay me the amount she'd promised me she would without me asking, made it seem like she certainly felt that way as well, so that was the only explanation I could believe for what'd been going on in our relationship for the past year after then.

The two things she said she'd pay for made up the original sum of $700 or $800 (I think she'd just promised to pay me for the items, but hadn't agreed upon a valuation, and these were estimates of what it'd come out to). I remember this changing at one point because of a situation that came up regarding our flights back east for school in the spring. Whenever we went back to school, I'd always go down to ██ and hang out with her and a bunch of friends I know there from high school (one of my best buds form high school is in a frat there I'd stay at a lot, and that made me an "honorary pledge" with a pledge name and all). Thus, we'd bought tickets in advance to fly back together a few days before housing became open here at Dartmouth in anticipation I'd be staying in Boston. When this no longer became the case, and it was clear I'd have to go later since I didn't have a place to stay, I asked her if we could work it out as soon as possible to see if I could get my flight changed for free. She told me that she'd have her mom handle it, and after we'd stopped communicating for a while, revealed that she'd changed her own flight instead of my own, despite me having been so deliberately clear that this was, unfortunately something we'd have to exchange a few pieces of information and quickly resolve now that we'd broken up. This resulted in my parents having to pay the cost of changing my flight – $150 – while ████ was able to get her own needlessly changed (she'd chosen when we were leaving at her own convenience), and so I tried to get them to pay for this briefly, but guess I must have dropped it or something. This all happened so long ago, and over so many countless days and events that I've just been trying to forget, that its not really possible for me to reproduce every exactly detail surrounding what happened for you. But these are all the ones that I can.

Later on, she would go on to tell me that she wasn't going to give me this money anymore, but refused to provide me a reason why. My assumption was that, because she had already spent more than she was supposed to over the previous months (her parents were planning to have a "serious talk" about how she'd been spending when she got back home), and so she just decided it'd be easier to rationalize some reason why she didn't, or shouldn't have to anymore (especially since the only ramification of acting immorally here would be hurting me, and she could do so without consequence once it started to seem like we probably wouldn't ever see each other again) rather than just pay me for a small fraction of the things she'd convinced me to buy for her against my own will and reason. The reason I demanded an explanation in lieu of the payment she'd promised me, was because in the case she decided not to give it to me, I couldn't accept that she wouldn't even acknowledge what she was doing was amoral. I knew it was well within her right not to, and that its atypical for someone to compensate their former significant other at the end of a relationship for expenditures of this type but I also knew that if she hadn't simultaneously been lying to me about how she really felt about the relationship, and also incessantly demanding I pay for so many things I kept telling her were beyond my means, there's no way she, or anyone else in the world could've gotten me to spend the amounts she'd asked me to on her. When she expressed she also agreed this was the case, that she'd manipulated me, and that it'd (at the very least) be fucked up of her to not at least compensate me for the costs she was most directly responsible for that I'd incurred over the past few months, it made it

DARTMOUTH008838

impossible for me to believe that deep down inside, she might not know how fucked up it was for her to swing on this without explanation.

Related to this is a complicated financial situation that was brought to my attention sometime in the mid-late spring. I noticed that I had been billed for winter-term housing and food, despite not having been there, also having done all that was necessary to inform them I'd be off that term, and having evidence of this, so I reached out to the financial aid office to ask what was up. At this point they notified me that they'd remove the bill for the meal plan, but that if I wanted them to undo the charge they were entire responsible for, I would have to talk with people in my own fraternity, explain the situation, and get them to return the housing stipend which the school had paid them out of my billing account. They also did not explain how I should go about doing so, which resulted in the problem going unresolved even after I did what they'd asked me to and started an email chain with the billing office and my frat's treasurer.  Additionally, at this time, they let me know that the billing office had not used my scholarship funds to cover my housing costs during the fall term of 2016, but instead, had given added it to a cash balance the school gives me at the start of each term to cover personal expenses. I think the lady I spoke with is named Christen O'Connor, but at this point she also revealed the accounting error had resulted in me having uncovered housing fees from that term, and that they had, and would continue to be charging me an interest rate you might pay on credit card debt on the balance until I paid it off. So essentially, I was told in the spring after I raised mistake billing had made to their attention, that the money I'd used to pay for virtually everything I'd done between the start of the fall term and the end of winter break (almost entirely things I'd spent money on while doing with Hannah) and had been told was a debit balance I could spend on things like clothes, dorm supplies, and personal expenses, was actually a high interest loan I'd taken out and not been told I'd have to pay back until long, long after when it was impossible for me to do so. Throughout our conversations, the people in the billing department have been painfully unwilling to consider that this would be tantamount to your bank depositing more in your bank account after your employer directly deposited your paycheck. If additional amount they deposited wasn't large enough for you to think there was probably a rational reason for you to receive whatever amount you had, how would this not just be sneaking a high interest loan on top of the cash going into your account, and then not showing the amount owed on your credit account until 6-months later when interest equivalent to 20% of the principal had already accrued?

Anyways, this term I received a check-in hold and was told I won't be able to attend classes unless I took out a student loan to pay off the amount I owed before the check-in deadline. They also finally got to actually removing the fees they'd totally incorrectly billed to my account for winter housing and food just at the start of this term, but also had the audacity to deny any culpability in creating an undesirable situation for me as a result of accounting errors the department had made because allegedly, the department does not make mistakes. Anyways, dealing with this intensely frustrating issue that I've been vehemently blamed for singlehandedly causing, and remembering what I spent most of the money on each time and why, hasn't made what happened in that last year of our relationship any easier to forget.

<div align="center">***</div>

After that, I started to ask her why she really ended it. There were so many unanswered questions, it was hard to help but think. I told her that no matter how much she thought it would hurt me to hear the full truth, it'd still be so much easier for me than the alternative – thinking every part of me I had any reason to think might not be enough really wasn't and that this was the reason she ultimately lost her admiration for me as a person. She'd only give me the answer about sex, so I started to ask if she'd cheated on me. I asked if she knew what her unresponsiveness throughout the weekend, in combination with her reasoning for breaking up with me implies she was up to with her friend over the weekend. When I asked her the last question, she totally lost her composure, and couldn't muster a response. After a few seconds of mumbled crying, and a delayed utterance of the word "no." I kept screaming "How?" and she just kept crying more and more. Her silence here was the only other thing she provided that could let me understand what happened. At the end of the call she said "I'm sorry I can't do this Mark" and hung up. It was five minutes long.

REDA meant the world to me, and losing her like this would've crushed me regardless of when it happened. But then, it made all the pain of the other insecurities I was dealing with at the time worse. Whenever the thought that I might really be ugly, or stupid, or unemployable, or not cool enough crossed my mind, it became a possible explanation for everything that'd happened which I was powerless to stop myself from dwelling on endlessly.

<div align="center">* * *</div>

Aside from that, everything else from between the time between when we broke up and when she was about to arrive back home for school, so everything here is based on what I can remember as I go back through the emails we exchanged during that time.

Looking back now, I guess I actually didn't reach out to **REDA** or her family at all until after she reached out to me on February 28th, a week after we'd broken up (it seems from the contents of the emails), to apologize for how she'd ended it. None of this happened during the time period which I was accused of violating Dartmouth's community standards of conduct during, but all of it is necessary to truly understand and make sense of what happened during the perpetrated the activity I was expelled for a few days ago, so I hadn't gone back and looked through these emails until now. Truthfully, it's because the memories of all this, especially after what happened during the Spring term, are too incredible to bear. I guess the only way I could stop them from seeping into my every waking thought was to try and forget as many of the little unanswered questions she never gave me a chance to ask, and try to rationalize how the little bits I do feel like I know enough to understand can really be pieced together to explain the little blank spaces in-between them that I'll never be able to make sense of.

Since before we met one another, **REDA** had a reputation for very unexpectedly doing things were are cruel or unfair to the people she was closest to, and then rationalizing her behavior if confronted to try and make her victim seem like the antagonist. Although she was popular in high school, she had more high-profile fallouts with the people she was closest to over those years, almost always spanning from her total lack of remorse for whatever she'd done, or refusal to acknowledge it – which manifested in her being known for having a very "selective" memory for simply trying to pretend things she couldn't recall bad things she'd done in the past if it seemed like she'd be able to get away with it in the particular situation Of the people she hung out with on a daily basis, she'd express a level of resentment, and extreme jealousy towards any girl that was attractive (no matter how close she was to them) that was so different that what you'd expect from observing her interactions with them that it made me worried for her. I also thought these feelings might relate to the other insecurities she was dealing with, and said she might want to seek help for both in concert. Whenever I brought up my observations to her (we were incredibly open with one another, and constantly had open dialogues about these sorts of things all the time), she'd readily acknowledge that she was, or had been cruel or wrong in whatever instance we were discussing, thank me for caring enough to bring it to her attention, and agree she needed help.

She did things like this to me too from time-to-time, but we'd always talk them out and after a calm respectful conversation (no matter how long it took – that was our rule we'd always pinky swear on). Little things, like becoming visibly upset if I ever asked to watch anything but her foremost program on TV: or agreeing not to eat at a certain restaurant while we were on the way to meet up with a friend to get food, and then suddenly acting so excited about that same option once the other person had joined us that I'd seem like a jerk for opposing. They were very occasional, and if I were the one to point things out to her, she'd almost always acknowledge what she'd done. If anyone else said or did those things to me, it wouldn't have mattered to me. To me, their words or actions would just be expressions of their own shortcomings or contorted worldview. From her, I guess they suggested the person who required such a high level of care and affection from me, and that I cared for so deeply, might not actually care enough to think about my far, far, lesser needs for this care, to consider or value them in the same way. It was just the total certainty I could never imagine pulling a similar stunt on her, and how certainly she'd be angry at me if I did. A few times she turned on her very best friends, because she thought they were being annoying or needy for texting her the same amount they always did, or when she'd always tell me her best friend from high school, **REDA**, was such a slut, or desperate for sex whenever she told **REDA** about some new guy or hookup **REDA** has always been jealous of how much attention **REDA** gets form guys since they were very young, and she was aware of this, and we talked about it a number of times and I tried to help her with it, but it didn't really change over time now that I think about it). On a few instances where she'd done this and I'd present my thoughts and concerns to her, I'd confess that observing her speak about and treat people she'd mislead to believe that she cared so deeply with so little respect made me worry that someday, she'd eventually do the same to me. Her assessment of what made her behave this way was that her insecurity manifested a sense of jealousy within her, and to cope with the feeling, she'd lash out at whoever she thought might be better than herself in some quality of importance to her, like intelligence or beauty. To reassure me, she always told me I was the only person she'd met in her entire life and not felt that way towards. She always said I was the exception, and that the whatever she said she felt to my face was nothing more than an expression of how she truly felt, and that despite us having spent more time together with each other than we had with anyone else but out families over our whole lives, she had only come to love me more with each passing day we spent together, and that I was the sole person she'd been close with and not come to ever feel that jealousy towards, because she said whenever I accomplished something, it made her proud and happy too.

DARTMOUTH008840

When I got this first email from her after a week after the breakup when we'd stopped contacting each other, it made me feel like she was doing all this to me. In my mind, there were only three possibilities. She could've secretly been cheating with me for any amount of time, but lying to me so she could keep the relationship going, and continue getting support and comfort from me until she felt too guilty to keep it going. She could've also been telling the truth in the email, and not meant any of the horrible things she said to me on the phone that I couldn't, and still can't believe she was capable of saying to me at the time – but then what could have caused her to say then in the first place? With the pieces of information I had though, the only explanation that made sense was that she'd felt what she said so deeply down inside that it made her cheat that weekend, knew it had to end after that, but felt so guilty (REDA) might lost her composure more in emotional situations than anyone else I've ever met) that she couldn't gather herself enough to do it right, and as a result, ended up doing it the way she did. I honestly don't know if that's any more right or wrong now than I did back then, but since I couldn't rationalize why she wouldn't do any of the things that would've made this hurt me less, like care enough to have waited two weeks until she got back so we could've ended it in person, or think about the circumstances she was ending the relationship in, what they would imply to me, how much that would hurt, and how little thought or care it would've taken to prevent me from having to feel that pain. The lack of care either implied our relationship, my feelings, and the prospects of being friends again someday mattered so little to her by the end that she didn't even force herself to stop, decide how she felt, and then show me consideration by acting on her sentiment in a way that wouldn't hurt more than it had to. And at the time, I was too hurt to assume anything but the worst of her. I thought her rendition of the conversation we'd had the past week was substantially altered. I thought this was because she'd altered it to rationalize what happened, and hide from the guilt of making me feel as hurt as she couldn't know I was experiencing (we hadn't spoken in a week), but that she must've not been able to forget how much probably hurt me based on what she said. Now, after everything we shared, I felt like I'd awoken on the back end of her using me up, throwing me aside, and then figuring out a way to rationalize it to herself so she wouldn't have to feel as bad about things afterwards.

On Tue, Feb 28, 2017 at 1:30 PM ████████████ REDACTED ████████ wrote:
I'm really sorry that it ended the way it did. I feel so bad about that. Initially, my call to you was going to just be my concerns about the relationship, thinking that I would end it in person during spring break. I wanted to call you to express my concerns because I thought that way you would have some warning. However, on the phone, as soon as you said "break up" (because of commitment issues or something), I freaked out and thought that you knew what was coming. I broke up with you, and while I don't regret it, I do regret how I did it. I eventually caved under the pressure when you were pleading with me to tell you concrete reasons because I think you wanted something you could fix and something you could actively work on. But ignore anything I said about you, Mark. Your skin is fine, seriously! You have a beautiful body and a gorgeous face. And I'm sorry you feel I led you on. I completely understand how you feel that way. I guess I thought that the more I talked about the future with you, the more excited I would start feeling. And then going back on what I said the next day resulted from going to bed after reading that message you sent me about not being sure if you could trust me again. I slept on that, and upon waking up I realized how right you were. I couldn't promise you that and that wouldn't be fair to anyone.
The next day, I decided I would have to end it once and for all, and while I was busy all day I decided that when I got home, I would call you and end it. When I responded to your long FaceBook message and then our phone call, I was hysterical and so were you. You kept messaging me questionable things, which were understandable given the circumstances but still a little scary, to the point where my friends confiscated my phone and computer and told me to leave the house. The threats, the begging, the constant calls–you really scared me, Mark. And it hurt to see you that way. But every time I've talked to you about this, you talk over me and you don't accept what I'm saying. Closure doesn't come from simply hearing someone's reasons. It comes from taking the time to accept what happened and be able to not regret four years of a relationship but instead see the good, see what was the bad, and be happy for the experience. I haven't reached closure yet, I'm still really sad. I don't expect to be over this for a very long time. It really hurt to lose you but it wasn't fair to either of us to keep it going.
It was really difficult for me to confront these feelings. It was easier to repress the feelings and pretend everything was okay instead of acknowledging that I had changed. I care about you so much, Mark. I will always care about you. But right now, I have to care about myself first and foremost. I need to be alone and independent for a while. I don't want another relationship realistically until after college. It wasn't you–it was that I didn't feel like I could be in a relationship any longer. I know I could've brought these concerns up to you earlier, but they're not fixable by you, so it didn't feel fair. There's no way for you to personally restore intimacy (on my end) to the relationship, and the lack of it ended up making us both feel shitty. I couldn't keep it going any longer knowing that what you needed I couldn't provide, and just in general, my feelings changed. I wish I could give you a more logical, concrete answer. I truly do. I'm sorry for all the pain I've caused. I hope we can eventually meet up and talk, but for now, I do think we need some space, as that will be the healthiest thing for both of us.
I cannot emphasize enough the cliche old saying of "it's not you, it's me." I really wish I could take back the things I said about you going to the gym or the dermatologist. Seriously, Mark, I caved under pressure and that was not cool. But do not feel bad about your looks for one second.

