# Exhibit 39

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF NEW HAMPSHIRE

3    -------------------------------x
     JOHN DOE,                      )
4              Plaintiff,           )   19-cv-00109-SM
          vs.                       )
5                                   )
     TRUSTEES OF DARTMOUTH COLLEGE, )
6                                   )
               Defendant.           )
7    -------------------------------x

8

9                    DEPOSITION OF

10               MARK IRWIN ANDERSON

11

12                 October 24, 2019

13                   10:42 a.m.

14

15          1201 Third Avenue - Suite 4900

16             Seattle, Washington 98101

17

18

19

20

21

22

23   Reported Stenographically By:
24   Mayleen Ahmed, RMR, CRR, CRC
     WA CCR No. 3402
25   Job No.: J4578187



```
 1              APPEARANCES OF COUNSEL

 2   Plaintiff, Pro Se:

 3       MARK IRWIN ANDERSON
         4547 19th Avenue
 4       Seattle, Washington 98105

 5
     On behalf of the Defendant:
 6       SHAPLEIGH SMITH, JR.
         DINSE P.C.
 7       209 Battery Street
         Burlington, Vermont 05401
 8       ssmith@dinse.com

 9

10   ALSO PRESENT:

11   BRIAN HOLLAND, ESQ., Dartmouth College
     [Telephonically]
12
                         o0o
13

14

15

16

17

18

19

20

21

22

23

24

25
```



1      Q.   Yes.  Mark, sometime in 2017, you were

2   served with a restraining order while you were a

3   student at Dartmouth College; correct?

4      A.   Yes.

5      Q.   And sometime in May of 2017, you were

6   arrested as a result of a violation of that

7   restraining order; is that correct?

8      A.   Partially, yeah.  I guess -- well, yeah,

9   the initial alleged violation.

10     Q.   You were charged with violating the

11  restraining order; is that correct?

12     A.   Yes.

13     Q.   And you were charged in Grafton County,

14  New Hampshire; is that correct?

15     A.   I can't remember.

16     Q.   Do you have a recollection about whether

17  you ever went to court in connection with the

18  violation of that restraining order?

19     A.   I did.

20     Q.   And do you remember whether you went to

21  court in New Hampshire?

22     A.   Yes.  It was in New Hampshire.

23     Q.   And when you went to court in New Hampshire

24  because of the alleged violation of the restraining

25  order, did you testify?



1  you and the Trustees of Dartmouth College?

2      A.    You'll have to -- again, I pressed for

3  information at some point earlier on.  It was refused,

4  The request.  I plan to make that same request for

5  information in a -- yeah, a formal legal requests for

6  production soon.  After I receive that information,

7  you know, I guess those notes of the event that took

8  place more than six years ago would help refresh my

9  memory.

10     Q.    Did you understand that your conduct at the

11 college would be governed by the student handbook?

12     A.    I -- yes, I believe so.

13     Q.    I didn't hear that.

14     A.    Yes, I believe so.

15     Q.    Did you understand, when you matriculated

16 at Dartmouth College, that if you violated provisions

17 of the student handbook, you could be subject to the

18 disciplinary procedure that was set forth in the

19 student handbook?

20     A.    Yes, I understood that was a possibility.

21     Q.    Did you understand, when you matriculated

22 at Dartmouth College, that there were any other

23 documents other than the student handbook that would

24 govern any disciplinary procedures that you would be

25 subject to if you violated the terms of the student



1   on Standards hearing that Mr. O'Leary said you were

2   going to be able to present at the SOC?

3        A.   Multiple Dartmouth employees said that I

4   would be able to share, yes, including Kevin O'Leary.

5        Q.   So is your answer yes?

6        A.   Yes, I believe so.

7        Q.   I'll ask the same question with regard to

8   Rebecca Biron.

9             Do you contend that you were not allowed to

10  present material at the second Committee on Standards

11  hearing that Rebecca Biron had represented you would

12  be able to present at the second Committee on

13  Standards hearing?

14       A.   Indeed, yes.

15       Q.   Did you understand during the Committee on

16  Standards process, this is both a first hearing and a

17  second hearing, that ultimately it was the decision

18  of the chair as to what material would be allowed to

19  be introduced at the Committee on Standards hearing?

20       A.   That was -- Kevin O'Leary made that point

21  later on after he -- yeah, I'm aware there's

22  something to that effect in the student handbook,

23  yeah.

24       Q.   So you were aware that the student handbook

25  gave the chair the discretion about what could be



 1  the responsibility to be familiar with the guidelines

 2  set forth in the student handbook with regard to the

 3  Committee on Standards hearing before you went

 4  through the Committee on Standards hearing?

 5       A.   Sorry.  One more time?

 6            MR. SMITH:  Can you read that back?

 7            (Record read.)

 8       A.   I had a sense that I was expected to be

 9  familiar with the rules.

10       Q.   So you understood that the Committee on

11  Standards hearing was controlled by the guidelines

12  set forth in the student handbook; correct?

13       A.   Yes.

14       Q.   Did you say yes?

15       A.   Yes.  Yes.

16       Q.   And you were familiar with that before the

17  Committee on Standards hearing in September of 2017;

18  correct?

19       A.   Sorry.  Could I -- could I pull up on my

20  computer a full version of the student handbook, not

21  just this excerpt, and then have you repeat the

22  question?  Which I kind of spaced out on because I

23  was thinking about that.

24       Q.   You can pull up the full copy of the

25  student handbook?

1   of my head, but it was sometime at the...

2        Q.   Excuse me?

3        A.   Sometime near the very start of the spring

4   term of 2017.

5        Q.   Was it sometime in March of 2017?

6        A.   I believe so.

7        Q.   And was that served on you at the Dartmouth

8   campus?

9        A.   Yes.

10       Q.   And after that was served on you, did you

11  speak with anybody at Dartmouth about the restraining

12  order?

13       A.   Yes.

14       Q.   And who did you speak to?

15       A.   I spoke with Safety and Security; I spoke

16  with -- I think I spoke with the Hanover police; and

17  I spoke with Kristi Clemens.

18            CERTIFIED STENOGRAPHER: "Kristi Clemens"?

19            THE WITNESS:  Kristi Clemens, yes.

20       Q.   Tell me about the conversation with security.

21       A.   I don't know.  That's a traumatic time.  I

22  don't really remember.

23            CERTIFIED STENOGRAPHER:  Did you say

24  "traumatic" or "dramatic"?

25            THE WITNESS:  Traumatic.



1     A.   I cannot remember the exact date.

2     Q.   Tell me what happened at that meeting with

3  Kristi Clemens.

4     A.   At the meeting, she told me -- Kristi told

5  me that -- yeah, they had gotten the complaint, it

6  was concerning, so they decided they needed to meet

7  with me to discuss it and see what was going on.

