# Exhibit 40

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE



\* \* \* \* \* \* \* \* \* \* \* \* \*

JOHN DOE                                        \*

       v.                                      \*

TRUSTEES OF DARTMOUTH COLLEGE                    \*

\* \* \* \* \* \* \* \* \* \* \* \* \*



ONLINE VIDEOCONFERENCE

DEPOSITION OF KATHARINE STRONG

Deposition taken at the Hanover Inn, 2 East Wheelock
Street, Hanover, NH, on Monday, October 28, 2019,
commencing at 10:58 a.m.


Court Reporter:

Jennifer A. Vaillancourt, LCR

LCR No. 42 (RSA 310-A:161-181)



```
1   APPEARANCES:

2   For the Plaintiff:      PRO SE
                            (Present via online
3                           videoconference for his
                            questioning of Ms. Strong only.)
4
    For the Defendant:      DINSE, KNAPP & MCANDREW, PC
5                           By:  Shapleigh Smith, Esq.
                            209 Battery Street
6                           P.O. Box 209
                            Burlington, VT 05401
7                           (802) 864-5751
                            smith@dinse.com
8                                    -and-
                            WADLEIGH, STARR & PETERS, PLLC
9                           By:  Christopher P. McGown, Esq.
                            95 Market Street
10                          Manchester, NH 03101
                            (603) 669-4140
11                          cmcgown@wadleighlaw.com
                            (Local Counsel.)
12                          (Present via online
                            videoconference.)
13

14  Also Present:  Dana Scaduto, Associate General Counsel,
                   Dartmouth College
15

16

17

18

19

20

21

22

23
```



```
 1                    I   N   D   E   X

 2

 3    WITNESS:          Katharine Strong

 4

 5    EXAMINATION:                                Page

 6    By Mr. Smith                                   5

 7    By Mr. Anderson                               62

 8

 9    EXHIBITS FOR IDENTIFICATION:

10    None.

11

12

13
      (Original signature page sent to Mr. Smith.)
14

15

16

17

18

19

20

21

22

23
```



```
 1                      KATHARINE STRONG
 2                having been duly sworn by
 3                Ms. Vaillancourt, was deposed and
 4                testified as follows:
 5                      EXAMINATION
 6  BY MR. SMITH:
 7       Q.   Ms. Strong, could you state your full name
 8  for the record.
 9       A.   My name is the Katharine Strong.
10       Q.   Could you tell me your current position.
11       A.   I'm director of Community Standards and
12  Accountability at Dartmouth.
13       Q.   And how long have you been in that position?
14       A.   I've been in that position three-and-a-half
15  years.
16       Q.   Okay.  Could you describe the roles and the
17  responsibilities of that position.
18       A.   My job is to manage the Office of Community
19  Standards and Accountability.  I have a staff of three.
20  We manage all response to -- of the College to
21  undergraduate student misconduct.
22       Q.   Okay.  So does that mean that you oversee the
23  disciplinary process for students?
```



1        A.   My office does, yes.

2        Q.   And could you generally take us through that

3    disciplinary process.

4        A.   Yes.  So we review reports from across campus

5    on a daily basis.  We look at those reports to see

6    first if they concern the behavior of undergraduate

7    students.  If not, we set them aside.  We then look at

8    those reports that concern the behavior of

9    undergraduate students and determine whether or not

10   there has been a possible or an alleged violation of

11   the standards of conduct.  If the answer's "no," we set

12   them aside; if the answer is "yes," we use a two-part

13   test.  One, is there -- in the past, has a similar

14   violation resulted in a student's removal from the

15   college?  If the answer is "yes," we begin the serious

16   misconduct process, which will go before the

17   Committee on Standards.  If the answer to that question

18   is "no," we prepare to have an administrative hearing

19   which will not interrupt a student's time at Dartmouth.

20       Q.   Who are the people that review the reports

21   that you just identified?

22       A.   By and large, it's the four of us in the

23   office.



1      Q.    Okay.  And who are those people?

2      A.    So Adam Knowlton Young is the assistant

3  director for the office, Hayley Racine is our case

4  coordinator, and Adelle Marie Cloutier is our office

5  manager.

6      Q.    Are where do the reports that you're

7  reviewing come from?

8      A.    They come from a variety of sources.

9  Security, UGA reports, reports sent to the college by

10  other investigative bodies, other college security

11  groups, sometimes other police departments.  Faculty.

12  Students can submit reports online.  That's mainly it.

13      Q.    So do you review these reports on a daily

14  basis?

15      A.    Daily.

16      Q.    And you do a screen at that time as to

17  whether the report will be entered into a disciplinary

18  process?

19      A.    Yes.

20      Q.    Okay.  If there is a decision or an initial

21  decision to move forward with the judicial process,

22  what do you do to initiate that process?

23      A.    So in either case, serious misconduct or



1  administrative-level response, we begin by sending the

2  student a letter notifying them that we have received

3  the report and what the next steps will be with the

4  office.

5      Q.   Is it typical that that will be the student's

6  first report that they may have to have an interaction

7  with the judicial process?

8      A.   Yes.

9      Q.   How is that communicated to the student?

10      A.   Usually, via our Maxient software.  Which

11  sends the student an e-mail.  The letters are form

12  letters we've written before that we fill in the

13  relevant information, review the letter, make sure

14  there's no typos or inconsistencies, and then send via

15  Maxient.

16      Q.   Let's focus on -- did you describe it as

17  serious misconduct?

18      A.   Um-hum.

19      Q.   Let's focus on that area.

20      Take me through the process once an e-mail is

21  sent to the student through Maxient.

22      A.   So the -- our current process?

23      Q.   Yes.



1        A.   The student receives an e-mail letting them

2    know that we have received a report and would like to

3    talk with them about next steps.  They're invited to

4    either call the Office, make an appointment;

5    occasionally, we have them check their student schedule

6    and make an appointment that seems convenient to their

7    schedule.  They're also welcome to ask for all of the

8    material we're reviewing ahead of that conversation.

