# Exhibit 41

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEW HAMPSHIRE

3

4      * * * * * * * * * * * * *

5      JOHN ANDERSON,              *

6                  Plaintiff,   *

7      vs.                        * NO. 1:19-CV-109-SM

8      TRUSTEES OF DARTMOUTH       *

9      COLLEGE,                    *

10                 Defendant.    *

11     * * * * * * * * * * * * *

12

13            DEPOSITION OF KATHERINE P. BURKE

14                    HANOVER INN

15                2 East Wheelock Street

16                Hanover, New Hampshire

17         November 19, 2019     11:18 a.m.

18

19

20

21

22            Maryellen Coughlin, RPR/CRR

23



```
 1   APPEARANCES:

 2   Appearing Pro se (Via Zoom):

 3          Mark Anderson

 4

 5   Representing the Trustees of Dartmouth College:

 6          DINSE

 7          PO Box 988

 8          29 Battery Street

 9          Burlington, Vermont 05402-0988

10          BY:  Shapleigh Smith, Esq.

11          802-864-5751

12          ssmith@dinse.com

13

14

15

16

17

18

19

20

21

22

23
```



```
 1                    I N D E X

 2   EXAMINATION                        PAGE

 3    BY MR. SMITH                              4

 4    BY MR. ANDERSON                          41

 5

 6                    EXHIBITS

 7    NO.        DESCRIPTION            PAGE

 8         None

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```



 1          Q.      What's the composition of the

 2      committee on standards?

 3          A.      So a hearing panel is two faculty

 4      members, one administrative member and two

 5      students.  The hearing panel composition is drawn

 6      from larger pools of faculty members who have

 7      been appointed for terms of service on the

 8      committee on standards, administrative members

 9      who have been appointed by the president's office

10      to serve for particular terms, and students who

11      have either been elected or appointed.

12          Q.      What is the role of the chair in

13      the committee on standards process?

14          A.      So the chair is responsible for the

15      hearing process itself.  The chair is a

16      non-voting member of the committee, so the chair

17      does not participate as a voting member in

18      reaching conclusions about responsibility or in

19      reaching any conclusions about an appropriate

20      sanction where a student has been found

21      responsible.

22              It's the chair's job to during the

23      hearing manage the process, and to follow our



1   process, the chair makes decisions about

2   admissibility of information, sequencing of

3   witnesses, those sorts of things that move a

4   hearing from the beginning to the end of the

5   hearing process, and then the chair is

6   responsible for facilitating the deliberations

7   process, and the chair is also typically the

8   person who informs the student who is appearing

9   before the committee what the committee's

10  decision is, and that typically takes place the

11  day after a hearing occurs.

12      Q.      And typically when does a chair get

13  assigned to be involved in a particular

14  disciplinary proceeding?

15      A.      Typically it's some period in

16  advance of a hearing.  We know that hearings may

17  occur during each week of a regular academic

18  term, but there aren't always cases that are

19  ready for hearings, and we have enough notice to,

20  typically, to take responsibility for decisions

21  about what might go into the case packet or other

22  procedural matters that may come up in connection

23  with a hearing that's been scheduled.



1      Q.      For those who might not understand,

2    what is a case packet?

3      A.      So a case packet is written

4    material relevant to the charges that the student

5    and the panel members will be talking about.

6            So typically a case packet would

7    include the original letter of allegation from

8    the judicial affairs office, which is the notice

9    letter to the student that the college has

10   information that suggests they may have violated

11   one or more standards of conduct.  They're

12   specified in the letter.  And provides other

13   procedural information indicating that the

14   process has begun.

15           Typically a case packet would

16   include what we refer to as the statement of

17   rights form which is sort of several pages of

18   formal responses from the student.

19           So if a student has been charged

20   with violating two or three different standards

21   of conduct, the student enters a response, admit

22   or deny, to each of those allegations, indicates

23   whether or not they wish to have an advisor in

1  the process.  Those kinds of things, procedural

2  things, so the case packet would include that.

3          And then the case packet would

4  include information that has come to the college

5  in writing that basically sets forth what the

6  case is about.

7          So if safety and security responded

