# Exhibit 42

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

CASE 1:19-CV-00109-SM

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                              \*
JOHN DOE,                                     \*
                                              \*
        vs.                                   \*
                                              \*
TRUSTEES OF DARTMOUTH COLLEGE                 \*
                                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF KRISTI CLEMENS

Deposition taken at the Hanover Inn,

2 East Wheelock Street, Hanover, New Hampshire,

on Monday, January 6, 2020, commencing at

11:17 a.m.

Court Reporter:

Dawn L. Griffin-Smith, LCR
New Hampshire LCR No. 108 (RSA 310-A:161-181)



```
 1                         APPEARANCES
 2

 3
      Representing the Plaintiff:
 4
              Mark Anderson - pro se
 5            9007 W. Shorewood Drive, #542
              Mercer Island, WA  98040
 6            jd2018265@gmail.com

 7


 8
      Representing the Defendants:
 9
              DINSE
10            209 Battery Street
              Burlington, VT  05402
11            By:  Shapley Smith, Esq.
                   (802) 859-7026
12                 ssmith@dinse.com
                      and
13            WADLEIGH STARR & PETERS
              95 Market Street
14            Manchester, NH  03101
              By:  Chris McGown, Esq. (via telephone)
15                 (603) 669-4140

16

17   Also Present: Dana Scaduto

18

19

20

21

22

23
```



```
 1                        I N D E X

 2

 3

 4   WITNESS:

 5

 6     KRISTI CLEMENS

 7

 8   EXAMINATION:                                    Page

 9

10     By Mr. Smith          . . . . . . . . . .       4

11     By Mr. Anderson       . . . . . . . . . .      52

12

13

14   EXHIBITS FOR IDENTIFICATION:

15      Number                                       Page

16
     21   3/29/17 Report                              18
17
     22   Email String                                42
18

19   ***Exhibits retained by Attorney Smith.

20

21

22

23
```



```
 1   Q.   Okay.  Prior to that role what role did you serve
 2        at Dartmouth College?
 3   A.   Beginning in April 2013 I served as the assistant
 4        dean of student affairs and director of case
 5        management.
 6   Q.   What is your educational background?
 7   A.   I have a masters in higher education and student
 8        affairs administration from the University of
 9        Vermont, and a bachelors in speech and
10        interpersonal communication from New York
11        University.
12   Q.   And in your prior role, the one prior to your title
13        IX, could you describe your roles and
14        responsibilities?
15   A.   My role was to assist other colleagues throughout
16        the division of student affairs with students of
17        concern and students who were struggling to remain
18        enrolled at the college.
19                 To do that, I oversaw our on-call system
20        as well as any emergency situations that arose for
21        undergraduate students.
22   Q.   Can you describe the on-call system?
23   A.   Sure.  Our on-call system we have a dean on call
```



```
 1        call, for responding to dean on-call reports as
 2        they came in; to determining, responsible for
 3        determining what would be the appropriate next
 4        steps.
 5                 I was not, I would often describe it as
 6        like an air traffic controller, not necessarily the
 7        person flying the plane but directing and keeping
 8        track of where a situation might be handled to
 9        insure that the ball wasn't dropped.
10   Q.   And other than the coordination of the on call,
11        what other roles and responsibilities did you have?
12   A.   During the day I would work with colleagues in the
13        undergraduate dean's office, in residential life,
14        in a number of different student affairs offices to
15        discuss students of concern.
