# Exhibit 45

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

CASE 1:19-CV-00109-JD

```
* * * * * * * * * * * * * * * * *
                                 *
MARK ANDERSON                    *
                                 *
        vs.                      *
                                 *
TRUSTEES OF DARTMOUTH COLLEGE    *
                                 *
* * * * * * * * * * * * * * * * *
```

DEPOSITION OF REBECCA BIRON

Deposition taken at the Hanover Inn,

2 East Wheelock Street, Hanover, New Hampshire,

on Thursday, February 27, 2020, commencing at

12:02 p.m.

Court Reporter:

Dawn L. Griffin-Smith, LCR
New Hampshire LCR No. 108 (RSA 310-A:161-181)



800.211.DEPO (3376)  
EsquireSolutions.com

```
 1                         APPEARANCES
 2

 3
     Representing the Plaintiff:
 4
             Mark Anderson - pro se (via telephone)
 5           9007 W. Shorewood Drive, #542
             Mercer Island, WA  98040
 6           jd2018265@gmail.com

 7

 8
     Representing the Defendants:
 9
             DINSE
10           209 Battery Street
             Burlington, VT  05402
11           By:  Kendall Hoechst, Esq.
                  (802) 859-7026
12                ssmith@dinse.com
                       and
13           WADLEIGH STARR & PETERS
             95 Market Street
14           Manchester, NH  03101
             By:  Chris McGown, Esq. (via telephone)
15                (603) 669-4140

16

17

18   Also Present: Dana Scaduto

19

20

21

22

23
```


800.211.DEPO (3376)
EsquireSolutions.com

```
 1                           I N D E X
 2
 3
 4    WITNESS:
 5
 6      REBECCA BIRON
 7
 8    EXAMINATION:                                         Page
 9
10      By Ms. Hoechst    . . . . . . . . . .    4
11      By Mr. Anderson   . . . . . . . . . .   23
12
13
14    EXHIBITS FOR IDENTIFICATION:
15      Number                                             Page
16
17
18     ***None offered.
19
20
21
22
23
```



1  Q. When did you first start working at Dartmouth?
2  A. 2006.
3  Q. What is your current title?
4  A. My current title is professor of Spanish and
5     comparative literature, and director of the local
6     center for the humanities.
7  Q. How long have you been in that position?
8  A. Since July 2019.  But I have been a professor since
9     I have been here.
10 Q. Did you have a role before July 2019 that was
11    different than your current position?
12 A. Yes, from 2015 to 2018 I was dean of the college.
13 Q. And what are the responsibilities generally
14    speaking of the dean of the college?
15 A. The dean of the college is senior officer
16    responsible for undergraduate academic experience.
17    The dean of the college also oversees the entire
18    division of student affairs.
19 Q. What does supervision of student affairs entail?
20 A. There are six divisional areas in student affairs.
21    So academic, advising and support, health services,
22    community stands -- which is where judicial affairs
23    is located -- student life, residential education



```
 1              MR. ANDERSON:  I can hear you now, but in
 2      that last response it was kind of a little.
 3              MS. HOECHST:  Okay.  I'm going to ask the
 4      court reporter to read back the answer and we'll
 5      move on from there okay?
 6              MR. ANDERSON:  Okay.  Thank you.
 7              (Record read.)
 8   Q. After, so in a typical appeal, after you received
 9      the packet of materials and the USB drive
10      containing the audio recording of the hearing, what
11      would happen next?
12   A. I would read the appeal letter, then I would read
13      the entire content of the notebook from judicial
14      affairs, and I would listen to the audio recording.
15      And then I would determine whether there were
16      procedural errors or new information.
17   Q. Is the scope of your review limited to those two
18      categories you testified about, procedural errors
19      and new information?
20   A. Yes.
21   Q. What are the options you have as the review officer
22      after you make your determination or what
23      determination could you make, what are the options
```



