# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
)
**MARK ANDERSON**                                        )
                                                         )
                            **Plaintiff,**               )
               **v.**                                    )          Civil Action No.
                                                         )          1:19-cv-00109-SM
**TRUSTEES OF DARTMOUTH COLLEGE,**                        )
                                                         )
                            **Defendant,**               )
_____)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

Plaintiff has not been able to find precise guidance on how he ought to format his response to this motion in this case. Following his intuition, and in an effort to make this motion easy to evaluate, plaintiff has copied the defendant's motion in its entirety to this document in boldface and placed responsive text in regular font. Quotes and references are typically italicized for visibility.

I. **Statement of Undisputed Facts**

    **A. Dartmouth's Disciplinary Process for Student Misconduct**

**Dartmouth's undergraduate student discipline policies and procedures are contained in the Student Handbook. Exhibit 1; see also Exhibit 40, Strong Dep. Tr. 14:2-5; Exhibit 43, Nelson Dep. Tr. 52:17-53:5. The Handbook defines nine Standards of Conduct for the Dartmouth community and describes the structure and operation of the undergraduate disciplinary system, including the Committee on Standards. Exhibit 1 at 7964-68, 7971-86. One of the Committee's purposes is "to hear cases involving undergraduates concerning violations of. . . the Standards of Conduct . . . ." Id. at 7972.**

Contrary to defense counsel's suggestion here, the <u>only</u> purpose of the COS at a hearing is to designate whether the allegations raised by the JAO in advance of a hearing are true, and if they reach such a determination, if and what sanction ought to be imposed. Despite what Dartmouth may suggest, and as Katharine Burke testified in her deposition, the COS does not have other powers or responsibilities

in Dartmouth's disciplinary hearing system, such as the power to issue allegations, or consider whether new allegations should be raised;

*"the committee, the committee administering a judicial hearing, does not initiate allegations of its own. And the committee, in hearing and deciding any case, is focused on the allegations that were set forth in the allegation letter from the judicial affairs office that began the case, and the COS is responsible for determining in a COS hearing, whether or not a student was responsible for violating College standards, and if so, what the appropriate sanction might be. The COS does not engage in issuing allegations of its own, and the job of the COS is to decide the case before that particular panel (K. Burke - Deposed by Plaintiff.mp4, 25:30-26:41)."*

**The Judicial Affairs Office is "responsible for receiving all complaints and issuing allegations." Id. at 7973. "Any student, faculty member, or employee may file a complaint regarding an undergraduate with the JAO," but it can consider "any source" in deciding whether to conduct an investigation. *Id*. The Judicial Affairs Office has exclusive discretion to "determine whether complaints or other information concerning a student shall result in formal disciplinary allegations." Id. In other words, it alone is empowered to determine when to initiate the formal disciplinary process described in the Handbook.**

Dartmouth erroneously suggests here that a phrase from the student handbook (The Judicial Affairs Office has exclusive discretion to "*determine whether complaints or other information concerning a student shall result in formal disciplinary allegations*") describes when Dartmouth's JAO can raise formal disciplinary allegations after receiving and evaluating evidence of student misconduct. Read in isolation or the overall context of the handbook, this phrase objectively does not pertain to the timing of when allegations might be raised by the JAO in any way. The only text from the Handbook which address when allegations will be raised states that if the JAO receives evidence of misconduct it determines might potentially justify imposing a formal disciplinary sanction against a student reads, "*Hearings will be scheduled as soon as possible after an incident,*" and no part of the Handbook could be interpreted to mean that after the JAO reviews evidence of alleged misconduct and determines it is not appropriate or justified to potentially impose a disciplinary sanction upon the student based on that evidence, that months or years after this determination, the JAO can arbitrarily re-evaluate this exact same evidence under different standards and come to a different determination. Katharine Strong testified in deposition (*K. Strong - Deposed by Defendant's Counsel.mp4, 2:50*) that the initial review of evidence conducted by the JAO is a determination on whether the student will be entered into the disciplinary process based on this evidence, and there is no question Dartmouth's JAO determined that according to Dartmouth's own

policies, the evidence contained in the March Report did not justify initiating disciplinary sanctions against the plaintiff, and that Dartmouth's JAO did not raise any disciplinary allegations regarding statements in the March Report until about 8-months after it initially reviewed it, and more than a month after plaintiff was wrongfully expelled because of a secondary review Dartmouth conducted of the report in violation of its own policies and procedures.

**If allegations are to be issued, the Director of Judicial Affairs must "determine whether information available in support of an allegation could result in suspension or separation if the student were found responsible." Id. at 7974. "If suspension or separation is a possible outcome" then the Director must "inform the student in writing and provide the student with copies of the available information related to the allegations," which the student then has the opportunity to admit or deny within five days of the written notice. Id.**

While the Handbook states this, Dartmouth failed to notify plaintiff that expulsion was a possible outcome of his disciplinary hearing in September 2017 prior to his expulsion.

**Katharine Strong is the current Director of Community Standards and Accountability in the Judicial Affairs Office. Exhibit 40, Strong Dep. Tr. 5:10-21. She and her staff manage all responses to undergraduate student misconduct. Id. On a daily basis, Ms. Strong and her team review reports that concern behavior by undergraduate students. Then they decide whether there has been a possible or alleged violation of the Standards of Conduct. If so, they determine whether a similar violation has resulted in a student's suspension or separation from the College previously and, if so, begin the serious misconduct process before the Committee on Standards. Id. 6:2-19. After the initial decision to move forward with a judicial process is reached, it is initiated by sending the student a letter stating that the Judicial Affairs Office received a report concerning him or her and describing the next steps. Id. 7:20-8:4, 9:1-8.**

**Responding students are entitled to reasonable written notice of the substance of the allegations against them. Exhibit 1 at 7977. That notice is provided to a student through an allegation packet from the Judicial Affairs Office. Exhibit 40, Strong Dep. Tr. 9:9-10:7, 12:5-8; Exhibit 44, Knowlton-Young Dep. Tr. 11:9-12:11. The packet includes, among other things, the allegation letter and a document used to allow the student accused of a policy violation to admit or deny the allegations called the Statement of Understanding. Id. The Statement of Understanding also includes a request that the student acknowledge that they have been notified where information about the process can be found (i.e. in the Student Handbook). Exhibit 40, Strong Dep. Tr. 14:15-23.**

**If the student denies the allegations, the case is referred to the Committee on Standards for a hearing. Exhibit 1 at 7974.**

**The hearing panel includes two members of the faculty, one administrator or staff member, two students, and a hearing Chair, who is a non-voting member. Id. at 7972; Exhibit 40, Strong Dep. Tr. 15:10-14. A member of the Judicial Affairs Office provides logistical and procedural support during the hearing. The Judicial Affairs Office representative does not vote. Id. 17:8-19:2; Exhibit 41, Burke Dep. Tr. 27:17-28:5; Exhibit 43, Nelson Dep. Tr. 11:12-23; Exhibit 44, Knowlton-Young Dep. Tr. 9:9-10:9.**

Although they may not be voting members, the JAO member and COS chair present at a student hearing bear considerable influence over the outcome of the hearing. Firstly, if the COS determines a preponderance of evidence supports a finding with regards to an allegation raised at the hearing, the JAO member present is responsible for telling the committee what sanctions such a finding might support – in other words, the JAO member determines what sanctions the COS might impose (*K. Strong - Deposed by Defendant's Counsel.mp4, 17:45*). The Chair determines what information can be shared with the COS at the hearing, and this power was exercised to undermine the fairness of plaintiff's second hearing, as later explained.

**Committee on Standards hearing rules are set forth in the Student Handbook. Exhibit 1 at 7975 ("In all . . . Standards of Conduct cases referred to the COS, the COS will conduct a hearing in accordance with the procedures set forth under 'Rights, Rules, and Responsibilities.'"); Exhibit 40, Strong Dep. Tr. 14:2-5. The Student Handbook explicitly states that the proceedings "are administrative in nature and [] not governed by rights and rules that apply in a court of law." Exhibit 1 at 7976. Students are entitled to have a single advisor present, but are individually responsible for responding to allegations and questions at the hearing. Id. Students are free to choose their own advisor. Exhibit 40, Strong Dep. Tr. 11:20- 12:4.**

**Hearings are to be scheduled "as soon as possible" after an incident. Exhibit 1 at 7977. The possibility that a student may face criminal charges does not limit the Judicial Affairs Office's ability to proceed with disciplinary procedures. Id.**

This is the only segment of the Handbook which describes when Dartmouth can raise allegations against a student regarding evidence of misconduct. As defense counsel has noted and the Handbook affirms "On a daily basis, Ms. Strong and her team review reports that concern behavior by undergraduate students. Then they decide whether there has been a possible or alleged violation of the Standards of

Conduct. If so, they determine whether a similar violation has resulted in a student's suspension or separation from the College previously and, if so, begin the serious misconduct process before the Committee on Standards." Central to this case is the fact that once the Director of the Judicial Affairs Office reviews evidence of alleged misconduct and determines it does not contain a "*possible or alleged violation of the Standards of Conduct*" that could be worthy of formal adjudication or potentially imposing a formal disciplinary sanction upon the student, the Handbook in no way permits Dartmouth to then, months or years later, arbitrarily re-review this same exact evidence once more under different standards or interpretations of Dartmouth's policies, and consequently, change its previous disciplinary determination. In deposition, Katharine Strong has affirmed that the right to speedy resolution of disciplinary processes promised in Dartmouth's policies exists so that student's "can go back to the business of working on their degree program" in a timely fashion (*K. Strong - Deposed by Plaintiff.mp4, 34:20*). Nothing in Dartmouth's policies or practices supports Dartmouth's assertion that once the JAO has reviewed evidence of misconduct and determined it does not justify initiating formal disciplinary allegations against a student, that the College might re-evaluate this same evidence months or years later in the student's educational career and impede or revoke the student's ability to complete their degree program at the College.

While, as mentioned elsewhere, this has never been done in another undergraduate disciplinary case in the institution's known history, if Dartmouth really had determined it might potentially raise allegations regarding the March Report at a later date despite having initially determined it did not contain evidence that might support initiating a formal disciplinary process, it surely would have communicated such an unprecedented finding to the plaintiff. The fact no such communication exists reflects the fact that Dartmouth made no such finding, and instead (as it does upon receiving all allegations and evidence of undergraduate misconduct), determined if and what disciplinary measures would be taken regarding evidence in the report at the time it was fully received and investigated by the College.

Plaintiff is not calling upon the Court to hold Dartmouth to the standards applied in legal proceedings, or anything beyond what it has itself promised or is required to do by law. Plaintiff simply asks that the court compel Dartmouth to abide by its own policies and decisions.

**Working with the Chair and the student, the Judicial Affairs Office prepares materials for the Committee on Standards in a set of documents referred to as the case packet. Exhibit 1 at 7975; Exhibit 40, Strong Dep. Tr. 13:6-14:1. The hearing Chair, who has the discretion to determine what is relevant to the proceeding, "makes the ultimate decision about what does or doesn't get included**

in the packet." Id. The final approved case packet is sent to the hearing panel and the responding student before the hearing. Id.; Exhibit 41, Burke Dep. Tr. 9:1-11:17.

Generally, the "hearing procedure is informal. The purpose is to provide the student an opportunity to be heard and to provide the COS relevant information on which to base a decision." Exhibit 1 at 7980. The Chair is empowered to make all procedural rulings, including rulings on relevance and admissibility of materials and information. Id. at 7978; Exhibit 41, Burke Dep. Tr. 7:12-8:11. Subject to the Chair's discretion, the student is entitled to request witnesses, present information and argument, and to hear and question the information presented during a hearing, as well as to make opening and closing statements. Exibit1 at 7978; Exhibit 41, Burke Dep. Tr. 12:2-13:20. While students may suggest questions for any witness, "[a]ll questions are posed by the Chair and members of the committee." Exhibit 1 at 7978. The Chair is responsible for ensuring the Committee hearing follows the standard procedures, participates in questioning, and facilitates deliberation, but does not vote. Exhibit 40, Strong Dep. Tr. 16:20- 17:7; Exhibit 41, Burke Dep. Tr. 24:12-26:3 (describing general hearing process); Exhibit 43, Nelson Dep. Tr. 8:8-10:4, 13:14-14:9 (describing general hearing process). Once presentations are complete, the Committee enters executive session, considers the information it has been provided, determines whether a violation has occurred, and then, if a violation is found, determines the appropriate sanction. Id. The Judicial Affairs Office representative provides relevant precedent to assist the Committee in evaluating the appropriate sanction. Exhibit 40, Strong Dep. Tr. 41:23-42:10; Exhibit 44, Knowlton-Young Dep. Tr. 9:21-10:3. A finding that there is a violation must be supported by a preponderance of the evidence. Exhibit 1 at 7981. Both the responsibility determination and the sanction require a majority vote of the Committee. Id. After the final decision is reached, the Chair drafts a document called a case note, which summarizes the Committee's rationale. Exhibit 40, Strong Dep. Tr. 21:20-23; Exhibit 41, Burke Dep Tr. 158:2-6; Exhibit 43, Nelson Dep. Tr. 16:14-17; 19:2-21.

The Office of Judicial Affairs promptly notifies students of outcomes of individual hearings. Exhibit 1 at 7981. The in-person meeting with the student usually takes place within twenty-four hours of the hearing, and the student's advisor and undergraduate dean (if different) writing. Students may submit a written request for review of the Committee's decision. There are only two bases for reversal of the decision:

1. Procedural error which has materially prejudiced the student's case;

2. Newly discovered information which, had it been available at the time of the hearing, would likely have affected the outcome either with regard to a finding of responsibility or with regard to

the sanction imposed (if the information was not reasonably available to the student at the time of the proceeding). Exhibit 1 at 7982; Exhibit 40, Strong Dep. Tr. 23:10-24:7.

"The reviewing officer has the sole discretion to determine whether the grounds for review have been met." Exhibit 1 at 7982.

"Following review, the original decision may be upheld, the imposed sanction adjusted as the reviewing officer deems appropriate, or referred back to the hearing officer or the COS panel that originally heard the case for further consideration." Id.; Exhibit 45, Biron Dep. Tr. 8:8-9:13. The Judicial Affairs Office does not have any involvement in the reviewing officer's review or decision. See id. If a request for review is granted, the Judicial Affairs Office implements whatever the review officer has requested as the next step. Exhibit 40, Strong Dep. Tr. 25:2-10.

**B. Plaintiff's Protective Order and Arrest**

Plaintiff's former girlfriend ended their relationship around January 2017. See Complaint ¶ 10. Thereafter, Plaintiff began a campaign of harassment and threats against both his former girlfriend and members of her family. As a result, she obtained a protective order against him. Complaint ¶ 12. Plaintiff was served with a copy of that order by a Dartmouth security officer. Exhibit 39, Anderson Dep. Tr. 10:1-4, 51:5-9.

The Judicial Affairs Office received a report regarding the protective order in March 2017, but decided not to initiate a formal disciplinary process at that time. Exhibit 40, Strong Dep. Tr. 31:8-20 ("[W]e determined at that time that we did not have enough information to move forward with allegations at that time. . . . [S]hould more information become available, we would review again."), 92:15-93:9. The Judicial Affairs Office did not consider its decision an adjudication. Id. 28:6-11. Plaintiff did not speak to anybody at the Judicial Affairs Office or receive anything in writing in April 2017. Exhibit 39, Anderson Dep. Tr. 58:12-19.

This was the plaintiff first relationship, and his former girlfriend violated his trust, ended the relationship, and made unprovoked statements about plaintiff's appearance and other intimate aspects of his character that would've had a profound emotional impact on any person in his situation. Several weeks before their relationship ended, plaintiff and his ex-girlfriend went traveling at her insistence and his expense because she was financially strained but desperately sought to travel with plaintiff. She was to repay him by financing a trip to Canada with the plaintiff after she returned home and received money from her parents. She ended the relationship shortly before the trip to Canada was planned to occur, and at the time, said she would compensate plaintiff for the travel expenses he had financed by repaying him

half of what he had spent on their recent trip. Shortly afterwards, plaintiff's ex-girlfriend told him she no longer planned to repay him for these expenditures. Plaintiff fully acknowledges that he reacted inappropriately in this situation and made "the most horrible statements I have in my entire life" (as plaintiff testified at his first and second disciplinary hearings) in this time, as shown in the defendant's motion. However, it is without question that Dartmouth received a report containing all the evidence Dartmouth's eventual decision to expel the plaintiff would be based upon in March 2017. At that time, Katharine Strong of Dartmouth's Judicial Affairs Office reviewed and investigated all of this evidence in accordance with the College's policies, and came to the determination that it was not appropriate to raise formal disciplinary allegations against the plaintiff regarding these materials. Although Dartmouth in no way explains its rationale for such disciplinary determinations, the result of the Judicial Affairs Office's investigation of the March Report was communicated verbally to the plaintiff by Dartmouth employee Kristi Clemens, who was in direct communication with the JAO and Title IX office regarding plaintiff's case at the time he met with her (*Kristi Clemens - Deposed by Defendant's Counsel.mp4, 11:00*), (*K. Strong - Deposed by Defendant's Counsel.mp4, 34:00*). At this time, plaintiff admitted all off the evidence in the report was true (as he did in all interactions with Dartmouth), Clemens notified plaintiff that having reviewed the March Report in its entirety according to the College's policies, that the JAO determined it was not appropriate to initiate formal disciplinary allegations against him regarding the evidence it contained (*Kristi Clemens - Deposed by Defendant's Counsel.mp4, 00:44:00*). Dartmouth's claim that the Kristi told plaintiff Dartmouth might later raise disciplinary allegations or sanction him regarding the March Report is an entirely fictitious narrative manufactured in an effort to justify actions performed over the course of Dartmouth's management of plaintiff's disciplinary hearing processes. Such action is inconsistent with Dartmouth's own policies, and as Katharine Strong testified in deposition, Dartmouth has never  reviewed the same information months after initially declining to investigate it and decided to initiate disciplinary proceedings against the student based on this same information in the institution's known history (*K. Strong - Deposed by Plaintiff.mp4, 1:57:00*). At the time plaintiff's disciplinary hearing process was conducted, Katharine Strong (who reviews "reports across campus on a daily basis" [*K. Strong - Deposed by Defendant's Counsel.mp4, 1:00*]) stated she had no memory of plaintiff's mandatory meeting with Kristi Clemens (*Anderson M. '18 – in person meeting 11.16.17, 16:05*) , though later confirmed she had reviewed the March Report and, upon reviewing it according to Dartmouth's policies, determined it was not appropriate to raise disciplinary allegations against the plaintiff based on the evidence it contained (*Anderson M. '18 – in person meeting 11.16.17, 19:25*).