Other than the 5-minute phone call she cried for most of and hung up at the end of, we hadn't had last words. As more time went by, and I sat alone at home with nothing to do but sit in my apartment and walk to the lookout in the woods where I used to go when we talked on the phone and read books, I grew more and more angry that she could unnecessarily hurt me so much. I felt like she'd hurt me and made me feel like a fool for no reason, and **. I felt that if I kept holding in how I really felt in what I said to her, I'd just be allowing myself to continue being tricked and controlled by my thought of who I thought she was and what I'd thought we were, that'd made it so the only way I knew how to resolve any problems that arose between the two of us was to talk them out and make sure both of got to share anything on our minds, and also tried our very best to understand the other person's perspective if there was a disagreement – that was another one of the pinky promises we made the most. Now that she'd presumably cheated on, and thrown me away like this, though my impulse was to be kind to her – it's the only way I knew how to treat her, and the inclination was so strong it still spilled out in the second half of this email in which I was trying to repress it – I started to loathe myself more and more for how pathetic I was for letting it continue to dictate my actions and make me hold back how I truly felt about her ending it the way she did.



This email of mine which wasn't included in the Judicial Affairs case file, but I'm showing it here in this complete record of virtually all the correspondence <span>REDA</span> and I exchanged during the period when I committed the actions that I was eventually expelled for, in order to make sure I communicate every piece of information I can that might contribute to your understanding of what happened.

It hurt so much that after I'd spent so many years helping her with her own body issues, the things she said to me on the phone just drove me insane. Between then and when she sent me the apology letter, my pain turned into anger, and my anger made me want to do something to show her my physical affection for her had been as fake as she said hers had been for me. This is when my ability to repress that evil emotion began to falter, and the feeling it'd be easier for me to move past what'd happened if I did let it out was the only in my mind that I could explain or believe. I was ready to believe any understanding of the situation I could rationalize then, and out of that desperation, became weak enough to believe it was right to consciously say something that'd make her feel the pain that she'd made me feel with what she said in the end, and those things were the best I could come up with.



These are the three logistical things we needed to resolve before we'd be able to stop communicating with each other until the time she got back in a few weeks, and I wanted to work them all out so I could stop speaking to her (until then) as soon as possible. I just wanted to get my things back, see her face one more time so it'd be easier for me to internalize what'd happened.



To me, what she said about the money was tantamount to her saying: "those two things you said to me were so cruel and unfounded that you deserve to lose these the money that I was the one to bring up and suggest would be fucked up for me not to pay you." It confirmed the suspicison that had been driving me mad – that she'd just come up with some alternative narrative that absolved her of wrongdoing, and which she could walk away from this without feeling bad about it by believing – when she accused me of trying to manipulate her by using her mom, because I really only told REDA what Babs had actually told me right after the breakup, and for the sole purpose of trying to convince her what she'd done was cruel when it started to seem more and more like she wouldn't even acknowledge that for me anymore.

This was a lot of money to me and my family and almost nothing to her's. After feellng so deeply disrespected already, this made me more angry and spiteful than I've ever been in my entire life. How could she so strongly feel I had no right to express the exact same type of hurtful thoughts she shared with me, after I pleaded she just do any. I guess I really just wanted anything that'd reassure me she at least knew how hurtful what she did to me was, and that she cared in some way, so I could feel like I knew she really did care about me in the end, and what we'd been through wasn't really a lie. That's really what I was so really desparately begging her to give me now that I look back.

I took her response to mean she didn't think all the things she'd said and done couldn't possibly justify any of the anger and hate I felt towards her, and that she should've been able to comeback whenever she wanted to and expect me to still be

there pleading she help me change things so that we might be friends again someday. I don't totally know why now, but it drove me mad that she wouldn't communicate the logistical things we actually needed to resolve. I guess when I explained it'd make things easier for me to handle them sooner than later, but she refused to, and drew out the process for so long nonetheless, it felt like another instance of her disrespecting me for no reason other than that it wasn't of consequence to her, and she didn't have any personal motivation to complete them so why bother instead of just having him wait? But the things I said after I'd started to think I might just be sitting back and letting her be unfair to me one last time, and that I was experiencing my final moment to achieve some better justice than I'd been dealt (which I couldn't live with myself for having been too in-control and reserved to capitalize on if she was really going to withhold the money from me) and so had to do something now, or just live with it forever. I do wish I'd just sat back and lived with it – its one of the couple of times in my life where I wish I'd listened to my parents advice, and the only time I can remember between now and when I started dating REDA that I couldn't just accept someone else had done something shitty to me, understand what they'd done to me was probably a manifestation of some shortcoming of their own, and be the bigger man by being unaffected by whatever they'd done, and coming out of the situation with nothing more than a mental note that I should expect that person might do the same sort of thing in the future. Before I was expelled, and despite these being the worst things I've ever said or done, RE had already dealt me a greater punishment relative to my transgressions that anyone has in my entire life. I have PTSD like symptoms from multiple things from them that come up in my everyday life and I don't know how to make go away, or if they ever will.

I said this during the hearing, but I really didn't have any intention of manipulating her in any way when I told her what her mom had said, and still don't know what she was talking about. I think I was just trying to use every method I could imagine to communicate things to her. That way, I could at least rule out the possibility she might be acting the way she was because she didn't know how it'd made me feel, or thought it wasn't actually that bad, and that I was just being unreasonable.

This is truly how I felt. I don't really know what else to say. I still really can't believe after everything and how she ended it, that she could think that what I said in that email to her was so different than what she'd said to me,and I was so unjustified for saying it instead of unconditionally forgiving her one more time and taking the sorry note she left me a week later, that she could just withhold money she'd suggested that she owed me.

I felt like I knew REDA so well that deep down inside, I felt like this had to be a misunderstanding in some way. I truly felt deep down inside that with enough time and me just trying to talk things out and explain things to her, she would eventually gain her composure enough to be able to act like she always had and show she wanted to understand and care

about how I felt. I thought she'd eventually come to see that we really could've had the option to be friends again someday if we got to a point where it might be good for us to be, and so I reached out to her again 5 days later.



I don't know why, but I really did find it torturous that she wouldn't just give me a time and place we were meeting. I gave her an agenda, freedom to choose the duration and place we'd meet, and asked so nicely her to just decide her preferences for this last contact so we could settle the logistical actions we had to perform as a result of the breakup, and when she wouldn't do that for me after I'd asked so many times, I took it as another act of disrespect, and her showing she actually had virtually no respect or care for me as a person now by refusing to do something that would take her almost virtually no time or effort (we were only going to be in the same place simultaneously for a few days, and had no obligations). I guess now she probably couldn't, or didn't want to accept that she'd have to see me again for some reason, and that's why she

wouldn't answer. I still don't know what could've made her feel that way, or how the sentiment could have been so strong that she was willing to throw away what'd be the last chance for us to ever see each other again, but the only answers I could, and slowly started to believe at the time, drove me mad.



I really had accepted there was no chance it could be remotely healthy for either of us to continue a long distance relationship a while before this point, but I still couldn't cope with the fact we'd almost certainly never talk or hang out with each other again with how it ended. I don't remember sending these, but if someone else had sent these I'd assume it was just a desperate attempt to



I remember really just wanting to go to the DMV because she'd scheduled a time to go, and so if she said that we could meet up together for the last time while she went out to do that, I could know for certainty when to expect it'd happen. We

always did those sorts of errands together (I'd take a book or newspaper and keep her company in the car or something) so its not as odd of a thing for one of us to ask each other compared to other people. In hindsight however, it is abundantly clear why she would not prefer to see her ex for the last time on the way to the DMV. At the time, my thinking was senseless, and I just took her refusal to provide me as her being rude and disrespectful, and to serve no reason or purpose I could understand.





I'd finally started feeling emotionally capable of seeing friends again and starting to tell people that we'd broken up, so I went to the University of Washington to hang out with a friend for the weekend. There's no need for me to explain the details, but <span>REDA</span> and this friend of mine still hated each other for a particularly bad feud they had many years prior (I remember, it was actually the feud where she became known for having a selective memory – a perspective he went to great lengths to make public after feeling she'd wronged him, but couldn't get her to acknowledge it afterwards), though I was very close with both of them during my senior year in high school and we hung out very regularly – I think I hung out with both of them after school at separate times almost every day of my second semester senior year, but sometimes those times would overlap and they'd see each other while with me. They always pretended to get along, and even seemed to enjoy each other at the time, but after, he told me they'd actually still hated each other and just pretended otherwise so I didn't feel like I had to pick which one of them I wanted to be friends with. When I told him we'd broken up, he (pretty callously, like it was amusing) said, "oh what dude? I thought you guys were going to get married someday?" He couldn't have understood how hard it was for me, or why that'd hurt me with how little information I could bring myself to reveal to him about the breakup, but it honestly disturbed me. I think my facial expression alone told him that wasn't the appropriate type of commentary to make, and he quickly changed his tone and tried to comfort me the rest of the times we hung out while I was home, but I think that initial response he gave me just ripped me apart. The version of this I described in the email is dramatized, but based on that.

The reason for this is that it made me think about everything she did to mislead me into thinking she was incredibly committed and certain about our relationship until the very end, which reminded me of my suspicion she might've secretly been using me by the end by simply lying and saying she felt that way when she knew she didn't so that she'd continue to benefit from it. The thing <span>RED</span> was referencing was a time when he'd asked me if I thought I'd get married to <span>REDA</span> someday. This had come up in conversations with friends a good number of times before then, and I'd always say I didn't know, or that I really hadn't talked about it with her, even though she really openly talked about & planned for the prospect of marriage very openly with me, and despite my hesitance for the last few years we were together. One time in conversation in the past year or so before this, she described how she had responded when a friend asked if she thought we'd get married, and then asked me how I responded when people asked me. When I told her very honestly, she expressed that she was a little hurt in some way, since she was more open with her friends about it and felt like me sort-of sharing it from mine might be an expression of the fact that I was really less committed than her, and despite us having always relished the fact that everything about our relationship – our respect, admiration, love, and affection for one another – was felt in the same way by us both. I thought it might be good for me to be more open with the people close to me about my thoughts like those anyways, so I said I'd let it out a little more when my buddies brought it up in the future to reassure her – I love trying to come up with little ways I might be able to do something for myself to justify going along with little things like these that might mean a lot to the people I love or know, even if I might not be able to understand why they might even care about or value what I'm doing for them. If there's a pretty good reason for me to do it anyways, and it'd make them happy, the activity becomes more than worthwhile. The reminder of how many of these kinds of things she's asked of me until the end, and how readily, happily (and now I felt, foolishly) I did almost, if not every single one of them that she asked me to.

At this point, one of the things I was incredibly anxious about at this point was that once I got back to school I wouldn't even have the heart to tell my friends what had really happened between <span>REDA</span> and I at the end, because I wouldn't be emotionally capable of confronting how it'd really ended each time I told it to someone. I don't know if I hold myself to a high standard, or have a fear of public failure, or both, but when I try and fail to achieve or produce an outcome, and then fail to despite having really put everything I had into it, it makes me hate and doubt myself more than anything else. I think part of the reason I was able to work so much harder during my internship this past summer and the first few weeks of fall term is that at work, I finally got acknowledgement and praise for things I had worked so long and hard to either improve,

or change about myself, but had started to worry more than anything in the world in the past few years I might never actually get a chance to use now, and had actually toiled so long to foster them for no reason at all, other than that I wasn't self-aware enough to realize I wasn't cut out for the job earlier, which'd at least have prevented me from being years behind in the pursuit of whatever line of work might really be obtainable for someone like me. I couldn't bear going back to tell everyone I knew, and that I'd exclusively told my relationship with **REDA** was fantastic – because that's the only way I'd ever felt, and the only way she'd ever told me she did – that she ended it by sending a 3-line message to me on facebook, and blocking me on all contacts aside from when she'd intermittently decided she wanted to talk again. I can't think there's anything I wouldn't have done to just help convince her it was worth it to sacrifice a few hours of her life while we were at home to make a different memory of the end that I could believe in and use to take the place of the one I kept going back to believing she must've only allowed to happen by mistake when her emotions had stopped her from being able to be her true self, as I did, and knew I'd only be able to abate the pain by forgetting. This term, two different friends who still didn't know what happened between us asked me if was still dating **REDA**, and I still just have to say "oh yeah, we broke up a while ago, wasn't working out" and hope my facial expression, tone, and punctuality are enough to tell them how pained I feel from the mere sound of her name, and desperately I don't want to talk about it.