8        At that time, I asked her if there would be

9  any further consequences regarding it.  And Kristi

10 told me that the Judicial Affairs Office had

11 reviewed -- processed and reviewed of the complaint,

12 and decided that it wasn't appropriate to raise

13 disciplinary allegations against me regarding its

14 contents.  She reassured me of that.

15    Q.   Did she say that there would be no

16 consequences as a result of this?

17    A.   She told me that it would count as a

18 warning/college reprimand, and that it wouldn't -- I

19 wouldn't have any formal disciplinary allegations

20 raised against me.  But the information would, like,

21 be on my file, I guess.

22    Q.   Did she put that in writing to you?

23    A.   No.  She told it to me in person.

24    Q.   She told that to you in person?

25    A.   Yes.



 1  restraining order; correct?

 2       A.   Yes.

 3       Q.   And that Kristi said to you that the

 4  restraining order had been reviewed by the Judicial

 5  Affairs Office; is that correct?

 6       A.   Yes.

 7       Q.   And that the Judicial Affairs Office had

 8  decided at that time that they were not going to take

 9  action as a result of the restraining order?

10       A.   Yes.  And the information in the report.

11       Q.   And the information that was underlying the

12  restraining order; correct?

13       A.   Yes.  Yes.

14       Q.   Did Kristi say that she would follow up

15  with you in writing to confirm what would happen as a

16  result of the restraining order and the underlying

17  documentation?

18       A.   Not that -- well, to the best of my memory,

19  she, yeah, delivered the decision at our meeting, and

20  I don't remember hearing after that.

21       Q.   Did Kristi ask you to undergo counseling?

22       A.   I do not remember.

23       Q.   Did she tell you that if additional

24  information was learned, that a judicial proceeding

25  could go forward as a result of the allegations in



1        A.    Yes.

2        Q.    You spoke to at least one person at

3   Security Services, correct?

4        A.    Sorry.  What was the timing?

5        Q.    This is before May of 2017 when you

6   violated --

7        A.    Yes.

8        Q.    -- the restraining order.

9        A.    Yes.  Yeah.

10       Q.    But you did not --

11       A.    I'm fairly certain.

12       Q.    But my understanding is that you did not

13   speak to anybody at the Judicial Affairs Office about

14   the restraining order prior to your violation of the

15   restraining order, correct?

16       A.    Correct.

17       Q.    And there was no written document that was

18   sent to you from the Judicial Affairs Office --

19       A.    No.

20       Q.    -- prior to your violation of the

21   restraining order saying that they would either

22   proceed with an investigation or that they weren't

23   going to proceed with an investigation; correct?

24       A.    I had not received anything in writing,

25   only the -- yeah.  The communication that has been



1  provided.  Dartmouth provided it verbally, not in

2  writing.  I believe.

3       Q.   During the meeting with Kristi Clemens, did

4  she tell you that there could be disciplinary

5  proceedings in the future if you violated the

6  restraining order?

7       A.   She told me that if I violated the

8  restraining order, then that, like, further action

9  could be -- allegations could be raised against me

10 regarding that action, and the other materials might

11 be viewed at the hearing, but they would not raise

12 allegations about those materials specifically.

13      Q.   She specifically said that to you?

14      A.   Yes.

15      Q.   So you're saying that she specifically said

16 to you that there would be no further consideration

17 or disciplinary action resulting from your actions

18 prior to the issuance of the restraining order?

19      A.   Yes.  Yes.

20      Q.   And, yet, she did not put that in writing

21 to you?

22      A.   I do not believe so.  And, you know, not

23 anticipating one would ever need such a thing, I did

24 not ask.

25              THE WITNESS:  I really have to -- I just



```
 1    have to pee real quick.  Should I just run?  I'll be

 2    like two minutes.

 3             MR. SMITH:  Yes.

 4             (Recess taken from 12:42 p.m. to 12:44 p.m.)

 5    BY MR. SMITH:

 6         Q.   Between the time that the restraining order

 7    was served on you and the date of the violation of

 8    the restraining order, did you have any further

 9    conversations with either Kristi Clemens or anyone

10    from the Judicial Affairs Office about the

11    allegations that were set forth in the restraining

12    order?

13         A.   I don't believe so.

14         Q.   And did you have any further conversations

15    with anybody else on campus about the allegations in

16    the restraining order before the violation of the

17    restraining order?

18         A.   I don't believe so.

19         Q.   Mark, at some point in time, were you

20    arrested because you had allegedly violated the

21    restraining order that had been issued against you?

22         A.   Yes.

23         Q.   When was that?

24         A.   I can't remember the exact date off the top

25    of my head.
```



Q. And were you brought to the local jail as a result of that?
A. Yes.
Q. And were you charged with violation of the restraining order?
A. I believe so.
Q. And were you released from the jail that day?
A. Within 24 hours, yeah.
Q. While --
A. I can't remember exactly what time I came in and came out. But, yeah, it was definitely less than 24 hours.
Q. And did you communicate with anybody at Dartmouth on the date that you were arrested for violating the restraining order?
A. Yes. I contacted Kristi Clemens in order -- as I was stuck out at the jail and did not have the means of getting back. I called her, and she said that there was no other option than to get a friend to drive me. So I -- yeah, one of my closest friends borrowed a car and got me.
Q. So did you get your friend to come get you and bring you back to campus?
A. Yes.



1     A.    Though I'm hesitant to confirm dates off

2  the top of my head, that sounds accurate.

3          (Exhibit 4 marked for identification.)

4     Q.    I'm going to show you what has been marked

5  as Exhibit 4, Mark.  I'll ask you to review that

6  document.

7          (Witness reviewing document.)

8     A.    Okay.

9     Q.    And were you notified on that date, May 10,

10  2017, that you had potentially violated the standards

11  set forth in the student handbook at Dartmouth?

12     A.    Yes.  The letter states:

13          "[I]t is alleged that on or about May 4,

14     2017, you communicated with parties in violation

15     of the restraining order...."

16          And then it goes on to say:

17          "This continued contact in violation of

18     the restraining order, if true, would be

19     violation of Standards II and VI."

20          Did you review this letter?

21     A.    I reviewed it to some extent.

22     Q.    What do you mean you reviewed it to some

23  extent?

24     A.    I did not conduct a review of the

25  information in the initial report from, about, March.



1   materials I was provided?

2        Q.   Well, that's actually different than what I

3   asked you.  So you're saying that your understanding

4   of what you would have to address in the Committee on

5   Standards hearing was the allegations that were made

6   in Exhibit 4?

7        A.   Pardon me if this isn't answering your

8   question, then you can repeat it.

9             The allegations material and the packet

10  that I was provided, I believe, described the

11  allegations that the JAO had raised against me on or

12  about May 4th when it was alleged that I violated the

13  restraining order.

14       Q.   Did you review -- actually, did you respond

15  to the allegations?

16       A.   Yes, I believe I did.

17            (Exhibit 5 marked for identification.)

18       Q.   I'm showing you what's been marked as

19  Exhibit 5.  Do you want to take a moment to review

20  that?