9            Many students do ask for that, and so what

10   they will receive is what we call the allegation

11   letter, which outlines, you know, what we have

12   received, what our next steps are, what is included in

13   the rest of the e-mail.  The next thing they receive is

14   a statement of understanding in which we outline the

15   student's rights in the process as well as write out

16   the actual alleged violations of the standards of

17   conduct --

18        Q.   Slow down.

19        A.   -- and give the students an opportunity to

20   respond.

21           After that, we would include any reports that

22   we have received or relevant information that we have

23   reviewed that have brought us to believe there is a



1   potential violation of the standards.

2           And then for serious misconduct, we do -- I

3   send a letter home to parents.  It does not outline the

4   behavior.  It does say:  This is what we have.  This is

5   what we're responding to.  It could possibly impact

6   your student's time at Dartmouth.  We'd encourage you

7   to be in contact with them.

8       Q.   So as an initial matter, a student will

9   typically receive an investigation letter; is that

10  right?

11      A.   Um-hum.  The students can request to receive

12  that whole packet at once, prior to meeting with us.

13      Q.   Prior to meeting with you?

14      A.   Um-hum.

15      Q.   And that's how it works now?

16      A.   Um-hum.

17      Q.   Is that right?

18      A.   (Witness nods head.)

19      Q.   Is that similar to the way that the process

20  worked in March of 2017?

21      A.   Yes.

22      Q.   Okay.

23      A.   With some changes to letters over time.



1      Q.   Okay.  And is -- what is the purpose of the

2  investigation letter?

3      A.   To give official notification to the student

4  about what the College is responding to.

5      Q.   Okay.  And what is the purpose of the

6  statement of understanding?

7      A.   To, again, give official notification but to

8  then receive the student's response within five

9  business days or seven calendar days.

10     Q.   When you send this statement of understanding

11 to the student, do you notify the students that there

12 is a set amount of time within which to respond?

13     A.   Yes.

14     Q.   And is the student also notified that they

15 will have access to an adviser?

16     A.   Yes.

17     Q.   And who makes a determination as to who the

18 adviser will be?

19     A.   The student.

20     Q.   Does the Judicial Affairs Office offer

21 candidates to be the adviser?

22     A.   Not specific people.  We encourage students

23 to consider their undergraduate dean, as someone who



1   frequently goes through the process.  That's the office

2   we most often work with.  But a student can choose any

3   Dartmouth staff, faculty, or student to be their

4   adviser, and we will work with anyone they choose.

5       Q.   When is the student given an opportunity to

6   review materials that may have given rise to the

7   allegation letter?

8       A.   Upon receipt of the allegation packet.

9       Q.   Okay.  What happens after the statement of

10  understanding is returned to the Judicial Affairs

11  Office by the student?

12      A.   So we look over the statement of

13  understanding to see how the student has responded,

14  determine what our next steps will be regarding what

15  type of hearing.  We then look at our calendar and see

16  if we can find time to schedule it.  We try to use the

17  next available hearing that works with both the

18  student's schedule and the office's schedule.

19      Q.   Um-hum.  Does the Judicial Affairs Office

20  work with the student to ensure that the hearing is one

21  that the student can attend?

22      A.   We work with the student's schedule and then

23  reach out to the student to confirm the date and time



1  that we have chosen based on their class schedule.  We

2  don't allow -- or, nor, don't generally make an

3  exception for things like athletics or student

4  extracurricular commitments, but we do not pull

5  students out of class for hearings.

6          Q.    Okay.  How does the Judicial Affairs Office

7  prepare materials for a Committee on Standards hearing?

8          A.    So when we receive the student response, we

9  begin what we call the draft case packet by taking out

10  of the allegation packet the item we sent and putting

11  in the student's filled-out version of that statement

12  of understanding.  Student are provided with a date by

13  which they need to present any information they would

14  like considered for inclusion in the packet.  We then

15  take whatever information is provided, review that with

16  the hearing chair, who makes the ultimate decision

17  about what does or doesn't get included in the packet.

18  We add a table of contents and take out the parent

19  letter, as it is irrelevant to the decision of the

20  Committee that the College reached out to the parent.

21  And then the packet is sent to the hearing chair for

22  final review.  And once the hearing chair okays it, it

23  is then sent to the Committee and is sent to the



1    student for them to have prior to the hearing.

2        Q.   And where are the rules that apply to the

3    Committee on Standards hearing and the entire process

4    located?

5        A.   The student handbook.

6        Q.   Are students provided with a copy of the

7    student handbook?

8        A.   Students have access to the student handbook

9    online.  When a student comes through our office, -- I

10   don't know at the time of this particular case which we

11   were operating.  We did, at one point, provide a paper

12   copy of the student handbook.  We have moved over to

13   providing links to the student handbook online and

14   allowing for a paper copy if requested by the student.

15       Q.   Do you know whether the students are ever

16   asked to confirm that they have reviewed and understood

17   the terms of the student handbook in writing?

18       A.   I can only speak to our process.  In our

19   process, when the student responds on the statement of

20   understanding, it includes that they have been notified

21   where information about the process is, and they are

22   confirming that notification.  And I do not ever ask

23   them to confirm if they have read the handbook.



1    Q.   How does the chair for the Committee on

2  Standards hearing get assigned?

3    A.   So at the start of every term, we collect the

4  schedules of our faculty members, our student members,

5  and our staff members, as well as our chairs.  And then

6  based on their availability, we complete an entire term

7  schedule, trying to be equitable in how we utilize the

8  time that our chairs, faculty, staff and students have

9  provided to us.

10    Q.   Okay.  Who sits on a Committee on Standards?

11    A.   For a Committee on Standards hearing, we

12  would have a hearing chair, who is a nonvoting member;

13  then two members of the faculty; one administrator or

14  staff member; and two students.