8  to a situation, typically the safety and security

9  report would be included in the case packet.  If

10 there were witness statements that had been

11 collected about behavior that the committee was

12 going to be talking about, those witness

13 statements might be included.  If there were

14 documents related to the case from some other

15 source, again, that came to the college that were

16 relevant to the allegations, they would be

17 included.

18          And then the student has the

19 opportunity to submit information to be included

20 in the case packet as well.  And so the case

21 packet may include all or part of what the

22 student submitted that the student thought was

23 relevant to the discussion the student was going



1   to be having with the committee.  That

2   information is submitted before the case packet

3   is completed.  The person who will be the chair

4   for that hearing will review that information and

5   determine whether or not all or part of that

6   information will be included in the case packet.

7   The case packet is finalized, and then it's

8   shared with committee members so that they can

9   introduce themselves to the case in advance by

10  reading the information in the case packet.

11       Q.      So if I understand it correctly,

12  the chair has a role in deciding what is included

13  in the case packet and what is not; is that

14  correct?

15       A.      Yes.  According to our procedures,

16  the chair makes all rulings about admissibility

17  of information and evidence.

18       Q.      And once the case packet is

19  finalized, it is shared with the members of the

20  committee?

21       A.      The judicial affairs office

22  transmits it to members of the committee so that

23  they can prepare themselves to participate in the



 1   hearing.

 2        Q.       Okay.   Is there anything about the

 3   process that you haven't -- the committee on

 4   standards process that you think is relevant that

 5   you haven't shared with me so far?

 6        A.       Occasionally we have witnesses

 7   participate in the hearing itself.   So the

 8   committee will certainly be talking with the

 9   student or students who are alleged to have

10   violated our standards so that the students have

11   an opportunity to answer the committee's

12   questions about what may or may not have

13   happened, why it may or may not have happened,

14   and other information that is relevant to them in

15   making their decisions.

16             At times there are people in our

17   campus community who actually witnessed something

18   or were a participant in a conversation or some

19   other action or activity that's relevant to the

20   committee's decisions, so our process may also

21   include bringing those witnesses into the hearing

22   room so that the committee members can ask the

23   witness questions about a witness statement they



1   may have provided or what they observed or what

2   they said or did that's relevant to the process.

3                In our process, the student also

4   has the opportunity to pose to the chair

5   questions for a witness.  So typically the

6   committee members ask their questions first of a

7   witness, and then the chair gives the student an

8   opportunity to suggest to the chair questions

9   that the committee members may not have asked

10  that the student thinks are relevant, and then

11  it's the chair's decision, again, in this role,

12  as the chair is the one who decides what's

13  relevant and what's not, the chair will either

14  ask the witness to respond to the question as the

15  student framed it, although the student isn't

16  directly questioning the witness, the chair may

17  reframe the question, or based on whatever the

18  question is, the chair may say to the student, I

19  don't believe that's a relevant question.  Do you

20  have anything else to suggest.

21       Q.     Were you involved in a committee on

22  standards hearing for allegations that had been

23  made against Mark Anderson?



1      A.      I was.

2      Q.      And when did you first become

3  involved in a hearing involving Mark Anderson?

4      A.      On the day of the hearing which I

5  believe was January 8th of 2018.

6      Q.      How did you become involved in that

7  hearing?

8      A.      One of my student affairs

9  colleagues was scheduled to serve as the chair in

10  that case.  She became very ill that day, and she

11  appeared in my doorway to say that she wasn't

12  sure she could participate in the hearing and

13  asked me if I was available to substitute if she

14  didn't think she could do it.

15      Q.      And what was your response to your

16  colleague?

17      A.      I said, "I will do what you need me

18  to do," which meant that I would clear my

19  calendar and make this a priority because we

20  would want a hearing to go forward if it were

21  possible for that to happen, for the hearing to

22  go forward.

23      Q.      When you were presented with the