16                 And so it's a model where we don't want
17        one area of campus sort of having information about
18        a student who might be struggling.  We try to make
19        those connections across the campus to say if
20        somebody is having difficulty in residential life
21        and also having difficulty in their academics,
22        rather than having two different people work with
23        that student how can we better coordinate our
```

```
 1      services to serve that student.
 2                  So I was the hub of that system, making
 3      those connections with the different colleagues and
 4      helping to share that information.
 5   Q. What was your responsibility with regard to the
 6      disciplinary process?
 7   A. I didn't have any responsibility in regard to the
 8      disciplinary process.
 9   Q. Okay.  Have you fully described what your role was?
10   A. The role of case management is a bit of a "what
11      needs to be done" sort of position.  When things
12      get messy, as they tend to do with student and
13      human lives, I would be the person to try to
14      untangle that mess a little bit and ensure that our
15      students are served in the best way possible so
16      they can do what they came here to do, which is get
17      an education.
18                  So that is, that sort of bringing
19      together and gathering of bread crumbs is the best
20      way that I can describe a number of different
21      things that were situation specific.
22   Q. And remind me your title again was?
23   A. Assistant dean of student affairs and director of
```



```
 1        case management.
 2   Q.   And were you referred to as a dean?
 3   A.   Yes.
 4   Q.   Let's turn our attention to you, the individual who
 5        is the plaintiff here, Mark Anderson.  When did you
 6        first learn that Mark Anderson had been contacted
 7        by Dartmouth's security services?
 8   A.   I received a dean on-call report the night of
 9        March 29, 2017, regarding Mark's interaction with
10        safety and security.
11   Q.   And tell me about what you learned at that time.
12   A.   Yup.  The report from the dean on call stated that
13        ████ University had contacted Dartmouth's safety
14        and security to express concern about Mr.
15        Anderson's behavior toward one of their students.
16                    ████ University Police Department was
17        issuing a protective order, an order of protection,
18        to Mr. Anderson, and asked for Dartmouth's
19        assistance in delivering that protective order.
20                    I believe that safety and security also
21        then worked or maybe ████ contacted the Hanover
22        Police Department to assist with, but ultimately
23        the report that I received as part of that dean
```



```
 1        on-call report that evening stated that there was
 2        some concerning behavior exhibited by Mr. Anderson
 3        that resulted in the issuance of a protective order
 4        that evening.
 5   Q.   And what did you do once you had received that
 6        information?
 7   A.   We didn't have a lot of information at that time
 8        about what was contained, what occurred that
 9        precipitated the order.
10              There was a mention in the dean on-call
11        report about potentially some mental health issues
12        or threatening behavior toward the other party at
13        ▇▇▇▇▇ but in the evening we did not have a lot of
14        information.
15              I believe that the, either the dean
16        on-call or the safety and security officer who gen,
17        who worked on this case that night said that they
18        were not concerned about Mr. Anderson at that time,
19        and that was my primary concern was, What is his
20        mental state?  Is he safe to remain on campus at
21        this time?
22   Q.   Who did you speak to when you received this report,
23        if you remember?
```