1       you have?
2  A.   So if there, if I found that there were procedural
3       errors that had materially affected the outcome of
4       the committee on standards findings, I could,
5       depending on what those were, I could overturn the
6       conclusion of the committee on standards, I could
7       adjust the conclusions.  In terms of sanctions, I
8       could overturn the sanctions or change the
9       sanctions or adjust the sanctions or ask for a
10      reworking of some part of the process.
11 Q.   And could that reworking include ordering a new
12      hearing take place?
13 A.   Yes.
14 Q.   How did you decide which of those potential options
15      in general might be appropriate in any given case?
16      Was there a particular process or procedure you
17      followed?
18 A.   There's no formal model because every case is so
19      different, so that decision would always be made
20      based on the particular appeal and the particular
21      information about procedural errors or new
22      information.
23 Q.   Is there any, after you in a general case in your



1  Q.  What did you decide?
2  A.  I decided that there were no procedural errors and
3      there was no new information.  So this was an
4      unusual appeal because in Mr. Anderson's appeal
5      letter he raised the issue that the dates listed in
6      the allegation letter to him were limited to his
7      violation of the restraining order, and the hearing
8      and all of the case information was considering all
9      of the events from the February problematic
10     communication through that moment of the violation
11     of the restraining order.
12              And his argument was that the dates on
13     the allegation letter did not correspond to the
14     dates of all of the events considered by the
15     hearing.  And his letter asserted that had the date
16     on the allegation letter included from February
17     through, I don't remember the last date, May, he
18     would have responded differently on the allegation
19     response form and in the hearing.
20              Given that he was claiming that he would
21     have responded differently, I found that the issue
22     of his ability to respond to the allegations does
23     potentially have material affect on the outcome of

1    the hearing; and therefore, a hearing in which the
2    allegation letter would more clearly state that the
3    hearing was going to cover events from the first
4    communications all the way through would allow him
5    to respond in a more wholesome way as he indicated
6    in the appeal letter he would like to.
7  Q. Did you consult with anyone else before you made
8    your decision?
9  A. I did.
10 Q. Who?
11 A. Kevin O'Leary.
12 Q. Without getting into any of the specifics of what
13    you discussed with Attorney O'Leary, what did you
14    do after you consulted with him?
15 A. After I consulted with him I drafted the response
16    letter to Mr. Anderson's appeal request.
17 Q. I am showing you what has been previously marked
18    for identification purposes as Exhibit 13.  Would
19    you please take a look at that document and let me
20    know when you've finished reviewing it.
21           MR. ANDERSON:  I'm sorry.  When she's
22    looking at that, I don't have an index of what the
23    exhibits are, so could you maybe give me a brief



```
 1   A.   No.
 2   Q.   Did you talk with Provost Kotz about any aspect of
 3        the first hearing or first appeal?
 4   A.   Not that I recall.
 5   Q.   Did you have any communication with Provost Kotz
 6        before he began his review as the hearing officer
 7        in the second appeal?
 8   A.   I remember a brief conversation about the role of
 9        appeals officers, stating with him -- because he
10        had never served as an appeal officer -- stating
11        that the role of the appeal officer was to
12        determine if there was materially relevant
13        procedural errors or new information.
14   Q.   Other than the testimony you just gave about the
15        parameters of the scope of his review were, did you
16        give him any other details or information regarding
17        Mr. Anderson's disciplinary case or any other
18        topic?
19   A.   No.
20   Q.   Did you ever express to Provost Kotz in writing or
21        in person or over the phone any view of yours as to
22        what his decision should be in the second appeal?
23   A.   No.  I didn't have any information about the second
```



1        case, the second hearing.
2   Q.   Before you issued your outcome letter reflected in
3        Exhibit 13, did you ever meet with Mr. Anderson in
4        person?
5   A.   No.
6   Q.   Focusing on that same time period, did you ever
7        speak to Mr. Anderson on the phone?
8   A.   No.
9   Q.   Now, focusing on the time period after you
10       transmitted Exhibit 13 to Mr. Anderson, did you
11       ever meet him in person?
12  A.   No.
13  Q.   Did you ever speak to him on the phone?
14  A.   Not that I recall.
15  Q.   Okay.
16            MS. HOECHST:  Off the record for a
17       second.
18            (Discussion held off the record.)
19            MS. HOECHST:  Back on the record.  So
20       while we were off the record, Mr. Anderson asked me
21       to locate a letter dated May 10, 2017, to him,
22       which I believe is Exhibit 4, which I'm now going
23       to hand to Ms. Biron.