**Kristi Clemens, at that time the Assistant Dean of Student Affairs and Director of Case Management, also received a report concerning the protective order against Plaintiff. Exhibit 42,**

**Clemens Dep. Tr. 5:1-5, 9:11-10:4. Ms. Clemens served as a point of contact for struggling students who might need assistance across multiple areas. Id. 7:10-8:21. She did not have any role in the disciplinary process, nor did she have any authority to make any adjudication regarding any report of troubling behavior she received. Id. 8:5-7, 42:5-9**

**Ms. Clemens contacted Plaintiff to set up a meeting to talk to him. Id. 12:5-10. He initially declined, but they ultimately met on April 4, 2017 after Ms. Clemens clarified that their meeting was not optional. Exhibit 2. During that meeting, Ms. Clemens told Plaintiff the Judicial Affairs Office had reviewed the protective order and decided not to raise disciplinary allegations at that time. Exhibit 39, Anderson Dep. Tr. 53:2-14, 55:3-13; Exhibit 42, Clemens Dep. Tr. 16:2-21 ("I let him know the college would not be taking any action on this report in terms of a judicial approach at this point, but wanted to let him know that should this behavior continue we may need to reconsider that."), 62:6-22. Ms. Clemens also told Plaintiff that if he violated the protective order, then allegations could be raised against him and other materials might be viewed at a future hearing. Exhibit 39, Anderson Dep. Tr. 59:3-12, 191:2-8; see also Exhibit 3.**

The student handbook clearly states that if the JAO receives evidence of student misconduct which it determines justify raising formal disciplinary allegations against a student, that allegations are to be issued "as soon as possible after the event." No portion of Dartmouth's Student Handbook provides that once specific evidence of misconduct has been subjected to scrutiny by Dartmouth's JAO and judicial processes and a decision (to impose a specific sanction, or none at all) has been reached in accordance with Dartmouth's policies, that at any subsequent point in the student's undergraduate career, Dartmouth can reevaluate this same evidence using different disciplinary standards and punish the student once more based on the exact same evidence of misconduct.

To clarify, Kristi Clemens told the plaintiff that although the Judicial Affairs Office has determined it was not appropriate to raise formal disciplinary sanctions against the plaintiff regarding the March Report, that the JAO had added the March Report to plaintiff's disciplinary record so that although allegations would not be raised regarding the Report itself, if a subsequent incident occurred which Dartmouth did initiate formal disciplinary proceedings against the plaintiff regarding, the March Report could be provided to the COS if it helped contextualize whatever (different) allegations the JAO had raised against the plaintiff.

*K. Strong - Deposed by Plaintiff.mp4, 49:00, Plaintiff: "In what circumstances upon receiving a complaint regarding student behavior, would the JAO not raise formal disciplinary allegations against a student*

*Katharine Strong: "there would be no formal disciplinary action taken against the student if the behavior described in the report was not in violation of the standards of conduct of Dartmouth College"*

In Nierenberg v. Trustees of Dartmouth College, No. 2152016CV00259, 2017, this Court wrote of Dartmouth's Student Handbook;

*"The document mandates that*

*[t]he Director of [the JAO] shall determine whether information available in support of an allegation could result in suspension or separation if the student were found responsible. If suspension or separation is a possible outcome of a disciplinary hearing, the Director shall inform the student in writing .... The student will have an opportunity to admit or deny the allegation within five days of the written notice of the allegations. If the student denies the allegations or the facts are in question, the case shall be referred to the [COS] for a hearing.(Handbook at 15 (emphasis added).)*

*These emphasized words and phrases suggest that the JAO's role is simply to assume the veracity of an allegation and then determine whether the facts, as alleged, "could" "possibl[y]" result in suspension, and if the "facts are in question" — as they were in this case — to schedule a hearing before the COS. Other areas of the Handbook also support the notion that the COS, and not the JAO, is the only body intended to weigh the truth of an allegation. (See id. at 12 ("The purpose of the COS is to hear cases involving undergraduates concerning violations of the Academic Honor Principle." (Emphasis added); id. at 14 (stating that the JAO "shall be responsible for receiving all complaints and drafting allegations"*

In this case, the Director of Dartmouth Judicial Affairs Office, Katharine Strong, came to the determination that by Dartmouth's own standards and policies,  the March Report did not contain information available in support of an allegation which could result in suspension or separation if the student were found responsible, as reflected by the fact the Director did not raise formal disciplinary allegations against the plaintiff regarding the information in the report. However, more than 6-months after making this initial decision, Strong would allow the COS at a disciplinary hearing she personally oversaw to find that the exact same evidence in the March Report (which Dartmouth had never raised allegations against plaintiff regarding) were somehow a violation Dartmouth's policies which supported imposing the harshest sanction possible against him; Katharine was one of two individual's present at plaintiff's hearing responsible for ensuring it was performed in accordance with Dartmouth's policies. Dartmouth never informed plaintiff that separation was a possible outcome of the hearing where he was unfairly and unlawfully expelled from Dartmouth in violation of its own policies and previous

disciplinary judgements. All these actions but those described in the first sentence of this paragraph were performed in violation of Dartmouth's policies.

**On May 4, 2017, a month after Plaintiff's meeting with Ms. Clemens, he was charged with violating the protective order and was arrested on Dartmouth's campus. Exhibit 39, Anderson Dep. Tr. 10:10-12, 60:19-61:6; Exhibit 42, Clemens Dep. Tr. 19:15-21. The Judicial Affairs Office became aware of these events. Exhibit 40, Strong Dep. Tr. 31:21-32:5. Ms. Strong and her colleagues reviewed all of the available information and determined that it was appropriate at that point to move forward with allegations "based on the totality of the information." Id. 32:10-33:1, 108:4-19 ("There was additional new information that was brought to the attention of the College. And that new information made the previously reviewed information appear to be more of a pattern of conduct rather than one interaction."), 160:7-161:3 (describing a "grouping of conduct" and "new conduct . . . of the same vein, continued harassment of the same non-Dartmouth community members"), 261:11-25 ("the Standard II [allegation] is about the entire pattern, not just the report from March").**

These claims are demonstrably erroneous. In accordance with the College's own policies, the JAO raised formal disciplinary allegations against the plaintiff stating the actions he had committed on or about May 4th 2017 in violation of the no contact order which had previously been issued against him were alleged to be in violation of Dartmouth's community standards of conduct II and VI. Despite defense counsel's suggestion, and as Dartmouth's own policies require, the JAO did not retroactively decide to raise allegations regarding the March Report it had reviewed months prior. Instead, the sole purpose of plaintiff's disciplinary hearing (according to the allegations drafted by Dartmouth itself) was to determine if the actions he committed on or about May 4th in violation of a restraining order were in violation of the standards of conduct, and if they were, what sanction this would justify imposing (under recommendation and guidance of the JAO member and COS chair present at the hearing [*K. Strong - Deposed by Defendant's Counsel.mp4, 17:45*]). Dartmouth never changed the JAO's determination that the actions plaintiff committed during the winter term evidenced in the March Report were in violation of the standards of conduct. This is reflected in the allegations Dartmouth issued against the plaintiff on May 10th, 2017 (*defendant's exhibit 6, DARTMOUTH000110,* DARTMOUTH000111). As admitted in Katharine Burke and Katharine Strong's depositions (*K. Burke - Deposed by Plaintiff.mp4, 1:02:00*), it is objectively true that Dartmouth did not raise disciplinary allegations regarding plaintiff's statements in the March Report until the end of October 2017, approximately eight months after it initially received, investigated, and decided it was not appropriate to raise formal disciplinary allegations regarding the report, and at least one month after September 22nd 2017 when Dartmouth expelled plaintiff because of

the March Report. In deposition, Katharine Strong agreed that if a Dartmouth employee reviews some given evidence supporting an allegation of student misconduct and determines it does not justify initiating formal disciplinary proceedings against a student, it would be arbitrary and capricious for Dartmouth to then sanction a student or separate them from the College based on this exact same evidence months or years after the initial determination (*K. Strong - Deposed by Plaintiff.mp4, 1:08:30-1:10:35*), yet this is precisely what occurred in the plaintiff's disciplinary case.

Plaintiff sent the message which Dartmouth did raise disciplinary allegations about because after speaking with a police officer, he was informed that in order to prevent his ex-girlfriend's mother from continuing to contact his parts was to attain a no contact order, and that to attain this plaintiff needed evidence he'd had asked for the contact to stop, and that his ex-girlfriend's family subsequently made contact nonetheless. In a state of extreme distress, plaintiff sent the following message in hopes it would provide him a means of ending contact if his ex-girlfriend's mother persisted;

"this is a formal reminder that you are not allowed to contact me or anyone in my family"

As a result of sending this message, plaintiff was arrested for violating the no contact order which had previously been issued again him by his ex-girlfriend. Without seeing the message plaintiff sent that resulted in his arrest, Dartmouth raised formal disciplinary allegations against the plaintiff regarding the actions he'd allegedly committed in violation of a restraining order on or about May 4th 2017.  Upon reviewing the email he'd sent in violation of the no-contact order and the result of plaintiff's court hearing, plaintiff's college appointed Anne Hudak advisor suggested he deny both allegations which Dartmouth had raised against him.

### C. Judicial Affairs Office's Initiation of Disciplinary Proceedings

**On May 10, 2017, Adam Knowlton-Young, a Hearing Officer in the Office of Judicial Affairs, sent Plaintiff a letter. It stated he was "writing to follow up on a report [his] office received from Safety and Security, regarding an incident on or about May 4, 2017 as well as behavior from spring term that had resulted in a restraining order being put in place on you." Exhibit 4. Mr. Knowlton-Young offered to share materials electronically before he and Plaintiff met. Shortly after receiving Mr. Knowlton-Young's letter, Plaintiff requested an electronic copy in advance of their meeting, which Mr. Knowlton-Young sent him later that day. Exhibit 5; Exhibit 6.**

**Enclosed with Mr. Knowlton-Young's cover letter was a letter explaining the allegations, a Statement of Understanding through which Plaintiff was to respond to the allegations, a redacted copy of the Safety and Security report and other reports detailing Plaintiff's behavior, a copy of a**

letter to Plaintiff's parents, and an explanation of resources for navigating the Committee on Standards conduct process. Exhibit 6; Exhibit 39, Anderson Dep. Tr. 63:9-12. The Statement of Understanding contained two allegations: (1) "I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term" and (2) "I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017." Exhibit 6 at 111.

Plaintiff requested a delay of his disciplinary proceeding while he attempted to resolve the parallel criminal proceeding concerning his violation of the protective order. Ms. Strong responded that he could finish the current term, but would need to resolve the judicial case before returning to Dartmouth. Exhibit 7; Exhibit 40, Strong Dep. Tr. 34:12-17. Plaintiff understood that in order to remain enrolled at Dartmouth, he would have to participate in a hearing, and he would not be able to register for classes until his disciplinary process was complete. 4 Exhibit 39, Anderson Dep. Tr. 74:20-75:11, 75:21-76:3; Exhibit 40, Strong Dep. Tr. 35:16-36:9.

Despite this understanding, on September 4, 2017, Plaintiff emailed Mr. Knowlton Young and Ms. Clemens stating he was coming back to Dartmouth and asking whether he still needed to participate in a hearing. Exhibit 8. Mr. Knowlton-Young informed Plaintiff his case needed to be resolved before he returned to campus, and the process could not move forward until he completed the Statement of Understanding. Exhibit 9; Exhibit 40, Strong Dep. Tr. 37:11-38:6.

On September 10, 2017, Plaintiff partially completed and returned the Statement of Understanding. Exhibit 10. He denied both allegations. Id; Exhibit 39, Anderson Dep. Tr. 69:14-70:7. On September 11, 2017, Adam Knowlton-Young notified Plaintiff of the date of his hearing, September 21, 2017, and identified the individual members of the panel. Exhibit 11; Exhibit 39, Anderson Dep. Tr. 76:7-22. Plaintiff had the right to, but did not, object to any of the panel members. Id. 78:8-79:11. Mr. Knowlton-Young's notice invited Plaintiff to submit written materials for potential inclusion in the case packet. Exhibit 11.

The deadline for Plaintiff to submit a written statement passed without Plaintiff submitting materials or requesting an extension. Exhibit 12. The case packet was prepared and transmitted to Plaintiff and others on September 19, 2017, and he was informed it would be used with the Committee on Standards. Exhibit 13. Plaintiff was also provided an updated list of panel members. Exhibit 14.

### D. First Committee on Standards Hearing

**The first hearing took place on September 21, 2017. Plaintiff was given the opportunity to respond to the allegations that had been raised, and he attempted to answer questions about the emails to his ex-girlfriend. Exhibit 39, Anderson Dep. Tr. 84:20-85:12. Plaintiff gave a final statement after the question period. Id. 88:6-12.**

**The Committee on Standards deliberated and found Plaintiff responsible for violating Standard of Conduct II, Exhibit 1 at 7964-65, and concluded the appropriate sanction was separation. Exhibit 15; Exhibit 39, Anderson Dep. Tr. 93:8-94:8. The Chair, Daniel Nelson, met with Plaintiff the following day, September 22, 2017, and verbally communicated the Committee's decision. Id. 86:12-25. Ms. Strong sent Plaintiff written notification the same day. Exhibit 15. 5**

The purpose of plaintiff's disciplinary hearing on September 21st 2017 was to determine whether actions he committed on or about May 4, 2017 and the spring term of 2017 in violation of a restraining order constituted violations of Dartmouth's community standards that warranted imposing a sanction upon him, as demonstrated by the allegations Dartmouth raised against him which read;

"*(1) "I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring 2017 term" and (2) "I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017." Defendant's Exhibit 6 at 111."*

At this hearing, the COS reviewed the single message plaintiff sent in violation of a no contact order during the spring term of 2017 and did not determine this action justified imposing a disciplinary sanction upon the plaintiff. As noted before, Dartmouth's Student Handbook clearly states "In order for the COS to conclude that a student has violated a College rule…..the COS must conclude that it is more likely than not that the student committed <u>the alleged violation</u>."

Defense counsel has failed to note that the COS did not determine either of the allegations that had been raised against the plaintiff were in fact true, or sanction him based on such a determination. Instead, at the plaintiff's first hearing about September 21st 2017, the COS found that the evidence contained in the March Report (which Dartmouth's JAO had not only reviewed 6-months before the hearing, determined it was not appropriate to raise formal disciplinary allegations about, and communicated this determination to the plaintiff. In doing so, the COS raised an entirely new allegation Dartmouth's JAO (the only entity capable of evaluating evidence of misconduct and determining whether or not disciplinary allegations ought to be raised) had previously determined it was not appropriate to issue, found him guilty of this new allegation which had never been issued, and expelled him, all in violation of Dartmouth's

policies, procedures, and previous decisions. It is without question that Dartmouth had not raised allegations regarding the March Report in advance of this hearing, and that at his hearing on September 21st 2017, plaintiff was sanctioned based off an allegation Dartmouth had never raised against him, and that while denying having done so at the time, Dartmouth raised new allegations in advance of plaintiff's second hearing which were materially different in substance than those raised in advance of his first disciplinary hearing (*K. Strong - Deposed by Plaintiff 2.mp4, 40:00-42:00*. The allegations raised against the plaintiff in advance of his first disciplinary hearing are materially different in substance than the allegation he was found guilty of at his first hearing, and the allegations which were raised against him at his second hearing; Dartmouth's policies do not allow it to raise allegations regarding evidence of misconduct its JAO has already reviewed and determined it is not appropriate to raise formal disciplinary allegations about, as supported by the fact that Dartmouth has never done this in any case over the institution's known history other than the plaintiff's (*K. Strong - Deposed by Plaintiff.mp4, 2:46:00*).

At the time of his hearing (which Strong participated in, and was tasked with ensuring was carried out in compliance with Dartmouth's policies) Katharine Strong had not only entirely forgotten that she had already reviewed the March Report 6-months before plaintiff's hearing and determined it did not contain information that justified raising disciplinary allegations against the plaintiff (*Anderson M. '18 – in person meeting 11.16.17, 16:05*), but also stated to plaintiff on the day of his hearing that the COS was able to impose a finding with regard to new allegations which hadn't been raised in advance of plaintiff's hearing. Also notable is that Katharine Burke, the Dartmouth employed attorney who served as chair as the plaintiff's second hearing, and was a violently unfair and biased adjudicator, helped Daniel Nelson (the chair of plaintiff's first hearing) draft his decision letter. Although no party to this communication

was acting as an attorney or providing legal advice, Dartmouth has withheld most of it.



From: Katherine P. Burke <Katherine.P.Burke@dartmouth.edu>
Sent: Friday, September 22, 2017 8:44 AM EDT
To: Daniel M. Nelson <Daniel.M.Nelson@dartmouth.edu>
Subject: RE: COS Case Note for Mark I. Anderson '18
Nicely done

   Dartmouth's decision to unlawfully expel plaintiff based on evidence of misconduct it'd previously reviewed and determined it was not appropriate to raise allegations about shocked members of Dartmouth's own disciplinary staff, who upon being informed of the decision stated in private emails to each other "*WTFFFFFFFFF*" (an exaggerated form of "wtf," an acronym for "what the fuck"), "*I don't understand this decision*," and "*we are in an anything can happen era*" (counsel for Dartmouth withheld both of these emails during the discovery process after assuring plaintiff it had produced all documents which do not qualify for attorney-client privilege, only to later produce them after receiving notification

plaintiff intended to file a motion to compel discovery).



**From:** Kristi L. Clemens <Kristi.L.Clemens@dartmouth.edu>
**Sent:** Monday, October 23, 2017 4:55 PM EDT
**To:** Katharine R. Strong <Katharine.R.Strong@dartmouth.edu>
**Subject:** RE: Anderson

I don't understand this decision.