I had said dark things before this, but when I was simultaneously reminded of all the pain and humiliation I'd come to suspect I might ultimately be suffering from on accordance of actions she perpetrated to use and take advantage of me for the last part of our relationship, and confronted with the fact that there was no chance we'd have a different memory of the end, but rather at best, a slightly amended version of the one we already had,

I also was so desperate for her to just tell me she was sorry and acknowledge that she had hurt me a lot more than she had to, and that I'd just deserved a little more in the end than having to beg the way I was to get her to do that. If she had virtually no understanding for what it must've been like for me, then I thought my impression of our love and how special the relationship was might've really just a one-sided fantasy she'd accidentally tricked me into living by saying words she didn't mean but I was stupid enough to believe were real. I stopped being able to control my emotions when I started believing I'd be a fool if I didn't hurt her back the same way she hurt me instead of begging her to say she way sorry, and as a result, resorted to writing the threats I made in this email. I should've let the money go, it was within her legal power and authority to decide not to give it to me, and I'd give up half my income for the next ten years now to be able to go back and tell myself to be strong enough to have just walked away. At the time though, I just couldn't take it, and weeks of the worst anxiety I'd ever felt made me so sick in the head that I produced these. I'm not trying to excuse what I did, I'm just trying to tell you how I really came to be able to say the things I did here. It's quite clear that her response to my email was the appropriate one for her to make now; it was inappropriate for me to share the experience with her at this point, and an affirmative response from her would've simply encouraged me to write more. It wasn't a real act of disrespect, but in that moment, I couldn't take that she wouldn't give me a sorry, and that was the only thing on my mind. These are all the emails I was expelled for sending.



I don't know what she ever said to them, but right after I sent the first email, **RED** started calling me and my parents. I remember telling her it wasn't ok for her to contact my parents (which I'd asked of her, and she'd agreed to when we talked in person the day of the breakup when we were still on good term with one another), and her telling me to "fuck off, because she and my mom were best friends and she could say anything she wanted to her." Since our last interactions had

been good, I assumed REDA must've misrepresented the dispute we were having over money when she'd described it to her, and that she was acting accordingly.



I don't know what RED said that motivated my dad to do that to me, but it hurt and I. Now I realize that since REDA and I were the only ones that really understood all things we'd bought for one another in the past 6-months or the nature of those purchases other than us, so to RE (who probably knew nothing about it) it might've just been me actually making threats out of nowhere to try and get money from her or something – I don't know. I don't really know any of the content from the conversations she had with my parents after this point, but when they responded to the empty threats I used to try and force them to come to the table on the issue by going to my parents, they didn't just try to stop and control me, they turned against me. And it was easier for me to believe they went that far because what RED said was so insane that it justified their behavior and refusal to believe anything I'd said, instead of that they really just turn on me so harshly at the first sign of trouble. I've learned better since I got expelled though. When I tell them things now or ask them for help, I can tell they don't respect or care about me now that I've just become an item of deep incredible shame that'll come up whenever they have to speak to anyone they know, and will probably keep them up at night hating every part of

DARTMOUTH008850

themselves that created such a fucked up monster that harassed his ex girlfriend so severely with the emails he wrote after they broke up that his school threw him out for it when he wasn't even found guilty of a crime. I know they're just worried I'm going to kill myself now, but if they could take the bigger perspective on things, I think they'd understand it'd probably be easier for myself that way in the end for them too.



This was actually true. When the police officer came to my house, everyone else left and he sat with me on my couch and I told him everything that'd happened, and the story behind the money I had threatened them about. He was very empathetic, but said that since we didn't have a contract or anything like that, it was within her power to just not give it to me or explain why. He also said the REDACT family and I were not to contact each other anymore, which I told him was my only desire and asked him to communicate to them that they were not to speak with my family anymore, and asked to look at my phone to confirm I didn't have any nude photos of REDA, which I immediately handed over. After this, I asked him if it would be illegal for me to post on social media about it or say shitty things about her to people outside of her immediate family as long as they were all true, and he said it was as long as I was merely expressing my opinions or feeling and not threatening or slandering them, that there was no reason I couldn't. That's the discussion I'm referring to in the email above.

After I sent the first email, her mom and dad started calling me and my parents saying she'd call the police or sue us if I didn't stop bothering her about the money. At the time, it felt like I was in a fight with the people I'd been closest to in the world just weeks before. I felt like she'd started this all when she broke my trust and said all the things she'd told me that Monday after she got back from Montreal with REDACTE The email I sent in response to her apology letter were the first words of mine I had any reason to believe she'd read. Thus, it was the first opportunity I had to say anything mean in response to the hurtful things she'd told me on the phone to me the week before, and I was too stupid and weak at the time to pursue the course of action that it's depressingly obvious would have made the best of the situation for everyone involved, and just accept her apology. Both of us would've been better off in the end if I'd had enough self-control to behave rationally and repress my desire to make her feel the way I did, no matter how much what she did might've made me hurt.

When I felt like they were trying to leverage the fact my parents don't have the means to oppose them in a legal battle to get them to control me by delivering the empty threat of a lawsuit. I was crazed enough to think RED 's sole intention for doing this was to effectively deliver a threat to my parents which they couldn't know was superficial, and would certainly do whatever was necessary to stop their son from exposing them to the risk of, and doing whatever he'd done that was so malicious and unsolicited that it'd brought their close friend RED so say whatever she told them about their son.

After this point I did two things to get back at her. I felt like I had to bring people from their family into the conflict and unnecessarily share truthful information that reflected poorly on them to reciprocate for how they'd turned my family against me, and that I also still needed to hold them accountable for the money, even if I wasn't going to get it anymore. Beyond that, I also wanted to do something that would make it so neither of us would ever be able to consider trying to engage in a friendship or relationship for the rest of our lives. Beyond that, I wanted to make it so I wouldn't have to worry she might come back to me someday and ask to try things again, and so Barbra and RE wouldn't try and continue being friend with my parents and make me suffer by keeping some memory of her on the periphery of my life. The two things I did to achieve these purposes were write a tweet, and message two people in their family things I knew they wouldn't want to know.

The tweet read something along the lines of "Lmao @ when your ex won't pay back the $800 she owes you after the breakup, even though her parents don't work and have been living off her grandpa's trust fund for decades." I deleted it less than 24-hours later. I shouldn't have done it, and was quick to realize it then when my thoughts were the most irrational they've ever been, but I felt like people at least had to know what she'd done now that she got away with it.

The messages were to the only family members of hers I was friends with on facebook – her cousin and aunt. They weren't even about them specifically. ██ hated her own family – mostly her father and brother – and I told the aunt things that she'd said about them. I did the same for the cousin regarding things ████ had said about his family. Although it did come under the scrutiny of the judicial affairs court, this is the action I regret the most, and the most unbelievably evil and fucked up thing I've probably done in my entire life, and certainly the main reason ██ did everything she could to hold true on her threat to "take away my scholarship." These were people I knew, and hung out with and loved. But in the moment, I was fucked up enough to be able to bring them into this just so I could get back at ████ and ██ for having done what I saw as the same at the time.

These are the last actions I committed with the motivation of causing any member of the ███████ family harm in any conceivable way. My only direct contacts with them in the last few days before March 12th when I stopped making contact with them entirely are the emails I've provided here.

Although I'd done these things under the presumption I was most certainly not going to receive any of the compensation ████ had promised me, they gave my dad the money a week later when my dad met up with ██ to exchange me and ████'s belongings (as I later found out from the email she provided in the police report, she'd actually convinced my parents that I was just demanding payment for some totally random sum of money and threatening to post her nudes if she didn't, as they also describes in their police reports). For several weeks until the Spring term, this was the last I heard of them.

DARTMOUTH008852

## ➢ The Information I Did Provide During the COS Hearing.

Weeks later after I'd arrived at school, [redacted] started to carry out a calculated & strategic effort to make me pay for what I'd done to them during the Winter. At some point she told my mom she was going to try and take my scholarship, and this past week when I was expelled, I think she succeeded so far beyond her goals I honestly think she'd be horrified, no matter how much I know and have been told they hate me by our mutual friends.

Pretty much all the exchanges from this period happened between [redacted] and the either college, police, or my parents, so there aren't any emails or messages for me to show other than the ones in the report, as well as the following email which I was arrested for sending on or about May 4th and provided during the hearing:

COMPOSE
Inbox (776)
Starred
Important
Sent Mail
Drafts (19)
Notes

quick privacy reminder

mark anderson <markianderson95@gmail.com> May 4
to [redacted]

I just wanted to write and formally remind you one more time that you're not allowed to talk to any of my family members.

To be absolutely clear, I'd like to reiterate that the information provided up till this point in this letter provides all the facts and circumstances necessary to understand the actions I committed which I was expelled for, and I provided none of it (aside from a brief few sentence summary) because the descriptions of the allegations which had been raised against me included very precisely defined time periods which Judicial Affairs had said the actions I'd committed during were potentially violations of the Dartmouth Community Standards of Conduct, and none of these events occurred in those time periods. After you've read what happened during the spring and see how much worse these actions would seem to the school

The following information is all that is required to understand the events which occurred in the spring term, the time during which I was arrested and given a restraining order (which made it reasonable for my public defendant who the school's officials had told me was familiar with the process, and was my only impartial advisor who have me any assistance with the process), and which I was led to believe the school was accusing me to have been acts of malicious harassment or coercion. Thus, this is the information that I provided to the committee during the hearing.

Weeks later when I arrived at school for the spring term, I'd assumed this was all over. I hadn't heard from the [redacted]s in weeks, and the police officers they'd asked to visit my house and evaluate the situation had told me that any subsequent contact the [redacted]'s or I made with each other family members against the other party's will would constitute the other party getting a restraining order against the agitator.

[redacted] must have looked up the Dartmouth term schedule online of something, because on the first day of spring term, my parents started calling me saying that [redacted] was calling them and saying that I'd made more death threats, harassed them, and done a number of other things that I just simply hadn't in the time since March 12th when I'd stopped contacting them in any way, because I simply wanted to know I'd never have to hear from them again at this point so I could just slowly start to forget them and stop everything in my life form bringing me back to the painful memories of them. In the winter when my parents started telling me they'd been in contact with [redacted] and were unconditionally taking her side & perspective in the affair over my own, I started reacting very, very adversely whenever they'd try to do something to control my actions on [redacted]'s behalf and I could identify that it was going on. For example, I remember at one point when my dad suggested he should take my laptop and phone away to make sure I didn't contact them again, I promised him that if he did, I do anything within my capabilities to make sure I was at the library the next morning before it opened so I could send the [redacted]'s something ten times more severe than anything I'd already said. Probably out of concern for their own son, who they wouldn't believe [redacted] was just lying to their faces about, and probably wouldn't admit what [redacted] said was true if he had been doing those things anyways, they kept accepting her calls and listening to whatever narrative she provided them, but would try to hide that they'd been speaking with her from me while simultaneously acting upon what she told her. They were horrible at this, and it was quite obvious when they were acting on new information she'd given them. I'd call them out on this in conversation when they accidentally revealed that they knew something or had a concern which is was almost or totally inconceivable they might raise if they hadn't spoken to her. They'd respond by getting defensive, admitting they'd continued to speak with her, and justify why they felt like they had to and couldn't trust what I

said. I'd get calls from them while I was studying, or with friends, or in class, and every time it'd just be lost in disbelief that RED could try and get me back for these things in such a fucked up, sociopathic way weeks later when even I'd become removed enough from the situation to just want to be past it. I wasn't sure if RED would ever deliver on the threats she'd directly and indirectly made to me, but I thought it'd be by spreading some dark rumor about me or something. I guess maybe she felt that over the weeks since I'd sent those messages in the end, the same crazy anger that built up in me when I felt that I'd been unjustly wronged at the end of the relationship, and which eventually brought me to send the messages in the first place probably built up in her, until she also couldn't help but try and at least try her best to bring some reciprocal hardship upon me.

After my parents started calling me and told me all the lies RED had told them about me over the phone, I became livid and sent the following email (from page 23 of the COS Hearing Packet)



On Mar 28, 2017, at 3:27 AM, B                    wrote:

My sister D         told me that she had just received your Facebook message yesterday.

H       has not asked me to contact your parents. That was all on me.

Sent from my iPhone

On Mar 27, 2017, at 8:45 PM, Mark Anderson                   wrote:

I did what I did to demonstrate to H        and B       how immature and needlessly harmful it was to bring members of our families into this that didn't want to and shouldn't have been involved, to make sure I never have to worry about ever hearing from you again, and because after h        was as cruel as possible to me for no reason in the end after everything, and had no desire to do anything to end it differently,  which made it honestly feel really good to do something that'd let me know she'd feel a fraction of the unnecessary pain I experienced because of her.

If you don't remember, she broke up with me by text after 4.5 years the Monday after she'd been gone for the weekend with 2 friends, one who she previously said was in love with her, and didn't answer my texts or calls while gone (we always called at least once a day, as she insisted). The only reason she gave was that she thought I was unattractive and she didn't enjoy the sex. After her being the one to have constantly pressured me into reassuring I wanted to be with her forever, she ended it without ever once saying she had a problem with the relationship beforehand and had virtually no desire to remain friends or reservations this might be a mistake. I could continue on but, I think you might remember some of the behaviors I'm referring to.

The police officer you had speak with my parents said you'd be harassing me if I contacted my family again.

I'm at school now and this was out of my mind. Intriguing you felt the need to threaten/provoke me again about something I sent 3 weeks ago. This is my final warning on this matter, do not ever speak to my mother, father, or

23.



She sent the following email in response the next day:



While this seems genuine, this aunt specifically has a reputation for constantly being on facebook (commenting on everyone's posts, live-streaming random everyday things she did like riding her horses, and always speaking in all caps because she thought it was funny) so I took this as <span>RED</span> simply continuing to. I guess there is a chance she went offline for a while or something, but since <span>RED</span> had threatened to make me pay for what I'd done, I was pretty quick to jump to the assumption that she'd suddenly reappeared in my life on the first day I got back to school to achieve her avowed vengeance, and write off the small improbability it was a coincidence and she might be right, but what she did in the weeks after confirmed my suspicion.

I'd asked to speak with <span>REDA</span> to communicate the nature of my request for privacy, and that if her mom contacted my parents like this and lied to them again, the only thing I'd be able to do in order to protect myself would be to go out and seek a restraining order. <span>RED</span> was nonresponsive to numerous requests and explanations I'd given her not to speak with anyone in my family since the first day of the breakup when we were still friends and spoke with one another, until the last few days before March 13th when she was speaking with them secretly, so I wanted to try and see if I could communicate the severity of what she was doing to <span>REDA</span> in hopes that she might be able to convince <span>RED</span> to stop.

<span>REDA</span> agreed to this, we unblocked each others' phone numbers, and she gave me a time that she was available and wanted to take the call at. Hours before that time when I was studying in the stacks, she called me, and I ignored the call and asked why she was calling so much earlier than planned. She said she needed to do it earlier now and told me she'd be free for the next 30 minutes or something like that. In less time than she'd told me she had available before her next class, I walked out to the graveyard on Tuck Drive and started smoking a cigarette and called her back. She didn't pick up and I got pretty impatient given that I'd been very flexible and given her full discretion in deciding when the call would take place. She then told me she had to go to class and blocked me again. I thought she'd agreed to my request at first because it was undeniably reasonable given what <span>RED</span> had done, but then just backed out at the last second because she couldn't bear to speak with me, even for a matter of seconds and for this reason, and made up an excuse. I couldn't, and still can't actually can't think of any other reason she'd have done those things.