21            (Witness reviewing document.)

22       A.   Yeah.

23       Q.   On the last page of Exhibit 5, it appears

24  to be dated September 11, 2017, and it has your

25  signature; is that correct?



1    A.    Yes.

2    Q.    So did you fill this out?

3    A.    Yes.

4    Q.    And you denied both allegations; is that

5 correct?

6    A.    At the advice of my adviser, I denied both

7 allegations.

8    Q.    And this particular document says that

9 Kristi Clemens was going to be your adviser?

10    A.    Yes.  As was reflected in my answer to a

11 previous question, although you are free to ask for

12 someone to be your adviser, the college ultimately

13 has the ability to decide who they make available to

14 be your adviser.  In this choice, Ann Hudak was

15 essentially chosen for me.  I did not know her at

16 all.

17    Q.    Down at the bottom of page 1, under "Type

18 of Hearing," it reads:

19        "I understand that I have been charged

20     with an offense that (if I am found responsible)

21     could merit a suspension or separation from the

22     College and that my case will therefore be

23     referred to Committee on Standards or an

24     individual hearing officer for adjudication and

25     imposition of a penalty."



1    disciplinary proceeding was finished?

2         A.   I do not believe so.  And that didn't end

3    up being the case, I guess.

4         Q.   Are you saying here today that you were not

5    told in May of 2017 that you would need to complete

6    your disciplinary process before you could be

7    reenrolled in Dartmouth?

8         A.   Sorry.  Repeat.  I missed the date.

9         Q.   Did you understand that before you could

10   start taking classes again at Dartmouth in the fall

11   of 2017, that you would need to complete the

12   disciplinary process in the Committee on Standards

13   hearing?

14        A.   That was not apparent to me at the time --

15   at the very start of the fall term.  However, I do

16   remember -- actually, that's all.

17        Q.   Keep going.

18        A.   That's all.

19             (Exhibit 7 marked for identification.)

20        Q.   Mark, I'm going to show you what's been

21   marked as Exhibit 7.  Is that an email exchange

22   between you and Katharine Strong?

23        A.   Yes.

24        Q.   And in that email exchange, were you told

25   by Katharine Strong that you would not be able to



1  register for classes until you -- in the fall term

2  until you resolved the disciplinary hearing?

3       A.   Yes.   That's what the email states.

4  However, the -- yeah, the disciplinary -- the

5  disciplinary hearing was scheduled as soon as

6  reasonably possible; so...

7       Q.   But at least in May of 2017, you were told

8  that until such time as the disciplinary hearing was

9  scheduled and concluded, you would not be able to

10 reenroll for classes at Dartmouth; correct?

11      A.   Yes, that's what it says.

12      Q.   And you had an understanding of that during

13 the summer of 2017?

14      A.   Let's see.  During the summer of 2017, I --

15 by virtue of the fact that I had to be on campus in

16 order to participate in the judicial hearing and that

17 it was happening as soon as possible in the term,

18 yeah, I guess.  By the time the start of the fall

19 term had come around, I had -- this was not in my

20 mind.

21      Q.   You understood, though, that if you wanted

22 to reenroll in classes at Dartmouth, that you would

23 have to resolve the disciplinary charges that had

24 been lodged against you?

25      A.   I knew that in order to remain enrolled, I



 1  would certainly have to undergo a COS hearing, and,

 2  you know, where the allegations which had been raised

 3  against me would be evaluated.

 4       Q.   Now, Mark, if you could look at Exhibit 6.

 5  Have you had chance to look at Exhibit 6?

 6       A.   Yes.

 7       Q.   And that exhibit is a letter to you from

 8  Adam Knowlton?

 9       A.   Adam Knowlton-Young.

10       Q.   Young.

11       A.   I believe.

12       Q.   And it notified you of the hearing date for

13  the Committee on Standards; correct?

14            (Witness reviewing document.)

15       A.   Yes, it seems so.

16       Q.   And so your hearing date was scheduled for

17  September 21, 2017; correct?

18       A.   Yes, it seems so.

19       Q.   And you were notified of the people who

20  would be members of the Committee on Standards;

21  correct?

22       A.   Yes.

23       Q.   Did you have an objection to any of the

24  people who were to serve on the Committee on

25  Standards?



1    Q.   Well, let me ask you this, Mark.  You had

2    had the opportunity to review the student handbook

3    prior to your disciplinary hearing on September 21,

4    2017; correct?

5    A.   Uh-hmm.

6    Q.   Yes?

7    A.   Yes.

8    Q.   And did you understand that there was a

9    certain period of time within which you were allowed

10   to object to the people who had been named to the

11   Committee on Standards?

12   A.   I believe.

13   Q.   And you chose not to object to the people

14   who had been assigned to the Committee on Standards;

15   correct?

16   A.   I believe so, yeah.  Though, again, I'm

17   hesitant to go on the record and say anything,

18   like --

19   Q.   What is that?

20   A.   I'm hesitant to go on the record and say,

21   like, definitively that I certainly thought this, you

22   know, given that it was, like, multiple years ago.

23   Q.   Let me ask you this:  Did you know anybody

24   on the Committee on Standards that was identified to

25   you on September 11, 2017?



1        A.    I had no previous interactions or knowledge
2   of the individuals --
3        Q.    And is that also --
4        A.    -- in the Committee.
5        Q.    -- true of the chair?
6        A.    Yes.
7        Q.    All right.  So at least as of September 21,
8   2017, you had no reason to object to the people who
9   had been named to the Committee on Standards or the
10  Committee chair; is that correct?
11       A.    Yes.
12             (Exhibit 8 marked for identification.)
13       Q.    Mark, I'm showing you what's been marked as
14  Exhibit 8.
15       A.    This is my personal copy of --
16       Q.    Yes.  I gave you a personal copy as well.
17       A.    Is this a -- oh, yeah.  Okay.
18       Q.    Exhibit 8 is a letter that was sent to you,
19  a packet that was sent to you on September 19, 2017
20  from Lori Welch at the Office of Judicial Affairs,
21  and it includes a case packet.  Did you receive that
22  case packet?
23       A.    I believe so.
24       Q.    Had you asked for any materials to be
25  included in the case packet prior to September 19,



1  random individuals who had -- or random advisers who

2  had virtually no obligation to assist me and, you

3  know, whose go-to response, as Kristi Clemens said,

4  would be to tell me, "No, you should go with Anne

5  Hudak."  You know, basically, I had already attempted

6  it once, and they told me, "No, go with your assigned

7  adviser."  So, yeah.

8       Q.   But you had an adviser who you could talk

9  to through the proceeding at the Committee on

10 Standards?

11      A.   I had a college-assigned adviser who gave

12 me -- who prior to my hearing gave me advice, and

13 then would later go on to lie about her previous

14 statements.

15           I really have to use the bathroom again.

16 Sorry.  Do you want me to go right now or do you have

17 any more questions you want to ask me real quick?