15    Q.   And how are the members of the Committee on

16  Standards chosen?

17    A.   Faculty members are appointed via the dean of

18  the faculty.  I believe through a lottery system.  They

19  have to be tenured in order to be on the Committee.

20  They're appointed for a two-year term, of which they

21  serve two terms out of every year.

22        Students have the option to nominate or be --

23  self-nominate or be nominated in the fall.  And we



1   review applications and check judicial records and

2   generally invite students to be a part of the Committee

3   that way.  Students can also be elected by their peers

4   in the spring.

5          Staff members are appointed by the president,

6   and that appointment is termless.  It just continues on

7   until the staff member is no longer available, retires,

8   or leaves the college.

9      Q.   And how are the individual members that will

10  sit on a Committee on Standards hearing chosen for a

11  particular hearing?

12     A.   The best way to describe it would be at

13  random.  It is scheduling 60 people into 20 hearings

14  over the course of a term based on their individual

15  availability.  We try to make sure there's a balance of

16  gender, there is a balance of background, but we can't

17  always guaranty that, depending on the availability of

18  the Committee members.  We do the best we can, but by

19  and large, I would describe it as random.

20     Q.   What is the Chair's responsibility for a

21  Committee on Standards hearing?

22     A.   The Chair is responsible to review and

23  approve the packet before it goes out to the Committee.



1  The Chair is responsible to ensure that the Committee

2  hearing follows all of the standard operating

3  procedures.  The Chair participates in questioning, and

4  the Chair facilitates deliberation.

5        Q.   But the Chair is not a voting member; is that

6  right?

7        A.   The Chair is not a voting member.

8        Q.   What is the Judicial Affairs Office's

9  responsibility during a hearing?

10       A.   Our responsibilities are similar, but we

11 don't question.  So we are there to ensure that the

12 standard operating procedures are followed.  We're also

13 there to make sure everyone has a packet, everyone has

14 access to the water or snacks they might need, that if

15 people need access to different rooms or private

16 spaces, that we're facilitating that access.  We run

17 the voice recorder in the hearing.  So that's our

18 responsibility.  And we are watching the clock, to make

19 sure we are taking breaks at regular intervals.  And as

20 we sit in on the majority of hearings, between Adam and

21 I, we're looking to ensure equity across the hearing

22 experience.  So hearing chairs do sit in, but there are

23 five of them and two of us.  We have a more conclusive

1  view of making sure people are treated in the same way.

2  Also, we're not asking questions, but we are listening

3  or we may suggest to a hearing chair a rephrasing of a

4  question, if we hear something that sounds like it may

5  present the impression of bias or may be implicitly

6  biased.  Or if a question goes outside the scope of

7  what the Committee should be reviewing, we might call

8  that to the attention of the hearings officer.  We're

9  an extra pair of ears but not there to make any

10  judgment or offer any information that would be

11  relevant to the case.

12      Q.   Does the Judicial Affairs Office assign more

13  than one person to a hearing?

14      A.   No.

15      Q.   And does the person that's assigned by the

16  Judicial Affairs Office participate in the hearing and

17  the deliberative process?

18      A.   Yes.

19      Q.   And if there is a finding of responsibility,

20  will the Judicial Affairs Office employee also be

21  present during the sanctioning process?

22      A.   Yes.

23      Q.   The Judicial Affairs Office employee does not



1   have any voting rights; is that correct?

2        A.    That is correct.

3        Q.    Other than you, who has responsibility at the

4   Judicial Affairs Office for overseeing a judicial

5   proceeding?

6        A.    Adam Knowlton Young.

7        Q.    And is it just the two of you?

8        A.    It is.

9        Q.    What happens once a decision of the

10  Committee on Standards has been made with regard to

11  responsibility?

12       A.    So if a Committee finds a student responsible

13  for one or any combination of allegations that have

14  been brought forward, we would disclose to the

15  Committee, as they entered into a sanctioning

16  conversation, the judicial history of the student,

17  whether they have been before the Committee before,

18  whether there's any relevant administrative hearings

19  that should play in or could play into their decision

20  making, and then precedence for the Committee for

21  similar findings of responsibility.

22             No cases are the same, and so we can't offer

23  directive based on the same case before, but we can



1  what sanctions will be issued after a finding of

2  responsibility?

3       A.    The Committee on Standards.

4       Q.    And does it have to be a unanimous vote?

5       A.    It does not.

6       Q.    And what happens after a decision has been

7  made to find responsibility and a decision has been

8  made with regard to sanctions?

9       A.    The Committee is thanked for their time and

10  dismissed.  The hearing chair -- well, let me -- after

11  a decision is made, the hearing chair may ask if

12  there's anything the Committee members specifically

13  want delivered to the student.  So "Any closing notes?"

14  "Anything you'd like me to put?"  Some hearing chairs

15  may confirm they have written down the important parts

16  for their rationale.  Some hearing chairs, I think,

17  don't feel they need to rehash what they have already

18  written down.  I mean, I think that's a preference

19  thing.  Then the Committee is thanked and dismissed for

20  the evening.  The hearing chair then goes to write up

21  the rationale for the decision and the case note for

22  the decision and prepares to meet with the student the

23  following day.  We try to have students meet with them



1  within 24 hours of the end of the hearing so that the

2  student's not left wondering what the outcome was.  And

3  that meeting is held with the student's adviser and

4  their undergraduate dean, if that's a different person.

5      Q.   And so I think you just answered my question,

6  but who notifies the student of any decision of the

7  Committee on Standards?

8      A.   So traditionally, it is the hearing chair and

9  a meeting with the student, their undergraduate dean,

10  and the, at times, their adviser, if that's different

11  and the student chooses to have them present.  I think

12  we leave it to the hearing chair as to whether or not

13  additional people would be in the room at the start.