```
 1   request to participate, what did you do next?
 2        A.      So in order to be an effective
 3   substitute chair, I needed to learn from her what
 4   she thought it was important for me to know in
 5   terms of decisions she might have made ahead of
 6   time.  I needed to get a copy of the case packet,
 7   which I had not seen or read before then, and I
 8   needed to become prepared to host and facilitate
 9   the hearing which was scheduled for that
10   afternoon at 2:30, I think.  So I had a few hours
11   to familiarize myself with the case to step in as
12   chair.
13        Q.      So in that afternoon, did you
14   familiarize yourself with the case packet?
15        A.      Yes.  The case packet itself was
16   60-some-odd pages, and I didn't do anything else
17   between when I learned that I would be
18   substituting as chair so that I could review the
19   material as closely as possible so that I was
20   ready to facilitate the hearing and ready to
21   facilitate the decisions.
22        Q.      What else other than the case
23   packet did you review prior to the hearing?
```



1        A.        So there was a fair amount of

2   written information that the student had

3   submitted and that my colleague, who had been

4   serving in the role as chair, had determined

5   would not be included in the case packet.  I

6   flipped through that very, very briefly.  It was

7   a large stack of submissions.  As she had made

8   the decision that that material would not be

9   included in the case packet, it was not my role

10  at that point to go back to the very beginning

11  when she might have first learned that she was

12  going to chair the case.  My role was to step in

13  where we were.  So I very quickly flipped

14  through, but I did not read for content because

15  my primary focus was being sure that I felt

16  adequately prepared to work with the case packet

17  material, which was the material that had been

18  provided to the committee.

19        Q.        Who were you replacing as chair of

20  the committee?

21        A.        Senior associate dean of student

22  affairs Liz Agosto, A-g-o-s-t-o.

23        Q.        Did you speak to Dean Agosto after

1   you had reviewed the materials?

2        A.      I may have.  I don't recall

3   specifically.  It certainly is possible that in

4   reading the material I had a question about

5   something that I read, but my goal, again, was to

6   prepare to play the role that I was assuming,

7   which was to serve as chair of the process, and

8   given my experience, I felt comfortable with the

9   chairing role of simply trying to get up to speed

10  on the content of the case.

11       Q.      Do you have a recollection of what

12  time the hearing was set for on January 8th,

13  2018?

14       A.      So the front of the case packet

15  usually indicates the date and time of the

16  hearing, and the front of the case packet says I

17  think 2:30 p.m. that day.

18       Q.      Prior to the hearing, did you have

19  the opportunity to meet with Mark Anderson the

20  student who had allegations lodged against him?

21       A.      Yes, that's part of my personal

22  practice as chair.

23               Typically a chair hasn't had prior



1   contact with the student who's appearing before

2   the committee, and it's important to me to be

3   able to meet the student ahead of time.  This

4   isn't a legal process.  It's a community process.

5   We're going to be sitting across the table from

6   each other.  I want to be sure that I've

7   introduced myself and that I've given them just a

8   little bit of information about how I think the

9   hearing is going to go.

10               They may have received information

11  from judicial affairs or the person that they've

12  selected to serve as their advisor in the

13  process, but since I'm going to be sitting in the

14  chair seat, I usually give them a brief overview

15  of how I think the hearing is going to go.

16               I let them know that I'll be

17  watching.  If they feel they need to take a break

18  to consult with their advisor or if they're

19  experiencing discomfort in any way and just need

20  to step out for a minute, we talk about how that

21  works.

22               And if there are going to be

23  witnesses in the case, I briefly explain here's



1  how we do that:  You don't question a witness

2  directly.  You propose a question to me.  I'll

3  let you know if I'm going to ask the witness to

4  answer it or reframe it.  If I say to you that's

5  not a question that I think is relevant, or if I

6  say I'm not going to ask the witness that

7  question, do you have another question to

8  suggest, I'm telling the student you haven't

9  don't anything wrong.  I want you to be prepared

10  for that.  My job is to pay attention to our

11  process, and so if you suggest a question and I

12  say I'm not going to ask it, we just move on.

13  You don't need to worry about that being a moment

14  where something terrible has happened.  We're

15  just following our process.

16      Q.    Who was Mr. Anderson's advisor for

17  this hearing?

18      A.    It was Ann Hudak, who is one of our

19  undergraduate deans.

20      Q.    Can you tell me what the substance

21  of the conversation was between you and

22  Mr. Anderson prior to the hearing?

23      A.    So I introduced myself.  I