1  Q.  Before you reached out to him, do you know whether
2      anybody else from Dartmouth, other than safety and
3      security, had spoken to Mark?
4  A.  I don't know, but I don't believe so.
5  Q.  Okay.  And what did you do to reach out to Mark
6      Anderson?
7  A.  Yeah.  I wrote to Mark and let him know that the
8      college was aware that he was served with a
9      protective order last night and that I would like
10     to speak with him about that.
11 Q.  Were you involved in gathering any additional
12     information about what had happened at ▇▇▇ and
13     with the individual who had made the complaint
14     against Mr. Anderson?
15 A.  I asked safety and security if they had received a
16     more detailed report from ▇▇▇ University because
17     I wanted to know the nature of the threats that
18     were made, and also whether we had a safety issue
19     in regards to Mr. Anderson.
20          I believe that I got a copy of that full
21     report from ▇▇▇ University that afternoon, which
22     when I read it and also I believe a colleague in
23     the counseling center read it, at that time we did



1        Carson.
2   Q.   And can you describe the discussion that you had
3        with Mr. Anderson?
4   A.   Sure.  He came in I believe it was towards the end
5        of the day, and I explained that, as I said, we
6        were aware of this protective order.  I explained
7        that my role, though I am a dean I'm not an
8        undergraduate dean, and so I'm someone who just
9        checks in with students to talk with them about
10       circumstances that may have occurred.
11              I let him know that we had read the
12       report and that I was concerned about him and
13       wanted to check in and see how he was doing.  I
14       recall that he said he was fine.  He was nervous
15       about remaining in his classes and how to talk to
16       faculty.
17              I let him know the college would not be
18       taking any action on this report in terms of a
19       judicial approach at this point, but wanted to let
20       him know that should this behavior continue we may
21       need to reconsider that.
22  Q.   How did you learn that the college would not be
23       taking any action since the disciplinary process



```
 1        Could you identify that document for me?
 2   A.   These are my notes in Mark Anderson's Maxient case
 3        management file.
 4   Q.   And that also includes your summary of what
 5        occurred on the April 4th, 2017, meeting?
 6   A.   Yes.
 7   Q.   Would that also include your communication to
 8        others about what you had communicated to Mark?
 9   A.   That is not included in this file.
10   Q.   Okay.  Was the Maxient note shared with Mr.
11        Anderson?
12   A.   No.
13   Q.   Do students have access to the Maxient note system?
14   A.   No, it's private, private online situation.
15   Q.   When was the next time that you learned about Mr.
16        Anderson's activities on campus?
17   A.   On May the 4th we received another dean on-call
18        report that the protective order had been violated
19        by Mr. Anderson, and that he was going to be
20        arrested and transported to the Grafton County
21        Jail.
22   Q.   What did you do when you learned that information?
23   A.   At that point our protocol and our practice for
```



```
 1        that he was not allowed to be on campus.
 2   Q.   And what did they say to that?
 3   A.   They understood.  I think they were concerned both
 4        for him and for the situation, and understood that
 5        he was not to be on campus and so they should
 6        leave.
 7   Q.   Did you have a subsequent conversation with his
 8        parents?
 9   A.   I think I only spoke with them on that Saturday,
10        but then Mark himself called me on Sunday to say a
11        number of things, but essentially to say that he
12        would be leaving with his parents.
13   Q.   What else did he say?
14   A.   He was very upset about what had happened; he was
15        upset about the outcome.  He was very emotional
16        during our conversation, and so what I tried to do
17        in that conversation was to support him, was to
18        reassure him that the appeals process was fair, and
19        that he would have the opportunity to share his
20        concerns in an appeal; but also to reiterate that
21        the best decision at this point would be to go home
22        because he could not remain on campus.
23                  He had brought up in that conversation
```



```
 1      happened at that moating in April.  It was not a
 2      hearing by any means necessary.  And then it was
 3      after that that I had that long conversation with
 4      him.  It's all coming back now.
 5   Q. You did not have the authority to have any sort of
 6      hearing in April of 2017 with regard to any
 7      allegations that might have been made against Mark
 8      Anderson; correct?
 9   A. That is correct.
10              MR. SMITH:  Can we get this marked.  That
11      will be Exhibit 22, I believe.
12              (Exhibit 22, Email string, marked for
13      identification.)
14   Q. I'm showing you what's been marked as Exhibit 22.
15      Could you identify that document for me?
16   A. This is the email where Mark wrote to me, read from
17      the bottom up.  He had asked to meet with me.  I
18      said, No, I can't meet with you.  And then he poses
19      the question about or makes the assertion that I
20      told him he had been given a college
21      reprimand/warning about the incident.  And then on
22      November 17th is the email where I correct that
23      factually.
```



```
 1       certainty about our meeting, that meeting being 4
 2       April, 2017?
 3   A.  The meeting on April 4th, 2017.
 4               MR. SMITH:  Same objection, but you can
 5       answer.
 6   A.  What I recall about that meeting is that I reached
 7       out to you to ask you to come in and speak about
 8       the incident, which resulted in the protective
 9       order being issued to you.
10               In that meeting I recall that we talked
11       about that the college was aware of this incident;
12       that I gave you some advice that this was behavior
13       that should not continue.  We talked about your
14       classes.  We talked about some supports like
15       counseling and other supportive areas.
16               And at that time I believe that you asked
17       me what would happen next in terms of the college
18       response, and I said to you that at this time the
19       college would not be moving forward with any
20       conduct or judicial action, but if something like
21       this came up again we may need to have a different
22       conversation.
23   Q.  Okay.  So at that point the judicial affairs office
```