---------------------------------------------------------------------------------------------

Kristi Clemens
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907

DARTMOUTH008401

**From:** Kristi L. Clemens
**Sent:** Monday, October 23, 2017 4:54 PM EDT
**To:** Sarah.L.McKinney@dartmouth.edu <Sarah.L.McKinney@dartmouth.edu>
**Subject:** FW: Anderson

WTFFFFFFFFFF

------------------------------------------------------------------------------------------
Kristi Clemens
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907



DARTMOUTH008403

**From:** Sarah L. McKinney <Sarah.L.McKinney@dartmouth.edu>
**Sent:** Monday, October 23, 2017 4:57 PM EDT
**To:** Kristi L. Clemens <Kristi.L.Clemens@dartmouth.edu>
**Subject:** RE: Anderson

Shocked but also not... we are in an anything can happen era.

Sent from my Verizon 4G LTE smartphone

-------- Original message --------
From: "Kristi L. Clemens" <Kristi.L.Clemens@dartmouth.edu>
Date: 10/23/17 4:54 PM (GMT-05:00)
To: "Sarah L. McKinney" <Sarah.L.McKinney@dartmouth.edu>
Subject: FW: Anderson

WTFFFFFFFFFF

------------------------------------------------------------------------------------------
Kristi Clemens
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907

**E. First Request for Review**

Before Plaintiff submitted his request for review, he asked for more information regarding the panel's decision, and on September 25, 2017, Ms. Strong sent him the case note authored by the Chair, Daniel Nelson. Exhibit 17.

 After several extension requests, Plaintiff submitted his request for review on October 4, 2017. Exhibit 39, Anderson Dep. Tr. 96:1-6; Exhibit 18; Exhibit 19. In it he stated, among other things, "I was not given such reasonable notice of the substance of my allegations from the school, because my advisors and I were able to come to the conclusion . . . that the COS committee put me on trial for a specific set of actions I'd committed during the Spring term, which did not encompass the things I'd done during the Winter term while I was home . . ." and consequently "I didn't get an opportunity to 'admit' or 'deny' the allegations I was found guilty of, & it wasn't possible for me to know exactly what information it was important for me to provide to the committee." Exhibit 19 at 1301.

5 (footnote, page 12) Dartmouth paid for Plaintiff's parents to fly from Washington state to Dartmouth to take Plaintiff home after he received the decision, but Plaintiff "elected not to return home" with them after they arrived on campus. Exhibit 39, Anderson Dep. Tr. 95:12-19; Exhibit 42, Clemens Dep. Tr. 35:7-12; Exhibit 16. Plaintiff understood that he had the right to request a review and that he was not permitted to remain on campus during the time period that he was seeking review. Exhibit 39, Anderson Dep. Tr. 95:20-25; see also Exhibit 15 ("As you know, you have the right to request review of the panel's decision . . . Please note: separated students who request review are expected to leave campus while their review is pending . . . ."). While Plaintiff understood that until the proceedings were resolved he was not permitted to enroll in classes or live on campus, he violated that directive by living at his fraternity. Exhibit 39, Anderson Dep. Tr. 104:18-105:8, 105:15-106:24.

Dartmouth did not have the right to bar Dartmouth students from campus in these circumstances without raising formal disciplinary allegations and doing so as the result of a disciplinary hearing process performed in fairly and in accordance with the institution's own policies, and it objectively did not fulfill this requisite condition. Despite having already expelled plaintiff, Dartmouth then forced him to participate in further disciplinary processes which necessitated he remain on Dartmouth's campus. Dartmouth faced plaintiff with two choices; remain and suffer on campus in secrecy, or majorly jeopardize his own ability to access resources necessary to navigate and cope with Dartmouth's disciplinary hearing processes, and also incur travel costs he could not afford. For example, after plaintiff

was no longer on campus and able to schedule in-person meetings with employees in Dartmouth's disciplinary staff, they refused to answer his inquiries or requests for information regarding his hearing process.

**Rebecca Biron, then Dean of the College, served as the reviewing officer. She considered all of the materials submitted to the Committee on Standards panel and Plaintiff's written request for review. Dr. Biron concluded that, while there was no new information or procedural error in the first hearing, because Plaintiff "was claiming that he would have responded differently" if the dates in the allegation letter had been more specific, "the issue of his ability to respond to the allegations [did] potentially have a material effect on the outcome of the hearing . . . ." Exhibit 45, Biron Dep. Tr. 14:1-15:6. She decided a new "hearing in which the allegation letter would more clearly state that the hearing was going to cover events from the first communications all the way through would allow him to respond in a more wholesome way as he indicated in the appeal letter he would like to." Id.; Exhibit 20 at 2106 ("This statement demonstrates that the discrepancy you perceived between the allegation letter and the committee's focus did significantly affect your response to the allegations, both in your denial of responsibility and in the way you answered questions during the hearing."). Plaintiff was granted a new hearing. However, while the matter remained pending, he could not enroll and was not permitted to be on campus. Id.**

Dartmouth has failed to note here, the substantial fact (which Dartmouth's employees denied throughout plaintiff's disciplinary hearing process, and until they were made to perform sworn depositions) the allegations Dartmouth raised in advance of plaintiff's second hearing, the allegations raised in advance of his first hearing, and the allegation Dartmouth found plaintiff guilty of at his first hearing are all materially different in substance; see(*K. Strong - Deposed by Plaintiff 2.mp4, 40:00-44:00, 1:05:30, 1:07*). Katharine Strong, Dean Biron, and Dartmouth's all of Dartmouth's other employees (other than Kevin O'Leary) who administered plaintiff's disciplinary hearing process not only vehemently denied this fact over the course of his disciplinary proceedings *("I have not changed the scope of what the COS will be responding to in either of the hearings," Anderson, M. '18 – KRS phone meeting 11.06.17*), but also admitted Dartmouth's policies do not allow such action.

However, Biron refused to acknowledge the objective fact that Dartmouth had found plaintiff guilty of an allegation that was not raised against plaintiff in advance of his hearing and that a procedural error occurred, despite that this is objectively the case, as Katharine Strong affirmed in deposition *(K. Strong - Deposed by Plaintiff 2.mp4, 1:07:00 ""we determined this was a procedural error")*, after vehemently insisting (as Biron has) that no procedural error occurred in his case over the entirely of plaintiff's

disciplinary proceedings. This is because Biron had no intention to acknowledge or attempt to remedy the procedural errors Dartmouth had committed in plaintiff's case, despite that it is her responsibility to do so. Rather, Biron made her decision based on alternate facts inconsistent with reality as part of a conscious effort to subject plaintiff to a biased disciplinary process set into motion and conducted to ensure the College would expel him, and support its previous decision to do so.

Given the events that had transpired during his first hearing, plaintiff was in no regular state of mind, planning how to end his life as painlessly as possible if certain circumstances arose, was constantly sleep deprived, unable to eat, and experiencing regular stress induced chest pains, none off which he had experience prior in his life. As supported by Mark Reed's (Dartmouth's Director of the Health Service) own psychological assessment of plaintiff, and the impression of Dartmouth's administrators who compelled plaintiff to meet with its medical staff on numerous occasions because they were concerned for plaintiff's safety, plaintiff was arguably unfit (again, according to Dartmouth's own staff) to participate in a disciplinary proceeding. If, and to the extent Dartmouth claims plaintiff's own statements made in his request for review, or elsewhere after his initial disciplinary hearing justify the College's actions which would otherwise be unlawful, these arguments should be rejected outright. If Dartmouth sanctions a student in violation of its own policies and drives them to a state of mental deprivation and suicidality, it cannot retroactively use statements the student makes in this state to justify its previous misconduct.

**On October 26, 2017, Ms. Strong communicated the result of the request for review in person to Plaintiff, and then followed up with a new allegation letter the following day. Exhibit 21; Exhibit 22; Exhibit 39, Anderson Dep. Tr. 99:13-19, 102:8-21; Exhibit 40, Strong Dep. Tr. 46:16-23, 47:1-4. The revised allegation letter stated "it is alleged that you engaged in harassing behavior or conduct targeted at an individual in January, February, and March of 2017. Additionally, it is alleged that you violated a restraining order on or about May 4, 2017." Exhibit 22 at 2012. The first allegation in the Statement of Understanding was also revised: "I violated the Dartmouth Standard of Conduct II by engaging in harassing behavior or conduct targeted at an individual in January, February, March, and/or May of 2017." Id. at 2013.**

Over the course of plaintiff's entire disciplinary process, Dartmouth's employees vehemently insisted that (1) no procedural error occurred during plaintiff's first disciplinary hearing, (2) that the allegations raised in advance of plaintiff's first disciplinary hearing were not materially different in substance than the allegation the COS found him guilty of, and (3) that the allegations raised in advance of plaintiff's first and second disciplinary hearings were not materially different in substance (*see defendant's exhibit*

20; also Anderson, M. - KRS, Hudak, A. - phone meeting 10.26.17; also K. Strong - Deposed by Plaintiff.mp4 00:20, 2:09:45;

Plaintiff:  "in October and November of 2017, you and I had multiple recorded conversations, do you have memory of this?"

Katharine Strong: "yes"

Plaintiff: "Do you memory in those recorded conversations, saying that no procedural error occurred in my hearing process, and that it had been conducted according to the same rules all disciplinary cases are performed by at the College?"

Katharine Strong:  "Yes")

Yet these same Dartmouth employees have now not only admitted that none of these assertions are true;(K. Burke - Deposed by Plaintiff.mp4, 1:02:00-1:04:00) ( K. Strong - Deposed by Plaintiff 2.mp4, 1:05:00-1:08:00, "we determined this was a procedural error," Katharine admits allegations from first letter did not allege actions from March Report were in violation of the Standards of Conduct) (K. Strong - Deposed by Defendant's Counsel.mp4, 56:45, "the reviewing officer determined that one of the allegations as written did not appropriately encompass the dates of the events which were in review by the COS"; 57:00 Plaintiff: "In your knowledge has Dartmouth ever admitted to committing a procedural error over the course of a disciplinary hearing process which resulted in the student being expelled; "Katharine Strong "in your case") (Katharine is lying here and the reviewing officer did no such thing), but that this would necessarily mean Dartmouth failed to comply with its own policies in the administration of plaintiff's disciplinary hearing process.

### F. Interim Between First Request for Review and Second Committee on Standards Hearing

On November 1, 2017 Plaintiff sent an email to Katharine Strong requesting to delay his second hearing. Exhibit 23 at 2782-83. Worried that Plaintiff was in distress, Ms. Strong responded the following day that she had "significant concerns about [his] ability to engage in the judicial process at [that] time" and asked that he meet with a counselor for an evaluation. Id. at 2782. Until he completed the evaluation and Judicial Affairs was notified of his ability to participate, the hearing would "not move forward." Id. Plaintiff responded that he understood Ms. Strong's expectations. Id.

On November 9, 2017, Ms. Strong emailed Plaintiff and restated that she had asked him to provide her office with a waiver so that she could speak to his counselor and confirm his availability

**to participate in the hearing process. Exhibit 24 at 3628-29. Plaintiff signed a waiver, and in Ms. Strong's conversation with Counseling and Human Development, "they recommended that the hearing be delayed while [Plaintiff] pursue[d] recommended treatment options." Id. Ms. Strong gave Plaintiff until November 14, 2017 to confirm that he would pursue treatment or, in the alternative, refuse treatment, complete the Statement of Understanding, and move forward with the hearing. She also noted that failure to respond would result in Immediate Temporary Suspension from the College. Id.; Exhibit 40, Strong Dep. Tr. 49:7-17, 51:18-52:5.**

**On November 15, 2017, Plaintiff emailed Ms. Strong. He did not confirm pursuit of recommended treatment options and did not return a completed Statement of Understanding. Exhibit 24 at 3628. Ms. Strong replied that since she had not received a direct response—or a request for an extension—she would move forward with scheduling his hearing, likely at the start of the winter term. Id. She also stated Dartmouth would enact an Immediate Temporary Suspension. Id. The next day, Brian Reed, Associate Dean for Student Academic Support Services and Dean of Undergraduate Students sent Plaintiff notice of the Immediate Temporary Suspension, which would remain in force until the formal disciplinary proceedings concluded. Exhibit 25. 6**

Dartmouth is lying here outright. As Katharine Strong revealed in sworn deposition, she did not impose a temporary suspension against plaintiff for the reasons described here. Rather, while claiming it was because plaintiff had somehow failed to comply with Dartmouth's procedures at the time, Katharine would later admit that she imposed this sanction upon the plaintiff to remedy procedural issues that had arisen as the result of the unprecedented disciplinary procedures Dartmouth subjected the plaintiff to (*K. Strong - Deposed by Defendant's Counsel.mp4, 1:08*). This is an unlawful use of a suspension, and on display here is the fact that Dartmouth's employees are either unsure, or do not believe they have an obligation to follow the College's own written policies (*see K. Strong - Deposed by Plaintiff.mp4; 27:00 – Plaintiff: "Is Dartmouth allowed to impose disciplinary sanctions or initiate disciplinary proceedings against a student if doing so would violate their promised procedural rights or protections?" Katharine Strong: "I don't know";*

*29:00 – Plaintiff: "if the college wanted to impose a disciplinary sanction upon a student, but would have to violate the student's promised rights and protections to do so, could it do this?" Katharine Strong: "I don't know"*

*22:00, Katharine says she does not know why students are afforded certain procedural rights and protections in Dartmouth's disciplinary hearing processes) (also Deposition of Michelle Clarke, 2:20*),

demonstrating Dartmouth's failure to adequately hire and train its disciplinary staff regarding students' rights and responsibilities in its disciplinary processes.

*"As a general rule, both notice and a hearing should precede a suspension." Goss, 419 U.S. at 582, 95 S.Ct. 729; Gorman, 837 F.2d at 12-13.*

**On November 17, 2017, Plaintiff's counselor, Mark Reed, recommended to Ms. Strong and to Plaintiff that he take a medical leave from the College. Exhibit 26. Plaintiff understood that if he did so, he would be granted an extension of time for the disciplinary proceeding, but if he did not take a medical leave, the disciplinary process would move forward. Plaintiff decided not to take a medical leave. Exhibit 39, Anderson Dep. Tr. 109:8-110:7. Ms. Strong inquired on November 20, 2017 about an update on the topic. Exhibit 26. She sent a follow-up email on November 21, 2017 explaining Plaintiff's status at the time and reiterating that if he believed he would benefit from taking a leave before his hearing, he could request one and there was no deadline to do so. Exhibit 28.**

**Plaintiff requested a delay in the proceeding so that he could file a lawsuit. Exhibit 29. Ms. Strong responded that Dartmouth would consider a request if a lawsuit was filed, but the hearing might proceed even if he did so. In the meantime, she stated they would proceed with scheduling the hearing. Id.**

**(page 15 footnote) After Dean Biron issued her decision giving Plaintiff another hearing, he initiated a campaign of harassment against a variety of Dartmouth officials—including the Judicial Affairs Office, the President of the College, and the Provost—seeking intervention in his disciplinary proceeding through repeated phone calls and written submissions. Exhibit 27. Plaintiff was told that the Committee on Standards hearing was the only proper venue for proceeding. Id.**

Thanks Laura.  Please know that he has been seen by counseling fairly recently, and we are keeping them updated as well.

-----------------------------------------------------------------------------------

Kristi Clemens
Assistant Dean of Student Affairs and Director of Case Management
Dartmouth College
132 Carson Hall
(603) 646-3907

**From:** Laura H. Hercod
**Sent:** Friday, November 17, 2017 11:59 AM
**To:** Kristi L. Clemens <Kristi.L.Clemens@dartmouth.edu>
**Subject:** FW: Meeting request

Hi Kristi–

As I know you are, we are not concerned about our safety but we are concerned about Mark.  Please let me know if there is anything we can do for him.

All best,
Laura



It is absolutely deplorable for Dartmouth to accuse plaintiff of perpetuating "a campaign of harassment against a variety of Dartmouth officials" for having pursued avenues suggested to him to <u>by Dartmouth's own employees</u>, including Mark Reed who suggested plaintiff contact the President and Trustees of Dartmouth College, and Hailey LaVoy - Asst. Secretary to the Board of Trustees, who recommended that plaintiff also contact the College Provost.

Dartmouth eventually issued a no-contact order against the plaintiff for having exercised his promised rights as a member of the institution – to both inquire and speak – in order to prevent plaintiff from acquiring information about his case, or using the institutions own mechanisms to encourage its compliance with its own written policies. In the voicemail where he notified plaintiff of the order's issuance, the Dartmouth employee who issued the order, Head of the Safety and Security Department Keiselim Montás, instructed plaintiff to contact him if he wanted information regarding the order or why it had been issued. Plaintiff repeatedly inquired why the order had been issued, writing emails and leaving messages and voicemails, but Montás refused to answer them, or provide virtually any reasoning as to

why his promised rights to speech, inquiry, and protest had been revoked, despite that he was aware of these requests.



**From:** Keiselim A. Montas
**Sent:** Wednesday, February 07, 2018 4:57 PM EST
**To:** David F. Kotz (David.F.Kotz@dartmouth.edu) <David.F.Kotz@dartmouth.edu>
**Subject:** FW: Voicemail from Mark Anderson--privileged and confidential

Just looping you in this email I sent a few minute ago.

Keysi

Following are URL links to two YouTube videos of Dartmouth students which demonstrate the type of speech and protest rights which Dartmouth promises its students;

https://www.youtube.com/watch?v=V90MqL2hzPU  (Students Occupy Parkhurst: Part I)

https://www.youtube.com/watch?v=OJAuVQlLxD0 (Dartmouth College #BlackLivesMatter Protest)

As demonstrated by the evidence, plaintiff did nothing that even begins to approach Dartmouth's own limits on inquiry, protest, and speech. Although plaintiff was given conflicting messages that he would be able to voice his concerns regarding Dartmouth's mismanagement of his disciplinary hearing process to the COS at his second hearing from multiple of Dartmouth's senior most employees, he would be denied the opportunity to do so at the direction of one of these very employees, Kevin O'Leary (DARTMOUTH007788- DARTMOUTH007790).

Following is a link to a statement by Dartmouth's administration where they boast of a community that "fosters and protects the rights of individuals to express dissent," that "Protest or

demonstration shall not be discouraged so long as neither force nor the threat of force is used, and so long as the orderly processes of the College are not deliberately obstructed," and advertise that these rights are enshrined in Dartmouth's Student Handbook; https://www.thedartmouth.com/article/2007/02/dartmouth-does-explicitly-protect-free-speech. Through its campaign to silence plaintiff and deprive him of these promised rights (including extensive efforts to prevent plaintiff from sharing information regarding his disciplinary hearing process with the COS), Dartmouth not only severely undermined the fairness of plaintiff's disciplinary processes, but also violated its own written, advertised policies.