I was just totally confused at this point – angry because I did not like these people, and wanted so badly to not still be interacting with them, but could not get them to respect or seemingly even listen to my requests for privacy. I called the police to determine what I'd have to do in order to get a restraining order, and they said I'd have to go to Grafton County District court in person in order to file one. This was a 1.5 hour drive with no public transportation, and I wasn't even ready

to talk to people about this breakup, let alone ask a friend to drive 3 hours and spend half their day with me in Grafton County getting a restraining order against the family of my ex-girlfriend I'd told them I was in a perfect relationship for the 2.5 years I'd known them for, because I couldn't deal with her mom shit talking me to my parents, so it was very apparent I would not be able to do this while I was in school for the term.

Thus, after ██REDA██ blocked me without taking the call or saying anything of substance after she'd agreed to have it, I decided to just try and get her to have it one more time, since I didn't really have another feasible way of trying to make them stop at this point anyways, and so I wrote again the next day:



The "alternative" I'm describing in a sort of threatening and ominous tone here is me going out to get a restraining order against them so I'd be able to feel secure and make sure that if they were harassing me now (as it almost certainly seemed in my mind due to the timing of when she reached out to my parents), I could at least rest easy knowing they wouldn't be able to continue to do so in the future.

Their response to this email was to go out and get a restraining order against me. Two police officers came to my dorm room while I was hanging out with my roommate and his girlfriend. After they said they were there to issue me a restraining order, I became frantic and asked them if we could go to the study room on our floor so we could speak more privately.

Over the next few weeks ██RED██ would call the police and S&S and told them I was presenting threats that were very obviously misconstrued versions of things I'd said before, or just totally fictional altogether. For example, at one point a few weeks after ██REDA██ attained the restraining order and I had continued not to contact the ██REDACT██ family in any way, a police officer showed up at my door to "sit down and have a talk with me"/look into the possibility that I might have nude photos of her. Because they had already requested another officer do this a month earlier, and had also already sent me the money which I had threatened to post the photos to get them back for refusing to give me (or just explain why they didn't think it was appropriate for them to give to me anymore), and not heard from me in any capacity whatsoever since March 13th when ██RED██ sent the police to my home, aside from the brief communications we exchanged about the nature of my privacy request on the first few day of Spring term after ██RED██ had started calling my parents again and telling them that I'd been doing otherwise, I did, and still can only believe that her sole intention for seeking protection from law enforcement and the school at this point was to try and get me back for what I'd done to her and ██REDA██ months before during the winter. I asked the policewoman who came to my dorm room to talk with me about this matter what reason she had for visiting me about this issue which I'd already done everything in my power to comply with law enforcement and demonstrate was not a threat I had virtually any intention, or even the materials necessary to act upon, and in response, she told me that ██RED██ and ██RE██ had called earlier that day and expressed fears it might be a current threat for some reason. After a few more visits by the police and phone calls to my parents where ██RRE██ cited things I'd said between March 10th-13[th], and contorted them to make it seem like I was presenting an active threat to her or her daughter, despite me really having just desperately wanted to not hear from them every again after that time.

I can't tell you how unsafe this made me feel in my everyday life at school. Every time I heard an S&S or Hanover Police officer going by Hitchcock down Mass Row, someone with heavy boots and a keychain walking up the stairwell, or the sound of a walkie-talkie, I was start panicking and worry it might be the first sign that they were coming to get me and make me explain a situation I couldn't bear to speak about or possibly be able to come up with a story to explain. I told a couple people at the school what was going on at the time, and they believed me (or pretended to at least), but said the only thing

I could really do would be to talk to the police and figure out how to get a restraining order of my own. The threat that RED might call my parents or the police and lie about the situation in a way I couldn't defend at any moment just to toy with me drove me mad, and after a while when it wouldn't stop, I decided that as soon as my phone came in the mail (mine had broken and an insurance replacement was on the way) I would call the Grafton County Police Department and see what materials I needed to bring them if I managed to find a way over so that I could file for a restraining order. They told me that I'd need to provide documentation that showed I had explicitly communicated to the individual that I was filing the order against that they were not to communicate with me or my family, and that they subsequently violated that request.


It was beyond unintelligent for me to think this would make it a good idea to send the email I did, but I think I understand what brought me to it. I was just general anxious and paranoid this entire term, and it made it incredibly hard for me to memorize information. I attended every class aside from the two periods I missed (the day after I'd spent the night in jail, and was not able to get back in time to attend), and tried to the absolute best of my capabilities to get the best grades I was capable of (I thought if I got a really high GPA in my last few terms, it might help my try and overcome my current one when I went to apply for jobs), but simply was not capable of retaining as much testable information as I normally could no matter how much time and effort I put in (my grades this term were largely determined by tests on names, dates, and vocab terms from different historical periods, and in-class participation and discussion). I was also taking what I thought was a much less rigorous class schedule than I'd typically enroll in, but despite all this I got even worse grades than usual. I can see how I was stupid enough to think sending the email might offer me some protection, but please understand that this action that me and the people I was able to get any information or help from this process all came to the conclusion my Judicial Affairs hearing would be about, and that these were the events I thought that I needed to explain.

The school had been given all the information that my conviction was based off of more than a month before I was arrested, and I had a meeting with dean Clemens after that time, but was not told I had to go through any sort of disciplinary hearing for the school until just after the time of my arrest, with allegations very specifically alleging that THESE ACTIONS WHICH I PERPETRATED ON OR ABOUT MAY 4TH 2017, AND DURING THE SPRING TERM OF 2017 (WHICH IS A PERIOD WITH A VERY WELL DEFINED BEGINNING AND END – FROM MARCH 28TH THROUGH JUNE 8TH – AND DOES NOT ENCOMPASS THE PERIOD OF TIME DURING WHICH I DID THE THINGS I WAS EXPELLED FOR) ARE THE ACTIONS WHICH EVERY ADVISOR I WAS CAPABLE OF GETTING HELP FROM AND I WERE MADE TO BELIEVE I HAD BEEN ACCUSED OF VIOLATING DARTMOUTH'S COMMUNITY STANDARDS FOR COMMITTING.

In other words, the school knew I had done all the things which the COS committee eventually considered when they made their decision to expel me, but did not accuse me of misconduct in the month after they'd been given the information. PLEASE UNDERSTAND HOW IT WAS MORE REASONABLE FOR ME TO BELIEVE THAT THIS TRIAL WOULD BE ABOUT THE ACTIONS I'D BEEN ASKED TO ATTEND THE HEARING RIGHT AFTER I COMMITTED, NOT THE THINGS I'D DONE A MONTH PRIOR AND ALREADY SPOKEN WITH THE SCHOOL WITH AND NOT BEEN ASKED TO ATTEND A JUDICIAL HEARING FOR HAVING COMMITTED. THIS IS ESPECIALLY TRUE GIVEN THE VERY SPECIFIC LANGUAGE AND PHRASING USED BY WHOEVER WROTE THE ALLEGATIONS I WAS PROVIDED, WHICH I HONESTLY CANNOT IMAGINE ANOTHER REASON A PERSON MIGHT'VE USED IN THEM, OTHER THAN TO IMPART THE SAME INFORMATION ABOUT THE NATURE OF THE ALLEGATIONS THAT'D BEEN RAISED AGAINST ME WHICH I MISTOOK THEM TO IMPLY.

To this day, I have a criminal arrest on my record, will almost certainly have to take out student loans to pay for tuition when I'm not able to graduate on time,  am overcome with anxiety whenever I hear or see an S&S or police office walking around in my building, am humiliated every time I see someone at home (a friend from our high school class who also goes to Dartmouth, and was at home on Mercer Island for the summer, said REDA couldn't stop talking about how funny it was that I got arrested, and how badly she destroyed me; another friend of mine at Berkeley who I saw over the summer, and one of the few people I knew in high school that she didn't, said he heard she "got me pretty good" from another person I hardly even knew).

I guess what drove me insane in the first place was just that when I was so hurt REDA, the only other person in the world that I thought could really understand what we'd been and what this was really like for me, wouldn't acknowledge that she had been worse to me in the end than she was worse to me in the end than either of us could've possibly imagined she'd be after everything we shared, and then when I eventually snapped a few weeks after we'd broken up when my pain and frustration turned into anger and I started to believe the only way I could stop her from hurting me anymore was to force her to understand how her actions made me feel with each thing she did to me from this point on by doing something to evoke the same emotions in her, that she could think I was so wrong for feeling that way I deserved to lose the money she'd said she would pay me.

Imagine if you'd done something in the darkest moment of your entire life, when it felt like the four people that cared about you most in your life started secretly colluding against you and lying about it to your face, and it made you so desperate to find some way to show them you'd hold them accountable for breaking your trust that you did the most unspeakable thing you've done in your entire life. But then afterwards they punish you for it times over, and the one institution you'd been tricked into believing might actually care about you too much to not only do the same, but by taking everything in your life away from you. Before high school, these kinds of situations – where you feel betrayed by people who'd convinced you to trust them, or where the way you'd not only make the best of the situation for yourself, but also get a more righteous justice than you could ever attain by lashing back out at them, by simply being the bigger man and making them live the rest of their lives with the memory of how wrong they were, and the inability to feel sure about how good of a person they really can be if they were able to do whatever they did at some point, the insecurity I feel about myself whenever I remember what I did during the winter – were the ones I was worst at dealing with. But I think from learning the hard way in enough situations, it eventually became one of the strongest parts of me. My friends here always come to me for advice for what to do in  situations that're too emotional for them to handle themselves: my best bud calls me his "social strategy consultant." One of the main nicknames REDA used to call my was "Spock," because she always said I was able to think more rationally than anyone she knew throughout emotional situations. I promise you this wasn't who I am. I feel the same depression and desire not to wake up in the morning now that I did back then, but while every waking thought of every second of my day is focused on this, I've at least been able to use this anxiety and desperate feeling of needing to make things right to give me enough energy to fight through the fog and type this for you in hopes this all really shouldn't have happened this way, and then when you know everything you might come to realize that and save me. But I'm already so fearful of what the day will be like after I turn this in, and am filled with that same constant, desperate feeling I need to do something to stop this, but without any way to act on that urge and do something that might possible help make it right. I've told my friends this before, but over winter break something I realized is that situations like these, where something so important to me in my life has gone awry, but I'm forced to sit at home with no way to act and stop the situation honestly, are the most unbearable for me to endure.

I know renowned sexual offender and textbook sociopath who finally did something crazy enough his own frat house didn't have a choice but to kick him out anymore, but he still gets to walk this campus every day, and return to his job after he graduates in the spring, and had good enough lawyers that the COS committee wasn't able to get him in any trouble at all after he fucking raped a girl whose had to avoid certain parts of campus for years just to escape the horrific memories her mind goes back through whenever she sees him. Meanwhile, despite having been humiliated times over for what I'd done before this trial even happened, directly and indirectly threatened by the people who'd originally raised the accusations of misconduct against me to the school, and mocked by in conversation with everyone I knew before I came to school here to make sure they isolated and ruined as many of the relationships I used to have as possible for what I did to them during the winter, I still deserve for the rest of the happiest memories from life from my time here at school to be turned into the most painful and salient ones in my mind, and to not only lose the thing that represents everything I've worked for in my entire life, but also have it taken from me in such a way that'll leave my academic record from college ruined for the rest of my life – something the court system wouldn't (and didn't) spend a second of time trying to get me for in a case like this

DARTMOUTH008858

where a guilty finding would necessarily require the jury suspend their presumption of innocence for the defendant and simply imagine what they think probably happened based on whatever unverified statements they'd been provided in advance of the hearing, and whatever the random assortment of people on the judiciary committee interpret the answer which the defendant provides in questioning to mean. I cannot believe that my own school was so willingly accept whatever narrative the people I'd been telling them were harassing me for months told them. If I turned on one of my friends here, they retaliated, and I submitted evidence they'd said immoral or incriminating things in the past, for the sole, avowed purpose of causing you pain by putting you under the scrutiny of a court system that is notorious for dealing incredible punishments based on limited or incomplete evidence, would the school as willingly and unconditionally believe my narrative and carry out my will the way that they did for Barbra?  Am I living through the vicious, arbitrary, and anti-male college judiciary system I'd been told about by the media and other people, but I'd been too stupid to believe might be more than a dramatized rumor until now?

There is a girl at this school who dated a friend of mine, and then stalked him for months after they broke up, calling him every single day and repeatedly threatening to kill herself if he didn't come back to her. Instead of expelling her for coercion, the school just put up a restraining order between them, and understood she might've been going through the hardest time of her life, and done something that didn't reflect her true character at all.

That didn't stop her from trying to coerce him into being with her. She telling her friends she was going to kill herself to make him feel like the only way he could save her life was by doing something. He emailed her mom to tell her what was happening, and she gave chilling responses that genuinely disturbed him, and made him tell me he felt like he did understand why she might kill herself now – because even her own parents did care about her. They only live a few hours driving form campus, and only said they'd come up in a few days when they had time after he'd written her that he thought her daughter might kill herself that night.

Later, it turned out she had actually planted a fake contact with him months before, and was posing as her own mother and writing the emails to try and manipulate him. He's genuinely scarred, and feels like he won't be able to shake the lingering feeling that whenever he's in a situation with someone like that that he feels like he needs to help, that they might secretly be faking their condition to manipulate him. But the school gives her 1-year medical leave for her violation of a restraining order, and expels me for mine? Is regret measured by nothing other than the perception that the random people of the committee have of the defendant based on their facial expressions and what they say during the trial? Is it not extraordinarily obvious that in any trial concerning an overly complicated situation that a committee would have to invest far more time than the judges in a COS hearing set aside to understand, or where the person is actually psychotic and manipulative, that taking this

If the school is so willing to allow the volition of the person submitting a complain about a student to cause them suffering and hardship, rather than the severity of the student's misconduct, determine how severe of a punishment they receive? Is it really fucking imaginable that this isn't, black-and-white, a more malicious, persistent, and remorseless act in violation of Standard of Conduct II than what I did during those few days in March would be considered? Why does the school keep trying so hard to help her after she's already explicitly refused their help and repeated her behavior post-interventions and warnings, but no matter how many times I've come begging for help, in the end, I guess nobody ever did try to understand or care.