18      Q.   I have more questions I'd like to ask.

19      A.   Okay.  I'll wait a couple of minutes.

20      Q.   You had the opportunity to present your

21 side of the story at the hearing on September 21st;

22 correct?

23      A.   I was given the opportunity to respond to

24 the allegations which had been raised against me.

25 And, again, I was specifically told to respond to



1  those allegations and not speak about any matters

2  other than the specific, yeah, alleged violations.

3       Q.   Were you asked during the September 21,

4  2017 hearing about any of the emails that you had

5  sent to the person who had been the complainant

6  against you prior to the restraining order going into

7  place?

8       A.   I was asked questions about those emails.

9       Q.   And did you answer questions to that?

10      A.   I attempted to, yes.

11      Q.   You attempted to?

12      A.   Yes, I attempted to.

13      Q.   How long did the hearing take?

14      A.   I could not provide you a time estimate.

15      Q.   Was there any information that you had

16  hoped to provide at that hearing that you weren't

17  able to on September 21, 2017?

18      A.   Well, on account of me being -- tried for

19  different allegations than those raised against me in

20  advance of the hearing -- sorry.  Repeat the question

21  one more time?

22      Q.   Was there any information that you had

23  hoped to provide at the September 21, 2017 hearing

24  that you were not able to provide?

25      A.   It's a difficult question to answer because



1  I was presented one set of allegations; I was tried

2  for a different allegation.  So I wasn't able to

3  provide all of the information that I would have

4  provided if the allegation I was found guilty of --

5  which wasn't raised in advance of the hearing -- had

6  been raised.

7         But, again, do you have one more question

8  you want to ask real quick?

9      Q.   Go.

10        (Recess taken from 2:25 p.m. to 2:29 p.m.)

11  BY MR. SMITH:

12     Q.   Mark, you participated in a Committee on

13  Standards hearing.  When did you learn of the

14  decision of the Committee on Standards?

15     A.   I can't recall the exact date off the top

16  of my head.  Oh.  Oh.  That I received the Committee

17  on Standards decision?  I believe it was the day

18  after the hearing.

19     Q.   And how was the decision communicated to you?

20     A.   It was at that time communicated to me

21  verbally.

22     Q.   Who communicated it to you?

23     A.   The chair of the hearing.

24     Q.   Excuse me?

25     A.   Daniel Nelson.



1  people in the room.  I don't remember what each

2  individual person was doing.  But, you know, I

3  couldn't tell you if, like, any individual in the

4  room, like, said any particular thing, for the most

5  part at least.

6      Q.   Did you give a final statement at the

7  Committee on Standards hearing?

8      A.   Yes, I believe so.

9      Q.   And did you do that after consulting with

10  your adviser?

11      A.   I did that after the question period.  Yes,

12  I did.

13      Q.   What did you say in your final statement,

14  if you recall?

15      A.   I can't -- I think it would be more

16  appropriate for you to refer to the recording than

17  for me to try to, you know, piece together for you.

18      Q.   You have heard the recording that was made

19  by the school at your hearing; correct?

20      A.   I do not believe that I have listened to

21  the recordings of the actual hearings.  But, again,

22  I'm not, like, absolutely certain.

23      Q.   Were they made available to you?

24      A.   They have been made available to me.

25      Q.   And you don't remember listening to them?



1  privately at any point in time during the hearing?

2      A.   I was not in the room for the majority of

3  the time that they were all together.  And, again, I

4  don't remember, of -- there would be like ten people

5  in the room; I could not tell you who spoke directly

6  to who.  It was a traumatic event, and it happened a

7  very long time ago.

8      Q.   So your -- so you were found to have

9  violated Standard II of the student conduct --

10  Standard II of the standards of conduct of the

11  Dartmouth community; correct?

12      A.   As a result of my initial hearing in

13  September 21, 2017, the Committee imposed a sanction

14  of expulsion upon me, and stated that this was

15  because I had violated Standard of Conduct II.

16          (Exhibit 11 marked for identification.)

17      Q.   Mark, Exhibit 11 is a letter from Katharine

18  Strong to you dated September 22, 2017.

19          Was that a notification that you had

20  violated Standard of Conduct II, and that you would

21  be separated from the school effective immediately?

22      A.   It was a notification that that was the --

23  well, I'll read it.  The letter states:

24          "This is an official notification that

25      following your hearing on September 21, 2017, a



1       panel" -- "a panel of the Committee on Standards

2       has found that you violated College Standard of

3       Conduct II when you had repeated contact

4       targeted at an individual.  The Committee made

5       no finding regarding the allegation that you had

6       violated Standard VI on or about May 4, 2017.

7       Based on these findings, you have been separated

8       from the college effective immediately."

9           Q.   Were you told that you had the opportunity

10   to request a review of that decision?

11          A.   The letter states:

12               "As you know, you have the right to

13       request review of the panel's decision.  If you

14       wish to do so, your request must be in writing

15       and must set forth the specific grounds for

16       reconsideration."

17          Q.   Did you discuss with Katharine Strong the

18   possibility of a request for review?

19          A.   Yes.

20          Q.   And did you have that conversation before

21   September 29th of 2017?

22          A.   I would rather not speculate as to the

23   exact date of my conversation.

24          Q.   I can't hear you.

25          A.   I would rather not speculate as to the



1    exact date of the conversation in September of 2017.

2         Q.   Did you talk to your adviser about seeking

3    review of the decision?

4         A.   Yes.  I met with my adviser for -- I

5    believe I at least attempted to meet with my adviser

6    for a consultation on -- out of my request for

7    review.  Although, she refused on several instances,

8    I believe.

9         Q.   I need you to speak up louder.

10        A.   Although, she refused to meet with me on

11   several instances, if I recall.

12        Q.   Did Dartmouth fly your parents out to meet

13   with you and to go home with you after this decision?

14        A.   They did do that.

15        Q.   And did you refuse to travel with your

16   parents back to Seattle?

17        A.    I did not refuse, but I elected not to

18   return home with my parents on account of the fact

19   that -- yeah.

20        Q.   Did you understand that you would not be

21   allowed to remain on campus during the time period

22   that you were seeking review of the decision?

23        A.   This was communicated to me.

24        Q.   This was what?

25        A.   I was told this, yes.



1      Q.    Mark, did you seek review of the decision?

2      A.    Yes.  I sought review of the decision of

3  the Committee.

4      Q.    Were you given an extension of time within

5  which to seek review of the decision?

6      A.    I believe so.

7            (Exhibit 12 marked for identification.)

8      Q.    Mark, you have Exhibit 12 in front of you.

9  Is that your request for review?

10     A.    It would appear so.

11     Q.    Did you submit this on October 4, 2017 to

12  the Office of Judicial Affairs, if you remember?

13     A.    That, I can't remember the exact date.  But

14  somewhere around then at least, I think.