14  And then we'll work with those people over the course

15  of a meeting.  Occasionally, I have had a hearing chair

16  who has been unwell, and I have gone and delivered the

17  outcome.  But it is most often the chair.

18      Q.   Okay.  We have talked about the process for

19  the Committee on Standards hearing and various people's

20  involvement.   What is the role of the adviser

21  throughout this process?

22      A.   The role of the adviser is to be an impartial

23  support to the student.  To listen to how the student



 1  is preparing to enter into the hearing.  To review a

 2  student's statement and offer feedback.  The adviser is

 3  not an advocate, so it is not someone speaking on

 4  behalf of the student, but it may be someone who helps

 5  connect the student with the relevant or appropriate

 6  person to get a question answered.  Often, advisers

 7  provide an emotional support for students, as well, as

 8  they're going through the process.  But that is mainly

 9  their role, is to help the student prepare.

10      Q.   Once the decision has been made, communicated

11  to the student, what is the next step in the process,

12  if any?

13      A.   So the student is notified of when the

14  sanction will be enacted, whether immediately or

15  whether at the end of a review period.  The student has

16  the opportunity to request review.  A request for

17  review can be based on one of two things.  The first

18  being a procedural error during their COS hearing.  So

19  that could be leading up to the hearing and our work

20  with our office during the hearing itself.  Or new

21  information not readily available at the time of the

22  hearing that has relevance to whether or not the

23  student would have been found responsible.  They have

1  generally seven days to submit that.  And that is sent

2  with the case packet and any other relevant case

3  materials to a review officer outside of our office who

4  takes a look at what the student has brought forward,

5  takes a look at what materials are in the case packet

6  or are in the overall case documents, and determines

7  whether either of those two thresholds have been met.

8      Q.   And how is a decision communicated once the

9  request for review has been considered by the dean or

10  the designee?

11     A.   Generally, requests for reviews are delivered

12  via e-mail by the review officer, unless there is a

13  concern for the impact it may have on a student whether

14  emotionally or whether we're trying to connect the

15  student with resources to get through the next steps.

16  In which case, the review officer can designate whom

17  they wish to deliver that.

18     Q.   And once the decision has been communicated

19  by the reviewing officer, is there any further step

20  that a student can take if the request for review has

21  been denied?

22     A.   No.  The process at that point has ended.

23  The College has followed its administrative processes,



1   and there is no further appeal.

2        Q.   What happens if the request for review is

3   granted?

4        A.   When a request for review is granted, we

5   follow what the review officer has requested as the

6   next step.  So at times, this means adjusting a

7   sanction.  At times, this might mean having another

8   hearing.  We would be taking our lead from the review

9   officer and start whatever the -- we've been directed

10  to do based on our normal process.

11       Q.   Ms. Strong, when a student has received an

12  allegation letter, and it's at the end of a term, and a

13  hearing can't be held during that term, what does the

14  College do with regard to the student's enrollment

15  status for the next term, pending a hearing?

16       A.   So we would put a judicial hold on the

17  student's account, which would not allow them to check

18  in for the next term, and we would schedule them for

19  the first available hearing in the following term, if

20  they were needing a full COS hearing.  For a student

21  who's admitting to behavior, who we can't fit in before

22  finals, we would do a -- if they requested a one-on-one

23  hearing, we would do that during the interim.



1   resolved.  So if it's a behavioral concern, they can't

2   return until there's been a judicial hearing and a

3   determination of responsibility.  If there are other

4   concerns around wellness or health, that is outside of

5   my purview.

6       Q.   Okay.  With regard to the effect of a

7   decision not to pursue an allegation letter based on a

8   report that you have received, what is the impact of

9   that decision?  In other words, is it considered an

10  adjudication?

11      A.   No.

12      Q.   And -- okay.  Ms. Strong, when did you first

13  learn about Mark Anderson?

14      A.   We received a report in March of 2017

15  regarding a protective order that had been put in

16  place.  And that was the first time I was aware of

17  Mark Anderson, to my knowledge.

18      Q.   So you were not aware, at least at that time,

19  of him having any previous involvement with the

20  Judicial Affairs Office?

21      A.   Not off the top of my head.

22      Q.   Okay.  And how did you learn about

23  Mr. Anderson?



1      Q.    Do you have a recollection of whether

2   Kristi Clemens reached out to Mark Anderson?

3      A.    My memory says she did.

4      Q.    And do you have a recollection of whether she

5   reported back with regard to her reaching out to

6   Mark Anderson?

7      A.    My memory is that she did.

8      Q.    And after she reported back, did the group

9   consider whether the restraining order necessitated the

10   sending of an allegation letter?

11      A.    I think that we determined, in fact, I know

12   that we determined at that time that we did not have

13   enough information to move forward with allegations at

14   that time.  That the restraining order had been put in

15   place outside of the work of our campus colleagues, and

16   we were not going to be investigating further because

17   it wasn't an on-campus or campus-related issue.  And so

18   we were not going to pursue allegations, but should

19   more information become available, we would review

20   again.

21      Q.    Okay.  At some point in time, did you learn

22   that there had been a violation of the restraining

23   order?



1       A.    In May of 2017.

2       Q.    Okay.  Do you have a recollection of when in

3  May of 2017?

4       A.    It, again, came in on the activity log, and I

5  don't recall the exact date.

6       Q.    And with regard to the receipt of the

7  original restraining order, do you have a recollection

8  of what term you received that information?

9       A.    I do not.

10       Q.    Okay.  When you received the information

11  about the violation of the restraining order, what did

12  you do?

13       A.    So we reviewed all of the available

14  information regarding that incident, which included an

15  arrest of a student, which would be a violation of

16  Standard 6 of the Dartmouth Standards of Conduct, and

17  that arrest been based on continued harassment of a

18  student -- of another person who had taken out a

19  protective order.  And in reviewing the behavior that

20  brought on the protective order, the behavior that was

21  a violation of the protective order and the arrest, we

22  determined it was appropriate at that point to move

23  forward with allegations, based on the totality of the

1   information.