1   explained that I was stepping in as the chair in

2   the hearing.  I did sort of have a usual routine

3   of things, as I just described, that I bring up

4   when I'm talking to a student, and I also let

5   Mark know that I was going to focus the attention

6   of the panel, and the purpose of the hearing was

7   to focus on the behavior that was alleged in the

8   charge letter, so the behavior that was alleged

9   for January, February, March and May of 2017,

10   that it was the committee's job to learn what

11   they could about those behaviors that were the

12   subject of the charges so that it could reach a

13   conclusion, and that that's where we were going

14   to focus.

15       Q.    Okay.  And did you have a

16   discussion with him about the other materials

17   that he had proposed including in the case packet

18   but which Dean Agosto had said would not be

19   included?

20       A.    We did.  I confirmed that we were

21   not going to be including those materials in the

22   discussion.  I let him know that it was going to

23   be important to stay focussed on the behavior



 1   because that was the committee's function and

 2   responsibility.  I let him know that if he --

 3   that in my job as chair, if he moved away from

 4   the focus of the hearing on his behavior to other

 5   areas that were not germane to the committee's

 6   decision about whether he violated our standards

 7   and what sanction might be appropriate, I let him

 8   know how I was going to handle it, which was I

 9   was going to tell him that we were not going to

10   pursue that line of discussion or questioning or

11   whatever it might be, and that I would refocus

12   him in the hearing back on the behavior.  He

13   became concerned about that.

14        Q.     What was his response?

15        A.        He asked me if I had read all of

16   the material that had been excluded, and I told

17   him I hadn't read it all.  I hadn't.  He told me

18   that other people had told him that he could say

19   whatever he wanted to say in the hearing about

20   that.  I said, "I'm stepping in today.  The focus

21   of the hearing is your behavior January,

22   February, March and May as alleged in the

23   allegation letter.  My job is to pay attention to



1   our process, and so that's where I'm going to

2   keep the focus today."

3          Q.        And did that require a period of

4   time in which Mr. Anderson had to re-collect

5   himself prior to the hearing?

6          A.        He became very upset and agitated

7   about that.  He wanted to do more than I was

8   telling him I was going to allow as part of our

9   process in the hearing.  He was agitated enough

10  that I was concerned for him and for his state of

11  mind, and I didn't want to proceed with the

12  hearing, notwithstanding that we had identified

13  that I would step in as chair, if he were in an

14  emotional state where he couldn't participate

15  effectively on his own behalf.  I was concerned

16  about that for him.  So we did take a break, and

17  he spent some time with his advisor and others.

18  And I told him if he wasn't in a state where he

19  could participate, we could arrange to have him

20  go home, and we could reschedule the hearing, but

21  that I wanted to be sure he felt he could proceed

22  given what I was telling him about how the

23  hearing was going to go.

1              So we didn't actually start the

2    hearing until after 4:30 that afternoon while

3    that was unfolding and we were confirming that he

4    felt he was ready to participate and I was

5    confirming myself that it was responsible and

6    okay for us to go ahead.

7         Q.     Okay.  Was your communication to

8    him about possible delaying the hearing basically

9    because you were concerned about his mental state

10   going forward with the hearing at that time?

11        A.     Yes.  Yes, it was.  I didn't --

12   it's a difficult thing for students to

13   participate in disciplinary hearings if they're

14   not in a state of mind where they can engage in

15   discussion with panel members.  That's a concern.

16   And I didn't want to proceed if he wasn't going

17   to be able to participate on his own behalf in a

18   way that seemed appropriate.

19        Q.     And at some point in time did the

20   hearing proceed?

21        A.     It did.

22        Q.     And can you generally discuss with

23   me how the process unfolded in the hearing?



1      A.      So maybe I'll do a bit of a general

2  arc of a hearing and then apply it here.

3      Q.      Yes.

4      A.      So in any disciplinary hearing, we

5  are sitting around a long rectangular table.  The

6  student is present with the advisor that they've

7  identified, if they have an advisor, the five

8  committee members, two faculty members, the

9  administrative representative --

10            THE COURT REPORTER:  Can you go a

11  little slower?

12      A.      Sure.  There are five committee

13  members on a hearing panel.  Two of them are

14  members of the faculty, one of them is an

15  administrative representative from a pool

16  appointed by the president and two of them are

17  students.  When we begin a hearing, part of what

18  the chair needs to do is to set the stage for the

19  process.  This is not a legal proceeding.  This

20  is an administrative proceeding where these