Dartmouth's employees promised to provide plaintiff information regarding his disciplinary case on several occasions, only to later refuse to provide him said promised information and refuse to respond to his relevant inquiries (*Katharine Strong, Anderson, M. – KRS, Hudak, A. – phone meeting 10.26.17, 00:46:00*). Plaintiff had every right to persistently exercise his rights in efforts to obtain this promised information.

**On December 8, 2017, Plaintiff was notified that he would be required to attend the Committee on Standards hearing on January 8, 2018, and was provided the names of the individuals who would sit on the panel. Exhibit 30; Exhibit 39, Anderson Dep. Tr. 110:21- 111:2.7 None of the voting members of the panel in Plaintiff's second hearing participated in or had any awareness of the first hearing. Exhibit 40, Strong Dep. Tr. 47:10-22, 158:7-9 (Plaintiff was "granted an entirely fresh and clean new hearing"); Exhibit 41, Burke Dep. Tr. 29:1-16 (the second hearing panel was not aware of the first hearing, rather it was "a fresh hearing, not related to any previous proceedings"). The scheduling letter informed Plaintiff he could submit a written statement or other materials for inclusion in the packet provided to the Committee on Standards, but he should do so no later than December 15, 2017. Exhibit 30. The letter also specifically stated the "COS Chair is empowered to determine the relevance and admissibility of all submitted materials." Id.**

Dartmouth has erroneously suggested otherwise, but the chair at plaintiff's second hearing, Katharine Burke, was not only acutely aware of plaintiff's first disciplinary hearing, its subject matter, and outcome, she was literally involved in drafting the case note in which Dartmouth justified the rationale for its decision. Other Dartmouth employees such as Katharine Strong, Adam Knowlton-Young, and Kevin O'Leary were also extensively participated in the administration of plaintiff's second hearing, for instance, by instructing the COS chair at his second hearing not to allow plaintiff to present allegations they and other Dartmouth employees had violated Dartmouth's policies over the course of Plaintiff's hearing process:

*K. Strong - Deposed by Defendant's Counsel.mp4; 32:30 "Both Adam and I reviewed the restraining order...we have a weekly meeting...with Safety and Security to get more information from them or to find out if there was more information. Case management sat in on that meeting.....and Title IX, Greek Life"*

*K. Strong - Deposed by Plaintiff.mp4, 17:20: states the COS chair weights in on committee's sanctioning decision; 1:21:30: Katharine and Adam Knowlton-Young work together closely, and consult with each other as they perform their duties in Dartmouth's hearing processes; 1:21:45: Katharine says she spoke to Adam Knowlton-Young regarding plaintiff's disciplinary process prior to his first hearing, but cannot recall the contents of these communications; 17:45 Strong states that if the COS determines one of more allegations is true, the JAO recommends what sanctions this finding could support.*

*K. Burke - Deposed by Plaintiff.mp4, 2:25 Burke admits she attended meetings about, and participated in administration of plain tiff's hearing process prior to serving as chair of plaintiff's second disciplinary hearing*

*Adam Knowlton-Young - Deposed by Defendant's Counsel & Plaintiff.mp4, 13:30: because of size of JAO, Adam is sure he had some involvement in plaintiff's hearing process prior to administering plaintiff's second hearing but cannot remember exactly what that involvement is.*

Plaintiff was "granted an entirely fresh and clean new hearing" in no way, and here Dartmouth violated basic fairness and its own policies. In reality, every Dartmouth employee involved in the administration of plaintiff's second disciplinary hearing process was intimately aware of his first hearing and its outcome from the day it was made (DARTMOUTH0087420 - DARTMOUTH008744).

**From:** Daniel M. Nelson <Daniel.M.Nelson@dartmouth.edu>
**Sent:** Thursday, September 21, 2017 6:13 PM EDT
**To:** Katherine P. Burke <Katherine.P.Burke@dartmouth.edu>; Elizabeth L. Agosto <elizabeth.l.agosto@dartmouth.edu>; Brian D. Reed <Brian.D.Reed@dartmouth.edu>; Susan M. Taffe Reed <Susan.M.Taffe.Reed@dartmouth.edu>; Kristi L. Clemens <Kristi.L.Clemens@dartmouth.edu>; Kevin D. O'Leary <Kevin.D.O'Leary@dartmouth.edu>; Katharine R. Strong <Katharine.R.Strong@dartmouth.edu>; Adam J. Knowlton-Young <Adam.J.Knowlton-Young@dartmouth.edu>; Anne B. Hudak <Anne.B.Hudak@dartmouth.edu>
**Subject:** COS Outcome

Dear Colleagues,

Mark I. Anderson '18 was found responsible by the COS this afternoon for violating Standard II. (The committee reached "no finding" about the alleged violation of law in the absence of a court decision.) The committee decided on separation as the sanction. I understand that there have been ongoing concerns about Mark's emotional health, and the committee shares those concerns as well. Katherine is alerting Heather Earle. My outcome meeting with Mark is at 9:00 tomorrow morning at the Judicial Affairs Office, and it might be helpful to Mark if he were encouraged and able to see a counselor after that meeting.

I'll be circulating a case note later this evening or tomorrow morning.

Thanks
Dan

Daniel M. Nelson, Director
Dartmouth Outdoor Programs
112 Robinson Hall
6 N. Main St.
PO Box 9
Hanover, NH 03755

603-646-2356

Furthermore, while Dartmouth has suggested Katharine Strong and Kevin O'Leary were not involved in plaintiff's second hearing, discovery documents show that Strong and O'Leary were involved in censoring plaintiff's descriptions of Dartmouth's misconduct that he attempted to produce to the COS; Strong and O'Leary prevented plaintiff from describing said misconduct to the COS as they themselves (along with Dean of the College Rebecca Biron) had been promised he be allowed to, a violation of basic fairness, as well as Dartmouth's own policies. Although Dartmouth admits that having the same individuals who carried out plaintiff's expulsion conduct his second hearing would be a violation of

fairness, this is just what occurred in plaintiff's case.

Laurie Welch

From:           Adam J. Knowlton-Young
Sent:           Thursday, January 4, 2018 10:02 AM
To:             Elizabeth L. Agosto; Kevin D. O'Leary
Cc:             Laurie Welch
Subject:        RE: DRAFT Case Packet for M. Anderson

Copy that Liz.

Kevin any other thoughts?  I have the text you recommended including when we send the packet:

"I have copied all of the information related to your conduct and Dartmouth's response to that conduct prior to May of 2017 and it is in the attached document.  The Chair of the Hearing has agreed that this information can be provided to the Committee and will plan to include this in the packet.  The other information is not related to whether or not your conduct violated the Standards of Conduct, the only issue before the COS."

If all looks OK, then we will get things out.

Adam

PS
I spoke with Anne Hudak briefly so she knows she is listed as the advisor in the SOU and has some sense of what's in the packet.

From: Elizabeth L. Agosto
Sent: Thursday, January 04, 2018 9:32 AM
To: Adam J. Knowlton-Young <Adam.J.Knowlton-Young@dartmouth.edu>; Kevin D. O'Leary
<Kevin.D.O'Leary@dartmouth.edu>
Subject: Re: DRAFT Case Packet for M. Anderson

Telephone: 603.646.0101
Facsimile: 603.646.2447

**From:** Adam J. Knowlton-Young
**Sent:** Wednesday, January 3, 2018 9:44 AM
**To:** Kevin D. O'Leary <Kevin.D.O'Leary@dartmouth.edu>; Elizabeth L. Agosto <elizabeth.l.agosto@dartmouth.edu>
**Cc:** Katharine R. Strong <Katharine.R.Strong@dartmouth.edu>
**Subject:** FW: Question About COS Hearing Rules/Procedures

Good morning Liz and Kevin,

Mark submitted the attached document last night for inclusion in the packet. I was hoping we could discuss this at Chairs as Katharine didn't think we would use the whole time for other things? I am planning to skim through and have some sense of what is germane to the upcoming hearing versus focusing on past grievances.

I had drafted his packet yesterday, prior to his submission, and Katharine has reviewed it. I am attaching that packet here as well.

Thanks folks,

Adam

**From:** Mark I. Anderson
**Sent:** Tuesday, January 02, 2018 6:58 PM
**To:** Adam J. Knowlton-Young <Adam.J.Knowlton-Young@dartmouth.edu>
**Subject:** Re: Question About COS Hearing Rules/Procedures

Dear Adam,

Thank you for your reply.

Because Plaintiff had returned to his home in Washington State, Plaintiff requested, and Kristi Clemens approved his request for, financial assistance and travel arrangements to attend his second hearing. Exhibit 31. Ms. Clemens was clear that Plaintiff would have to depart Hanover if he were found responsible a second time, even if he decided to pursue a request for review. Id. Plaintiff ultimately accepted the terms Ms. Clemens outlined. Id.

On December 22, 2017, Adam Knowlton-Young told Plaintiff again that materials are included in the case packet in the discretion of the Chair. Furthermore, the Chair would "only be allowing materials or discussion related to the allegations and associated behavior" and the hearing would not be a "venue for discussing [his] concerns about the previous hearing or concerns with College procedures." Exhibit 32.

(page 16 footnote) Katharine Strong had no involvement with the second Committee on Standards hearing and removed herself from the process in December 2018. Exhibit 40, Strong Dep. Tr. 54:21-55:1, 55:19-22, 56:4-18. Adam Knowlton-Young sat in on Plaintiff's second hearing in order to have "someone fresh" from the Judicial Affairs Office as the representative. Exhibit 44, KnowltonYoung Dep. Tr. 17:15-18:10.

**On January 2, 2018, Plaintiff submitted materials he hoped would be included in the case packet. Exhibit 33. He also completed the Statement of Understanding, and named Ms. Clemens, among others, as a witness. Id. at 8748. The Chair, Liz Agosto, in her discretion, and consistent with the authority given to the Chair in the Student Handbook, reviewed Plaintiff's submission and selected a portion for inclusion in the case packet. Compare Exhibit 33 with Exhibit 34; Exhibit 39, Anderson Dep. Tr. 116:16-24, 119:22-120:2, 120:9-13. 8 Plaintiff received the final case packet on January 4, 2018. Exhibit 34; Exhibit 39, Anderson Dep. Tr. 112:13-19.**

**G. Second Committee on Standards Hearing**

**The scheduled Chair, Liz Agosto, became ill at the last minute and could not attend Plaintiff's second hearing. Katherine Burke substituted as the Chair. The members of the Committee on Standards who actually made the decisions did not change. Exhibit 39, Anderson Dep. Tr. 111:23-112:11.**

As previously noted the COS chair and JAO member present at a hearing help determine what sanction ought to be imposed, *(K. Burke - Deposed by Plaintiff.mp4, 2:23:30 & 2:42:00, the COS chair and JAO official present at a hearing recommend what sanctions ought to be imposed if the COS determines the student is guilty of one or more of the alleged violations of the Standards of Conduct raised in advance of their hearing)*, and so the members of the committee who made the decision did change. Additionally, no member of the COS (including the chair) reviewed the information plaintiff attempted to bring to their attention at the hearing, despite Dartmouth's policies which necessarily imply all such information will at the very least be evaluated the COS chair of a student's hearing.

**Ms. Burke, an experienced chair, immediately familiarized herself with the case packet. Exhibit 41, Burke Dep. Tr. 15:2-21. She met with Plaintiff in advance of the hearing to explain the process. They discussed the materials he had proposed to be included in the case packet. Id. 19:20-22:2. She made it clear to him before the hearing started that the Committee's responsibility was limited to reviewing the case packet, and that she would maintain the focus of the hearing on his behavior as alleged in the materials, determining whether he violated Standard of Conduct II, and, if so, what the appropriate sanction would be. Id. 87:17-88:20. She stood by Dean Agosto's decision to allow consideration of only a portion of Plaintiff's written materials.**

**(Page 17 footnote) It is unclear how the information that Ms. Agosto decided should be removed would have improved Plaintiff's position before the Committee on Standards.**

This information which Kevin O'Leary, Kathrine Strong and Dean Biron all explicitly told plaintiff he would be given an opportunity to share with the COS at his hearing, but which plaintiff was then wrongfully prevented from sharing with the COS in any capacity by Katharine Burke, and at Kevin O'Leary's command had an obvious effect on, and undermined the fairness of plaintiff hearing in several ways. As communicated in the case note from plaintiff's second hearing, the committee's decision was based on the fact he felt animosity towards Dartmouth; an explanation of why Plaintiff felt animosity towards Dartmouth (for refusing to abide by its own policies throughout his disciplinary hearing process) is obviously relevant to evaluating if and how such emotions should be accounted for in the committee's disciplinary decision. Despite that Katharine Burke has testified it would not be proper for the COS to consider topics a student was not allowed to share information about at their hearing *(K. Burke - Deposed by Plaintiff.mp4, 3:18:45)*, this is exactly what happened at plaintiff's second disciplinary hearing, and no member of the COS present other than Burke was aware of the substance of plaintiff's concerns in any capacity *(Deposition of Michelle Clarke, 11:00)*. Although the Handbook states the hearing Chair has discretion to determine what is relevant to the proceeding, basic fairness and any good faith interpretation of Dartmouth's policies does not allow the College's Dean of the College, Director of the JAO, and Office of General Counsel to promise a student they will be allowed to describe and present evidence regarding failures of the College's employees to follow the institution's policies over the course of his hearing process to the COS at their hearing, subsequently revoke the student's right to speak about this at their hearing, and then write that the student's animosity towards the College supports a decision to sanction them.

*DARTMOUTH006465 – Dean Rebecca Biron says in an email correspondence to the plaintiff that at his upcoming hearing, "You will have the opportunity to explain to the committee how you view the pending allegations."*

*Email from Kevin O'Leary to the plaintiff titled "re follow up:" "Of course, there is nothing in the correspondence that suggests that the JAO had "decided these actions ought to be addressed via an administrative hearing…" You have made that argument repeatedly to me and to others. Such a decision is not discussed or addressed in any way in any email, letter or other type of correspondence from the JAO or anyone else at Dartmouth that you have shared with me. <u>As we have discussed, you are free to make this argument at your COS hearing. You should consider what evidence you will show to the Committee to support this claim."</u>*

*Also see the following excerpt from an email sent to the plaintiff by Kevin O'Leary*

In your case, Dartmouth is going to have a hearing where you have notice of the charges that you violated the Standards of Conduct and the opportunity to respond to them.  At that hearing, you are free

DARTMOUTH008540

to introduce your evidence you alluded to when we spoke yesterday, i.e., that you had received a prior sanction for the earlier conduct and thus should not be subject to a new sanction.

Also see (*Anderson, M. – KRS, Hudak, A. – phone meeting 10.26.17)*, where Katharine tells the plaintiff he will have an opportunity to explain his concerns with Dartmouth's administration of his disciplinary process to the COS at his second hearing.

Despite Dartmouth's erroneous suggestion Katharine Strong had no involvement in plaintiff's second hearing, when plaintiff's hearing approached, Kevin O'Leary, Adam Knowlton-Young, and Katharine Strong instructed the chair to prevent plaintiff from describing Dartmouth's misconduct to the COS (*DARTMOUTH007788- DARTMOUTH007791, 2nd production, also following image*). If the most senior administrators of Dartmouth's disciplinary staff tell a student they have the right to describe the college's alleged failures to abide by its own policies to the COS at a disciplinary hearing, the College (let alone these very same administrators) cannot then revoked this promised right. For Dartmouth to then go on to say that ("*Despite his assertion that he accepted responsibility and described his behavior as the "worst thing" he'd ever done, the student's other statements led the Committee to believe that he felt his actions during this period were justified, and that the student, her family, and Dartmouth were to blame,"* (*DARTMOUTH005403*) and that plaintiff's feelings that Dartmouth had committed fault supported sanctioning him, is a wild violation of basic fairness and the College's policies regarding not only its disciplinary processes, but also separate promised rights regarding freedom of expression and dissent.

**At his hearing, Plaintiff admitted the first allegation and acknowledged the messages he sent to his ex-girlfriend were "inappropriate" and, at some points, constituted "harassing behavior targeted at an individual." Exhibit 39, Anderson Dep. Tr. 113:5-114:2. The Committee on Standards reviewed Plaintiff's admission of a violation and concurred that he was responsible. Exhibit 41, Burke Dep. Tr. 30:16-31:5. The Committee then concluded that "given the nature of the behavior, it was behavior that should lead to permanent separation from the college." Id. 31:23-32:6. The basis for the conclusion was described in the case note but, briefly, the Committee "did not believe that during the hearing [Plaintiff] displayed an understanding of what [Dartmouth's] community expectations are or a capacity to conform his behavior to those expectations going forward." Id. 32:7-21; 100:12-101:3 (describing the purpose and content of a case note). A member**

**of the second panel of the Committee, Michelle Clarke, testified that "the primary reason" she recalled "supporting that sanction was for the safety of the community" because there was a "pattern of threatening behavior and an unresponsiveness to various level of authority" and that "there didn't seem to be much in the way of an awareness of how frightening and inappropriate the behavior was." Exhibit 46, Clarke Dep. Tr. 16:21-17:10, 21:17-23. Plaintiff's focus was "exclusively or almost exclusively on the repercussions that the events and the" Committee on Standards Hearing "was having on [him] as opposed to the victim in the case." Id. 22:1-8.**

At the plaintiff's second hearing, Dartmouth compelled him to attend a disciplinary hearing in which, as the result of several actions which Dartmouth's employees had performed in violation of its own policies, Dartmouth raised disciplinary allegations against the plaintiff regarding the March Report it had reviewed approximately 9-months prior to this hearing, and determined it was not appropriate to raise formal disciplinary allegations about at that time. At this hearing, plaintiff felt significant resentment towards Dartmouth's employees for having refused to adjudicate his case according to Dartmouth's policies and previous judgements, and attempted to describe his concerns in protest, only to be forcefully cut-off from speaking by Chair Burke who would yell plaintiff's name until he continued speaking about a limited number of events she gave him permission to speak about immediately before his hearing (which prevented him from speaking about subject matter which Burke had the COS consider, such as plaintiff's meeting with Kristi Clemens). On its own, Dartmouth used the fact plaintiff felt resentment towards Dartmouth to justify its decision to expel him as the result of this second hearing. As Michelle Clarke (a member of the COS from plaintiff's second hearing) revealed in her deposition that if Dartmouth had failed to treat the plaintiff fairly or follow its own policies, that it would be reasonable for him to be upset about this at his hearing (*Deposition of Michelle Clarke, 35:00*).