The thing that scares me the most is that no matter how hard my closest couple of friends and I try to think of something I might be able to trick myself into believing so that I'll be able to stop myself from taking a half gal and a pack of Newports out to the lookout behind my house and just taking them in until my head gets warm and dizzy enough where that I'll be able to just stand by the edge and eventually fall off on my own, and numb enough that I won't have to feel the trees hit me on the way down, there are no other solutions left to escaping this life of humiliation and trying to forget the things that used to be dearest to me, but which the memories of make so depressed I want to curl up and die, or hit myself in the face so that the lesser physical pain will stop the torturous thoughts in my mind. I could try, and probably fail, to jeopardize the safety of my fraternity, and the happiness of all these people in it who I love, by doing thing the o writing something like Andrew Lohse's book, but I don't think that life could be worth living either, and I couldn't justify exposing them to the risk of losing one of the things that're still valuable to them in their lives so I could do something that'd give me a one-in-a-million shot at making mine worth living again someday.

I don't know if anyone at this school cares about providing its students with equal rights, protects, or opportunities in any way it can't advertise on a brochure, but I think the people at this school's judicial affairs department would be well served

DARTMOUTH008859

if they took the time to read this and try to understand how the system they've put in place very clearly and systematically deals harsher outcomes to poorer students who're put through than it does to wealthy ones, regardless of their crimes or guilt. That is to say, without reference to my own case, this system is set up in such a way that a poor students who are not actually guilty of misconduct, but come under the scrutiny of the Judicial Affairs system by chance, are exposed to a substantially greater risk of being wrongly punished, and must invest far more time and effort to defend and represent themselves than wealthier students who find themselves in the same situation, but whose parents can actually provide them any sort of assistance or pay for a lawyer to help them with the process. Do you have any idea how impossible it is to defend yourself for a hearing in a court with made up rules you can't look up? Or figure out what you're supposed to say, or write your own statements because you can't pay a lawyer to help you with them. The people who work at this place like to say that the Judicial Affairs hearing isn't like a court trial because its rules and procedures are designed to get the outcomes the Dartmouth Community wants to uphold, which are different form the ones our nation's legal system are meant to uphold. If that is true, then why does the school seem to think that it's acceptable to allow the sole factor which determines the quality of assistance and instruction that a student receives during, and in advance of a hearing, be the amount of money their parents CAN PROVIDE them for these purposes.

If I'm ever going to be a student here again, it would be so good for me to just be able to stay here and do productive things and try and heal. If there's any way I could just be allowed to walk on campus so I can just see people and feel mentally healthy enough to heal, and not be isolated at home with nobody to talk to, and nothing on my mind other than how easily Barbra was able to take everything in my life away form me, and take away the best memories and opportunities of my entire life away. I can't tell you how much this will change me for the worse. I'd spent so much more time reflecting on all of this. By this point, the only thing that could become of me from being at home with nobody to talk to or anything to help my mind escape the thoughts of everything that has become of this now would be the memories of it all, and the damage and pain they cause me to become more permanent.

DARTMOUTH008860

# ➢ LINE-BY-LINE RESPONSE TO THE JUDICIAL AFFAIRS COMMITTEE'S FINDING REPORT

**EACH SECTION IN RED IS COMMENTARY ON THE SECTION OF TEXT FROM THE JUDICIAL AFFAIRS COMMITTEE'S FINDING REPORT WHICH PRECEDE. COMMENTARY IS PRIMARILY FOCUSED ON SECTIONS OF THE ORIGINAL REPORTS WHICH ARE IN BOLD FONT.**

COS 17F#3 - September 21, 2017 Casenote

Student: Mark I. Anderson '18

Finding: Responsible for violating Standard II; no finding regarding violation of Standard VI
Sanction: Separation, effective immediately

The student was charged with violating Standard of Conduct VI when he reportedly "violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017." He was also charged with violating '**Standard of Conduct II through repeated behavior or conduct targeted at an individual."**

**The student denied both allegations, and his case was heard by the Committee on Standards.**

I HAVE PASTED A COPY OF BOTH OF THE ALLEGATOINS I WAS GIVEN AN OPPORTUNITY TO "ADMIT" OR "DENY" BEFORE THE TRIAL. PLEASE UNDERSTAND THAT WHILE THE (2ND) ALLEGATION WHICH THE COMMITTEE DID NOT FIND ME GUILTY OF IS DESCRIBED IN A WAY THAT INCLUDES ENCOMPASSES ALL THE INFORMATION FROM THE CORRESPONDING ALLEGATION I WAS SHOWN (MOST IMPORTANTLY, THE DATES WHICH I WAS TOLD THE ACTIONS I'D COMMITTED DURING WERE THE BASIS FOR THESE ALLEGATIONS BEING RAISED AGAINST ME).

HOWEVER, THE FIRST ALLEGATION, WHICH THEY DID FIND ME GUILTY OF AND EXPELLED ME FOR, IS NOT RECREATED HERE IN THE SAME WAY THAT THE 2ND ALLEGATION IS. RATHER, ANOTHER ALLEGATION WHICH IS SIMILAR TO THE FIRST ONE I'D BEEN CHARGED WITH IN ADVANCE OF THE HEARING, BUT WHICH WAS REWRITTEN WITH SPECIFIC DETAILS FROM THE ORIGINAL OMITTED THAT SUBSTANTIALLY ALTERED THE SUBSTANCE OF THE ALLEGATION.

SIMPLY PUT, THE ONLY WAY IT'D BE PROCEDURALLY POSSIBLE FOR THEM TO EXPELL ME FOR MISCONDUCT ON ACCOUNT OF THE THINGS I DID IN THE WINTER WERE FOR THE COMMITTEE TO EITHER (1) HOLD ANOTHER TRIAL WHERE I'D HAVE TO EXPLAIN THESE OTHER ACTIONS WHICH WERE VERY CLEARLY NOT WITHIN THE PARAMATERS OF WHAT THEY TOLD ME WAS TO BE CONSIDERED, OR (2) JUST CHANGE THE WORDING AROUND A LITTLE BIT ON THE ALLEGATION THEY DECIDED TO CHARGE ME WITH PART-WAY THROUGH THE HEARING SO IT MAKES SENSE, JUSTIFY DOING THIS BY SOME CITING SOME OTHER DECISION THIS CLOWN COMMITTEE CAME TO IN THE PAST WHERE IT APPLIED SOME METHOD OF ADJUDICATION THAT COULD LOOSELY BE INTERPRETED AS SIMILAR ENOUGH TO THE ONE THEY MUST'VE EMPLOYED HERE TO JUTIFY DOING IT, AND THEN JUST PUT HIM DOWN TO MAKE SURE NOBODY'LL BE TOO BUSY AT THE OFFICE NEXT WEEK DEALING WITH PAPERWORK THAT'D NEED TO BE COMPLETED TO FIT HIS HEARING INTO THE SCHEDULE WHICH IS BOOKED FOR WEEKS OUT.

IF YOU CONFIRM THAT THIS IS REALLY HOW THIS COURT IS INTENDED TO OPERATE, I COULD GO OUT TOMORROW AND THREATENED EVERY STUDENT I HAVE DIRT ON FOR WHATEVER I WANT IN A WAY THEY WON'T BE ABLE TO PROVE, AND THEN SUBMIT A COMPLAINT TO THE SCHOOL ALLEGEING THEY'D DONE SOMETHING THEY HADN'T, BUT ALSO INCLUDE EVIDENCE PROVING THEY'D ENGAGED IN A MYRAID OF

DARTMOUTH008861

REPRIMANDABLE ACTIVITIES UNRELATED TO THE SUPERFICIAL ACCUSATION THEY'D MADE IN THEIR COMPLAINT, THAT THE SCHOOL WOULD SO READILY CARRY OUT MY WISHES BY GETTING THEM ON THOSE THINGS IN THIS VERY, EXACT, SAME MANNER – WITHOUT LETTING THEM KNOW THEY WERE BEING CHARGED WITH ALL THE POTENTIAL THINGS THE EVIDENCE COULD POTENTIALLY SUGGEST THEY'D DONE, RATHER THAN THE ACTIONS THAT WERE DESCRIBED IN THE VERY, VERY SPECIFICALLY WORDED ALLEGATIONS WHICH I WAS PROVIDED, AND GIVEN A CHANCE TO RESPOND TO, AND PREPARE AND PARTICIPATE IN A HEARING ABOUT.

This student's former girlfriend, a student at REDACTED , obtained a restraining order in late March, 2017 following her report to REDACTED Police about the Dartmouth student's behavior following the breakup of their relationship earlier in the year. At about the same time, Dartmouth Security received a call from the woman's mother detailing the family's concerns about the Dartmouth student's behavior and asking for assistance.

DO YOU NOT SEE HOW, GIVEN THAT I DID NOT CONTACT ANYONE IN THEIR FAMILY IN ANY WAY AFTER MARCH 13TH, ASIDE TO REITERATE MY REQUEST FOR PRIVACY WHEN THEY STARTED CALLING MY PARENTS AND LYING TO THEM AGAIN ON THE FIRST DAY OF SPRING TERM, SHOULD MAKE IT PRETTY UNAMBIGUIOUS TO SOMEONE WHO'S TOTALLY UNFAMILIAR WITH THE PEOPLE INVOLVED IN THE SITUATION, THAT REDA MADE THESE CALLS TO THE SCHOOL TO MAKE DUE ON HER THREATS TO GET ME BACK FOR WHAT I'D DONE BEFORE, NOT BECAUSE I'D DONE ANYTHING TO MAKE THEM FEEL UNSAFE.

Shortly thereafter, Dartmouth Security and Hanover Police met with the charged student to deliver a restraining order issued by RE police. In early May, Dartmouth Security and Hanover Police were informed that this student had violated the terms of the restraining order by sending the woman an email. The student was arrested by Hanover Police.

The RE student reported that the Dartmouth student had **"said that the only thing he wanted to do more than end his own life was to end my life or that of my mother's."**

For them to have initially brought this to light by presenting my emails to the police and school to convince them I posed a threat when this was clearly not the case, and then for me to explain that to the COS committee, only for them to unconditionally believe the words of the two individuals who you could plainly see were providing intentionally misleading descriptions of my behavior by checking all of the statements provided on page 10 of the COS hearing packet to the emails they're based on to see that, although upon a loose examination they seem to support her allegations, if you look closely enough, it is clear that minor details and facts have been altered in such a way that cause them to support the narrative I was posing an active threat that needed to be stopped for the sake of their safety, rather than that I'd threatened them for money that they'd already given me a month prior.

She provided a series of emails from the charged student, replete with obscenities and slurs, sent after she had told him to stop contacting her.

Please understand how the only unsolicited contact I made with the REDACT 's was after I'd said I didn't want to meet up with REDA anyone, but she still hadn't given me an explanation for why she didn't it'd be immoral for me to not compensate me for those things anymore, and so I eventually delivered threats I had no intention of ever acting on to try and do something to make her feel like she had to.

This wasn't a long or repeated pattern of harassment on my behalf. I only contacted them again in the spring after my parents starts calling me for hours crying, and begging me to tormenting with the people I'd only been desperately trying to forget, for the purpose of trying to get them to promise me they'd stop, and while they'd explicitly accepted, encouraged, and reciprocated to the communication.

DARTMOUTH008862

The Dartmouth student wrote he would do "whatever I can to hurt you as least a fraction as much as you hurt me." He wrote things like, **"I hope life brings you nothing but pain and suffering," and "This is only going to be worse if you try and have your mom deal with it. Kill yourself you spineless fuck." He insisted on repayment for expenditures during their relationship and stated that "if you take your time I'll make sure you regret it."**

I have so few words to describe the way it feels to know that months of me going to the school and saying I'd been trying to get these people out of my lives, and that they were harassing me and seemed to be providing misleading narratives to the police to convince them they ought to come meet with and monitor me, in order to hold true on threats to get me back for things I'd done to them in a personal feud that ensued after we broke up during the winter term, that they would could just take a segment from the report I'd told them was fabricated, and paste it in this report which details what they decided was so unquestionably true they'd expel me for them. I don't understand how they could justify copy and pasting this as an explanation if they'd actually considered what I said. Although Dean Hudak did warn me to think about what I might do if I did end up getting suspended the day before the Judicial Affairs hearing, she said it was because it was always important to "hope for the best, but prepare for the worst." I internalized that I might get a suspension as a result of this trial at that point (I'd honestly been trying to deny anything else might come of this relationship so I wouldn't be so stressed out by the thought of this looming trial that it'd be impossible for me to perform in my classes, or produce high-quality application material for the fall recruiting cycle. I thought the potential punishments in consideration were so severe because of how egregious of a violation of the community standards of conduct my actions could potentially be based on the crimes I was arrested for committing. It was being alleged that I'd harassed my ex-girlfriend in defiance of a restraining order over a duration of months, and arrested for this reason, so it made sense that the worst punishments I could receive for those actions would be incredibly severe. I did not think it was imaginable the school would use materials which it previously had for a month and not asked me to attend a hearing on behalf of, but then were brought to light later in a trial where a different set of actions I'd performed, and in which the allegations against were worded in a specific way that could ONLY be interpreted to mean that my actions which they'd known about for months without asking me to undergo a judicial hearing for, that I'd constantly told all the school representatives and police officials I've had to talk with about this over the last 7 months since I sent the email and RED started holding true on her promise to make me pay.

Can you please try and understand how when I received multiple police reports saying the REDACT's needed protection from me because I was threatening them for money they'd actually already given me, it became very impossible for me to believe they might actually be scared and doing this out of self-defense, and not making true on the promise to make me suffer.

If you also think I'm just some psychopath whose coming up with lies to get out of trouble after he got caught harassing and coercing his ex-girlfriend despite her begging me to stop contacting her the way the committee did, please, please just go back and look at both of the explanations each of us provided as to what happened, and compare each of them to the emails (which are a record of nearly every exchange we have February 22nd when we broke up) and just look one more time and make sure you really think what I've said here might not be true.

He called her a "fucking pathetic disgraceful piece of shit." He threatened to post on social media things that would be "just too fucked up and hurtful for you to believe..." He insisted the woman comply with his demands "because the alternative is worse for everyone." He called her a "heartless cunt" and threatened to "post your nudes on reddit every day until they finally reach the front page." The charged student also sent distressing messages to the woman's family members (mother, brother, cousin, aunt). He wrote to his former girlfriend's mother, stating that if she contacted his mother he would "do something equally immature to make you regret it." He also wrote to her mother that "It's clear to me why some many people in your family kill themselves now.