15     Q.    Did you present all of the material that

16  you wanted to in your request for review to Rebecca

17  Biron?

18     A.    I don't know.  It's -- yeah, it's kind of

19  unbearable to read.  And I was under so much stress

20  at that specific period, I -- I have a particularly

21  hard time recollecting.

22            CERTIFIED STENOGRAPHER:  "I have a" --

23  what? -- "hard time recollecting"?

24     A.    I have a particularly hard time

25  recollecting the days following my expulsion.



1   correct?

2        A.   At a new hearing, there would be a decision

3   about whether or not I -- the new set of allegations

4   raised against me were true.

5        Q.   Let me state it a different way.

6             The review was granted by Dean Biron of the

7   initial decision, your request for review was granted;

8   correct?

9        A.   That's what the letter states.

10       Q.   Yes.

11       A.   However, those are not my words.

12       Q.   Your new -- strike that.

13            Did you receive a new allegation letter

14   after your request for review was granted?

15       A.   After the request for review was granted, I

16   was handed a new allegation letter with allegations

17   that were materially different in substance than

18   those which had been raised against me in advance of

19   my first hearing.

20       Q.   And you were told that you would have a

21   Committee on Standards hearing for those allegations;

22   right?

23       A.   That's what I was told, yes.

24       Q.   And you were going to have a new Committee

25   on Standards hear that, those allegations, correct?



1    I'll just be restating what I said before.

2         Q.   Did Dean Hudak continue to be your adviser

3    when you received that new --

4         A.   Dean Hudak --

5         Q.   -- October 26, 2017 allegation letter?

6         A.   She continued to be my adviser.

7              (Exhibit 15 marked for identification.)

8         Q.   Mark, I'm going to show you what's been

9    marked as Exhibit 15.  Excuse me.

10             This is a letter dated October 27, 2017

11   from Katharine Strong that provided you with the

12   allegation letter as well as the Statement of

13   Understanding of Student Rights in Disciplinary

14   Matters, and a letter that was sent to your parents.

15             Did you receive this document on

16   October 27, 2017?

17        A.   I believe I received it at about that time.

18        Q.   And it set forth the allegations that were

19   being made against you; correct?

20        A.   It set forth the new allegations which

21   Dartmouth had chosen to raise against me.

22        Q.   Which Dartmouth what?

23        A.   Which Dartmouth was now raising against me.

24        Q.   Did you understand that you needed to

25   complete the form and send it back to the Office of



1  my case.  They had refused to answer it.

2          Mark Reed told me that any reasonable

3  person in my situation would not be mentally fit to

4  participate in a COS hearing at the date provided.

5  And so he delayed it, basically.  Yeah, he called

6  them to delay it.  And it became complicated in that

7  Katharine Strong told Mark Reed that I would be given

8  so much time to fill out the thing.  And then,

9  inexplicably, would then later on go to impose a

10  sanction upon me for -- for not meeting a deadline

11  that she had extended.

12          Q.  Mark, while this second proceeding was

13  pending, did you understand that you were still not

14  to enroll in class at Dartmouth?

15          A.  During the second proceeding?  Yeah.

16          Q.  Excuse me?

17          A.  Yes.

18          Q.  So you understood that until the

19  judicial -- or until the proceedings were resolved,

20  you were not going to be permitted to enroll in

21  campus -- or in classes; correct?

22          A.  Yeah.

23          Q.  And during that period of time, were you

24  also to not live on campus?

25          A.  No.  I was not to.



1       Q.    Excuse me?

2       A.    I was not supposed to live on campus.

3       Q.    So you understood as of the initial

4    allegations that were made in May of 2017, that until

5    they were resolved, one, you couldn't enroll in

6    classes and, two, you weren't allowed to live on

7    campus; correct?

8       A.    Yeah.

9       Q.    And during that fall -- strike that.

10            And you also understood that campus

11   included your fraternity; right?

12      A.    I mean, the fraternities are privately

13   owned, so not necessarily.  Yeah.  I was told not to

14   stay in my own fraternity.  Although, yeah -- yeah.

15      Q.    So you understood, until the allegations

16   were resolved, you weren't to enroll in classes, you

17   weren't to live on campus, and you weren't to live in

18   your fraternity; correct?

19      A.    That is what Kristi Clemens had instructed,

20   yes.

21      Q.    In May of 2017; correct?

22      A.    Yes.

23      Q.    Add during the fall of 2017, you violated

24   that by living at your fraternity house; isn't that

25   correct?



1      A.   Well, it was -- I had to go there to get

2   belongings and whatnot.  But I did live there to some

3   extent.  But, primarily, to the extent I could, I did

4   not.

5      Q.   So you stayed at Bones Gate, which was your

6   fraternity, throughout much of the fall of 2017,

7   including part of September of 2017 and October of

8   2017; correct?

9      A.   I couldn't recall the exact dates.

10      Q.   But you spent at least some nights at Bones

11   Gate in September and October of 2017; correct?

12      A.   September and October?  I'm not totally

13   sure.

14      Q.   Did you have a room that had been assigned

15   to you at Bones Gate in September and October of

16   2017?

17      A.   I did, yeah.

18      Q.   And did you stay in that room at least some

19   nights of September and October of 2017?

20      A.   I'm not sure exactly when I stayed there.

21   But I'm sure I had to stay there at some point when

22   it wasn't possible for me to stay the -- yeah, when

23   it was just logistically impossible for me to stay

24   anywhere else.

25      Q.   Where else were you staying in September



1      Q.   Did you understand that the extension was

2  contingent on you taking a medical leave from

3  Dartmouth?

4      A.   Yes.  However, and the reason that...

5           I'm not sure if I agree with the premise,

6  yeah, given the circumstances to full -- time of your

7  question.

8      Q.   Let me ask you this:  Was there a

9  recommendation made to you that you should take a

10 medical leave from Dartmouth College?

11     A.   That was recommended to me, yes.

12     Q.   And was that a recommendation that was made

13 by Mark Reed?

14     A.   That recommendation was made by Mark Reed,

15 yes.

16     Q.   And did you understand that if you took a

17 medical leave from Dartmouth College, that you would

18 be granted an extension of time for the disciplinary

19 proceeding arising out of the allegation letter dated

20 October 27, 2017?

21     A.   One more time?

22          MR. SMITH:  Can you read that back?

23          (Record read.)

24     A.   I believe that was expressed to me, yes, by

25 at least Mark Reed.



1          Q.    And did you understand that if you declined

2    to take the medical leave, that the disciplinary

3    proceeding would move forward?

4          A.    Yes.

5          Q.    And did you decide not to move forward with

6    the medical leave?

7          A.    Yes, I did decide that.  All...

8                I remember there was some confusion around

9    it.  I was interested, but then he told me something

10   about it and it seemed not good.  And I think he was

11   going to look at other options or something.  And,

12   then, while he was looking at other options -- yeah.