2        Q.   And who made that decision?

3        A.   I can -- none of us makes a decision in a

4   vacuum.  Me, but in consultation with colleagues.

5        Q.   Who wrote the allegation letter that was sent

6   to Mr. Anderson after the -- there was a decision to

7   pursue the allegations?

8        A.   I believe it was signed by Adam.  It is a

9   form letter.  And we both would have reviewed it before

10  sending.

11       Q.   Was there a discussion about the allegations

12  that would be made in the allegation letter?

13       A.   There always is.

14       Q.   And the two of you reviewed the allegations

15  that were made in that letter before it was sent?

16       A.   We did.

17       Q.   And does that allegation letter get sent with

18  other materials?

19       A.   Yes.

20       Q.   And it was sent with other materials?

21       A.   To my knowledge.

22       Q.   What happened after the allegation letter was

23  sent to Mr. Anderson?



1      A.    My memory is that he did meet with Adam.

2   They had a conversation about next steps.  Fairly

3   standard interaction regarding a student case.

4      Q.    Was Adam the person that was assigned to be

5   the point for the Judicial Affairs Office for the

6   proceeding with Mr. Anderson in May of 2017?

7      A.    Adam was available at the time that

8   Mr. Anderson wanted to come in.  I don't think that I

9   would describe any of our work flow as assignments or

10  directives.  If I had been available when Mr. Anderson

11  was available, I would have met with him.

12     Q.    Okay.  Do you know what happened after Adam

13  met with Mr. Anderson?

14     A.    At some point, we were either contacted by

15  Mr. Anderson or his dean regarding a request to delay

16  having a hearing until the outcome of the arrest could

17  be determined.

18     Q.    Okay.  Along with the allegation letter, was

19  there a statement of understanding that was sent to

20  Mr. Anderson?

21     A.    There was.

22     Q.    Do you know whether Mr. Knowlton Young

23  reviewed that with Mr. Anderson?



1        A.    I do not.

2        Q.    Are you aware whether Mr. Anderson returned

3   the statement of understanding letter to the Office of

4   Judicial Affairs?

5        A.    He -- I don't recall.

6        Q.    Do you remember in May of 2017 having any

7   conversation with Mr. Anderson's assigned adviser?

8        A.    His chosen adviser?

9        Q.    Yeah, excuse me, his chosen adviser.

10       A.    I'm sure I spoke to Mr. Anderson at some

11  point about his request to delay.

12       Q.    Were you the one who considered his request

13  for delay?

14       A.    I would have considered it in consultation

15  with colleagues.

16       Q.    And what was the decision that was made with

17  regard to the request --

18       A.    That it was a completely average request.

19  That we were going to permit him to delay a hearing

20  until the outcome of his arrest was determined, but

21  that he would be told he could not return to campus

22  until his judicial matter was resolved.

23       Q.    What was the basis for telling Mr. Anderson



1   that he couldn't return to campus until the matter was

2   resolved?

3       A.   So the request was at his -- was made by him.

4   There was not a delay on the part of the College.  And

5   we would have moved forward with the hearing in the

6   summer when he was not registered to be here anyway.

7   And so because we were delaying based on a schedule we

8   did not know, what we said was:  You can delay, but

9   we'll need to resolve this before you return.

10      Q.   Okay.  And that was communicated to

11  Mr. Anderson?

12      A.   Yes.

13      Q.   And did he acknowledge that he understood

14  that was the case, that he needed to resolve this

15  before he returned to school?

16      A.   I believe he communicated -- that was

17  communicated to him by Adam and Ann.  And I believe he

18  did acknowledge, but I was -- I don't recall being in

19  on those exchanges.

20      Q.   Was there any activity with regard to

21  Mr. Anderson's allegation letter during the summer term

22  of 2017?

23      A.   Only to say that we were awaiting -- in our



 1  weekly reviews of cases -- pending cases, we were

 2  awaiting notification from him that he was ready to

 3  move forward.

 4      Q.    And at some point in time, did Mr. Anderson

 5  return to Hanover to attend the hearing for the

 6  Committee on Standards?

 7      A.    No.

 8      Q.    No.   That was not phrased well.

 9           What happened in the fall term of 2017 with

10  regard -- strike that.

11           When did Mr. Anderson return to participate

12  in the allegation process?

13      A.    Mr. Anderson returned to campus, my

14  understanding with the intention of going to class, at

15  the start of the fall term, 2017.  He interacted with

16  our office at our request.

17      Q.    And what happened?

18      A.    We had notified him he needed to resolve

19  before coming to campus.  He came to campus without

20  doing so.  Adam and I met with him in person.  Notified

21  him that we were concerned that he had come back to

22  campus without resolution of his judicial case.  And

23  that there was concern that he was not following the



1   directives of college officials, and that that was

2   problematic.  And that there was an immediate temporary

3   suspension under consideration.  And if he could help

4   us to understand why he was on campus, having not

5   resolved his judicial case, that would help us to fully

6   participate in that conversation.

7       Q.   And what did Mr. Anderson do in response to

8   the concerns that you raised?

9       A.   Mr. Anderson expressed that he had been

10  unaware that he needed to resolve his judicial concerns

11  before coming to campus.  He was distraught about the

12  possibility of having to go home and concerned -- he

13  let us know his lawyer was supposed to send a letter to

14  the office explaining what the outcome of the State

15  case was.  We had not received that.  And so we let him

16  know we had not received that.  But he was seemingly

17  lost in the process in a way that was unexpected to

18  myself.

19      Q.   After that meeting, did you schedule a

20  hearing for the Committee on Standards?