21  representatives of the community engage in

22  dialogue with the student and other members of

23  the community about possible violations of

 1  community standards.  So we set that stage.  I

 2  invite the community members to introduce

 3  themselves, so that we're all part of the

 4  conversation and the student knows who they're

 5  talking to, and the faculty members have

 6  introduced themselves and the other panel members

 7  have introduced themselves.

 8            We go through some procedural

 9  things.  We confirm that the student received the

10  charge letter and the case packet.  We confirm

11  that the information in their statement of rights

12  form is accurate as of the time that we're having

13  the hearing.  The chair reminds the student that

14  the college expects all students participating in

15  disciplinary proceedings to be completely

16  truthful, and we talk a little bit about what

17  that means.  You may say I don't know.  You may

18  decline to answer a question.  But if you're

19  providing information, you're providing

20  information that's accurate and complete.  You're

21  not making misrepresentations.  So we go through

22  that process, which happens with all students,

23  and then typically we would give the student



1   who's appearing before the committee a chance to

2   make an opening statement.  They get the first

3   word.  They get the last word.

4            So we did that.  We did all of that

5   here in this hearing.  The student made an

6   opening statement.  Because we were starting

7   after 4:30 and the one witness that the student

8   and the panel had identified as being someone

9   that they wanted to speak to had limited

10  availability --

11           THE COURT REPORTER:  And the

12  student?

13           MR. SMITH:  I'm sorry, you do have

14  to --

15       A.    I will slow down.  So because we

16  were starting after 4:30, we had one witness who

17  the student had proposed appear before the

18  committee, and the committee wanted to speak to

19  whose availability was limited.  So the student

20  made his opening statement, and instead of

21  engaging in more questioning of the student, at

22  that point we asked the witness to come in, and

23  the committee members asked her questions.  The



1  student posed a couple of questions.  We excused

2  her, and then we went back to questions that the

3  committee members had for the student.

4            When those questions were

5  exhausted, we gave the student an opportunity to

6  have the last word through the student's closing

7  statement, and then we ended the hearing and

8  moved into executive session.

9        Q.      And other than the student and the

10  advisor and the members of the committee, who

11  else was present at the hearing?

12       A.      As is the case for all of our major

13  misconduct hearings, a representative of the

14  judicial affairs office is present for the

15  hearing, and in this case, that was Adam

16  Knowlton-Young.

17       Q.      And what is the role of a judicial

18  affairs office employee during the hearing?

19       A.      During the hearing they're

20  basically providing logistical support for the

21  process.  They're turning the tape recording on

22  and off.  If there are multiple witnesses,

23  they're leaving the hearing room and making sure

1  that witnesses are ready to appear in a timely

2  way.  They -- if the chair needs something, I, as

3  chair, could turn to Adam and say, Can you get me

4  this because I can't get up right now.  So it's

5  logistical support.

6       Q.      Once you got into executive

7  session, what was the issue that you initially

8  considered?

9       A.      So committee deliberations

10 typically take place in two phases.  The first

11 phase is about the question of whether or not the

12 student has indeed violated one or more of the

13 standards of conduct that they were charged with

14 violating.

15         So the first topic for the panel

16 members is do they agree that the student was

17 responsible.  In a case where a student has

18 admitted, do they agree that the student is

19 responsible for violating standards of conduct.

20 If they find the student responsible, and only

21 if, then they move to a discussion about what the

22 appropriate sanction would be based on the nature

23 of the behavior of the student in question.

1     Q.      And this was a hearing that

2  occurred after a previous hearing had been

3  reviewed and there had been a decision that there

4  should be a second hearing.  Is the committee

5  made aware of the prior hearing by the school?

6     A.      No.  There are only limited

7  circumstances in which that would occur.  That

8  would occur if there were a request for review

9  and there were new information that wasn't

10 reasonably available at the time of the first

11 hearing that the reviewing officer had decided

12 the same panel should consider.

13    Q.      Mm-hmm.

14    A.      That was not this case.  This was,

15 as I understood it, a fresh hearing, not related

16 to any previous proceedings.

17    Q.      Okay.  So did the committee on

18 standards review whether Mark Anderson had

19 violated community standards?

20    A.      Yes.  There were two community

21 standards included in the letter of allegation

22 that he had received, one of them was Standard 2,

23 and the other was Standard 6.  Standard 6 is the