**On January 9, 2018, Plaintiff was informed of the Committee on Standards' decision that he had violated a standard of conduct and would be separated effective immediately. Exhibit 39, Anderson Dep. Tr. 120:17-24. He received written confirmation on January 11, 2018. Exhibit 35.**

**H. Second Request for Review**

**Adam Knowlton-Young sent Plaintiff the case note for his second hearing on January 17, 2018. Exhibit 36. Plaintiff requested review of his second hearing on January 23, 2018. Exhibit 37; Exhibit 39, Anderson Dep. Tr. 123:4-11. He also attached the documents he requested to submit at the hearing. David Kotz reviewed Plaintiff's request.9 Dr. Kotz denied the request, upholding the Committee on Standards' decision. Exhibit 38; Exhibit 39, Anderson Dep. Tr. 124:10-17.**

David Kotz was not a fair or appropriate arbitrator of plaintiff's second request for review. Kotz had virtually no experience or background in evaluating requests for review or with Dartmouth's disciplinary hearing procedures other than the guidance provided to him by Rebecca Biron who had evaluated plaintiff's first request for review, and who plaintiff alleged failed to follow Dartmouth's policies in his second request for review which Kotz allegedly evaluated.

Kotz's response to plaintiff's request for review merely recited portions of the Student Handbook and made no specific reference to any element of plaintiff's case, as Dartmouth's employees remarked upon.

DARTMOUTH008687

**From:** Adam J. Knowlton-Young
**Sent:** Tuesday, February 06, 2018 4:24 PM EST
**To:** Elizabeth L. Agosto <elizabeth.l.agosto@dartmouth.edu>; Katharine R. Strong <Katharine.R.Strong@dartmouth.edu>
**Subject:** RE: M. Anderson

Thanks Liz.

That is a succinct review letter.

Be Well,
Adam

**From:** Elizabeth L. Agosto
**Sent:** Tuesday, February 06, 2018 4:23 PM
**To:** Katharine R. Strong <Katharine.R.Strong@dartmouth.edu>; Adam J. Knowlton-Young <Adam.J.Knowlton-Young@dartmouth.edu>
**Subject:** FW: M. Anderson

**For the files**

Plaintiff seeks a continuation of discovery so that he may depose Kotz on this matter, but there is no reason to believe Kotz actually reviewed the plaintiff's request for review, or performed a good faith effort to determine the veracity of the plaintiff's allegations which it contains, and this is a violation of Dartmouth's policies, which any good faith interpretation of requires the reviewing officer will conduct a good faith effort to discern if Dartmouth's policies were adhered to over the course of petitioning student's disciplinary process. As Katharine Strong testified, a procedural error at any part of judicial process can be grounds for request for review to be granted (*K. Strong - Deposed by Defendant's Counsel.mp4, 23:00*). Yet while it is objectively true that unidentified and unremedied procedural errors had been committed in plaintiff's case, Kotz failed to identify any. Any good faith interpretation of

Dartmouth's policies require the reviewing officer to conduct a good faith effort to not only ensure the College's policies were adhered to over the course of a student's disciplinary proceedings, but also identify and rectify procedural errors when they have occurred, and there is god reason to believe Kotz made such an effort as the reviewing officer of plaintiff's second hearing.

**Procedural Background**

Plaintiff filed his Complaint on January 30, 2019. ECF No. 1. It contains twelve alleged claims: breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), violation of Title IX (Count III), negligence (Count IV), negligent infliction of emotional distress (Count V), intentional infliction of emotional distress (Count VI), estoppel and reliance (Count VII), unfair and deceptive trade practices (Count VIII), equitable relief in the form of a declaratory judgment (Count IX), negligent training and supervision of employees (Count X), fraudulent misrepresentation (Count XI), and fraudulent concealment (Count XII).

Plaintiff's expert disclosure deadline passed on December 31, 2019 without Plaintiff disclosing experts. See Endorsed Order, Sept. 17, 2019; Discovery Plan, ECF No. 26 at 2. Additionally, Plaintiff did not produce any documents or electronically stored information in response to Dartmouth's requests for production.

(page 19 footnote) 9 Rebecca Biron discussed the general parameters of the role of a review officer with Dr. Kotz but did not discuss any other details or provide him any information or advice, including any of her own opinions or any information about the first review. Exhibit 45, Biron Dep. Tr. 21:14- 22:1.

**II. Argument**

**A.  Choice of Law**

Almost all of Plaintiff's claims are based on state common law. "In determining what state law is relevant, a federal court must apply the choice-of-law framework of the forum state." Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003). "Under New Hampshire choice-of-law principles, when more than one state may have an interest in the suit and the choice involves substantive law, the court must first decide whether relevant New Hampshire law actually conflicts with the laws of the other interested states." SIG Arms Inc. v. Emp'rs Ins. of Wausau, 122 F. Supp. 2d 255, 258-59 (D.N.H. 2000). "An actual conflict exists only when application of the laws of an interested state other than the forum would change the outcome . . . . When no actual conflict

is shown, the court will apply the law of the forum state . . . ." Vollmar v. Atrium Med. Corp., No. 17-CV-704-LM, 2019 WL 3935364, at *2 (D.N.H. Aug. 20, 2019).

Dartmouth submits that the Court should apply the law of New Hampshire. All of the acts at issue in Plaintiff's Complaint occurred on Dartmouth's campus. There are no facts in the record that demonstrate any state other than New Hampshire has an interest in his suit, nor has Plaintiff identified any substantive conflict between New Hampshire law and any other state's law.

### B.   Count I - Breach of Contract

"A student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007).

10 "The relevant terms of the contractual language between a student and a university typically include language found in the university's student handbook." Id. Courts "interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should expect the student to take from them." Id.; see also Nierenberg v. Trustees of Dartmouth College, No. 2152016CV00259, 2017 WL 10259668, at *4 (N.H. Super. Ct. July 07, 2017) ("[T]he relationship between the parties is contractual in nature and is based on the terms of the Handbook as the parties should have reasonably interpreted them in light of their unique studentcollege relationship . . . ."). In "order to survive summary judgment the plaintiff must demonstrate genuine issues as to procedural errors resulting in material prejudice to his case or actions of Dartmouth that deprived him of basic fairness." Id.; see also Van Ness v. Dartmouth Coll., No. 04-E-288, at 7 (N.H. Super. Ct. Mar. 28, 2006) [attached hereto as Exhibit 47] (reasoning a plaintiff "is entitled only to those procedural safeguards which the school specifically provides" and "Dartmouth has broad discretion in determining appropriate sanctions for violations of its policies, but [its] rules and disciplinary proceedings must comport with basic notions of due process and fundamental fairness").

(page 20 footnote) 10 Although the Havlik court applied Rhode Island law, there is no material difference between Rhode Island and New Hampshire law that would prevent the Court from applying it here.

i.   Plaintiff Cannot Demonstrate that Dartmouth Failed to Meet its Obligations Under the Student Handbook.

**There was no breach of the contract embodied in Dartmouth's adherence to the provisions of the Student Handbook as a matter of law. The undisputed facts demonstrate that Dartmouth followed its own rules and procedures, and Plaintiff was not deprived of basic fairness. Dartmouth anticipates that Plaintiff may raise four arguments regarding his potential entitlement to relief. None have any merit. First, Plaintiff may allege that his meeting with Kristi Clemens on April 4, 2017 was an adjudication that prevented the Judicial Affairs Office from later issuing disciplinary allegations against him in connection with the underlying conduct (i.e. the threatening and harassing communications to his ex-girlfriend and her family) that resulted in the protective order. Such an allegation confuses her role at the College, as well as misinterprets her statements. The Student Handbook vests the authority to determine when and whether to issue disciplinary allegations in the Judicial Affairs Office. No other person or office is given such authority. Exhibit 1 at 7973. While not a perfect analogy, members of the Judicial Affairs Office are like prosecutors who decide if and when to bring charges, the Committee on Standards is like a jury, and the Chair is like a judge. Ms. Clemens was none of the above. Since she was not a member of the Judicial Affairs Office, she had no authority to initiate or decline to initiate allegations.**

*K. Strong - Deposed by Defendant's Counsel.mp4;*

*1:00 – Katharine Strong: "we review reports from across campus on a daily basis…and determine whether or not there has been a possible or alleged violation of the standards of conduct. If the answer is no, we set them aside, if the answer is yes, we use a two-part test. One, in the past has as similar violation resulted in the student's removal from the College? If the answer is yes we begin the serious misconduct process which will go before the COS. If the answer to that question is no, we prepare to have an administrative hearing which will not interrupt a student's time at Dartmouth"*

*00:02:50 Defense Counsel: "do you view a screening at that time [when the JAO initially receives and review evidence and/or allegations of misconduct] as to whether the report will be entered into a disciplinary process"*

*Katharine Strong: "Yes"*

*00:32:45 – Defense Counsel: "do you know if you had seen the restraining order at the time you decided not to raise allegations [regarding the March Report]"*

*Katharine Strong: "I believe I had"*

*00:34:00 – Katharine Strong:  Kristi Clemens reached out to plaintiff based on instructions given to her at a meeting with employees from Dartmouth's JAO who had reviewed the March Report.*

*00:34:20– Defense Counsel:  "After she [Kristi Clemens] reported back, did the group consider whether the restraining order necessitated the sending of an allegation letter?"*

*Katharine Strong: "We determined at the time that we did not have enough information to move forward with allegations at that time....we determined it wasn't appropriate to further investigate events which happened off campus"*

Kristi Clemens met with the JAO regarding plaintiff and the March Report both before and after she met with the plaintiff, and communicated the JAO's determination that Dartmouth would not initiate formal disciplinary allegations regarding the evidence it contained to plaintiff at their meeting. As the defense has noted, "The Student Handbook vests the authority to determine when and whether to issue disciplinary allegations in the Judicial Affairs Office. No other person or office is given such authority." In plaintiffs' case, Clemens communicated the JAO's decision that the March Report did not contain evidence of misconduct that justified raising formal disciplinary allegations against the plaintiff. Dartmouth does not explain its reasoning for such decisions to students, and simply informs them the JAO has determined it is not justified or appropriate to initiate formal disciplinary action against them upon reviewing evidence of misconduct that has come to its attention.

The student handbook clearly states that if the JAO receives evidence of student misconduct which it determines justify raising formal disciplinary allegations against a student, that allegations are to be issued "as soon as possible after the event." No portion of Dartmouth's Student Handbook provides that once specific evidence of misconduct has been subjected to scrutiny by Dartmouth's JAO and judicial processes and a decision (to impose a specific sanction, or none at all) has been reached in accordance with Dartmouth's policies, that at any subsequent point in the student's undergraduate career, Dartmouth can reevaluate this same evidence using different disciplinary standards and punish the student once more based on the exact same evidence of misconduct. According to Katharine Strong, if a Dartmouth employee reviews some given evidence supporting an allegation of student misconduct and determines it does not justify initiating formal disciplinary proceedings against a student, it would be arbitrary and capricious for Dartmouth to then sanction a student or separate them from the College based on this exact same evidence months or years after the initial determination, and Dartmouth has never done this in any other case but the plaintiff's in the institution's known history (*K. Strong - Deposed by Plaintiff.mp4, 1:09:00, 1:57:00*).

Important to note is the fact that in compliance with its own policies, Dartmouth did not raise any allegations regarding evidence in the March Report it had previously reviewed and determined it was not appropriate to raise disciplinary allegations about many months prior to plaintiff's first hearing. The allegations stated that plaintiff had violated Dartmouth's policies through actions he committed in violation of the restraining order were potentially violations of Dartmouth's community standards. Following is the only message that plaintiff was ever alleged to have sent in violation of a restraining order during the Spring term of 2017, the only action which Dartmouth raised allegations about prior to plaintiff's expulsion, and the only actions its own policies would permit allegations to be raised about in these circumstances – however, this message was not the basis or justification for plaintiff's expulsion at his hearing:

*"this is a formal reminder that you are not allowed to contact me or anyone in my family"*

**There is no dispute that she communicated the Judicial Affairs Office's initial decision not to issue allegations to Plaintiff at that time, but there was nothing in the Student Handbook that prevented Judicial Affairs from revisiting the issue at a later time. Returning to the admittedly imperfect analogy of prosecutors and judges above, the Judicial Affairs Office's decision, as communicated by Ms. Clemens, was nothing more than the exercise of prosecutorial discretion. Dartmouth did not believe it had enough information to move forward at that time and determined to do nothing unless more information became available. See Exhibit 40, Strong Dep. Tr. 31:8-20. When Plaintiff violated the protective order and was arrested in May 2017, the Judicial Affairs Office reconsidered Plaintiff's case because the arrest provided new information. A pattern of inappropriate contact had continued, and Plaintiff had not been able to let go of his animosity. The continuing nature of the behavior and involvement of the police put Plaintiff's conduct in a more serious light. It was entirely appropriate for Judicial Affairs to issue allegations at that time, and nothing in the Handbook limited their discretion.11**

Defense counsel's uncited claims here are not based in fact. The Handbook clearly states that "*The JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations*," and that if the JAO determines evidence it has reviewed might potentially support imposing a suspension level sanction or higher, "*Hearings will be scheduled as soon as possible after an incident*." Contrary to defense counsel's suggestion, in no way provides that the Judicial Affairs Office can initiate formal disciplinary processes regarding evidence of student misconduct months or years after it initially receives and investigates evidence of student misconduct and determines it does not justify subjecting the student to a formal disciplinary process, and informing the

student of this decision.  As previously noted, in Katharine Strong's knowledge Dartmouth had never initiated disciplinary allegations against a student in this manner prior to the plaintiff's case; every other student in the known history of this educational institution has had disciplinary allegations raised against them by the JAO as soon as reasonably possible after the evidence was received and evaluated. As Katharine Strong testified, this promised right to timely resolution of disciplinary matters is designed to help assure students can go back to the business of working on their degree program without unreasonable hindrance or delay(*K. Strong - Deposed by Plaintiff.mp4, 00:34:20*). Dartmouth's own JAO, in accordance with the College's own policies, did not raise allegations regarding plaintiff's actions evidenced in the March Report which it had reviewed entirely 6-months prior to plaintiff's initial hearing, and determined it was not appropriate to raise formal disciplinary allegations regarding.

**(page 22 footnote) 11 The section of the Handbook titled "Rights, Rules and Responsibilities" applies only "if a student is alleged to have violated the . . . Standards of Conduct and must appear before the COS for a hearing . . . ." Exhibit 1 at 7976. In other words, these procedural requirements regarding hearings are only relevant once the formal disciplinary process has been initiated. There is obviously no need to schedule a hearing if no allegation letter has been issued.**

**Second, Plaintiff may allege that Dr. Biron should have concluded that he was not responsible or decided that no or only a minimal sanction should be imposed on him instead of deciding that a new hearing was an appropriate remedy. The review officer "has sole discretion" to determine whether "grounds for review have been met" and may refer a matter back for further consideration. Exhibit 1 at 7982. Dr. Biron thought there was no procedural error because a reasonable person in Plaintiff's position should have understood the scope of the allegations. If there was no procedural error, technically, Dr. Biron should not have granted Plaintiff's request for review, and his initial separation should have stood. Nonetheless, Dr. Biron recognized that Plaintiff's subjective perception of the allegations may have prevented him from participating fully, even though there was enough evidence to support his separation at that time. As a result, she ordered a new hearing. Dr. Biron erred on the side of caution because the effect of Plaintiff's perception could have been a procedural error. Her decision was fundamentally fair to Plaintiff, and ultimately gave him a second bite at the apple with an entirely new panel of the Committee on Standards.**

Here, Dartmouth again materially misrepresents the facts of this case by omitting key relevant facts. Although Dean Biron denied it, Dartmouth objectively violated its own policies by separating him from the college based on a determination that evidence in the March Report (which Dartmouth's JAO had

never raised allegations about, and previously decided it was not appropriate to raise allegations about upon review). While the handbook may state the review officer "*has sole discretion*" to determine whether "*grounds for review have been met,*" despite Dartmouth's suggestion, this does not permit her to ignore the fact that Dartmouth (objectively) committed a procedural error which (objectively) affected the outcome of plaintiff's hearing, or attempt to remedy the effects of this error. If Dartmouth did not find plaintiff guilty of allegations it'd already determined it was not appropriate to raise against him at his hearing, and "*there was no procedural error because a reasonable person in Plaintiff's position should have understood the scope of the allegations*" as Dartmouth has suggested, there should have been no issue having plaintiff attend a second COS hearing where he faced the same allegations he did in the first. However, this is not the case. Instead, while denying it had done so, Dartmouth raised entirely new allegations against plaintiff in violation of its past decisions and policies after Dean Biron ruled on his request for review. While Dartmouth employees like Katharine Strong may claim that the COS can suggest new allegations be raised as the result of a disciplinary hearing, she has also admitted that she cannot think of a single instance where this has occurred (*K. Strong - Deposed by Plaintiff.mp4, 00:56:00*) and Katharine Burke (currently the most experienced member of Dartmouth's disciplinary staff) has declined this very suggestion in deposition *(K. Burke - Deposed by Plaintiff.mp4, 00:25:30).*

Regardless, this is clearly not what Dartmouth did in this case. Although Biron refused to acknowledge a procedural error occurred in plaintiff's case (as did all but one of Dartmouth's other employees did until their depositions), the one Dartmouth employee that would acknowledge this fact during the course of plaintiff's disciplinary proceedings was Kevin O'Leary, the member of Dartmouth's General Counsel advising all Dartmouth employees whose actions are at the center of this case. Although Kevin does accurately identify that a procedural error occurred in plaintiff's case, his suggestion that Dean Biron acknowledged this and ruled accordingly is entirely fabricated, and Dean Biron denies that any procedural error occurred in plaintiff's disciplinary hearing procedures to this day (*Rebecca Biron - Deposed by Defendant's Counsel & Plaintiff.mp4, 20:30*)

*"In your request for review, you asserted a procedural error. In other words you said that the College had not followed its procedures correctly. As I mentioned above, Dean Biron agreed with you and directed that there be a new hearing." – Kevin O'Leary in email with subject line "re follow up"*

All Dartmouth employees but Kevin O'Leary would (like Biron) vehemently suggest Dartmouth had followed its policies without fault over the course of plaintiff's hearing processes.