**The charged student did not provide a written statement or any other materials in advance of the hearing.**

Once more, these are all things my advisors and I did not believe I was being accused of misconduct for committing, solely because the information which the school had provided very specifically said so. Consequentially, I dedicated seconds of my opening statement at the hearing to summarizing all of the information included in the first portion of this letter, which is at least necessary to truly understand them in full, and which I should've been given a chance to show before this was done to me, so that I could at least know my life is over now for certain instead of potentially waiting here, more depressed and unable to simply stop feeling this psychological and physiological pain throughout me ever second I'm awake.

My public defendant, George Ostler, who helped me with the court case I had regarding things that'd occurred during the Spring term, told me not to worry about this Judicial Affairs hearing based on the results of my court trial and the information I'd provided him, so I was going about my normal life up until this hearing – attending classes and applying for jobs I was going to work next fall. In advance of the trial, the thing he told me I had to worry about in all this was that if ▮RED▮ and ▮REDA▮ hated me enough to come up to the trial and actually try and have me convicted of a crime for sending them the email I wrote on May 4th, they might well be able to achieve this.  I was juggling this with a very complicated financial aid problem as well, and managed to oversee the deadline that I had to submit materials I wanted the committee to see by. As soon as I realized my mistake, I asked if I could submit what I'd written so far, but they said I could not, and would just have to provide any information I wanted them to know in my opening statement. This is why I did not submit a statement in advance of my hearing.

Additionally, since the time of the hearing, it has taken me every waking hour of over 10 days for me to write this entire statement. Since two days after I had the state court hearing regarding incidents from the spring, I was gone at work from 6:30 am – 7:00 pm every workday over the summer, until I came back to school two days before the fall term began, at which point I became equally busy with school, extracurriculars, and fall recruiting. If everyone you'd been able to get help from with this process told you it was alleged my activity in the spring was a community standard violation, and that didn't require the vast majority of this letter, do you think there's any chance you also wouldn't have also write out all these things which you'd been told were unnecessary?

At the hearing, he said that his former girlfriend had created a "misleading narrative" that was presented "in retaliation" **following a bad break-up, and that his messages should be construed as a justified response to her harassment of him and his family.**

He said that the messages from him in the packet were out of chronological order and without context. **He acknowledged that some actions on his part could be interpreted as malicious, but he stated his view that they were "protected by free speech."**

Again, I was trying to ensure them I'd done nothing in violation of the law, which'd be in violation of Standard IV, so I told them the things I did were really fucked up to help them make sense of the whole story, but also wanted to reassure them they were not illegal. They got law enforcement involved as quickly as possible after I sent the first threatening email, and when the police came to my apartment, they said what I'd written alone wasn't enough for them to be able to even force me to talk with them against their will, but I was very compliant with them nonetheless after that (letting them look through my phone and just explaining the situation) and by the end they came to agree

There are two sets of events in this whole affair: those which occurred during the winter term, and those which transpired in the spring. In the winter, I was the one trying to hurt them; but in the spring, I was the victim in the affair, and ▮RE▮ tortured and made to pay more dearly for my transgressions than I could've ever imagined is possible, just like she said she would.

This statement by the committee really illustrates what I think went wrong, and what I urge you to understand did detriment my ability to prepare for, and even participate in the Judicial Affairs hearing, and that there is virtually no way anyone could argue that there isn't enough of a chance that it did to justify taking everything I have in my entire life away from me without at least putting aside the few resources

necessary to at least make sure they were right. The things I wrote in those emails I sent during the Winter are the worst things that I've ever expressed in my entire life, and the most evil and disturbing that have ever passed through my mind. I'd been led to believe that I wasn't being tried for misconduct during the winter term, but wanted to give a little background on the letter in the packet, and so unnecessarily (or so I thought) described in a few short sentences to them to help them make sense of what motivated Barbra to do the things she did later on in the Spring.

The charged student brought to the hearing a copy of the text he sent, in violation of the restraining order, telling the woman to have no contact with him. He also provided a letter he had received from his lawyer about the status of his case in N.H. **The charged student insisted that it was not true that he threatened to kill his former girlfriend or her mother, as the ▮▮RE student reported in her complaint, although he acknowledged he might have written something to the effect that he wished she were dead.**

Because the allegations I was presented with so specifically stated that it was the actions I'd perpetrated in the spring term, which I was arrested and made to go through an actual court trial for. I'm sure you can imagine that I didn't feel the desire to go through all the emails I provided in the first section of this email to try and remember exactly what happened when I'd been given very specific information which stated these actions were not the ones I'd come under the scrutiny of the Judicial Affairs court for committing.

He said the committee should view his communications to the woman as justified responses to the hurtful dynamics of their relationship. He also acknowledged, in his closing statement, that some of his behavior was "super fucked up" and that he deeply regretted some of the messages he sent. **He denied, however, that any of the threats were real, and he argued that some of the apparently threatening statements were being misconstrued.**

**During deliberations, committee members observed that although the student eventually expressed some regret, they did not find his explanations or justifications for his behavior to be reasonable.** They viewed the written threats as credible, and they noted that the woman had reason to feel threatened and afraid, **especially after she had been clear in her request for no further contact from him.**

Once again, the only period of time I made malicious, unsolicited contact with the ▮REDACT▮ family was between March 10th and 13th of 2017, and since that time, the only direct or indirect contact I've had with anyone they'd consider family or friends were the two contacts I had with ▮RED▮ and ▮REDA▮ where I asked them to just stop torturing me and let this finally pass. They'd handed me the money without explanation shortly after we stopped contacting each other, in March, so there was nothing left on the table they had any reason to worry I might try and get them back for at all, and so the only way they could convince the school and authorities that I was still posing an active threat that they needed protection from was to take those threats and make it seem like they were representative of how I was acting a month later when the opposite was true

**They noted that he continued to harass her and that his explicit and implied threats, which seemed real and frightening, escalated.** Committee members noted that his behavior violated Standard II in "multiple ways." One committee member described the behavior as "a textbook example of coercion."

I don't know what else I can do to affirm the negative assertion that I did not do this for more than two days in the spring, and willingly ceased the day after I was confronted by a police officer about it, and at a time I thought, and had accepted that I was simply not going to receive the money I had threatened them for. If you simply do not believe what I'm saying is true and my punishment is for that, if there is absolutely any evidence I could provide you, or anything I could do at all to affirm that what I'm saying is true, but which I haven't thought of, or had the time to include as I've written this letter, PLEASE, PLEASE, PLEASE TAKE THE TIME TO ASK ME ABOUT IT, OR REQUEST I PROVIDE IT FOR YOU BEFORE YOU MAKE THE FINAL JUDGEMENT ON THIS DECISION. I know you're probably tired or reading every iteration of this I've written in this letter, and that it wasn't necessary for me to even tell you in the first place given the ruling, but this is everything I have in life that they decided I deserved to be taken away, so please make sure it was a justified one.

The Committee found the student responsible for violating Standard ll. The reached no finding concerning the violation of Standard VI in the absence of a court finding.

In reaching its decision to separate the student, Committee members acknowledged that he appeared to be experiencing a great deal of distress, but they were especially concerned about his apparent inability to take responsibility for his actions and his lack of awareness of the significance of his actions and their impact on others. **They concluded that the student's well documented and repeated behavior was a clear and egregious violation of Standard II and incompatible with his continued status as a Dartmouth student.**

Because of the procedural error that occurred in this case, I truly believe they did not have all the information necessary to make this judgement about me with certainty. I hope this letter was coherent enough to convey it all to you so that you may now after reading it. If you really just read and tried to understand this, than you've done all that I'm asking , and could possibly deserve from you here.

Daniel M. Nelson, Director
Dartmouth Outdoor Programs

# ➢ Photo Copy of my opening statement from the COS hearing

As you can see in the last note I made to myself at the top of the packet based on my meeting with my advisor Anne Hudak the day before was to focus on explaining the actions that happened **"***During that term**"** and as little else as I had to while still giving the committee enough information to make sense of the very specific set of actions they'd alleged were misconduct. This is the only person in the entire world the school gave me access to for help with understanding the JA hearing process.



> Get there by 2
> Things I wrote in emails that weren't nice – need to know why I said them.
> ***Thank you for being here and listing to my account of what actually happened: ***
> Will make closing statement at the end as well.
> Need to explain any information that might help the committee understand why I said anything
> ***During that term***

I should preface this by saying this this is the most traumatic thing I've gone through, so I apologize in advance if I ramble, am incoherent in any way, or forget to provide any background info that is important to the discussion, please just interrupt me at any time, let me know exactly what I was unclear about or failed to provide, and I'll make sure to clarify as well as I can.

Overall, this was a thinly veiled attempt to get back at me for some retaliatory personal affronts I made during a short personal feud we had after our breakup.

The accounts provided are a very small, misrepresentative fraction of the events that transpired and messages that were exchanged from sometime mid/late February through March 14th, and then between March 27th, and misconstrue their chronology and relation to one another in order to form a misleading narrative that would be sufficiently condemning to convince my parents, school, and the authorities to retaliate against me in ways that'd cause me to endure hardships such as being arrested and going through this Judicial Affairs process. Presumably, this was done to get back for the previously mentioned retaliatory personal affronts I made during a short personal feud we had after our breakup.

For reasons I'd more than happily describe if you'd like to know, but that I'll exclude under the presumption you won't, many of the text/facebook messages we exchanged are not immediately available to me, but may be reclaimable by certain means. If at any point you believe its crucial to see any sort of documentation that might exist to verify my account of what actually happened in this situation, just take note of it and ask me about it afterwards and I'll tell you if I might be able to immediately access it, or track it down for you. However, most of what I'm saying can be affirmed by looking closely at information already contained in the file – as I'll show later when I go through the individual articles within it.

The narrative from the letter is presented in such a way that makes it appear as though I'd made any sort of contact with the REDAC amily in the weeks before I'd arrived at school (between March 14th and March 27th), when in reality I had not spoken with them or done anything publicly or privately that could conceivably be interpreted as having any impact on their lives, and also transmitted a request they not speak with anyone in my family.

REDACTED and I broke up in January after having dated for 4½ years or so. The breakup was very severe and traumatic for both of us (for me, because of the reasons I describe in the email on page 23, and for her [according to her mother when we spoke/exchanged messages at some

# ARTICLE 4 – *"EMAIL RESPONSE SENT BY DEAN REBECCA BIRON ON OCTOBER 27TH"*

Table Of Contents

 **Dartmouth College**     HANOVER • NEW HAMPSHIRE • 03755-3529

*Dean of the College, 6004 Parkhurst Hall*          • Tel. (603) 646-3113

Rebecca E. Biron
*Dean of the College*

October 25, 2017

Mark I. Anderson
Sent electronically to: Mark.I.Anderson@dartmouth.edu

                                        **PERSONAL AND CONFIDENTIAL**

Dear Mark,

I write to notify you of the determination I have made after carefully considering your request for review of your separation from the College for violating Standard II. For the reasons set forth below, I am granting your request and directing that a new hearing be held.   While this matter is pending, you will remain not enrolled and are not allowed on campus.  However, you may be on campus to access services at Dick's House and/or to meet with advisors related to your COS case.

As stated in the Student Handbook, Requests for Review may be granted on one of the following grounds:

1. Procedural error that has materially prejudiced the student's case.
2. Newly discovered information which, had it been available at the time of the hearing, would likely have affected the outcome either with regard to a finding of responsibility or with regard to the sanction imposed (if the information was not reasonably available to the student at the time of the proceeding).

You have asserted that a discrepancy between the allegation letter you received on May 10, 2017 and the hearing committee's focus during their process constitutes a procedural error that materially prejudiced your case.  The allegation letter states that "it is alleged that on or about May 4, 2017 you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. This continued contact in violation of the restraining order, if true, would be in violation of Standards II and VI." The materials in the case packet and the recording of the hearing indicate that the Committee on Standards did not limit their consideration to your actions on or about May 4. In finding you responsible for violating Standard II, the hearing committee focused on the connection between your May 4 communication in violation of the restraining order and "previous behavior that was threatening or harassing" over time between February 28 and May 4, 2017. This focus does not by itself constitute a procedural error. Rather, it is a reasonable interpretation of the phrase "continued contact" to consider the violation of the restraining order in the context of the entire course of the communications from February to May.

DARTMOUTH008868

However, you assert that your own understanding was that the allegation letter and statement of understanding concerned only behavior on May 4. You write in your request for the review (page 2) that "if this error had not occurred and the substance of the allegations against me were communicated with the care and attention to detail that students hope and assume this school will put into things like these, I would have admitted to the allegation of having committed a violation of Standard of Conduct II during the Winter term." This statement demonstrates that the discrepancy you perceived between the allegation letter and the committee's focus did significantly affect your response to the allegations, both in your denial of responsibility and in the way you answered questions during the hearing.

For this reason, your request for review is granted. I am instructing the Office of Judicial Affairs to issue a revised allegation letter and to conduct an entirely new hearing. Please note that there is no guarantee that a new hearing will result in a different outcome. As it appears that there is sufficient evidence to support the sanction that was imposed, you will remain not enrolled and are not allowed on campus. However, you may be on campus to access services at Dick's House and/or to meet with advisors related to your COS case.

Mark, your appeal letter makes a number of concerning references to your emotional distress throughout this entire matter. I encourage you to seek out all the counseling and advising resources available to you for support during this difficult time. I wish you well as you learn and grow from these experiences.

Sincerely,

Rebecca E. Biron
Dean of the College

Cc:
Anne Hudak, Undergraduate Dean
Katharine Strong, Assistant Director of Undergraduate Judicial Affairs

# ARTICLE 5 – *DEAN BIRON'S RESPONSE TO MY "LETTER TO DEAN BIRON" (SHOWN IN ARTICLE 2)*

Table Of Contents

Dear Mark,

I received and read your letter this morning.

I am concerned about the reference in your letter to your being "scared for your life" in relation to your COS case. Please call Dean Hudak and/or seek support through counseling.

As for the case itself, I understand your view that remaining separated pending the next hearing is unfair to you. I disagree.

I have granted your request for review and directed a new hearing. A new hearing with a revised allegation letter is the appropriate remedy for the issue you raised in your request.

As I may be called upon to consider a request for review for your second hearing, it would be inappropriate for us to meet to discuss my decision in this case.

I encourage you to participate fully in the new hearing granted to you. You will have the opportunity to explain to the committee how you view the pending allegations.