13         Q.    At any point in time, were you notified

14   that your Committee on Standards hearing would move

15   forward?  Let me actually rephrase that.

16               (Exhibit 16 marked for identification.)

17               THE WITNESS:  I'm going to run to the

18   bathroom real quick?

19               (Recess taken from 3:22 p.m. to 3:29 p.m.)

20   BY MR. SMITH:

21         Q.    You have Exhibit 16 in front of you, right,

22   Mark?

23         A.    I do.

24         Q.    On December 8, 2017, were you notified that

25   you would be required to attend the Committee on



1  Standards hearing on Monday, January 8, 2018?

2        A.   Yes.

3        Q.   And were you told who would sit on your

4  Committee on Standards hearing?

5        A.   I was not given an accurate list of the

6  individuals who would go on to serve.

7        Q.   Well, let me break that down.

8             The Committee chair identified in this

9  letter, dated December 8, 2017, was designated as

10  Dean Liz Agosto.  And she was not the Committee chair

11  on your January 8, 2018 hearing; correct?

12        A.   That's correct.

13        Q.   And the person who was the Committee chair

14  at that hearing was Katharine Burke; correct?

15        A.   Yes.

16        Q.   And you weren't notified about that until

17  the day of the hearing; is that correct?

18        A.   Until, literally, the start of the hearing,

19  yes.

20        Q.   The other members of the Committee on

21  Standards did not change; is that right?

22        A.   I believe that is correct.

23        Q.   Okay.  So the chair changed, but the people

24  who would make the decision about the violation and

25  what the penalty for that violation would be did not



1   change; correct?

2          A.   Repeat the -- repeat the question?

3          Q.   The members of the Committee on Standards,

4   the ones who would make the decision about whether

5   there was a violation and then would make a decision

6   about what the sanction would be did not change from

7   December 8th to January 8th when your hearing

8   actually occurred?

9          A.   If one does not consider the Committee

10  chair to be a part of that group, it would make that

11  statement correct.

12               (Exhibit 17 marked for identification.)

13         Q.   Showing you what's been marked as

14  Exhibit 17.  It is a letter dated January 4, 2018,

15  written by Adam Knowlton-Young, who is the assistant

16  director of judicial affairs.

17               Did you receive that packet on January 4,

18  2018, Mark?

19         A.   I think so.

20         Q.   Let me direct your attention to --

21         A.   "The information at" -- yes.  It looks like

22  it.

23         Q.   So page 4 of the packet, you admitted on

24  that page that you had violated --

25         A.   Page?  Oh.



1      Q.   -- the Dartmouth Standard of Conduct II; is

2  that correct?

3      A.   Yes.

4      Q.   Did you understand that you were admitting

5  that allegation?

6      A.   I understood -- yes.  Yeah, at the

7  suggestion of my adviser.

8      Q.   Who is that?

9      A.   Anne Hudak.

10     Q.   And why did she suggest that you should

11  admit that?

12     A.   Because she said the other option

13  definitely didn't work the other time.

14     Q.   And did you disagree with her about that?

15     A.   Well, the new allegations, I -- you know, I

16  do admit that the messages I did send prior to the

17  spring term, a period in which the new allegations

18  encompass, were, you know, inappropriate.

19     Q.   Would you agree that those communications

20  were harassing behavior targeted at an individual?

21     A.   Restate the question?  Could you be more

22  specific?

23     Q.   I said, would you agree that the

24  communications in January, February, and March of

25  2017 constituted harassing behavior targeted at an



1   individual?

2        A.    I mean, it was -- yeah, at some points, yes.

3        Q.    And so while Dean Hudak recommend that you

4   admit the allegation, you yourself would admit that

5   the allegation was true; correct?

6        A.    Well, it's difficult to say in that the

7   material was reviewed, what does or does not

8   constitute a sanctionable violation of the standards

9   of conduct, or one where they're raising an

10  allegations against a student is -- there is

11  information not made available to the students that

12  would -- that is required to understand those things.

13            According to the Judicial Affairs Office

14  and the people responsible for conducting the

15  school's disciplinary procedures, the individuals

16  that reviewed the complaint on the date it was

17  received, these actions, were not a violation of the

18  standards which would -- well, I guess they -- you

19  know, again, I was told it was the equivalent of,

20  like, a warning.  So it is a violation of the

21  standards, but not to the extent that would warrant

22  expulsion.

23        Q.    So let me go back to my question, which

24  was: While Dean Hudak recommended that you admit the

25  allegations, you also would agree that the



1   of that determination; right?

2        A.   No.  Other than -- no.

3        Q.   In this packet, it appears that you

4   provided information to the Committee on Standards;

5   is that correct?

6        A.   I attempted to provide information, but the

7   vast majority of them was omitted.

8        Q.   Well, this was part of the case packet?

9        A.   Sorry?  "This" being?

10       Q.   Excuse me?

11       A.   "This" being Dartmouth 17?

12       Q.   Look at Exhibit 17.  On the third page of

13  Exhibit 17 --

14       A.   Yeah.  This is the -- these are the -- I

15  think these are the excerpts, yep.

16       Q.   And so those are materials that you asked

17  to be included in the packet; correct?

18       A.   This was a fraction of the materials which

19  I submitted to be shown to the COS.

20       Q.   Do you know whether they were shown to the

21  COS?

22       A.   These are the pages that Dartmouth's

23  administrators determined I would be allowed to show

24  the COS.

25       Q.   Did you understand that the chair had the



1   subjected to to the COS.

2          When I presented Burke with this

3   information, I also had to make sense of the fact,

4   that, yes, the handbook stipulates that the -- that

5   the chair is responsible for evaluating that

6   information.  In my case, the chair did not evaluate

7   the information.

8          I asked her to evaluate the information.

9   She said that she would not.  I gave her -- at her

10  request, I forwarded her an email from Dartmouth's

11  general counsel member who was responsible for

12  overseeing disciplinary affairs, and, according to

13  him, ensuring that the college's employees obey its

14  own policies.  I can't remember where I was.

15      Q.  So if I understand it correctly, as

16  permitted under the student handbook, Dean Burke

17  declined to allow certain materials to be considered

18  by the Committee on Standards even though you had

19  requested that the materials be submitted; is that

20  right?

21      A.  No.

22      Q.  You're saying -- if I understand your

23  testimony, Mark, you're saying: I wanted certain

24  materials to be presented to the Committee on

25  Standards, and Dean Burke did not allow me to present



1    those materials?

2         A.    That is correct.   I wanted to share

3    information, and she would not let me share that

4    information.

5         Q.    And she had the discretion to do that; is

6    that not correct?

7         A.    I do not -- I'm not sure if I would agree

8    with that assessment.

9         Q.    The student handbook gives the authority to

10   the chair to decide what materials would be submitted

11   to the Committee on Standards and what materials

12   won't be; isn't that correct?