21      A.   We did.

22      Q.   And did that hearing take place?

23      A.   It did.



1        A.   He still had a judicial hold.

2        Q.   Judicial hold.  Okay.

3             What was your role at the hearing in

4   September of 2017?

5        A.   So my role was to help facilitate a hearing.

6   I operated the voice recording machine and ensured that

7   all members of the hearing had the case packets and any

8   other items that they needed.  Pens, pads, water,

9   snacks.  I ensured that there were private meeting

10  spaces for the student and the adviser and that we

11  followed our standard operating procedure throughout

12  the hearing.

13       Q.   Was there anything that Mr. Anderson asked be

14  included in the hearing that he was not allowed to

15  present?

16       A.   I don't recall.

17       Q.   Were you involved in the deliberation process

18  after the hearing occurred?

19       A.   I was present for the deliberation process.

20       Q.   Do you have any recollection of participating

21  in the deliberation process?

22       A.   I do not.

23       Q.   Once there was a decision made by the



1  Committee on Standards to find responsibility for the

2  allegation, were you involved in the sanctions

3  decision?

4      A.   So I was present for the conversation around

5  deciding an appropriate sanction; I did not participate

6  in that conversation.  I would have, in my role as a

7  staffer for the hearing, brought forward any relevant

8  judicial history for the student and brought forward

9  any relevant precedent regarding how the Committee has

10 responded in other similar cases.

11     Q.   Do you have a recollection of whether there

12 was a prior judicial history for Mr. Anderson?

13     A.   I don't recall.

14     Q.   Was the decision regarding sanctions one that

15 was made by the members of the Committee on Standards?

16     A.   Yes.

17     Q.   And you did not have a voting role in that

18 sanctions decision; is that correct?

19     A.   That is correct.

20     Q.   And you did not make any recommendations with

21 regard to the sanctions; is that correct?

22     A.   That's correct.

23     Q.   All right.  After the decision was made by



1   therefore, she determined that he should be given a new

2   hearing with a new committee and, in the intervening

3   period, that he should not be on campus and not be

4   enrolled.

5       Q.   Okay.  Once the review letter was received by

6   the Judicial Affairs Office, what did the

7   Judicial Affairs Office do next?

8       A.   In consultation with colleagues, we

9   determined that we were concerned about sending a

10  review letter that did not permit Mark to be on campus

11  to him.  We weren't entirely sure where he was.

12  What -- like, we were just concerned about him.  And so

13  we determined that delivering that information in

14  person, with the ability for his dean to be present and

15  for us to provide resources, was the safest course.

16      Q.   So was the review letter delivered to

17  Mr. Anderson in person?

18      A.   My memory is yes.

19      Q.   Who delivered the decision on the review

20  letter to Mr. Anderson?

21      A.   My memory is that I did.

22      Q.   Was anybody there with you?

23      A.   His dean.



1     Q.   Once the review letter was delivered, was a

2   new allegation letter sent to Mr. Anderson?

3     A.   I believe it was provided at the same time as

4   the review outcome.

5     Q.   Who was that allegation letter drafted by?

6     A.    It would have been drafted in consultation

7   between Adam and I, and we would have checked in with

8   other colleagues to make sure that it fully encompassed

9   what the COS was to review.

10     Q.   What was the process after the new allegation

11   letter was delivered to Mr. Anderson?

12     A.   The process would be the same as the process

13   for the first hearing.

14     Q.   Okay.  So that would mean that Mr. Anderson

15   would be given an opportunity to respond to the

16   statement of understanding?

17     A.   Um-hum.

18     Q.   And a new case packet would be prepared?

19     A.   Yes.

20     Q.   And he would be given a new Committee on

21   Standards hearing; is that correct?

22     A.   That's correct.

23     Q.   Do you have a current recollection of when



 1  allegation letter?

 2      A.   So we are working with students who have a

 3  variety of things going on.  I don't recall the reason

 4  why he gave us he wanted more time.  We would generally

 5  allow a student with a reasonable request to have more

 6  time to respond.

 7      Q.   At some point in time, did you become

 8  concerned that Mr. Anderson might not have the capacity

 9  to participate in the judicial process?

10      A.   Yes.

11      Q.   When did you develop that concern?

12      A.   Over the month of October into November.

13      Q.   Of 2017?

14      A.   2017.

15      Q.   And at some point in time, did you

16  communicate that to Mr. Anderson?

17      A.   Yes.

18      Q.   Did you also communicate that to his adviser?

19      A.   Yes.

20      Q.   And that was Dean Hudak?

21      A.   Yes.

22      Q.   Did you communicate that to Mr. Anderson in

23  writing?



1      Q.   Do you know whether she recommended to

2   Mr. Anderson that he engage in counseling?

3      A.   Not offhand.

4      Q.   At some point, did Mr. Anderson communicate

5   to you that he was considering taking a medical leave?

6      A.   I believe he did.

7      Q.   At some point in time, did you communicate

8   with Mr. Anderson that if he took a medical leave, that

9   the hearing would be suspended until such time as he

10  returned from that medical leave?

11     A.   I believe I did.

12     Q.   Do you have a recollection of whether

13  Mr. Anderson ever told you that he planned to seek a

14  medical leave?

15     A.   My recollection is that it was something he

16  was considering.  I don't know how far down that path

17  he shared with me he had gotten.

18     Q.   At some point in time, did you set a deadline

19  by which Mr. Anderson would need to tell you that he

20  was either taking a medical leave or that he was going

21  to proceed with his hearing?

22     A.   Yes.

23     Q.   And do you have a recollection of when you



1   told Mr. Anderson that he needed to make a decision one

2   way or another?

3       A.   I believe it would have been in November, as

4   we were running out of time to have a second hearing

5   during the fall term.

6       Q.   Okay.  And was it your hope to have a hearing

7   during the fall term?

8       A.   Yes.

9       Q.   And was there a particular reason that you

10  wanted to have a hearing during the fall term?

11      A.   We try to resolve things for students so they

12  can make informed decisions about their next steps.  To

13  continue to have this case open didn't seem to behoove

14  any of us.  There was no reason that I was being given

15  to not get it done in the fall term.  And so I'm aiming

16  to have it done before the close of the term.