1   community standard that prohibits violating

2   local, state or federal law.

3           If we have no evidence of a

4   conviction at the time of a hearing, we simply

5   enter no finding on the violation of law charge.

6   So we entered no finding, and we -- I think we

7   explained at the very beginning of the hearing,

8   because there was no evidence of a conviction,

9   the focus of the hearing was going to be on the

10  Standard 2 allegation.

11          The committee concluded that he had

12  indeed violated Standard 2 during the first part

13  of the deliberations.  So they believed that he

14  had engaged in the behaviors alleged in January,

15  February, March and May.

16      Q.      So Mr. Anderson had admitted --

17      A.      Yes.

18      Q.      -- that he had violated that

19  standard, but the committee ended up reviewing

20  that again to see whether they concur with the

21  admission; is that right?

22      A.      Yes, but briefly so.  Typically, in

23  a situation like that, if the student has



1    admitted, the student's admission is accepted.

2    You confirm that.  And they believed that he had

3    violated Standard 2.  So they confirmed that he

4    was responsible for violating standards of -- our

5    standard of conduct.

6        Q.      And prior to going into

7    deliberative session, you had confirmed with

8    Mr. Anderson that he did admit to the violation

9    of Standard 2, correct?

10       A.      Yes, as part of the sort of

11   preamble that I was describing earlier at the

12   beginning of the hearing when we're going through

13   the statement of rights form that is included in

14   the packet, he had admitted on the statement of

15   rights form that he had violated Standard 2.  So

16   that had been confirmed at the very beginning of

17   the hearing, and throughout the hearing, as he

18   and the committee were discussing his behavior,

19   there were also questions from the committee

20   members clarifying what he felt he was admitting

21   to, so that had been also the subject of

22   discussion during the hearing.

23       Q.      Okay.  And during the deliberative



1   session, were sanctions considered?

2        A.        After the finding of

3   responsibility, yes, and the committee's ultimate

4   conclusion was that given the nature of the

5   behavior, it was behavior that should lead to

6   permanent separation from the college.

7        Q.        And what was the basis for that

8   conclusion, if you recall?

9        A.        So the basis for the conclusion is

10  included in the case notes for the case, which we

11  typically prepare after each case for the record.

12  The committee felt that he had engaged in

13  harassing behaviors in January, February, March

14  and May, that his behavior was particularly

15  egregious.  They did not believe that during the

16  hearing he displayed an understanding of what our

17  community expectations are or a capacity to

18  conform his behavior to those expectations going

19  forward.  And because of those conclusions, they

20  decided that he should be permanently separated

21  from Durham.

22        Q.        Okay.  And what was the role --

23  what was your role in that process?



1   range of sanction for the behaviors that were the

2   subject of the case very generally and very

3   briefly, and as the panel members themselves

4   know, cases that occur before a panel of the

5   committee on standards have been determined to be

6   cases in which, if the student is found

7   responsible, temporary or permanent removal from

8   the community may be an outcome.

9        Q.       So once the sanction had been

10  determined, what is the process after the hearing

11  closes?

12       A.       So an outcome meeting had already

13  been scheduled for the following day, meaning me,

14  in my role as chair, the student and the

15  student's advisor were scheduled to meet.  We

16  were scheduled to meet in the same conference

17  room in which the hearing had occurred, and it

18  was my job at that meeting to convey to the

19  student what the committee's decision was.  The

20  meeting was scheduled for late the next morning,

21  that would have been the 9th.  I had the outcome

22  letter, which is a typical letter generated by

23  the judicial affairs office, which is the

1  official written notification.  That conversation

2  usually includes an explanation of the

3  committee's finding:  Here's what they did.

4  Here's anything they wanted you to know about

5  their conclusion.  It usually includes a reminder

6  to the student that they have the right to

7  request a review and a brief explanation of what

8  that process is.  You don't have to decided

9  today, but you do have the right to request

10  review.  Here's a brief explanation of that

11  process.  Your advisor, the judicial affairs

12  office can help you with that.

13            And then typically when I'm doing

14  an outcome meeting, I also say to the student

15  that if it would be helpful for one of their

16  family members to hear from me as chair, that I

17  could be available to have a conversation with

18  them about that, and that conversation would not

19  normally be a substantive one.  It would simply

20  be I was the college representative responsible

21  for the hearing process --

22       Q.       Mm-hmm.