Dartmouth's employees have repeatedly acknowledged that disciplinary allegations are only to be raised by the JAO. In plaintiffs case however, unlike any other case in Dartmouth's known history, the

JAO decided evidence did not justify raising disciplinary allegations against the student, but the COS then imposed a sanction upon the student based off this same information. Rather than acknowledge this, Dean Biron fraudulently ruled that the JAO actually had raised allegations regarding the March Report in advance of plaintiff's hearing, and this meant no procedural error occurred and Dartmouth was at liberty to make plaintiff attend another hearing facing the same (allegedly) allegations as he did in his first. As demonstrated by the testimony of Rebecca Biron *(Rebecca Biron - Deposed by Defendant's Counsel & Plaintiff.mp4, 1:14:00)*, Katharine Burke (*K. Burke - Deposed by Plaintiff.mp4, 1:02:00*), and Katharine Strong (*K. Strong - Deposed by Plaintiff 2.mp4, 00:40:00*)  Dartmouth did not allege plaintiff's admitted actions evidenced in the March Report were potential violations of the Dartmouth standards which might warrant imposing a formal disciplinary sanction upon him. Rather, they alleged a subsequent action plaintiff had made was in violation of the standards. Although Dartmouth denied it over the course of his disciplinary hearing process, the allegations the JAO raised against plaintiff in advance of his second hearing were materially different in substance than those which it raised before the plaintiff's first. These actions, which Dartmouth would not admit to but objectively committed, are not permitted by the College's policies.

**Third, Plaintiff may allege that he should have been able to present more information regarding his disciplinary process during his second Committee on Standards hearing but he was prevented from doing so by the Chair. Specifically, he may argue that he should have been allowed to present information about how the Judicial Affairs Office and Dean Biron had treated him unfairly throughout the Committee on Standards Process. The Student Handbook is clear: "the Chair is empowered to make all procedural rulings, including rulings on relevance and admissibility of information." Exhibit 1 at 7980. Plaintiff concedes that he was aware that the Chair had such discretion. Exhibit 39, Anderson Dep. Tr. 45:15-23. The revised allegations under consideration at the second hearing concerned Plaintiff's conduct towards his ex-girlfriend up to and including his arrest for violation of a protective order. The materials Plaintiff sought to include in the case packet went far afield from the core question of Plaintiff's behavior leading up to his arrest and were not relevant to the issues before the panel. Plaintiff's concerns about the first hearing had nothing to do with the second hearing, and Ms. Agosto appropriately removed irrelevant materials from the case packet. Likewise, Ms. Burke appropriately directed Plaintiff to focus on the specific allegations in the Statement of Understanding, which were the only issue the Committee was being asked to—and had the power to—consider and decide. Her only goal was to guide the panel towards evaluating whether Plaintiff was responsible for violating the Standard of Conduct as alleged and, if so, what the appropriate sanction should be. The Committee on**

**Standards does not and cannot make rulings about whether any Dartmouth employees, including members of the Judicial Affairs Office, did their jobs appropriately. Their sole focus is on the responding student's conduct. The Chair's decision to restrict the materials provided for the Committee's consideration was within the discretion afforded her by the Student Handbook, and did not constitute a breach of contract.**

Plaintiff has already addressed the points raised here. Having read Dartmouth's policies, no reasonable individual situated in the plaintiff's position would believe that after the three most senior Dartmouth administrators tasked with overseeing its disciplinary hearing processes (Rebecca Biron, Katharine Strong, and Kevin O'Leary) told him he'd be given the opportunity to share specific information regarding his disciplinary process with the COS, that the Chair at his hearing (and at the instruction of Kevin O'Leary and Katharine Strong) would not only prevent plaintiff from sharing this same information at his hearing, but cite the fact plaintiff felt animosity towards Dartmouth to justify the sanctioning decision. Dartmouth's own policies and basic fundamental fairness do not allow the College to prevent students from sharing information with the COS on subject matter relevant to sanctioning decisions, and especially not in these circumstances.

**Fourth, Plaintiff may argue the ultimate outcome was simply wrong. Plaintiff's first hearing is essentially moot since he was given a brand new hearing with a new panel. In advance of the second hearing, he admitted that he had violated Standard of Conduct II and engaged in harassing behavior or conduct targeted at his ex-girlfriend. He did not dispute that he sent messages including the following to her: • Calling her "a stupid fucking pathetic bitch;" • Calling her "a crooked fucking whore;" • Telling her to "kill yourself you fucking sociopath;" • Calling her a "heartless cunt;" • Telling her he would "probably post your nudes on reddit every day until they finally reach the front page (cause with your gross flabby tits, it'll probably take some work!);" • Telling her would do "whatever I can do to hurt you as [sic] at least a fraction as much as you've hurt me;" • Stating he hoped "life brings you nothing but pain and suffering;" • "This is only going to be worse if you try and have your mom deal with it. Kill yourself you spineless fuck;" • Calling her a "fucking pathetic disgraceful piece of shit;" • "If you take your time I'll make sure you regret it;" • "You will know the same pain and suffering that you caused me now;" • Stating "the thought of you crying excites me;" • Hearing she failed a test was "truly exhilarating;" • Once he "let [his] feelings out publicly…. the pain you'll feel might resemble mine." Exhibit 36 at 5401-5402. Throughout his many written explications to various Dartmouth employees about the termination of his relationship, he consistently failed to take responsibility for the damage he may have done to his ex-girlfriend or the fear or pain he may have caused her and her family. The materials he asked**

**to be included in the case packet were no different. See, e.g., Exhibit 33. Panel members were "deeply concerned by" Plaintiff's "impulsive, unwanted, harassing and threatening pattern of behavior" and further concerned that "nine months later, [his] description of his pain, anger and motivations did not appear to have diminished over time and did not convey genuine remorse or growth." Exhibit 36 at 5403. The panel "expressed concern for the safety and security of the Dartmouth community if [Plaintiff] were to continue his education" at Dartmouth and "did not believe a long period of suspension would be appropriate given the severity of the behavior, or that it would be effective in protecting the community." Id. While the Court need only decide whether Dartmouth complied with its policies and notions of basic fairness, the Committee's decision was justified.**

Plaintiff affirmed the veracity of the evidence contained in the March Report at the time Dartmouth initially received and evaluated it, and at all other times inquired. One reason the outcome of plaintiff's first and second hearings were wrong is that the decision to sanction plaintiff was based on its evaluation of the contents of the March Report the JAO had evaluated about 6-months prior to plaintiff's first disciplinary hearing, and determined it was not appropriate to raise formal disciplinary allegations about upon this review.

Dartmouth's Student Handbook states *"Dartmouth's undergraduate disciplinary system is not intended to address every social ill or every grievance one member of the community may have against another. There are many behaviors that most members of the community would find rude, disrespectful or obnoxious that violate no College regulation and are, therefore, not adjudicable under the disciplinary system."*

Dartmouth receives countless complaints containing evidence of inextricable violations of the standards of conduct which it deems inappropriate or unnecessary to initiate formal disciplinary processes about. For instance, when Dartmouth's JAO receives iron-clad evidence a student has participated in hazing or used illegal drugs, based on the application of its own subjective standards, the JAO will sometimes initiate the serious misconduct process, sometimes initiate an administrative hearing level process, and sometimes (most often) determine the evidence does not support initiating any formal disciplinary action against the student; for example, plaintiff has intimate personal knowledge that a student living in the hall of his freshman year dormitory who sold drugs and used them in his room each day (something it was impossible for fellow residents of the hallway not to notice) was caught by Dartmouth's Safety and Security using these substances, and with drugs and paraphernalia (confiscated by campus authorities) on at least six unique occasions, but Dartmouth declined to ever initiate more than

an administrative hearing against the student, and took no action whatsoever in response to receiving evidence regarding most of these instances. Yet, in other cases plaintiff is aware of, Dartmouth has punished students much more harshly for having been caught using illegal substances, and regularly punishes students (of legal age) caught possessing hard liquor more harshly than it does students who are found in possession of illegal drugs (plaintiff can name the students in question in a sealed document if the court desires). Even if the law does entitle Dartmouth to make such arbitrary disciplinary determinations, once it has made the subjective disciplinary decision it is entitled to, it is not allowed to revisit the same evidence at whatever time it pleases and come to a new subjective decision regarding the student's ability to complete their degree program based on the application of different, arbitrarily conjured standards. According to the interpretation of the Student Handbook Dartmouth's employees have advocated for in this case, if a student who admits to participating in a hazing ritual during their sophomore year at Dartmouth to the JAO, which in turn declines to initiate formal disciplinary proceedings against the student upon investigating the incident and all relevant evidence, the JAO could then (without telling the student this might be a possibility) use this precise same evidence and admission to justify initiating the serious misconduct process against the student and revoking their ability to complete their degree program at Dartmouth during the student's senior year. Such action has never been taken in another student's disciplinary case at Dartmouth, and no student informed of Dartmouth's policies would believe this to be how the College's disciplinary processes are designated to operate. The JAO is the sole entity tasked with evaluating evidence of misconduct and determining whether it justifies raising formal disciplinary allegations against a student by the Handbook. After the JAO evaluates evidence of student misconduct and determines it does not justify raising formal disciplinary allegations against a student, Dartmouth's policies do not permit the College to sanction a student due to this exact same information, or raise disciplinary allegations about it via processes inconsistent with those described in its own Handbook, or as the result of a series of unremedied procedural errors Dartmouth committed in administration of plaintiff's hearing processes.

Furthermore, the fact Dartmouth's own JAO reviewed and investigated the March Report and determined it did not support initiating a serious misconduct or administrative level disciplinary hearing at the time it was received affirms that according to Dartmouth's policies and procedures, these actions evidenced in the report do not support imposing such a sanction upon the plaintiff, and that the COS's decision to expel plaintiff based on these same materials (at the suggestion of the JAO member present) is not justified.

Plaintiff requests a continuation of discovery so that he can continue to try and depose or otherwise question the members of the COS from his hearings as to the basis of their decision, as well as how they

would have acted had they been aware of what allegations had been raised at his hearing, and the history of Dartmouth's administration of his disciplinary case. The only member of the COS plaintiff has been able to depose thus far is Dartmouth Professor Michelle Clarke, who did not participate in his first hearing, and could not recall most details from plaintiff's second hearing. As mentioned elsewhere, Plaintiff also seeks a continuation of discovery so he may continue trying to attain information regarding Dartmouth's history of disciplinary decisions in other students' cases to demonstrate disparities in both the administration and outcome of his hearing compared with other students found guilty of committing similar misconduct. Of the seven cases Dartmouth has shared information about thus far, the College took no action regarding the following case; "*Student A (M) and Student B (F) were in a dating relationship. After it ended, Student A requested and received a No Contact Order against Student B. Student A reported that Student B text messaged him, called him, and talked to him in person in violation of the No Contact Order*" (DEFENDANT TRUSTEES OF DARTMOUTH COLLEGERS FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES), demonstrating that the College sometimes subjectively declines to subject students found guilty of the same actions as the plaintiff to any disciplinary processes.

### ii.     The Student Handbook is the Only Contract.

**The only relevant contractual source is the Student Handbook. To the extent Plaintiff has alleged "a contractual relationship existed between Dartmouth and the Plaintiff through . . . oral statements" by Dartmouth employees, his claim must fail as a matter of law because he has offered insufficient evidence in the record to demonstrate any enforceable oral contract. Complaint ¶ 185.12 See, e.g., Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993) ("Where, as here, the moving party does not have the burden of proof at trial, that party must make a showing that the evidence is insufficient to support the nonmoving party's case.").**

Dean Biron, along with JAO head Katharine Strong, and Dartmouth's former member of the General Counsel's office charged with overseeing Dartmouth's undergraduate disciplinary system, Kevin O'Leary, all explicitly and in no uncertain terms, told plaintiff that he would have the opportunity to share his concerns regarding Dartmouth's mismanagement of his case with the COS at his second hearing. Dartmouth itself has argued that the terms of the Handbook are to be interpreted according to the reasonable meanings assigned to them by the administrators tasked with "*promulgation, revision, and enforcement*" of the institution's policies, and cannot selectively argue this to be true only when it serves the College's purposes. When the Dean of the College herself has explicitly represented to the plaintiff that Dartmouth's policies permit him to share certain information regarding his case with the COS,

Dartmouth then has an obligation to uphold, and not deliberately, arbitrarily, and without good cause, deny plaintiff these promised rights.

### C.   Count II - Breach of the Covenant of Good Faith and Fair Dealing

**"In every agreement there exists an implied covenant that each of the parties will act in good faith and deal fairly with the other." Seaward Constr. Co. v. City of Rochester, 118 N.H. 128, 129, 383 A.2d 707 (1978). The covenant of good faith and fair dealing generally does not give rise to an independent action in tort. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 137, 562 A.2d 187, 189 (1989); see also Bennett v. ITT Hartford Grp. Inc., 150 N.H. 753, 757, 846 A.2d 560, 564 (2004). A separate claim will lie only where the facts make out a breach of a duty owed to the plaintiff independent from the contract. Id. Plaintiff's claim rests on a general duty by Dartmouth to act fairly and in good faith in administering the disciplinary proceedings described in its Student Handbook. Cf. Complaint ¶ 192. It does not implicate a separate, independent duty owed to Plaintiff, and therefore cannot be asserted as a standalone claim.**

*"Under agreement that appears by word or silence to invest one party with degree of discretion in performance sufficient to deprive another party off substantial proportion of the agreement's value, parties' intent to be bound by enforceable contract raises implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with parties' purpose or purposes in contracting." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (N.H. 1989).*

*"In our decisions setting standards of conduct in contract formation, the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (N.H. 1989).*

*We agree with the Does that the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness. See Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 805 N.E.2d 957, 964 (2004). In Coveney v. President & Trs. of Coll. of Holy Cross, the Massachusetts Supreme Judicial Court ("SJC") recognized that even where a student does not have a contractual right to a disciplinary hearing, if a school does hold a hearing, the school has a duty to conduct it with basic fairness. See Cloud, 720 F.2d at 725 n.2 (citing Coveney, 388 Mass. 16, 445 N.E.2d*

*136, 139 (1983) ) (''[W]hen a hearing is held, it must be conducted fairly.''), Doe v. Trustees of Boston College, No. 19-1871 (1st Cir. 2019).*

*"3. Contracts — Construction — Implied Terms Implied good faith obligations of a contracting party with respect to contract formation are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (N.H. 1989).*

*6. Contracts — Construction — Implied Terms A claim for relief from a violation of the implied covenant of good faith contractual performance potentially raises four questions: (1) Does agreement ostensibly give defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value? (2) If ostensible discretion is of that requisite scope, does competent evidence indicate that parties intended by their agreement to make a legally enforceable contract? (3) Assuming an intent to be bound, has the defendant's exercise of discretion exceeded the limits of reasonableness? (4) Is the cause of the damage complained of defendant's abuse of discretion, or does it result from events beyond the control of either party, against which the defendant has no obligation to protect the plaintiff? Centronics Corp. v. Genicom Corp., 132 N.H. 133, 137, 562 A.2d 187, 189 (1989)*

Dartmouth's violated implied good faith obligations when reviewing officers refused to acknowledge the objective fact that Dartmouth violated its procedures in way that materially affected the outcome of his hearings, and abused discretionary power Dartmouth's Handbook gives its disciplinary staff (such as the Dean of the College and COS chair) to deprive plaintiff of protections promised in the College's policies. Dartmouth attempted to lie and misrepresent its actions at every step of plaintiff's disciplinary process.

Dartmouth's Student Handbook states "*Students are subject to disciplinary action in accordance with this Handbook.*" Yet, the actions which resulted in Dartmouth raising allegations against the plaintiff regarding the March Report months after its JAO made the initial determination it was not appropriate to potentially impose a formal disciplinary sanction upon plaintiff based on it (by first expelling plaintiff without ever raising allegations regarding the Report, and then subsequently refusing to acknowledge the objective fact that it had already previously determined it was not appropriate to raise allegations regarding the report, and that Dartmouth had not ever raised allegations regarding the Report it had expelled plaintiff because of) are not only described nowhere in Dartmouth's own policies, but are also plainly inconsistent with them.

Furthermore, a member of Dartmouth's COS, and even the Director of Dartmouth's Judicial Affairs Office have all testified in this case that they do not know if Dartmouth has an obligation to follow its own policies over the course of student's disciplinary hearing processes.

*(Deposition of Michelle Clarke, 2:20) Michelle Clarke states she does not know if College has an obligation to follow its own rules during undergraduate students' disciplinary proceedings*

*(K. Strong - Deposed by Plaintiff.mp4, 2:46:00)Plaintiff: "if the college wanted to impose a disciplinary sanction upon a student, but would have to violate the student's promised rights and protections to do so, could it do this?"*

*Katharine Strong: "I don't know"*

Dean Rebecca Biron, the reviewing officer in Dartmouth's hearing system, also testified that she does not know if it would be procedurally incorrect for a student to be sanctioned based on allegations Dartmouth had never raised against them (*Rebecca Biron - Deposed by Defendant's Counsel & Plaintiff.mp4, 02:04:00*), despite that Dartmouth's own policies unquestionably require this. Good faith observation of the College's obligation to ensure students' disciplinary hearing processes are performed in accordance with the College's own written policies does, or should require selection and training practices that at least ensure the members of Dartmouth College carrying out these processes are cognizant of facts as fundamental to their proper performance as that the institution's own policies must be followed.

**Even if Dartmouth were not entitled to summary judgment on that basis, Plaintiff cannot establish any conduct by Dartmouth that could constitute a breach of the covenant. "[T]he obligation of good faith performance" demands behavior consistent "with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations." Centronics, 132 N.H. at 140. "Good faith and fair dealing cannot be separated from context, however—and in evaluating those covenants in the educational milieu, courts must accord a school some measure of deference in matters of discipline." Havlik, 509 F.3d at 35. There is no genuine dispute that Dartmouth acted reasonably and complied with its Handbook, as described above. The Court should give Dartmouth appropriate deference and find in its favor on Count II.**

**(page 26 footnote) 12 Likewise, Plaintiff has not and will not be able to identify any "matriculation contract" or other written document that has any bearing on his disciplinary process apart from the Student Handbook. Complaint ¶ 185.**

### D.  Count III - Title IX

Federal law prohibits excluding any person "on the basis of sex" from "participation in," denial of "the benefits of," and subjection to "discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "[A]ttacks against a university disciplinary process on grounds of gender bias generally fall within" an "erroneous outcome" or "selective enforcement" theory of liability. Haidak v. Univ. of Massachusetts Amherst, 933 F.3d 56, 74 (1st Cir. 2019). The outcome of Plaintiff's disciplinary proceedings was not erroneous, Plaintiff has offered no evidence whatsoever to support a claim of gender-based decision-making, nor did Dartmouth engage in selective enforcement.