Sincerely,

Dean Biron

DARTMOUTH008870

# ARTICLE 6 – EMAILS I SENT TO PRESIDENT HANLON ON NOVEMBER 7TH

Table Of Contents

Dear President Hanlon,

I am urging you once more to understand that I have already done what you have suggested, and done everything within my power to resolve this within the judicial affairs department. I realize you play no role in the Judicial Affairs process, but several people who work at the school told me you are the only person I can write to try and get someone within the college to make this right for me, and the only options I have left to me if you won't help is to contact the authorities to get them to stop this from happening to me, or to just sit back and let them take more away from me than I can possible afford to lose, for no reason other than that they needlessly caused me harm by failing to perform their jobs, and in a system that refuses to hold them accountable for doing so. I have written a letter to Dean Biron and repeatedly tried to communicate with Katharine Strong about the issues I described to you, and each time in response, I have only gotten an affirmation that the school maintains it's previous stance (in spite of what I've written), and one that does not provide an explanation for why, or that gives me an opportunity to engage in a conversation like the one you've suggested.

If I could have a conversation with Dean Biron and/or Katharine Strong where we both explain our positions to an unbiased, 3rd party mediator chosen by the school, I feel very strongly believe they will support my own position. If they do not however, this will at least allow me to get a reasoned explanation for how what the school has done over the past several months could be according to its own policies, which is all that I am entitled to, and all that I have been asking for. I've shown and explained all my concerns about the Judicial Affairs department to 9 people other than Strong, Biron, and yourself – 4 school counsellors and 5 of my closest friends here. Every single one of these people has been unable to think of a defensible explanation for Katharine Strong and Dean Biron's position, and stood as vehemently in support of my own as I do. Two of the counsellors, **who work at this college**, told me I should seek legal advice because what the college was doing to me seemed so plainly inappropriate, and one of the other two who I am currently speaking with told me to write you one last time before I sacrifice the next year of my life fighting for justice in court, in spite of the fact that this is not according to the rules and procedures in the student handbook.

I truly cannot communicate the type of suffering I've experienced over the past few months as I've done everything humanly possible to try and simply get my life back, but I'm not the only person that continues to suffer as this drags on. I'm all too aware of how hard it has been for my parents to unexpectedly need to cover my living expenses this term, and for my friends to put time aside and sacrifice their own privacy so I could sleep in their rooms when the school gave me no other place to stay, but put me in a position where I had no choice but to stay in

DARTMOUTH008871

Hanover for months while beg the school to acknowledge what it has done to me and make it right. I am asking that you respond to request I've presented in this paragraph by Thursday, because I cannot bear to anxiously wait to hear if the next period of my life will be spent fighting this because nobody at the school was willing to acknowledge some of my most basic rights and protections had been violated, or watch the people I care about do things they can't really afford to in order to support me.

I could create a list of things which I would simply need the school to provide a reasonable explanation for me to move along with my scheduled hearing, which anyone at the school who might be willing to could respond to. I do not care how the information I have asked for is presented to me, I am just asking that you give me an opportunity to attain it, because I have literally done everything I possibly can to try and get it from someone at this college myself, and with virtually nothing to show for my efforts. I am simply asking that you acknowledge I have a credible concern that people who work at the school you oversee have neglected to act as they've required to, and to understand that when these same administrators deny this and refuse to explain why, this is not an adequate investigation of these concerns, or a response that even demonstrates you really care about stopping what might be happening to me (if you believe any of what I've written could be true, which must be the case unless you're willing to totally back the opinions of Dean Biron and Katharine Strong against those of a student without consideration or discretion). President Hanlon, if the first thing that comes up whenever someone Google's my name for the rest of my life is a lawsuit with my college pertaining to this subject matter, my entire life will have to change in ways I desperately don't want it to. I'm begging you to understand that this is the only rational option available to me in life if you don't do anything more than refer me back to the judgement of the same administrators I'm telling you that I've been painfully made aware either will not acknowledge, or cannot understand the nature of their wrongdoing here, or how their behavior has caused me harm.

Sincerely,
Mark Anderson

DARTMOUTH008872

Dear President Hanlon

Upon further consideration, I've decided that having the conversation I've requested to have over email would not be conducive to resolving this issue in a timely manner (based on how long it has taken Dean Biron and Katharine Strong, specifically, to respond to the very questions I've addressed to you in my letter, and the fact they've repeatedly refused to provide the information you've directed me to seek from them). Again, I can send you all the attempts I've made to do what you've asked me to in your response to my letter if you'd like, but I can assure you it is a potential solution to this situation which I have harder than you'd believe to make work, and painfully learned cannot succeed.

I promise you that if you simply provide a fair, intelligent arbitrator who is willing to carefully hear, and evaluate the evidence in support of my own opinion and that supported by Katharine Strong and Dean Biron, they will find much of the latter to be unambiguously false, and understand the things I've asked for must necessarily be done to make this right.

Sincerely,
Mark Anderson

DARTMOUTH008873

Here is a copy of the court complaint I'm working on that articulates why all these things I've described in this letter are not just violations of my rights as a member of the College, and the rules and regulations of its judicial hearing process, but moral and legal wrongs. If you had witnessed and heard all the things I have in the past three months, you'd know as well as I do that these people have no intention of treating me fairly for what they've done.

UNITED STATED DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Mark Anderson

Vs.                                                                      CIVIL ACTION NO.

Dartmouth College

## COMPLAINT WITH JURY DEMAND

Plaintiff: Mark Anderson. Resides in Mercer Island, Washington, West Concord Way, Apartment #481

Defendant: Dartmouth College. Located in Hanover, NH

## INTRODUCTION

*This cause of action arises from the Defendants' failure to treat the Plaintiff according to the terms of various contractual agreements the two parties are engaged in. Defendants' negligent and/or intentional failure to make due on contractual obligations to the Plaintiff in the events described since September 21st 2017 have caused the Plaintiff to experience extraordinary educational, professional, personal losses, and incredible emotional suffering. The Defendant has committed a myriad of moral and legal wrongs unto the Plaintiff by failing to uphold its contractual obligations to Plaintiff Anderson, and these wrongs are the sole, and proximate cause of the Plaintiff's suffering and loss described in this letter.*

An undergraduate degree is an incredible investment of one's money, and time. Thus, Dartmouth College promises all its undergraduate students that if they invest the time and money required to earn an undergraduate degree at the institution, it will not deprive them of this, or impose disciplinary sanctions against them above the probation level unless the following occurs; (1) the undergraduate judicial affairs office alleges that a student has violation the community standards of conduct, and that if the allegations against the student are true, it would be appropriate to impose an above-probation level sanction upon them, (2) the student undergoes a COS hearing which is performed fairly, according to the rules and procedures of the undergraduate disciplinary hearing process, and with respect to the procedural rights and protections students are promised in the Student Handbook, and (3) as a result of such a COS hearing, the committee determines that the JAO's allegations against the student were, in fact, true, and justified

DARTMOUTH008874

suspending the student, or separating them from the College (aside from in a few unique cases, none of which are applicable here). This division of the United Stated Judicial Branch has repeatedly ruled that it is both morally and legally wrong for Private Colleges & Universities to fail to make due on such contractual promises as the ones which Defendant Dartmouth College had a contractual obligation to uphold for Plaintiff Anderson in this case, and has caused him and his family incredible, extraordinary personal, emotional, financial, and professional loss and hardship by failing to make due on this contractual obligation to the Plaintiff.

<div align="center">JURISDICTION</div>

Jurisdiction in this case is based on the diversity of citizenship of the parties and the amount in controversy. Plaintiff Mark Anderson is a citizen of the State of Washington, and Dartmouth College is an institution located in the State of New Hampshire. The amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interest and cost.

<div align="center">STATEMENT OF CLAIMS</div>

1. Plaintiff Anderson matriculated at Defendant institution Dartmouth College in about September 2014, and at this time, Plaintiff and Defendant engaged in several contractual agreements which outlined Plaintiff Anderson's rights as a member of the Dartmouth College community, and in which the Defendant made a clear promise to uphold these rights on the Plaintiff's behalf.
2. In said contractual agreements, Defendant Dartmouth College promised to conduct its disciplinary hearing procedures in a way that is consistent with the procedures, rules, regulations stated in the Dartmouth College Student Handbook, and also promised that if Plaintiff Anderson were asked to undergo a disciplinary hearing for alleged violations of the Dartmouth Community Standards of Conduct, that the Plaintiff would be provided certain rights and procedural protections while participating in the Defendants undergraduate disciplinary system.
3. About March 28th, 2017, Defendant Dartmouth College received a police report and/or student complaint, about Plaintiff Anderson, and notification a restraining order had been issued against him.
4. About March 28th, 2017, Defendant Dartmouth College's Judicial Affairs Office processed and reviewed the information in this complaint about Plaintiff Anderson, and determined it was not appropriate to initiate allegations of misconduct against the Plaintiff based on the materials it contained (according to the testimony of Katharine Strong).
5. Kristi Clemens, Assistant Dean of Student Affairs and Director of Case Management, emailed Plaintiff Anderson stating that he was required to participate in a disciplinary seminar of some sort with her on March 30th.
6. About April 4th, Kristi Clemens and Plaintiff Anderson met to discuss the information in the report, and during this conversation, Kristi told the Plaintiff that the Defendant Dartmouth College's Undergraduate Judicial Affairs Office had reviewed the information in the complaint, and decided the report did not describe actions Plaintiff Anderson had allegedly committed which, if true, would justify imposing a disciplinary sanction upon him.

DARTMOUTH008875

7.  Plaintiff Anderson reported to Dean Clemens at this time that the individuals who had submitted the complaint against him had threatened the Plaintiff several weeks before they'd submitted the complaint to the College, telling both the Plaintiff and his parents they would do anything they could to have his Gates Millennium Scholarship taken from him as revenge for a conflict they'd had over the winter term of 2016 (January 3rd – March 25th); he also told Dean Clemens that after not having spoken with the individuals who submitted the complaint about him, they'd started harassing him and making unsolicited contact with his family on the first day of the spring term when he arrived in Hanover on or about March 27th.

8.  On or about May 4th, Defendant Dartmouth College received a report from Hanover Police alleging he had acted in violation of public law, and consequently, been arrested.

9.  Defendant Dartmouth College's Judicial Affairs Office initiated allegations that Plaintiff Anderson's actions "on or about May 4th" and/or which he'd performed "during the Spring term," were in violation of Dartmouth's Community Standards of Conduct II and IV, and required him to attend a judicial hearing before the Committee on Standards (COS) which would then adjudicate Plaintiff Anderson's alleged misconduct.

10. Plaintiff Anderson's COS hearing was rescheduled for a date after he had gone through his public court trial in Lebanon District Court for the actions he was arrested for performing about May 4th.

11. Plaintiff Anderson attended this public court hearing in June 2017, and the jury did not find him guilty of violating the law for the actions he'd committed on or about May 4th.

12. Plaintiff Anderson maintains to this day, on the record, that the actions he committed during "the spring term" and "on or about May 4th" (the period which the College had alleged Plaintiff Anderson had committed actions in violation of Standards of Conduct II and IV during) were not malicious, and the COS did not determine these actions were violations of Dartmouth College's Community Standards of Conduct II and IV.

13. Anderson was a student at Dartmouth participating in his 4th year of undergraduate studies during the 2017-2018 academic year from September 11th-21st.

14. Plaintiff Anderson's COS hearing was scheduled for September 21st, 2017.

15. Plaintiff Anderson denied that either of the two allegations made against him before the hearing, and the COS made no indication it believed the specific allegations that had been made against the Plaintiff before his hearing were, in fact, true.

16. During Plaintiff Anderson's COS hearing on September 21st, 2017, the COS did not find that any of the actions which the JAO had initiated allegations against him about were, in fact, violations of the Standards of Conduct.

17. During Plaintiff Anderson's COS hearing on September 21st, 2017, the COS did decide that actions he had committed prior to the start of the Spring term, which the JAO had reviewed but decided it was not appropriate to initiate allegations regarding, were in violation of the Standards of Conduct, and imposed the harshest sanction available to its jurisdiction unto him: separation from the College.

18. On September 21st 2017, employees of Defendant Dartmouth College violated the terms of the contractual agreement which Plaintiff Anderson and the Defendant engaged upon in September 2014. Specifically, Defendant Dartmouth College promised that before it would impose any disciplinary sanctions upon plaintiff Anderson or any other member of the College for alleged misconduct, that the accused member(s) would be given fair notice of the substance of the allegation(s) against them at this hearing, and Plaintiff Anderson was not

DARTMOUTH008876

provided such notice of the allegations which were brought against him at a judicial hearing he attended on September 21st.

19. Daniel Nelson (who served as COS Chair at the Plaintiff's disciplinary hearing), and Katharine Strong (head of the Judicial Affairs Department, also present) are tasked with ensuring student's disciplinary hearings are performed appropriately, fairly, and in a way that is consistent with the Student Handbook.

20. Furthermore, Defendant Dartmouth College is responsible for ensuring that all its employees are properly trained and supervised to perform their jobs, and is responsible for any harm these employees do unto members of the College if they fail to perform their duties appropriately, or perform acts of negligence or misconduct that cause other individuals harm.

21. Daniel Nelson and Katharine Strong did not perform their assigned duties appropriately at Plaintiff Anderson's COS hearing by making sure that the rules of the COS hearing process, and the rights and procedural protections which Plaintiff Anderson is afforded in the Student Handbook were protected; thus, Defendant Dartmouth College failed to uphold its obligation to ensure its employees were adequately trained and supervised to perform their jobs appropriately, and Plaintiff Anderson has suffered incredible harm as a result of these employees' negligence/misconduct.

22. In the months following the date of Plaintiff Anderson's wrongful dismissal, he has found himself thrust into the confusing, terrifying, and lonely process through which those who're inappropriately persecuted by Dartmouth College's judicial hearing process are left to hopelessly try and maneuver with no hope of being able to attain fair treatment by these means.

23. Plaintiff Anderson submitted a "Request for Review" letter, explaining that the COS hadn't actually punished him for any of the actions which Anderson was presented allegations about in advance of his hearing, and that the COS had separated Plaintiff Anderson from the College for actions which the JAO reviewed and did not initiate allegations regarding, and that he had presented virtually no allegations about the actions he was expelled from the College for committing in advance of his hearing.

24. The Plaintiff's "Request for Review" letter was reviewed by Rebecca Biron, Dean of Dartmouth College, who replied in an email sent on October 27th, 2017, by sending Plaintiff Anderson a letter titled "v3 DCOL Response to Anderson Appeal 2017.pdf".

25. Dean Biron's "v3 DCOL Response to Anderson Appeal 2017.pdf" is the only substantive attempt Defendant Dartmouth College has made to justify its clear, objective, and material breach of its written contractual agreements with the Plaintiff.