13        A.    Yes.

14        Q.    Did you proceed with the hearing on

15   January 8, 2018?

16        A.    I believe so, yes.

17        Q.    And were you informed on January 9, 2018,

18   that you had been found to violate the standards of

19   conduct at Dartmouth?

20        A.    Yes, I believe so.

21        Q.    Were you informed that the decision by the

22   Committee on Standards had been to separate you from

23   the college effective immediately?

24        A.    I believe so.

25              (Exhibit 18 marked for identification.)



1   wrote giving feedback on how Dartmouth was processing

2   the complaint, which I feel is, you know, pretty --

3   pretty good evidence.

4        Q.   Mark, were you given an opportunity to

5   request a review of the January 8, 2018 decision by

6   the Committee on Standards?

7        A.   I was given the opportunity to submit one.

8        Q.   And did you?

9        A.   I was told to write it to Dean Rebecca

10  Biron, which is problematic.  I wrote it to her, and

11  David Kotz reviewed it instead.

12            (Exhibit 19 marked for identification.)

13       Q.   Is that 19?

14       A.   I believe so.

15       Q.   Mark, is Exhibit 19 your request for review?

16       A.   I believe so.  With some other documents

17  included.

18       Q.   Are those documents that you did not provide?

19       A.   No.

20            (Witness reviewing document.)

21       Q.   Have you seen that document before?

22       A.   No.

23       Q.   I don't think that was actually supposed to

24  be attached to this, so I'd ask for it back.  Those

25  were not supposed to be attached to that.



1      A.   I am compelled to return this?

2      Q.   Yes.

3      A.   (Witness complying.)

4      Q.   Mr. Anderson, you made a request for

5   review; is that correct?

6      A.   Yes.  Yes.

7      Q.   And you received a response to that; right?

8      A.   Yes.

9           (Exhibit 20 marked for identification.)

10      Q.   Is Exhibit 20 the response to your request

11   to review?

12      A.   Yes.

13      Q.   Do you understand that that request to

14   review was made by David Kotz?

15      A.   Yes.

16      Q.   And that was denied; correct?

17      A.   Correct.

18      Q.   Now that you have a copy of the student

19   handbook, can you identify the specific provisions of

20   the student handbook that you allege were violations

21   or breaches of contract?

22      A.   Sorry.  One more time?

23      Q.   You now have copies of the student

24   handbook.  Can you now identify specific provisions

25   of that handbook that were breached by Dartmouth?



 1       Q.   That was your complete answer?  Okay.
 2  Fine.  My apologies.
 3            Mark, you have a claim that you were
 4  discriminated as a result of your gender, correct, in
 5  the case?
 6       A.   Yes.
 7       Q.   And that's the only discrimination claim
 8  you're making in this case; correct?
 9       A.   Yes.
10       Q.   You say that you were treated differently
11  than two other female students who are accused of the
12  same conduct violations; is that correct?
13       A.   Yes.
14       Q.   Can you identify those students?
15       A.   I can.  I guess this is a private -- is
16  this like public?
17       Q.   Well, you know those students?
18       A.   So, yeah, I've been told that #1
19  #1          , and I don't know if it's #2             or
20  her sister.
21       Q.   And tell me what the allegation was against
22  #1             .
23       A.   Well, these are, like, some of the only --
24  you know, students don't have access to any
25  information regarding previous.  But according to her



1  ex-boyfriend, ███████████████, stating -- the guy's

2  name is ████.  And he broke up with her, and she is

3  persistently, like, stalking him.  So either the

4  college or the state gave her an order to not make

5  contact with him again.

6           So then she perpetrated a rouse by which

7  she pretended that she was her mom and was speaking

8  to the ex-boyfriend, pretending that she was her own

9  mom trying to, like, compel him to make contact with

10  her again by -- yeah.  I can give you more detail if

11  you'd like.

12           CERTIFIED STENOGRAPHER:  Did you just say:

13  "I can give you more detail if you'd like"?

14           THE WITNESS:  Yes.

15           CERTIFIED STENOGRAPHER:  Okay.

16      Q.  Do you know whether she was sent an

17  allegation letter as a result of this conduct?

18      A.  I do not believe she was.

19      Q.  Do you know whether it was reported to the

20  Office of Judicial Affairs?

21      A.  It was reported to the school, which the

22  Judicial Affairs investigates all incoming

23  information.  Right?

24      Q.  Do you know whether she was charged with

25  violating a restraining order?



1    A.   I'll have to wait till the file is shared

2  in the discovery process to get back to you with more

3  details on that.

4    Q.   Well, you made a specific allegation in the

5  complaint.  Do you have an understanding of whether

6  that happened or not?

7    A.   Oh, she was -- I know that she was ordered

8  not to make contact in some official capacity.  I'm

9  not sure exactly what official capacity that was.

10    Q.   But you don't know whether she was found to

11  have violated a restraining order?

12    A.   I -- yeah, I'm not totally certain.

13    Q.   And do you know whether Dean Biron had

14  anything to do with deciding whether she would be

15  found to have violated the code of conduct for

16  Dartmouth?

17    A.   Sorry.  One more time?

18    Q.   Do you know whether Dean Biron had any

19  involvement with the investigative process in

20  determining whether a violation letter would be sent

21  to ?

22    A.   I do not know the -- it is impossible for

23  me to know such specifics of other people's dealings,

24  you know, private, protected dealings with the

25  college.  It is what I've heard, yeah, which is,

```
 1   again, the only source of information available, you
 2   know, virtually anywhere.
 3        Q.   Who provided this information to you?
 4        A.   The boyfriend.
 5        Q.   Do you know who was the other student that
 6   you identified?
 7        A.   His name is #3    .
 8        Q.   Excuse me?
 9        A.   His name is #3    .
10        Q.   But who was the other female student that
11   you said was treated differently than you?
12        A.   Oh, I know of a girl in my grade by the
13   last name #2     , I believe, who wrote about it
14   openly.  Like she was mad at her boyfriend after he
15   broke up with her, so she went to, like, vandalize
16   his car.  Yeah.
17        Q.   Do you know whether she was investigated by
18   the Judicial Affairs Office?
19        A.   I'm not sure.
20        Q.   Do you know whether anybody reported it to
21   the Judicial Affairs Office?
22        A.   That much is not known to me.
23        Q.   So do you have any understanding of whether
24   she received any sanctions as a result of her conduct?
25        A.   It would appear that she did not.  However,
```



1    I do not know with certainty the details of other

2    people's disciplinary processes with the college or

3    lack thereof.

4         Q.    Do you know whether she made any threats of

5    physical harm to her former boyfriend?

6         A.    I'm not privy to their conversations, no.

7         Q.    And the same question with regard to #1

8    #1           .  Do you know whether she made any threats

9    of physical harm to her former boyfriend?

10        A.    She -- not that she would harm him, but

11   that she would harm herself, I guess.

12        Q.    Do you know whether she threatened to

13   expose any nude pictures of her former boyfriend?

14        A.    I do not believe that was an element of the

15   case.