17      Q.   And did you communicate that to Mr. Anderson?

18      A.   I think so.

19      Q.   And were you communicating that to his

20  adviser, as well?

21      A.   Yes.

22      Q.   At some point in time, did you tell

23  Mr. Anderson that because he had not told you whether



1  delivered in Dean Biron's letter, nor did it accurately

2  reflect the College's expectations about his ability to

3  enroll prior to the resolution of his hearing.  So we

4  were looking to administratively correctly identify his

5  status with the college.

6       Q.   Who ultimately was the person who made the

7  decision and wrote to communicate that decision to

8  Mr. Anderson?

9       A.   I believe it was Dean Reed.

10       Q.   Did the formalization of the immediate

11  temporary suspension impact Mr. Anderson's status on

12  campus?

13       A.   I don't believe it should have.

14       Q.   After the immediate temporary suspension, did

15  you continue to communicate with Mr. Anderson?

16       A.   My recollection is I did.

17       Q.   Okay.  Do you have a recollection of

18  communicating with Mr. Anderson about his hearing after

19  the immediate temporary suspension was enacted?

20       A.   Yes.

21       Q.   At some point in time, you removed yourself

22  from Mr. Anderson's judicial process.  Do you have a

23  recollection of when that was?



1        A.    It was the beginning of December.

2        Q.    And at that time, had any decision been made

3   by the Committee on Standards with regard to the second

4   judicial proceeding?

5        A.    You mean had a Committee --

6        Q.    At that time, a Committee on Standards had

7   not met again to consider the second allegation letter

8   that had been sent, correct?

9        A.    Correct.

10       Q.    Do you know whether a Committee on Standards

11   hearing had been scheduled at that time that you

12   removed yourself from the process?

13       A.    If it hadn't been confirmed, we were very

14   close.

15       Q.    At that point in time, had a statement of

16   understanding been returned to the Judicial Affairs

17   Office either admitting or denying the allegations?

18       A.    I don't recall.

19       Q.    Were you involved with the second Committee

20   on Standards hearing that considered the allegations

21   against Mr. Anderson?

22       A.    No.

23       Q.    Do you know who was present at that hearing?



1      A.   I know Adam staffed that hearing and that the

2  hearing chair was Kate Burke.  I don't recall who else

3  was on that hearing panel.

4      Q.   Were you involved after you removed yourself

5  from the process in preparing any documents for the

6  hearing?

7      A.   No.

8      Q.   Okay.  You weren't involved in the

9  consideration of the second hearing at all, right?

10     A.   Right.

11     Q.   Okay.  And you were not involved in

12 communicating the results of that hearing to

13 Mr. Anderson; is that correct?

14     A.   I was not involved, no.

15     Q.   Did you have any further involvement with

16 Mr. Anderson's judicial process after you removed

17 yourself from it in December of 2017?

18     A.   No.

19     Q.   Okay.

20          MR. SMITH:  Can we take a quick break?

21          (Discussion off the record.)

22          (Lunch recess taken at 12:11 p.m.)

23          (Deposition resumed at 2:05 p.m.)



```
1              MR. SMITH:  Objection.

2              You can answer.

3       A.   Based on what we had, we would have needed

4   more information to make a determination as to whether

5   or not a violation occurred, as the behavior was being

6   investigated outside of the college.  And your own

7   conversation with Kristi Clemens, as she reported back

8   to us, led us to believe there was additional

9   information that was missing.  That there was two sides

10  to the report.  We determined at that point that we

11  would not take any further action on the report as we

12  received it.  And we didn't.

13  BY MR. ANDERSON:

14      Q.   Very well.

15             You said that you needed additional

16  information in order to determine if you wanted to

17  raise allegations.  Could you describe this additional

18  information?

19             MR. SMITH:  Objection.

20             But you can answer.

21      A.   A report about someone requesting protective

22  custody -- or protective order.  We would generally be

23  wanting statements from all witnesses.  We would want
```



1  to have the ability to interview those witnesses, to

2  get a better picture of what went on.  Again, because

3  this was done well outside the purview of the college,

4  we were not going to have access to all of that

5  information, and we were not going to start an

6  investigation of our own into behavior that occurred

7  well off campus and not on another college campus.  And

8  so we did not seek more information at that time.  We

9  offered you support on campus.

10  BY MR. ANDERSON:

11      Q.   So if you had decided that the information in

12  the report alone indicated a violation that could

13  potentially justify imposing a disciplinary sanction

14  against a student, you would be able to raise

15  allegations without further information, right, if

16  there was some sort of statement made that, on its

17  face, without additional information, would justify

18  imposing a sanction?

19          MR. SMITH:   Objection.

20      A.   I would say for the type of report we

21  received regarding you, no, I would not have made a

22  decision to pursue action without additional

23  information in any case.  Had it been a report of an



1           In your mind, how does that differ from my

2   case?

3           MR. SMITH:  Objection.

4       A.    So Mark, there was less than a year between

5   the two points of review.  There was additional new

6   information that was brought to the attention of the

7   College.  And that new information made the previously

8   reviewed information appear to be more of a pattern of

9   conduct rather than one interaction.  We do not make a

10  decision to expel; we make a decision to raise judicial

11  allegations, which is what we did.  And it was the

12  Committee that made the determination about how to find

13  or not find you responsible and what, if any, sanction

14  was appropriate.  That was not an individual reviewing

15  the same information twice, at one point, not raising

16  allegations, and at one point, entering into a decision

17  on sanction; that was the Office conducting its normal

18  business using the procedures of the College

19  appropriately there.

20  BY MR. ANDERSON:

21      Q.    So your statement is that -- so there was a

22  restraining order against me.  You're saying that the

23  statement that I made in violation of the restraining



 1  officer who was present at my first hearing, it might

 2  be necessary for me to request information from you

 3  specifically to understand what occurred at my first

 4  hearing?