23       A.       -- and if they need to ask



1   chair, stepping in as substitute hearing chair,

2   was mine.  It was not anyone else's.

3        Q.      On the day of my hearing I raised

4   to you that I had repeatedly been told by

5   administrators of the college that the only

6   place, and the place that I was designated to

7   raise concerns that my disciplinary hearing

8   process had not been performed in accordance with

9   the college's procedures were -- was my second

10  COS hearing.  Do you remember me pleading with

11  you that that was the case and to allow me to

12  share information these administrators had told

13  me I would be allowed to share at the COS

14  hearing?

15             MR. SMITH:  Objection.  You can

16  answer.

17        A.      I remember discussing this with you

18  when I came to meet you before the hearing was to

19  begin that afternoon at 2:30.  The committee on

20  standards hearing panel's responsibility is to

21  review the letter of allegation and the materials

22  that are included in the case packet and to

23  engage in questioning during the hearing process



1   to inform themselves about the alleged violation.

2            In this case, this committee's

3   responsibility was limited to the information in

4   the case package, which was that you were alleged

5   to have violated and had admitted violating

6   Standard 2 in January, February, March and/or May

7   of 2017.  That was the focus, and I remember

8   telling you that the focus of the hearing was

9   about your behavior as alleged in the materials

10  that you had received for that case.  Their focus

11  was to be on the behavior, and my job, as chair,

12  was to ensure that our focus remained on the

13  alleged behavioral violations to which you had

14  admitted.  And the responsibility of the

15  committee was to determine whether they agreed

16  that you had violated Standard 2, and if so, what

17  the appropriate sanction would be.  That's what

18  the committee was responsible for.  That's where

19  I kept the focus of the hearing.  That was my

20  decision.

21       Q.       Very well.  Yes, so you remember

22  correctly that I was told in advance of the

23  hearing the committee would not deliberate



1  bases of your decision or reasoning to --

2              THE COURT REPORTER:  All the bases

3  of your decision?

4       Q.     Oh.  Do you remember all -- sorry.

5  I looked for the letter, and I did not find it.

6  But, yes, you wrote that you perceived that the

7  remorse I showed during the hearing was not

8  genuine.  Do you remember any other details from

9  the letter?

10             MR. SMITH:  Objection.  You can

11  answer.

12      A.     So I don't think that's what I

13  wrote, and in writing a case note, I'm not

14  speaking for myself as a person, as an

15  individual.  I'm writing a very brief summary as

16  the chair.  The case notes reflect what happened

17  in very general terms during the hearing and

18  generally the basis for the decision.  So the

19  words on the page of that case note are about

20  what was said during that hearing and what was in

21  the case packet.  And in the paragraph that would

22  have reflected the committee's thinking, the

23  committee's thinking would have been based on



1   what was said and what occurred during that

2   hearing and what was in the case packet related

3   to the charges before them.

4        Q.        Mm-hmm.  Off the top of your head,

5   you said you don't think you said this, but can

6   you remember anything that I did, any specific

7   behaviors or actions that suggested that my

8   remorse was not genuine?

9        A.        I think in the case note there is

10  reference to the committee's perception -- I'm

11  going from memory here -- that although you said

12  this behavior -- that you understood this

13  behavior -- I think you described it in various

14  ways yourself -- was in violation and that you

15  accepted responsibility, I think that statements

16  that you made during the hearing led the

17  committee to question whether you fully

18  understood your responsibility or whether you

19  felt that the responsibility for the situation

20  that you were in was attributable to others

21  rather than you.

22       Q.        And that led to deliberation of

23  what sanction would be suitable, correct?



1   information from the case, right?

2           A.      The case note is a brief summary.

3   It is not a transcript.  It is not a lengthy

4   analysis, nor is it intended to be.  It is a

5   brief summary for the record of what the case was

6   about and what the committee concluded.

7           Q.      The ultimate basis for its

8   conclusion, correct?

9           A.      That's what I just said.

10          Q.      Okay.  Okay, so -- I really have to

11  go to the bathroom again, but I have one question

12  I'd like to ask.  Let me see if I can do it.

13              Oh, okay.  So like in my case,

14  right, in the case note I believe that there were

15  references to the specific statements that I made

16  and specifically actions I performed which the

17  committee --

18              THE COURT REPORTER:  I'm sorry.

19  Specific --

20          Q.      Sorry.  In the case note, as you

21  said, you described actions, specific actions,

22  which most heavily influenced the committee's

23  decisions, right?  The actions that you put in