#### i.    Selective Enforcement

In order to succeed on a claim for selective enforcement under Title IX, a plaintiff must prove "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Haidak, 933 F.3d at 74 (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)). "For a statistical disparity to support an inference of sex discrimination, the evidence must tend to show that there was a causal connection between the outcome of [the] disciplinary proceedings and gender bias." Id. at 75 (internal quotation and citation omitted).

There is no evidence in the record that Plaintiff's gender affected the decision to initiate a formal disciplinary process or the outcome of that process in any way. Plaintiff alleges in the Complaint that "Dartmouth employees selectively enforced their policies so as to find the male student ([Plaintiff]) responsible for a policy violation while declining to initiate formal disciplinary proceedings or impose similar sanctions on female students accused and/or found guilty of committing the same behavior." Complaint ¶ 201. At his deposition, Plaintiff identified two female students whom he believed were comparable to him.[13] He did not know, however, whether either student's alleged conduct was reported to Judicial Affairs; the content of any report about them to Judicial Affairs; how the report, if any, was handled; or whether the situations were factually similar enough to his own to create meaningful comparisons. See Exhibit 39, Anderson Dep. Tr. 138:10-140:12 ("[I]t is impossible for me to know such specifics of other people's dealings, you know, private protected dealings with the college."), 141:10- 142:22 ("I do not know with certainty the details of other people's disciplinary processes with the college or lack thereof."), 144:5-146:3 ("I don't know if they decided it was worthy or appropriate to raise an investigation. I don't know what conclusion the JAO came to."). For example, Plaintiff did not testify that either female student made threats similar to those Plaintiff made to his ex-girlfriend (such as threatening

**physical harm or to post nude photos on the Internet), or involved the issuance—let alone violation—of a state court issued protective order. Plaintiff's allegations regarding these two other students are based on rank speculation and hearsay, and are insufficient to create a material dispute of fact regarding any allegation of selective enforcement.**

Plaintiff concedes part of his complaint here is based upon information he heard from student involved in incidents at Dartmouth, and both was, and remains ignorant of the College's private disciplinary records and decisions (which it has refused to produce in any adequate way upon discovery request, and plaintiff will continue trying to attain once he has finished writing this motion, which has consumed all of his available time in the past few months, preventing him from making discovery requests he will file soon after this is submitted). If this is a reason to reject plaintiff's claim and a student must be privy to actual reports or documents from other students' disciplinary cases, then it is virtually impossible for any student (regardless of the disparity in outcomes of their own disciplinary cases, and those of female students found guilty of similar misconduct) to meet the evidentiary standards set forth by the court for such a claim to survive this motion (given legal statues which [according to the defense] prevent them from disclosing information from other students' disciplinary cases), and they must be amended so that it is possible for university students who are victim to illegal actions which accurately fall under this count to prove such and achieve retribution.

For instance, the victim of a harassment campaign (a Dartmouth student being harassed by another Dartmouth student) conferred with plaintiff over the course of the time he was victim of harassment (plaintiff has omitted the names of the student's involved for privacy reasons, but can readily provide their identities to the court if desired). Despite that plaintiff has repeatedly requested information pertaining to this case over the course of discovery, Dartmouth has refused to provide any information about it despite repeated requests, and plaintiff requests a continuance of discovery so that he may continue seeking to obtain information from cases he knows of which demonstrate a causal connection between the outcome of his disciplinary proceedings and gender bias.

**Plaintiff also likely will allege that an article Dr. Biron authored before she became Dean of the College reflects bias against men. Exhibit 45, Biron Dep. Tr. 5:10-12. Dartmouth denies that this conclusion reflects a reasonable inference based on the content of the article, or that the article, standing alone, would be sufficient to permit a selective enforcement claim to move forward since Dr. Biron had no involvement in deciding to initiate the allegations or determine the sanction. In fact, there can be no dispute that Dr. Biron granted Plaintiff's request for review and gave him a**

**fresh start, even though she did not believe there actually was a procedural error in his first hearing. Plaintiff's claim cannot survive based on Dr. Biron's alleged bias alone.**

*"Gender bias – unfair difference in the way women and men are treated (Cambridge Dictionary,* [https://dictionary.cambridge.org/us/dictionary/english/gender-bias](https://dictionary.cambridge.org/us/dictionary/english/gender-bias)*)*

When questioned about her article titled; "BEHIND CLOSED DOORS: RAPE, MURDER, AND THE MISPLACED CONFIDENCE OF MEN; What makes it so hard for some men to question their own assumptions and so easy for them to act boldly and brutally when faced with closed doors?," Biron affirmed that a key theme of her article is that *"We must demand of men, whether in College or not, a bit more self-doubt, and a bit less self-confidence when they are faced with closed doors, whether they be physical, verbal, or figurative,"* and that men literally ought to be subjected to different treatment on account of their inherent flaws (*Rebecca Biron - Deposed by Defendant's Counsel & Plaintiff.mp4, 02:23:00*). The article states "*CERTAINTY AND CONFIDENCE DON'T ALWAYS MAKE A WINNING COMBINATION. IF WOMEN CAN RESIST THE GENDERED TENDENCY TOWARD RETICENCE, SHOULDN'T MEN RESIST THE GENDERED TENDENCY TOWARD RASHNESS?"* These transparent displays of gender bias demonstrate Biron was is unfit adjudicator of cases such as the plaintiff's, and it is clear that the possibility of plaintiff receiving fair treatment from Dean Biron at the request for review phase of his disciplinary proceedings was non-existent. In a parallel, if Dean Biron's article instead read, "CERTAINTY AND CONFIDENCE DON'T ALWAYS MAKE A WINNING COMBINATION. IF **WHITE PEOPLE** CAN RESIST THE **RACIALIZED** TENDENCY TOWARD RETICENCE, SHOULDN'T **BLACK PEOPLE** RESIST THE **RACIALIZED** TENDENCY TOWARD RASHNESS?" there would be no question that she is a biased adjudicator unfit to oversee the disciplinary hearings of black students; the same logic should be applied here.

**(page 28 footnote) 13 Although Plaintiff's allegations are meritless, Dartmouth has obligations, including but not limited to those stemming from the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, to protect the privacy of its students, so it has redacted the names of the individuals about whom Plaintiff testified.**

**ii. Erroneous Outcome**

**To demonstrate the outcome of a disciplinary proceeding was erroneous, a plaintiff must offer evidence "cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and indicating that "gender bias was a motivating factor." Doe v. Trustees of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).**

**Plaintiff cannot do so here. There can be no dispute that the second hearing panel's decision to find Plaintiff responsible for a violation that Plaintiff himself admitted was not erroneous. Even so, there is no evidence in the record that any member of the Committee on Standards was motivated by Plaintiff's gender in any way.**

Here, plaintiff has cast "articulable doubt on the accuracy of the outcome of the disciplinary proceeding and indicating that gender bias was a motivating factor." Based on his review of previous cases of this variety, plaintiff focus here is on challenging the objectively erroneous and unfair decisions made by Dartmouth employees (some of which hold discriminatory views) who were tasked with administering plaintiff's disciplinary hearing process (including the COS chair and JAO member present at plaintiff's hearings, who determine the range of possible sanctions which might be imposed on a student if the COS find a student guilty of one or more allegations), not the subjective decisions of the COS members who attended these ill-conceived hearings, as he has no reason to believe their decisions (though made under the guidance of biased Dartmouth employees) were motivated by gender bias.

### Count IV - Negligence

**The hornbook elements of Plaintiff's fourth claim—duty, breach, causation, and damages—are no doubt familiar to this Court. See, e.g., Macie v. Helms, 156 N.H. 222, 224, 934 A.2d 562, 565 (2007). The only duty alleged by Plaintiff in Count IV is a "duty of care, imposed on [Dartmouth] by its policies and voluntarily undertaken, to conduct its disciplinary hearing procedures fairly, consistently, and in accordance with Dartmouth's own rules and regulations." Complaint ¶ 207. In essence, Plaintiff alleges that Dartmouth was negligent because it breached a duty to follow its own policies and procedures. This is not a claim for negligence. Rather, it duplicates Plaintiff's claim for breach of contract, which is meritless as set forth in Section II.B above.**

**Courts throughout this Circuit have held that when it comes to college and university disciplinary hearings, there is no independent duty of care outside of the contractual relationship between school and student as a matter of law. See, e.g., Doe v. Trustees of Bos. Coll., 892 F.3d 67, 93-95 (1st Cir. 2018); Doe v. Amherst Coll., 238 F. Supp. 3d 195, 228 (D. Mass. 2017); Doe v. Brown Univ., 166 F. Supp. 3d 177, 196 (D.R.I. 2016); Doe v. Brown Univ., 209 F. Supp. 3d 460, 477 (D.R.I. 2016); Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 43 (D. Me. 2005). These and other precedents preclude Plaintiff's claim of negligence.**

(In earnest) based on conversation between defense counsel and judge Steven J. McAuliffe during pre-trial conference, and subsequent readings by plaintiff which seem to affirm the statements made there,

it seems contract and not tort law is most pertinent and appropriate to apply to this claim. If plaintiff is mistaken, he asks that this claim be evaluated considering the evidence provided here and elsewhere over the course of these legal proceedings.

### E.   Count V - Negligent Infliction of Emotional Distress

**The elements of a claim for negligent infliction of emotional distress include "(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms." Wenzel v. Nat'l Creditors Connection, Inc., No. 16-CV-481-LM, 2018 WL 1902699, at \*15 (D.N.H. Apr. 20, 2018) (quoting Tessier v. Rockefeller, 162 N.H. 324, 342 (2011)). Like "any other negligence claim," a claim for negligent infliction of emotional distress "demands the existence of a duty from the defendant to the plaintiff." Id. (citation omitted). The duty identified by Plaintiff in connection with his claim for negligent infliction of emotional distress is somewhat confusing. Plaintiff asserts "Defendant Dartmouth owed duties of care to Plaintiff as averred in the sixth cause of action." Complaint ¶ 212. Plaintiff's sixth cause of action is intentional infliction of emotional distress, which requires a higher standard for liability than breach of a duty. The sixth cause of action does not identify a legal duty. Dartmouth will assume arguendo that Plaintiff meant to refer to the duty alleged in the fourth cause of action for ordinary negligence, but there is no such duty as a matter of law as set forth in Section II.E above. Plaintiff's claim for negligent infliction of emotional distress fails as a matter of law for the same reason his claim for negligence fails.**

**Regardless, the Court must also dismiss Plaintiff's claim for negligent infliction of emotional distress for another reason: Plaintiff has failed to disclose any expert witness and expert testimony is necessary to prove the objective physical symptoms required. O'Donnell v. HCA Health Servs.of New Hampshire, Inc., 152 N.H. 608, 612, 883 A.2d 319, 324 (2005).**

(In earnest) based on conversation between defense counsel and judge Steven J. McAuliffe during pre-trial conference, and subsequent readings by plaintiff which seem to affirm the statements made there, it seems contract and not tort law is most pertinent and appropriate to apply to this claim. If plaintiff is mistaken, he asks that this claim be evaluated considering the evidence provided here and elsewhere over the course of these legal proceedings.

If lack of expert testimony is an issue here, plaintiff is currently obtaining responses to interrogatories from a Dartmouth psychiatrist who he met with extensively over the course of these proceedings so that his testimony can be used to help verify the veracity of his mental suffering and physical symptoms. If

this is insufficient, plaintiff will also produce testimony of his current medical doctor before the end of the discovery period if the court deems this proper. Dartmouth itself so strongly believed plaintiff was at risk of suicide during his disciplinary proceedings (despite him making any indication this was the case other than being distressed) that by force, it submitted him to the hospital on one occasion, and to its on-campus medical facilities on several others.

## F.   Count VI - Intentional Infliction of Emotional Distress

The standard for a claim of intentional infliction of emotional distress is "very high." Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 511 (1st Cir. 2002). A "plaintiff must allege that a defendant by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to another." Tessier, 162 N.H. at 341 (internal quotation, citation, and alteration omitted). To demonstrate extreme and outrageous conduct, "it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." Id. Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

The undisputed material facts demonstrate that Dartmouth's treatment of Plaintiff could not be characterized as "beyond all possible bounds of decency" "atrocious" or "utterly intolerable in a civilized community" as a matter of law. Id. To the contrary, Dartmouth appropriately adhered to the Student Handbook and fairly separated Plaintiff from the College. While Plaintiff may subjectively feel his separation was unfair, that subjective belief is not sufficient to create a material dispute of fact requiring a jury trial. Compare Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 730, 972 A.2d 1050, 1056 (2009) (upholding dismissal of claim for intentional infliction of emotional distress where teacher falsely reported misconduct by a student who later committed suicide allegedly as a result) and Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 293 (D.N.H. 2016) (conduct that was "retaliatory" and "deplorable" was insufficient to state a claim for intentional infliction of emotional distress") with Yale v. Town of Allenstown, 969 F. Supp. 798, 801 (D.N.H. 1997) (denying motion to dismiss intentional infliction of emotional distress claim where plaintiff alleged her field training officer harassed her, made sexual advances, touched her without her consent, made her afraid he would shoot her, and made disparaging remarks to others to prevent her from advancing or forcing her to resign); see also Rand v. Town of Exeter, 976 F. Supp. 2d 65, 76 (D.N.H. 2013) (explaining co-worker who sexually assaulted plaintiff could be liable for

intentional infliction of emotional distress but her employer could not be held liable for emotional distress caused by an employee acting outside his employment).

Furthermore, the New Hampshire courts have not settled whether expert testimony is needed to support a claim for intentional infliction of emotional distress, but other cases from this Circuit suggest such a requirement is sound. See Horstkotte v. Comm'r, New Hampshire Dep't of Corr., No. 08-CV-61-JL, 2009 WL 4907025, at *7 (D.N.H. Dec. 11, 2009); Francisco v. U.S. Marshalls Serv., No. CA 11-231L, 2014 WL 652147, at *11 (D.R.I. Feb. 19, 2014) ("In the ordinary case, proof of physical symptomatology requires expert medical testimony on the existence of a causal relationship between the defendant's wrongful conduct and the plaintiff's claimed emotional distress."); Morin v. E. Maine Med. Ctr., 779 F. Supp. 2d 166, 189 (D. Me. 2011) (explaining Maine courts held that the possibility of proving a claim for intentional infliction of emotional distress without testimony of an expert is remote possibility). Lack of expert testimony should preclude this claim as well.

(In earnest) based on conversation between defense counsel and judge Steven J. McAuliffe during pre-trial conference, and subsequent readings by plaintiff which seem to affirm the statements made there, it seems contract and not tort law is most pertinent and appropriate to apply to this claim. If plaintiff is mistaken, he asks that this claim be evaluated considering the evidence provided here and elsewhere over the course of these legal proceedings.

If lack of expert testimony is an issue here, plaintiff is currently obtaining responses to interrogatories from a Dartmouth psychiatrist who he met with extensively over the course of these proceedings so that his testimony can be used to help verify the veracity of his mental suffering and physical symptoms. If this is insufficient, plaintiff will also produce testimony of his current medical doctor before the end of the discovery period if the court deems this proper. Dartmouth itself so strongly believed plaintiff was at risk of suicide during his disciplinary proceedings (despite him making any indication this was the case other than being distressed) that by force, it submitted him to the hospital on one occasion, and to its on-campus medical facilities on several others.

### G.  Count VII - Estoppel and Reliance

The Complaint states Count VII is asserted "[i]n the event the Court were to find that no contracts exist between Plaintiff and Defendant . . . ." Complaint ¶ 223. In other words, this claim appears to be pled in the alternative to a breach of contract claim. Promissory estoppel is not available where there is an agreement between the parties covering the same subject matter. See

Rockwood v. SKF USA Inc., 758 F. Supp. 2d 44, 58 (D.N.H. 2010); Great Lakes Aircraft Co., Inc. v. City of Claremont, 135 N.H. 270, 290, 608 A.2d 840, 853 (1992). Assuming the Court accepts that a contract existed between Plaintiff and Dartmouth embodied in its Student Handbook, there is no need to reach this claim.

But even if this claim were properly pled in the alternative, any claim for estoppel must fail. The elements of estoppel are (1) a false representation or concealment of material facts made with knowledge of those facts, (2) the party to whom the representation was made must have been ignorant of the truth of the matter, (3) the representation must have been made with the intention of inducing the other party to rely on it, and (4) the other party must have been induced to reply upon the representation to his or her injury. Thomas v. Town of Hooksett, 153 N.H. 717, 721, 903 A.2d 963, 967 (2006). Reliance by the party bringing the estoppel claim must be reasonable, and reliance "is unreasonable when the party asserting estoppel, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was improper, materially incorrect, or misleading." Id.

Promissory estoppel claims appear inherently complicated, with the UCLA Law Review writing *"scholars writing in this area… disagree with each other regarding what, exactly, promissory estoppel is and how it should (and does) work in practice" (https://www.uclalawreview.org/pdf/57-3-2.pdf page 671*), but plaintiff earnestly believes this cause of action is entirely appropriate to raise and pertinent to this case.

When stating "[i]n the event the Court were to find that no contracts exist between Plaintiff and Defendant . . . ." plaintiff meant to express that with respect to each individual count presented, that if the court finds a contract was not established compelling Dartmouth to uphold its promises (due to a lack of consideration, or failure to meet necessary writing standards, for instance) that damages arising from plaintiff's reliance on Dartmouth's promises be tested under this theory of liability.

There are essentially two different estoppel and reliance related claims brought by the plaintiff here, based on promises made by Dartmouth which plaintiff relied on, but which Dartmouth refused to uphold to plaintiff's detriment.