26. Furthermore, in Dean Biron "v3 DCOL Response to Anderson Appeal 2017.pdf," Biron fails to acknowledge how the Plaintiff's rights as a member of the College, and the rules and procedures stated in the Student Handbook had been violated at the Plaintiff's expense since the time of his COS hearing (on or about September 21st), or provide remedy or relief for the Plaintiff's wrong and needless suffering.

27. Some of Biron's statement's in "v3 DCOL Response to Anderson Appeal 2017.pdf" are objectively false, and her judgements and rulings plainly inconsistent with the Student Handbook, plain sense, and reason.

DARTMOUTH008877

28. In her "v3 DCOL Response to Anderson Appeal 2017.pdf," Dean Biron replied to the "Request for Review" by saying that she believed the JAO indeed had presented allegations which stated that the actions I was expelled for were to be considered as sanctionable offenses during my trial about September 21st.

29. In her letter send on October 27th 2017, Dean Biron ruled that the appropriate remedy for what'd happened during Plaintiff Anderson's COS hearing was to have the Plaintiff attend another COS hearing where the Committee on Standards would deliberate if the actions he had committed in "January, February, March, and/or May of 2017" were in violation of the Dartmouth College Community Standards of Conduct II and IV; this is inappropriate because the JAO had previously decided the Plaintiff should not have to attend a judicial hearing for actions he had committed in January and February of 2017 when it received information about these actions about March 28th, 2017.

30. In her letter sent about October 27th 2017, Dean of Dartmouth College Rebecca Biron also stated that she believed it was appropriate for Plaintiff Anderson to be denied access to his student meal plan, housing, the computer repair store, and other rights, privileges, and resources, which the Defendant is contractually obliged to not deny members of Dartmouth College for alleged violations of the Standards of Conduct until that member is given a COS hearing for the alleged violations, and which have and continue to undermine the Plaintiff's ability to participate in the COS hearing process.

31. Plaintiff Anderson replied to Dean Biron's "v3 DCOL Response to Anderson Appeal 2017.pdf" in a letter titled "Letter to Dean Biron" on October 29th, 2017; in this letter, the Plaintiff expresses his confusion as to how Biron thought any of the allegation materials he had been presented by the College in advance of his hearing could conceivably be interpreted to say the College was alleging actions Anderson had prior to Spring term in January and February of 2017.

32. Dean Biron replied to the Plaintiff Anderson's "Letter to Dean Biron" on October 30th, 2017, stating she understood the Plaintiff's concerns and disagreed with them, but providing virtually no information to explain why. Biron also said she did not believe it was appropriate for her to discuss her decision with Plaintiff Anderson.

33. In the contractual agreement Defendant Dartmouth College and Plaintiff Anderson initiated about the time he matriculated in September 2014, Defendant Dartmouth College also made an implied promise that members of the College who have been asked to participate in its judicial hearing procedures for alleged misconduct would be given the opportunity to ask the College's Judicial Affairs Office or their College Advisor for information about the rules and procedures of the College's judicial hearing process; the Defendant tells student's they may freely ask the JAO and their College advisor for any information regarding the COS hearing process, which implies members of the College will be able to attain response to questions they submit to these parties if they're asked to participate in the COS hearing process.

34. Plaintiff Anderson has repeatedly made such informational requests since about mid-October 2017 through November 21, 2017, and defendant Dartmouth College has failed to make due on its obligation to fulfill such requests, causing the Plaintiff harm by making it impossible for him to acquire information which he needs to participate in his upcoming COS hearing which the JAO has asked him to participate in on January 8th.

DARTMOUTH008878

35. The Defendant also instructed the plaintiffs parents, Mark and Elsa Anderson, to contact Dean Kristi Clemens, if they'd like to know any information about their son's disciplinary hearing and ongoing status with the College after the date he was expelled, but Dean Clemens has failed to respond to their calls or voice messages, further demonstrating the Defendant's failure to make due on its contractual obligation (outlined in the Student Handbook) to provide the Plaintiff certain information regarding his hearing, and more generally, the rules and regulations of the COS hearing process.

36. Katharine Strong, Administrator and employee of defendant Dartmouth College, has failed to provide plaintiff Anderson with treatment that is consistent with that which the Defendant promised the Plaintiff that the individual holding her office would provide him throughout the disciplinary hearing process from September 21st 2017, through November 22nd 2017 (and onward, since this allegation is based on her ongoing refusal to provide the Plaintiff with information the Defendant promised the individual occupying her position would provide him in these circumstances).

37. Strong has also infringed upon Plaintiff Anderson's contractual agreement with her employer, Defendant Dartmouth College, in a fashion that clearly would (and has) caused plaintiff Anderson harm, amounting to intentional or negligent infliction of emotional distress.

38. Defendant Dartmouth College's Community Principles also state that "Protest or demonstration shall not be discouraged, so long as neither force nor the threat of force is used, and so long as the orderly processes of the College are not deliberately obstructed."

39. Plaintiff Anderson repeatedly wrote emails to Phil Hanlon, President of Dartmouth College, describing the Plaintiff's concerns, and that he felt he had very good reason to believe the rules and procedures of the College's disciplinary process had been wildly and irresponsibly violated by Katharine Strong and Daniel Nelson (amongst others) to his own great expense.

40. President Hanlon on November 7th, 2017, stating that he appreciated Plaintiff Anderson was trying to resolve his concerns about the judicial affairs proceeding by communicating with him; that he did not think it was appropriate for him to consider and/or evaluate the concerns Plaintiff Anderson had raised to him; and advised he should move along with the hearing process as scheduled, and accept Katharine Strong, Dean Biron, and Daniel Nelson's rulings despite (as the Plaintiff had repeatedly articulated to every College employee and administrator that might hear his concerns by this point) that they'd clearly been made in violation of the Plaintiff's contractual agreements with the Defendant, and at tremendous expense to the Plaintiff.

41. Both Defendant Dartmouth College's Judicial Affairs Office and President's office have denied Plaintiff Anderson the right to ask for information or protest this decision since on or about November 17th 2017, infringing upon the Plaintiff and Defendants contractual agreement in which the Defendant promised to respond to such information requests made by the Plaintiff.

42. Plaintiff Anderson protested the JAO and President's response to his concerns (both simply stated they agreed with Dean Biron's decision, and did not respond to or acknowledge the informational requests the Plaintiff made to them, and which they have a contractual

obligation to respond to, as outlined in Defendant Dartmouth College's Student Handbook, and

43. The Dartmouth College Student Handbook states that members of the College who are accused of misconduct and asked to participate in a COS hearing can request to have the date of their hearing delayed (for any reason).

44. The Dartmouth College Student Handbook states that it is the duty of the Judicial Affairs Office to process and respond to such requests for delays.

45. Plaintiff Anderson asked Mark Reed, Director of Dartmouth College Health Services, if there was any other employee of the College he could reach out to for intervention, and Mark Reed told the Plaintiff that the President of Dartmouth College and the Dartmouth College Board of Trustees were the only parties within the College's jurisdiction that could address his concerns.

46. About November 2nd, Plaintiff Anderson reached out to "ex officio trustees" Phil Hanlon (President of the College), and Chris Sununu (Governor of New Hampshire) explaining how the Defendant had clearly infringed upon a myriad of contractual obligations to the Plaintiff, and how this failure by the Defendant caused the Plaintiff harm.

47. About November 2nd, 2017, Plaintiff Anderson submitted a request to Katharine Strong, Director of the Defendant's Judicial Affairs Office, to have his scheduled hearing delayed until the Plaintiff's outstanding concerns could be reviewed by the President of the College and the Board of Trustee's

48. Strong responded to Anderson's request in an email send about November 2nd, 2017; in this email, Strong did not acknowledge Anderson's request for a delay in any way; Strong also said in the email;" I am asking that you meet with someone from Counseling and Human Development (or a practitioner approved by that office) and sign an appropriate waiver so that they can confirm your ability to engage in the process. Until you have completed this evaluation and we are notified of your ability to participate, we will not move forward."

49. On November 9th, Mark Reed told Plaintiff Anderson he might benefit from participating in a trauma recovery program, and asked the Plaintiff to sign a waiver so he could speak with other offices at the College and get more information about this program.

50. Plaintiff Anderson said he would only agree to sign the waiver if Mark Reed could assure him that, aside from Reed gathering information about the program he'd suggested for the Plaintiff, there virtually nothing else would be done on account of the Plaintiff signing the waiver.

51. Mark Reed assured the Plaintiff of this, and for this reason alone, the Plaintiff signed the waiver.

52. Later in the day on November 9th after the Plaintiff signed this medical waiver, Katharine Strong notified Plaintiff Anderson via email that as a result of him signing it, she had acquired information that made it appropriate for her to start proceeding with the Plaintiff's COS hearing process.

53. In Strong's email, she instructs Plaintiff Anderson that he must provide confirmation that he would participate in the suggested CHD treatment programs, or provide his "completed Statement of Understanding and written refusal to complete those options" by November 14th.

DARTMOUTH008880

54. Plaintiff Anderson met with Mark Reed the next day, expressing his concerns regarding why Strong had imposed this November 14th deadline on him the previous day.

55. Plaintiff Anderson also told Mark Reed that given the fact Reed would not be able to gather information about the program he'd suggested the Plaintiff participate in by November 14th, it was impossible for her to be able to reasonably expect him to commit to such a thing in writing in leu of this information.

56. Mark Reed agreed with Plaintiff Anderson's concerns, and wrote Katharine Strong an email during their counselling session.

57. Strong replied to Mark Reed's email later that day (about November 10th) saying the Plaintiff could respond to her informational request after the original deadline of November 14th, 2017, if he needed more time to gather information before he could respond.

58. On November 15th, Plaintiff Anderson wrote Strong an email to ask if there was a set-deadline to the extension she'd granted him the week before.

59. On November 16th, Strong replied by notifying Plaintiff Anderson he'd been suspended for failing to fulfill her information request by November 14th.

60. Plaintiff Anderson met with Katharine Strong on November 16th, 2017, to ask why she suspended him for not meeting a deadline she'd given him an extension on previously (in writing), amongst other things.

61. In a recorded conversation on or about November 16th, Strong confessed to Anderson that she had suspended him, at least in part, because this was the easiest way to resolve logistical problems brought about by the Plaintiff's ambiguous, undefined status with the College.

62. In this recorded conversation on or about November 16th, Strong also promised Anderson that she would answer questions and provide information about the COS hearing process which the Plaintiff had asked for a myriad of times in the weeks before this date, expressing that she both understood why it was necessary for the Plaintiff to be provided this information to proceed with his COS hearing, and that it was her duty and responsibility to provide it to Plaintiff Anderson according to the Student Handbook.

63. In a phone conversation about November 30th which Strong would not give the Plaintiff consent to record, Strong stated she was no longer willing to provide the Plaintiff any of the information she'd promised to about November 16th, and would not explain why she would not provide it to the Plaintiff.

64. About November 30th, Associate General Counsel Member Kevin O'Leary and Anne Hudak wrote Plaintiff separate emails with totally contradictory information about the Plaintiff's upcoming COS hearing, further demonstrating Defendant Dartmouth College's failure to ensure its employees and staff are adequately trained to provide the information about the College's judicial hearing process as the Student Handbook

65. Defendant Dartmouth College has also violated Title IX of the Education Amendments of 1972 by selectively enforcing its disciplinary rules and procedures to impose harsher punishments on male than female students, based on how defendant Dartmouth College handled complaints about and treated Plaintiff Mark Anderson, compared with fellow Dartmouth student REDACTED (a female comparator) who was treated differently and preferably by the College after she committed the same violations Plaintiff Anderson was separated from the College for performing, through her contract with REDACTED.

66. This comparison demonstrates how the College treats female students in similar circumstances more favorably than it treats males. This specific female comparator is mentioned here for the fact she is the only comparable case that plaintiff Anderson (who is writing this letter) is aware of that would be a good example to compare with his own; there are very probably a number of other cases that should be looked at to evaluate this claim, but all this information is privately held by defendant Dartmouth College.

67. Because of defendant Dartmouth College's failure to fulfill its contractual obligations to Plaintiff Anderson, plaintiff Anderson has experienced both severe emotional trauma & financial hardship, as well as extraordinary educational, professional, and personal losses. Furthermore, plaintiff Anderson would not have experienced any of the hardships if Defendant Dartmouth College hadn't infringed on its contractual obligations to the plaintiff by failing to act in accordance with the Dartmouth College Student Handbook and the various contractual agreements it is engaged in with the Plaintiff that are described in this letter.

<u>DEMAND FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests judgement in his favor, and against Defendant Dartmouth College as follows:

A. Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of professional and educational opportunities, and his family's unreimbursed out of pocket expenses incurred in response to these circumstances.

B. Punitive damages; on December 13th 2017, Dartmouth College employee Kristi Clemens told Plaintiff Anderson (in a phone conversation she would not allow him to record) that even if the College determined the Plaintiff's allegations – that the sole reason a sanction had been imposed upon him as a result of his College disciplinary hearing on September 21st, is that employees of the College who were responsible for ensuring the Plaintiff's hearing was performed in accordance with the rules and regulations of the undergraduate disciplinary hearing process, and the Plaintiff's rights as a member of the College, failed to do so – that the College would not implement remedies for the incredible, and permanently life-altering personal, professional, emotional, and financial hardships the Plaintiff has experienced, and which the negligent behaviors/misconduct performed by the Defendant's employee's is the sole and proximate cause of, unless the College were compelled to by a court of law.

C. Injunctive relief requiring Defendant Dartmouth college to revert all disciplinary sanctions and rulings which have been made or imposed in violation of the contractual agreement the two parties initiated about September 2014, and make accommodations to allow plaintiff Anderson to graduate from Dartmouth College in June 2018, as the plaintiff would have if defendant Dartmouth College had acted appropriately throughout the events described here. Additionally, injunctive relief measures requiring Dartmouth College to briefly appear before the Dartmouth College Board of Trustees, so he may explain his concerns and experiences before them, and have them deliberate if changes ought to be made to the Defendant

DARTMOUTH008882

Dartmouth College's judicial hearing processes and/or operating procedures based on the experiences of the Plaintiff described here.

The plaintiff respectfully requests judgement against defendant for the sum of $500,000, plus interest but accounting for costs, as restitution and compensatory damages.

November 23, 2017

Sign_____

Mark Anderson

3204, West Concord Way, Apartment 481

Mercer Island, Washington

DARTMOUTH008883