16             CERTIFIED STENOGRAPHER:  That was?

17             THE WITNESS:  I do not believe that was an

18   element of the case.

19        Q.    And with regard to #2        , Ms. #2        , do

20   you know whether she threatened to expose any nude

21   pictures of her former boyfriend?

22        A.    I do not believe that was the case.

23        Q.    What is your basis other than an article

24   that Dean Biron wrote, that you were discriminated

25   against as a result of your sex?



1   ███████ ?

2        A.   I do not know the details, precise details

3   of █████████ ' disciplinary record, or lack

4   thereof, at Dartmouth College at this point.

5        Q.   So you're purely speculating that Katharine

6   Strong had any involvement with any investigation

7   that might have occurred with regard to ████

8   ██████ ?

9        A.   Oh, well, the student handbook states --

10   well, I'm speculating that on this occasion she

11   abided by the student handbook which states the JAO

12   director will review all determinations regarding

13   student behavior.

14        Q.   Well, you're speculating first that there

15   was an investigation of Ms. ██████ , right?  You

16   don't know that to be true; correct?

17        A.   I don't know if they decided it was worthy

18   or appropriate to raise an investigation.  I don't

19   know what conclusion the JAO came to.

20        Q.   You don't know even whether they considered

21   it; correct?

22        A.   No.  No.  Again, I do not know the details

23   of virtually -- like, I do not know the details of

24   virtually any other disciplinary case other than my

25   own with absolutely certainty as is the case of



```
 1   virtually every Dartmouth community -- members of the

 2   Dartmouth community regarding other people's

 3   disciplinary cases, just because of the school's own

 4   policy which prevent you from accessing that

 5   information; and necessitate, if you are to do such

 6   analysis, as I am, that you must get information from

 7   people who are, you know, willingly providing it.

 8        Q.   And with regard to Ms. #2       , you don't

 9   have any specific information with regard to any

10   consideration of her conduct by the Judicial Affairs

11   Office; correct?

12        A.   My previous statement applies to that as

13   well.

14        Q.   And so the answer is yes?

15        A.   To the extent that my previous answer would

16   imply; so...

17        Q.   So actually, the answer is, no, you do not

18   have any specific information with regard to any

19   investigation that the Judicial Affairs Office has

20   done of any conduct involving Ms. Donald; correct?

21        A.   Yes.  As is true for every member of the

22   Dartmouth community.  Due to the college's own

23   policies, it is virtually impossible for anyone to

24   have the knowledge you were describing, you know,

25   with absolutely certainty unless, for some reason --
```



1  | which I don't think anyone has ever published their
2  | own disciplinary records.  So, yeah, so the question
3  | doesn't really make sense to me.
4  |     Q.   Mark, you make a claim for negligent
5  | infliction of emotional distress in your complaint.
6  |         Can you identify for me the physical
7  | symptoms that you've experienced as a result of the
8  | negligent infliction of emotional distress?
9  |     A.   Yes.  Exactly what point in time are you
10 | referring to?
11 |     Q.   Why don't we take from September of 2017 to
12 | January of 2018?  So the beginning of September 2017
13 | to the end of January 2018.
14 |     A.   Wait.  The end of December 2017?
15 |     Q.   No.  Beginning of September 2017 to the end
16 | of January 2018.  Can you identify for me the
17 | objective physical symptoms that you experienced as a
18 | result of the alleged negligent conduct of Dartmouth?
19 |     A.   Yes.  I could not eat; I could not sleep;
20 | my heart hurt all the time.  Yeah, I -- yeah.  I had
21 | to -- yeah.  I was, like, also stuck inside like a
22 | small, dark room not able to leave.
23 |     Q.   Other than Mark Reed, were you treating
24 | with any health care provider, medical doctor, or
25 | nurse practitioner from the beginning of September



Page 158

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF NEW HAMPSHIRE

3    _____

4    MARK ANDERSON,                    )
                                       )    Case No.
5               Plaintiff,             )
                                       )    1:19-cv-001109-SM
6          vs.                         )
                                       )
7    TRUSTEES OF DARTMOUTH COLLEGE,    )
                                       )
8               Defendant.            )
     _____

9

10                         DEPOSITION OF

11                 MARK I. ANDERSON, VOLUME II

12

13                      December 9, 2019

                             10:24 a.m.
14

15                 1201 Third Avenue, Suite 4900

16                 Seattle, Washington 98101

17

18

19

20

21

22

23

24

25              Eva P. Jankovits, CCR No. 1915

Page 159

1                    APPEARANCES OF COUNSEL

2

   Plaintiff, Pro Se:

3

        MARK I. ANDERSON
4        4547 19th Avenue
         Seattle, WA  98105

5

6   On Behalf of the Defendant:

7        SHAPLEIGH SMITH, JR.
         DINSE, P.C.
8        209 Battery Street
         Burlington, VT  05401
9        802.864.5751
         ssmith@dinse.com

10

         CHRISTOPHER P. MCGOWN (via telephone)
11       Wadleigh Starr & Peters, PLLC
         95 Market Street
12       Manchester, NH  03101
         603.669.4140

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 160

 1                      INDEX OF EXAMINATION

 2

 3        WITNESS:  MARK I. ANDERSON

 4        EXAMINATION                              PAGE

 5        BY MR. SMITH                              161

 6

 7
                        INDEX TO EXHIBITS
 8
          DEFENDANT'S        DESCRIPTION          PAGE
 9
          Exhibit No. 21   1-page e-mail.  Bates No.    170
10                         DARTMOUTH004386

11

12

13                    PREVIOUSLY MARKED EXHIBITS

14        NO.   DESCRIPTION                        PAGE

15              (No exhibits marked for identification.)

16

17

18

19

20

21

22

23

24

25
```

**MARK I. ANDERSON VOLUME II**  **December 09, 2019**
ANDERSON vs TRUSTEES OF DARTMOUTH COLLEGE

Page 191

1   would happen.

2       Q.  Did Kristi Clemens communicate to you that if

3   you violated the restraining order that disciplinary

4   action could be taken against you?

5       A.  I -- I believe that she represented to me that

6   if I violated the restraining order, then that subsequent

7   action could be subject to disciplinary allegations or

8   procedures.

9       Q.  Can you tell me the specific words that she

10  used communicating to you?

11      A.  To any questions where you're asking for

12  specific words in an event that happened over six months

13  ago, my answer is going to be I -- I cannot give you an

14  answer under oath that I could be, you know -- yeah.  I

15  think it's sort of an exceptional ask to give the exact

16  wording of the substance of the conversation.

17          MR. SMITH:  Can you read that back for me?

18          THE WITNESS:  Do you know how much time we

19  have?

20          MR. SMITH:  What's that?

21          THE WITNESS:  Do you know how much time we have

22  left?

23          MR. SMITH:  At least an hour.

24          THE WITNESS:  An hour, okay.

25          MR. SMITH:  At least an hour.