 5          MR. SMITH:  Objection.

 6          You can answer.

 7      A.   You were granted an entirely fresh and clean

 8  new hearing, and so the information I had to share

 9  about your first hearing was largely irrelevant.

10          MR. ANDERSON:  Sorry.  Could the court

11  reporter read my question back.

12          (The record was read as requested.)

13          MR. ANDERSON:  Okay.  Thank you.

14  BY MR. ANDERSON:

15      Q.   So, Katharine, if a student didn't understand

16  what occurred at a judicial hearing of his, if they

17  weren't able to understand how it could be in line with

18  an interpretation of the student handbook, is there any

19  way for them to figure out what went on other than

20  asking the Judicial Affairs representative who was

21  present at that hearing?

22      A.   Yeah, a student could review the recording of

23  their hearing.  A student could talk to another member



1  the College has responsibilities to comply with federal

2  law and with its own handbook.  And I am instructing

3  the witness to not answer your questions so that she

4  can comply with the law and the handbook.

5              MR. ANDERSON:  Hmm.  Okay.

6  BY MR. ANDERSON:

7      Q.   In your own words, could you explain why

8  Dartmouth initially decided to raise disciplinary

9  allegations against me and what it hoped to achieve by

10  doing this?

11             MR. SMITH:  I'm going to object to the extent

12  that it's relevant (verbatim).

13             But --

14      A.   Dartmouth received notification there had

15  been a violation of a previously enacted protective

16  order.  In reviewing that notification, we determined

17  that it was appropriate to move forward both regarding

18  a violation of state law and that, following the

19  protective order, which was enacted after a -- I'm

20  missing a word -- a grouping of conduct, that the new

21  conduct was of the same vein, continued harassment of

22  the same non-Dartmouth community members, and that this

23  was something for the Committee on Standards to



 1  consider, whether or not it rose to the level of a

 2  violation and whether or not there was an appropriate

 3  response to be given to that.

 4  BY MR. ANDERSON:

 5      Q.   Okay.  So it was -- would you say it was in

 6  order to investigate the alleged violation of a

 7  protective order that was issued against me on or about

 8  May 4?

 9          MR. SMITH:  Objection.

10          You can answer.

11      A.   I think that it was both the protective --

12  the violation of state law, the protective order, and

13  then the new conduct in the context of the previously

14  reported conduct, making that conduct appear more in

15  line with our harassment standard than it had been

16  previously.

17  BY MR. ANDERSON:

18      Q.   Okay.  Do you remember the -- there was one

19  e-mail that I sent after the -- when Dartmouth

20  initially received the report at the end of March; do

21  you remember that e-mail?

22          MR. SMITH:  Objection.

23          You can answer, if you know.



**In the Matter Of:**

ANDERSON vs TRUSTEES OF DARTMOUTH

1:19-cv-109-SM

# KATHARINE STRONG

*December 20, 2019*

*Volume 2*



800.211.DEPO (3376)
EsquireSolutions.com

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW HAMPSHIRE
2     _____
      MARK ANDERSON,                         )
3               Plaintiff,                   )
                                             )      Civil Action No.
4     V.                                     )       1:19-cv-109-SM
                                             )
5     TRUSTEES OF DARTMOUTH COLLEGE,         )
                Defendant.                   )
6     _____)

7                             VOLUME 2
                        CONTINUED DEPOSITION
8                             - of -
                        KATHARINE STRONG
9
          taken on Friday, December 20, 2019, at
10        Hanover Inn Dartmouth, Two East Wheelock
          Street, Hanover, New Hampshire,
11        commencing at 1:35 p.m.

12    APPEARANCES:

13    ON BEHALF OF THE PLAINTIFF:

14        MARK ANDERSON, PRO SE
          (Via Videoconference)
15
      ON BEHALF OF THE DEFENDANT:
16
          SHAPLEIGH SMITH, JR., ESQUIRE
17        Dinse P.C.
          209 Battery Street, P.O. Box 988
18        Burlington, Vermont 05402-0988
          (802) 864-5751 | ssmith@dinse.com
19
          DANA SCADUTO, ESQUIRE
20        Dartmouth College
          Office of the General Counsel
21        63 South Main Street, Suite 301
          Hanover, New Hampshire 03755
22        (603) 646-2444 | dana.scaduto@dartmouth.edu

23    ALSO PRESENT:  ELIZABETH EWING (Via Videoconference)

24

25    COURT REPORTER:  KAREN L. WRIGHT, RPR, CRR



```
 1                    I N D E X

 2  KATHARINE STRONG                                PAGE

 3  CONTINUED EXAMINATION BY MR. ANDERSON            178

 4

 5                  E X H I B I T S

 6  EXHIBIT     DESCRIPTION                         PAGE

 7

 8  (None offered.)

 9

10                    *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



 1  resulted in a pattern of behavior to which the college
 2  is responding.
 3       Q.   Okay.  But are there any cases where the
 4  further -- the subsequent action was not deemed to be
 5  worthy of imposing the sanction upon the student but
 6  the prior action was?
 7            MR. SMITH:  Objection.
 8       Q.   BY MR. ANDERSON:  As was in my case.
 9       A.   That is a mischaracterization of your case, so
10  I cannot answer that question.
11       Q.   In what way?
12       A.   You contacted the other person in May.  That
13  the committee did not find you responsible for a
14  violation of Standard VI does not mean that the
15  committee did not believe that you had contacted the
16  other student in a manner similar to what you had done
17  before, where you had been told to stop contacting, you
18  continued to contact, now you've got a protective order
19  and you make contact.  That is a pattern of behavior.
20            The Standard VI is whether or not there was a
21  violation of law.  The committee did not make a
22  determination of that.  But the Standard II is about
23  the entire pattern, not just the report from March.
24            And so what you have described and are asking
25  me to answer does not characterize your case.