First is that as a result of the fact Dartmouth's fully evaluated the March Report, and upon that review, notified him of its decision that it had determined it was not appropriate to potentially impose a formal disciplinary allegation regarding the evidence it contained, and that these events would not impact plaintiff's ability to attain an undergraduate degree from Dartmouth, plaintiff continued to allocate funds towards attaining additional credits at Dartmouth that could not be applied towards attaining a degree

elsewhere. It is without question that when Dartmouth's JAO initially received and reviewed the March Report, determined and reported to the plaintiff that the evidence contained in the report did not potentially support raising a formal disciplinary sanction upon him, as evidenced by the fact Dartmouth's policies state allegations will be raised "as soon as possible after the event," and that Dartmouth did not raise formal disciplinary allegations regarding the Report its JAO had investigated it entirely, as well as the testimony of multiple Dartmouth employees cited here. Based on assumption Dartmouth would adhere to its own rules and perform his disciplinary hearing procedures in a manner consistent with all others that have occurred at the College, and not sanction him because of evidence its JAO had already reviewed and determined it was not appropriate to raise allegations about evidence it'd already reviewed pursuant to the College's policy and determined it was not appropriate to initiate formal disciplinary action regarding, plaintiff consumed educational services at Dartmouth during the Spring 2017 term. Dartmouth declared and promised the evidence in the March Report would not jeopardize plaintiff's ability to attain a Dartmouth degree, and that it would perform a good faith effort to adjudicate disciplinary cases such as the plaintiff's according to the institution's own policies. These promises induced plaintiff to consume education services at Dartmouth which are of no value to him, and which plaintiff would not have consumed otherwise. Due to limits on the amount of credits you can transfer from another institution, plaintiff is unable to apply these credits towards earning an undergraduate degree at any other major institution in the United States. Had Dartmouth initiated disciplinary proceedings and expelled the plaintiff when it investigated the March Report, he would not have consumed these incredibly expensive services from Dartmouth which are of no value to him.

Second, plaintiff passed on opportunities at comparably prestigious academic institutions to attend Dartmouth, based in part on the promise that if plaintiff were subjected to its disciplinary procedures, that these procedures would be performed in accordance with the institution's own written, advertised policies. Dartmouth knowingly deceives prospective students into believing that if a procedural error occurs that materially affects the outcome of their COS hearing case, that the reviewing officer (the Dean of the College of an appointee) will identify and rectify the ramification, or at least carry out a good faith effort to do so. In reality, the Dean of the College's review process only exists to give the appearance of equity and fairness, and the Dean will not recognize or rectify even the most obvious and severe procedural errors, as demonstrated by the fact that none of the most senior members of Dartmouth's disciplinary staff could think of a single instance where the College had done this in the history of the institution *(K. Strong - Deposed by Plaintiff.mp4, 2:46:00), (K. Strong - Deposed by Plaintiff.mp4, 1:09:00, 1:57:00), (K. Strong - Deposed by Plaintiff.mp4, 00:34:20), (Rebecca Biron - Deposed by Defendant's Counsel & Plaintiff.mp4, 1:56)*. In the plaintiff's case, we can see it is objectively true that he was found guilty of an

allegation materially different in substance than those Dartmouth had raised against him in advance of his hearing, yet Biron (a professor of literature at an Ivy League institution (who surely has a strong enough understanding of grammar and semantics to grasp this fact, which multiple other academic and non-academic Dartmouth employees have testified to) by simply looking at the allegations Dartmouth's JAO raised against plaintiff in advance of his first hearing, and the allegation which the COS found him guilty of) refused to acknowledge this outright. This was not an error performed unwittingly; it is a manifestation of an ideological choice Biron and Dartmouth's Administrators have made to support any decisions yielded by its disciplinary staff and committees, regardless of the circumstances of an individual case, and fervently deny wrongdoing regardless of what Dartmouth's policies might state or require. Again, despite having settled numerous lawsuits that contain incredible allegations regarding its disciplinary hearing system, Dartmouth has never once admitted that an undergraduate student's disciplinary hearing was not performed in accordance with its own policies in the institution's known history. As current Title IX investigator for Dartmouth, Kristi Clemens, told plaintiff in a phone conversation she would not allow him to record, the unspoken rule amongst Dartmouth College's disciplinary staff is to deny any wrongdoing in its disciplinary processes unless compelled to do so by a court of law.

**Plaintiff cannot demonstrate that there is a genuine dispute as to whether he detrimentally changed his behavior based on any representation by Dartmouth, or that he relied on any particular representation by Dartmouth to his injury. He alleges he "gave up competing offers from other prestigious schools" but also conceded in his deposition that he knew at the time he matriculated that he would be bound by the Student Handbook, and if he violated a Standard of Conduct, he could be subject to discipline. Complaint ¶ 224; Exhibit 39, Anderson Dep. Tr. 34:10-20. As set forth above, Dartmouth adhered to the Handbook and appropriately and fairly separated Plaintiff.**

### H.  Count VIII - Unfair and Deceptive Trade Practices

**Plaintiff alleges that Dartmouth has violated the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 (the "CPA"). To succeed in such a claim, a plaintiff must prove (1) the defendant is a person, (2) the defendant used an unfair method of competition or a deceptive act or practice, (3) the act occurred in trade or commerce, and (4) the defendant's conduct rose to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 369, 965 A.2d 1032, 1038 (2009) (internal quotation and citation omitted).**

Plaintiff has alleged here that Dartmouth (a participant in the market for private secondary education) advertises it will adhere to its own written policies to create the impression or expectation of certain levels of fairness, and gives students the ability to anticipate how the institution might act. However, Dartmouth does not intend to uphold these policies, or do so in practice.

**"Although the general provision of the CPA is broadly worded, not all conduct in the course of trade or commerce falls within its scope." State v. Sideris, 157 N.H. 258, 262, 951 A.2d 164, 168 (2008) "An ordinary breach of contract claim, for example, is not a violation of the CPA." Turner v. Shared Towers VA , LLC, 167 N.H. 196, 209, 107 A.3d 1236, 1248 (2014) (internal quotation and citation omitted). Plaintiff's claim should be treated as an ordinary contract claim, which is not subject to the statute. The essence of the dispute between the parties is private, and did not occur "in trade or commerce" as a matter of law.**

**Even if that were not the case, this claim is also based on Dartmouth's alleged failure to follow its own policies in the Student Handbook. See Complaint ¶¶ 231-233. There is no genuine dispute that Dartmouth complied with its policies and fairly and appropriately separated Plaintiff.**

**I.    Count IX - Equitable Relief in the Form of a Declaratory Judgment**

**Count IX is styled as a claim for equitable relief in the form of a declaratory judgment. A New Hampshire statute permits:**

**Any person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties, and the court's judgment or decree thereon shall be conclusive.**

**N.H. Rev. Stat. Ann. § 491:22; see also 28 U.S.C. § 2201. "To establish standing to bring a declaratory judgment proceeding under RSA 491:22 . . . a party must show that some right of the party has been impaired or prejudiced by the application of a rule or statute." Duncan v. State, 166 N.H. 630, 645, 102 A.3d 913, 925 (2014).**

**The nature of the declaratory judgment or equitable relief Plaintiff is seeking is unclear based on the contents of Count IX. However, Plaintiff's prayer for relief asks the Court to reverse the outcome of his disciplinary proceeding and reinstate him as a student in good standing, among other things. Complaint at 56. Because plaintiff is not entitled to any relief as set forth herein, this claim must also fail.**

**Although Dartmouth submits all of Plaintiff's claims are meritless, the only appropriate remedy for a procedural error would be another hearing before the Committee on Standards—not reinstatement, a reduced sanction, or any other relief. See Nierenberg v. Trustees of Dartmouth Coll., No. 16-CV-259, at 7 n.2 (N.H. Super. Ct. Oct. 26, 2016) [attached hereto as Exhibit 48] ("[T]he court anticipates that if the plaintiff prevails at trial on this matter, the COS should be ordered to conduct a new hearing with the necessary procedural protections."); Ramaiah v. Trustees of Dartmouth Coll., No. 215- 2015-CV-00351, at 4-5 n.2 (N.H. Super. Ct. Jan. 22, 2016) [attached hereto as Exhibit 49] ("Although the Court is not making any rulings at this time as to the proper remedy, the Court notes that it would appear the College is correct that if the plaintiff prevails at trial, the Court should order the COS to conduct a new hearing with the necessary procedural protections."). At a minimum, the Court should rule that the only injunctive remedy potentially available to Plaintiff is a third hearing.**

Plaintiff's case does not resemble either defense has cited here. Dartmouth has already subjected the evidence contained in the March Report three times and either come to the disciplinary conclusion it was not appropriate to raise formal disciplinary allegations against plaintiff regarding the evidence contained the report (as it initially did), or attempted to inappropriately sanction plaintiff in violation of its own policies and previous disciplinary decision (as it did at disciplinary hearings which occurred about six and nine months after Dartmouth initially reviewed the March Report). No jury would find the just and appropriate remedy to this case would be to subject plaintiff to a fourth disciplinary review of the March Report. The appropriate action is to impose the decision Dartmouth's JAO came to when it initially reviewed the March Report – the only disciplinary decision regarding the report which Dartmouth made in compliance with its own written policies.

### J.   Count X - Negligent Training and Supervision of Employees

**"[A] claim of negligent hiring, training and supervision can encompass direct liability as a result of the misconduct of the employee." Cutter v. Town of Farmington, 126 N.H. 836, 840, 498 A.2d 316, 320 (1985). However, Plaintiff must establish as an element "an underlying tort or other wrongful act committed by [Dartmouth's] employees." Town of Londonderry v. Mesiti Dev., Inc., 168 N.H. 377, 385, 129 A.3d 1012, 1019 (2015).**

**Plaintiff cannot demonstrate that any of Dartmouth's employees committed an underlying tort or other wrongful act for which Dartmouth could be liable for negligent training or supervision. In other words, because all of Plaintiff's other claims are meritless, he cannot succeed in this claim, nor is there any evidence in the record that any employee's training was deficient.**

(In earnest) based on conversation between defense counsel and judge Steven J. McAuliffe during pre-trial conference, and subsequent readings by plaintiff which seem to affirm the statements made there, it seems that although Dartmouth certainly negligently fail to adequately train and supervise its employees in a colloquial sense, that contract and not tort law is most pertinent and appropriate to apply to this claim. If plaintiff is mistaken, he asks that this claim be evaluated considering the evidence provided here and elsewhere over the course of these legal proceedings.

### K.  Count XI - Fraudulent Misrepresentation

**"One who fraudulently makes a misrepresentation for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." Tessier, 162 N.H. at 331-32 (internal quotations, citations, and alterations omitted). "The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." Id.**

**Although Fed. R. Civ. P. 9(b) is most often applied in the context of a motion to dismiss, Plaintiff cannot meet its requirements even after the benefit of discovery. See e.g., Micronics Filtration Holdings, Inc. v. Miller, No. 18-CV-303-JL, 2018 WL 4845749, at \*3 (D.N.H. Oct. 4, 2018), reconsideration denied, No. 18-CV-303-JL, 2018 WL 6529081 (D.N.H. Dec. 12, 2018). ("To meet this standard, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (internal citation and quotation omitted)). This claim is essentially duplicative of plaintiff's estoppel claim and is meritless for the same reasons. There is no evidence in the record that any particular misrepresentation alleged by Plaintiff induced his justifiable reliance to his detriment, or that any particular agent of Dartmouth intended for him to rely on his or her representation with knowledge of its falsity or conscious indifference to its truth. Likewise, there is no evidence that any representation materially affected the outcome of his disciplinary process in any way.**

Plaintiff has alleged here that Dartmouth (a participant in the market for private secondary education) advertises it will adhere to its own written policies to create the impression or expectation of certain levels of fairness, and gives students the ability to anticipate how the institution might act. However, Dartmouth does not intend to uphold these policies, or do so in practice. Herein, plaintiff has performed all of the following *"(1) specify the statements that the plaintiff contends were fraudulent, (2)*

*identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.*"

**M. Count XII - Fraudulent Concealment**

**Count XII is styled as a claim for "fraudulent concealment." However, the "doctrine of fraudulent concealment is an equitable ground to justify the tolling of the statute of limitations based on the wrongful conduct of the defendant," not a freestanding cause of action. Conrad v. Hazen, 140 N.H. 249, 253, 665 A.2d 372 (1995). As described above, Plaintiff has failed to demonstrate a material dispute of fact exists with respect to any type of fraud.**

Herein, plaintiff has demonstrated a material dispute of fact with respect to whether Dartmouth committed fraud. Plaintiff has alleged that Dartmouth advertises it will adhere to its own written policies to create the impression or expectation of certain levels of fairness and gives students the ability to anticipate how the institution might act. However, Dartmouth does not intend to uphold these policies, or do so in practice.

## CONCLUSION

**No student's right to remain enrolled at a private college is absolute, and Dartmouth is entitled to some discretion in its disciplinary process. The undisputed factual record before the Court demonstrates that Plaintiff admitted he engaged in misconduct in violation of Dartmouth's Standard of Conduct II, and the second hearing panel of the Committee on Standards imposed a reasonable sanction based on the totality of the information available. Dartmouth complied with the Student Handbook and appropriately separated Plaintiff. For all the reasons set forth above, Dartmouth respectfully requests that the Court enter judgment in its favor on all twelve claims.**

Dartmouth is indeed entitled to a great deal of discretion in its disciplinary processes, as the federal courts have ruled in the past – in the opinion of most Americans, they are too unfettered to do as they please despite being capable of dealing punishments, the severity of which can only be rivaled by prolonged incarceration. However, even the meager legal limitations the courts have imposed on the disciplinary actions of private universities do not permit what Dartmouth has done here. They do not allow Dartmouth to abandon its clearly defined procedures for raising disciplinary allegations, and they do not allow Dartmouth to re-evaluate evidence it has already reviewed, arbitrarily apply different standards upon this subsequent review, and come to different disciplinary decisions based on said subsequent review of evidence it had already imposed sanctions upon the student for, or reviewed and determined the evidence was not appropriate to initiate disciplinary processes regarding, especially when

the College's own policies in no way indicate that evidence of disciplinary misconduct remains potential cause for disciplinary action against a student once it has already been reviewed and subjected to Dartmouth's disciplinary processes once. If Dartmouth is permitted to do this here, any private university that disciplines (or determines it is not appropriate to discipline) an undergraduate student for virtually any act of misconduct, is then free to expel the student for that same act of misconduct, and no further found violation of the institutions policies, at whatever time it desires. A student who is found guilty of underage drinking, or participating in a hazing during their freshman year, and whom a college sanctions, or decides not to sanction, can be expelled for this same infraction they've already admitted to at any subsequent point in their undergraduate career; despite what the College's policies state, this is exactly what administrators tasked with overseeing its hearing processes have argued in this case (*Katharine Strong*, *Anderson, M. – KRS, Hudak, A. – phone meeting 10.26.17, 00:24:30*). Dartmouth is likely to argue that the portion of its Student Handbook which states the JAO can consider "any source" in deciding whether to conduct an investigation permits this, as its administrators have in depositions and conversations with the plaintiff, and as appears to be reflected in Dartmouth's motion;

      ***The Judicial Affairs Office is "responsible for receiving all complaints and issuing allegations." Id. at 7973. "Any student, faculty member, or employee may file a complaint regarding an undergraduate with the JAO," but it can consider "any source" in deciding whether to conduct an investigation. Id. The Judicial Affairs Office has exclusive discretion to "determine whether complaints or other information concerning a student shall result in formal disciplinary allegations." Id. In other words, it alone is empowered to determine when to initiate the formal disciplinary process described in the Handbook.***

      However, even if are permitting of the most attenuated logic, no interpretation of these phrases from Dartmouth's Handbook permit the actions it had committed in this case that Dartmouth has claimed, or is suggesting they do.

      Because it is virtually the only means by which plaintiff could possibly pursue justice in this case, he is representing himself pro se. According to defense counsel (in conversation following plaintiff's second deposition), Dartmouth has hired the most competent attorneys available to draft this motion for summary judgement, and anticipate this civil action will come to a close shortly after the summary judgement process comes to a close. The summary judgement process is complicated, and especially with regards to this case, but plaintiff has done his best to comply with the applicable rules and standards here. For these reasons, plaintiff asks that if this lawsuit is somehow in consideration for dismissal for any reason potentially pertaining to his elementary understanding of the FRCP & LRCP, or the rules regarding

evidence, that the Court either hold a telephonic hearing, or otherwise notify plaintiff of his failure to produce whatever information he has or likely has but has not provided.

*"plaintiff advocates that the "law requires Dartmouth to comply with the letter of its own handbook" and, therefore, the defendant's request that the court "apply a fuzzier and possibly more lenient 'substantial compliance' standard … should be rejected." (Pl.'s Opp'n at 3 (citation omitted).) The plaintiff also argues that "[t]he terms of the contract are to be interpreted based on the 'reasonable expectations' of the student." (Pl.'s Mot. Summ. J. at 6 (citing Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) ("We interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.") Regarding this latter dispute, the court rejects any invitation to defer to the school's interpretation of its Handbook. While "[t]he relationship between a university and its students is distinctive" and, therefore, "a strict doctrinal approach [to resolving this dispute] is inappropriate," the general rule that "the proper interpretation of a contract is ultimately a question of law for this court" and should be based upon "the meaning that would be attached to it by reasonable persons" still applies. Gamble v. Univ. Sys. of New Hampshire, 136 N.H. 9, 12–13, 15 (1992) (applying traditional rules of contract interpretation to resolve a dispute over a university's decision to increase tuition mid-semester by examining "all documents which constitute the agreement [in order to] determine the reasonable expectations of the parties" in light of their "distinctive" relationship). Nierenberg v. Trustees of Dartmouth College, 2017 WL 10259668 (2017)*

*"That said, all contracts include an implied covenant of good faith and fair dealings that functions "to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations as well as with common standards of decency, fairness and reasonableness." Birch Broad., Inc. v. Capitol Broad. Corp., 161 N.H. 192, 198 (2010) (quotation omitted). Dartmouth, thus, had an "obligation to provide basic fairness in its proceedings … separate from and in addition to its contractual obligation to follow the rules it set forth in the Handbook." Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 601 (D. Mass. 2016)*

Respectfully submitted,

Dated:  7/17/2020                    **Mark Anderson**

/s/Mark Anderson

_____

Mark Anderson

JD2018265@Gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the following document was sent electronically to Dartmouth's

Counsel via the ECF.

Date: _7/17/2020_                                             Mark Anderson

                                  Signature:_____