UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Mark Anderson,
         Plaintiff

         v.                              Case No. 19-cv-109-SM
                                         Opinion No. 2020 DNH 210
Trustees of Dartmouth College,
         Defendant

## O R D E R

Mark Anderson, plaintiff, was expelled from Dartmouth College.  Proceeding pro se, he asserts claims arising from the College's disciplinary process.  Dartmouth has moved for summary judgment on all of Anderson's claims against it.  For the reasons given, the College's motion is granted.

**STANDARD OF REVIEW**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the

evidence of record permits a rational factfinder to resolve it
in favor of either party, and 'material' if its existence or
nonexistence has the potential to change the outcome of the
suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016)
(citation omitted).  Consequently, "[a]s to issues on which the
party opposing summary judgment would bear the burden of proof
at trial, that party may not simply rely on the absence of
evidence but, rather, must point to definite and competent
evidence showing the existence of a genuine issue of material
fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir.
2014).  In other words, "a laundry list of possibilities and
hypotheticals" and "[s]peculation about mere possibilities,
without more, is not enough to stave off summary judgment."
Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52 (1st Cir.
2014).  See generally Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 249 (1986).

### BACKGROUND

Anderson challenges Dartmouth's application of its
disciplinary rules and processes on several grounds.  A review
of that system, as described in Dartmouth's Student Handbook,
follows.

1.   <u>Dartmouth's Disciplinary System</u>

Dartmouth's Student Handbook defines "Standards of Conduct" for the Dartmouth community, standards "which govern the behavior and activities of individual students and student organizations on or off campus."  Def.'s Mot. for Summary Judgment, Exh. ("Def.'s Exh.") 1 at 2.  The Handbook identifies nine standards, but Standards II and VI are the only ones relevant to this case.  Standard II prohibits students from engaging in "behavior that threatens . . . the safety and security of others."  Def.'s Exh. 1 at 3.  Under Standard VI, students "are subject to disciplinary action for violation of the laws of any jurisdiction, whether local, state, federal or foreign."  <u>Id</u>. at 6.

The Handbook describes the operation of, and procedures to be followed by the undergraduate disciplinary system.  Dartmouth College's Trustees exercise "ultimate authority for the structure and operation of the undergraduate disciplinary system at the College."  Def.'s Exh. 1 at 10.  The Trustees have delegated their authority to the Vice Provost for Student Affairs and the Committee on Standards (COS), which are charged with promulgating, revising and enforcing "rules concerning the disciplinary system as it relates to undergraduates."  Def.'s

Exh. 1 at 10.  The Committee on Standards is tasked with hearing cases involving violations of the Standards of Conduct.

The COS is generally comprised of 12 faculty members, 12 undergraduate students, and 8 members selected by the college's president.  COS panels, designated to hear a specific case, consist of two faculty COS members, two student COS members, and one of the administrative members of the COS selected by the president, as well as the hearing Chair, who does not vote, and is a member of the College's Office of Judicial Affairs.

### A.   Office of Judicial Affairs

Dartmouth's Office of Judicial Affairs is responsible for "receiving all complaints and issuing allegations."  Id. at 12. The Handbook reads:

> [T]he JAO may conduct an investigation and initiate an allegation on the basis of information coming to its attention from any source.  The JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations.  The JAO shall coordinate the investigation and disposition of complaints and shall call upon other members of the College community for assistance as necessary.

Id. at 12.

If the JAO determines that formal disciplinary allegations are necessary, and those allegations could potentially result in suspension or separation if the student is found responsible,

4

the Director of Judicial Affairs must "inform the student in writing and provide the student with copies of the available information related to the allegations." Id. at 13.

Within five days of written notice of the allegations, the student is allowed an "opportunity to admit or deny the allegation." Id. If the student denies the allegations, or the facts in question, the case is referred to the COS for a hearing.

The Handbook states that COS hearings "are administrative in nature and [] not governed by the rights and rules that apply in a court of law." Def.'s Exh. 1, at 15. However, "[t]he disciplinary system does provide . . . student[s] with certain rights and obligations," as delineated in the Handbook. Id. at 15. Students appearing before the COS "are expected to be familiar with [its] rules and procedures." Id. at 15.

B.   "Rights and Obligations" Under the Handbook

Among the rights the Handbook provides students are "reasonable written notice of the substance of the allegation(s) against them," and a "reasonable period of time in which to prepare for a hearing." Id. at 16. The Handbook provides: "[h]earings will be scheduled as soon as possible after an incident," and a "student who needs additional time to prepare for a hearing may request, in writing, an extension of time."

Id.  The COS Chair is responsible for scheduling hearings, and making decisions with respect to requests for delay or rescheduling.[1]

The Handbook gives students the right to have a faculty advisor of their choosing present at the hearing.  The advisor's main role is to "assist the student in reviewing and understanding the procedures related to the hearing and to assist the student in obtaining answers to questions about the hearing."  Id. at 15.  According to the Handbook, "an advisor might appropriately help a student anticipate questions and issues likely to arise at a hearing, and while an advisor might provide feedback about the effectiveness of a student's written or oral presentation of the facts, the advisor does not function in the way an attorney would in a criminal or civil proceeding." Id. at 16.

---

[1]  With respect to scheduling, the Handbook also states: "[w]hen a COS hearing cannot be scheduled during the term of the incident, a temporary hold will be placed on the student's registration and tuition bill until the case can be heard or by the deadline for administrative withdrawals (whichever comes first) is reached."  Id. at 17.

The Handbook also contemplates that "conduct that may violate one of the Standards of Conduct may also be a violation of law," and in such instances, the "College will take independent action . . . regardless of the status or outcome of any criminal proceedings."  Id. at 13.

The JOA is charged with providing COS with "all relevant material relating to cases which come before it," material that the college calls the "case packet."  Id. at 14; Def.'s Exh. 40 at 13:6-14:1.  The non-voting Chair of the COS panel is vested with authority over all "procedural rulings, including rulings on relevance and admissibility of material" within the case packet.  Id. at 17.  Before the hearing, both the student and the COS hearing panel are provided with copies of the case packet.

C.   COS Hearings

COS hearings are "informal," and are intended "to provide the student with an opportunity to be heard and to provide the COS relevant information on which to base a decision."  Def.'s Exh. 1 at 19.  Pursuant to the Handbook:

> Formal rules of evidence and courtroom procedures are inapplicable.  The COS may hear and consider any information it considers to be trustworthy and to have probative value.  . . . [T]he Chair is empowered to make all procedural rulings, including rulings on relevance and admissibility of information.

Id.  Students may request witnesses, present information and argument, and make opening and closing statements.  Id. at 17.

COS decisions require a majority vote, and, for the COS to conclude that a student has violated a Standard, "the COS must be persuaded that a preponderance of the evidence supports such

a finding," that is, that it is "more likely than not" the
student committed the alleged violation.  Id. at 20.  After the
COS reaches a decision, the Chair drafts a "case note,"
summarizing the decision and its rationale.  Students are
promptly notified of the COS's decision.  Id. at 20.

### D.   Requests for Review

Requests for review of COS decisions are received by the
Vice Provost for Student Affairs, the Dean of the College, or a
designee.  Id. at 11.  Requests may be made on the following
grounds:

1.   Procedural error which has materially prejudiced
     the student's case;

2.   Newly discovered information which, had it been
     available at the time of the hearing, would
     likely have affected the outcome either with
     regard to a finding of responsibility or with
     regard to the sanction imposed (if the
     information was not reasonably available to the
     student at the time of the proceeding).

Id. at 21.  Sole discretion for the decision as to whether those
grounds for review have been met is vested with the reviewing
officer.  Id.  Upon review, "the original decision may be
upheld, the imposed sanction adjusted as the reviewing officer
deems appropriate, or referred back to the hearing officer or
the COS panel that originally heard the case for further
consideration."  Id. at 21.

8

2.   Mark Anderson and the Disciplinary Process

In January, 2017, while Anderson was in his junior year at
Dartmouth, his girlfriend of approximately four years broke up
with him.  Angry and upset, plaintiff sent his former girlfriend
and her family members several inappropriate and threatening
communications over the next few months.  On March 29, 2017,
Anderson's former girlfriend (who, at the time, was a student at
a college in another state) obtained a protective order from a
state court close to where she was attending school.  The order
prohibited Anderson from having any further contact with his ex-
girlfriend, or her family members.

Dartmouth's JAO learned of the protective order around the
time it was issued, but decided not to initiate a formal
disciplinary process at that time.  Dartmouth's Director of
Community Standards and Accountability in the JAO, Katharine
Strong, said "we determined at that time we did not have enough
information to move forward with allegations at that time . . .
[S]hould more information become available, we would review
again."  Def.'s Exh. 40 at 31:12-20.

Kristi Clemens, then Dartmouth's Assistant Dean of Student
Affairs and Director of Case Management, was also notified of
the protective order.  As Assistant Dean of Students Affairs and
Director of Case Management, Clemens "served as a point of

9

contact for struggling students who might need assistance across multiple areas."  Def.'s Mot. for Summary Judgment at 8. Clemens had no disciplinary authority with regard to reports of troubling behavior.  See Def.'s Exh. 42 at 5:1-5, 8:5-8; 42:5-9.

Clemens contacted Anderson to set up a meeting to discuss the protective order.  Anderson declined initially, but Clemens informed him that the meeting was not optional.  The two met on April 4, 2017.  At the meeting, Clemens told Anderson that the JOA had reviewed the protective order, and decided not to raise formal disciplinary allegations at that time.  As Clemens later stated, "I let him know the college would not be taking any action on this report in terms of a judicial approach at this point, but wanted to let him know that should this behavior continue[,] we may need to reconsider that."  Def.'s Exh. 42 at 16:2-21.

Plaintiff tells a slightly different story.  According to plaintiff, Clemens told him that "if a subsequent incident occurred," which then prompted Dartmouth to initiate formal disciplinary proceedings against him, "the March Report could be provided to the COS if it helped contextualize whatever (different) allegations the JAO had raised against the plaintiff."  Pl.'s Opp. to Mot. for Summary Judgement at 9.  See also Def.'s Exh. 39 at 59:3-24 ("She told me that if I violated

the restraining order, then . . . further action could be –
allegations could be raised against me regarding that action,
and the other materials might be viewed at the hearing, but they
would not raise allegations about those materials
specifically."); 191:5-8 ("she represented to me that if I
violated the restraining order, then that subsequent action
could be subject to disciplinary allegations or procedures.").

A.   <u>Violation of the Protective Order</u>

On May 4, 2017, Anderson violated the protective order by
sending a message to his ex-girlfriend's mother, instructing her
not to speak to any of his family members.  Anderson was
subsequently arrested by the Hanover Police Department, and
charged with violating the order.

The JAO was promptly informed of Anderson's arrest, and,
after reviewing the available information, decided to initiate
formal disciplinary procedures.  Accordingly, on May 10, 2017,
Adam Knowlton-Young, a member of the Office of Judicial Affairs,
wrote to Anderson "to follow up on a report . . . received from
[Dartmouth's Department of] Safety and Security, regarding an
incident on or about May 4, 2017[,] as well as behavior from
spring term that had resulted in a restraining order being put
in place on you."  Def.'s Exh. 4.  Knowlton-Young further wrote:
"I have reviewed the report from Safety and Security and

prepared materials regarding our concerns.  I would like to share them with you," and "schedule a time to discuss the steps going forward and answer any questions you might have."  Id.

Enclosed with Knowlton-Young's May 10 letter were two additional letters, also from Knowlton-Young and also dated May 10.  See Def.'s Exh. 5.  The first letter states:

> [O]ur office received a report from Safety and Security detailing events you were involved in on or about May 4, 2017[,] and during the spring term 2017. Specifically, it is alleged that on or about May 4, 2017[,] you communicated with parties in violation of a restraining order, which had been issued for previous behavior that was threatening or harassing. I have reviewed the information in this report, and based on the nature of the incident described[,] I have determined that this should be referred to the Committee on Standards.

Def.'s Exh. 5 at 2.  That letter describes its attachments, including, inter alia, a "letter explaining the allegations," a copy of the Safety and Security report, an explanation of resources for navigating the Committee on Standards process, and a "Statement of Understanding."  Id.  The Statement of Understanding sets forth two allegations:

(1)   I violated the Dartmouth Standard of Conduct II through repeated behavior targeted at an individual during the Spring 2017 terms; and

(2)   I violated the Dartmouth Standard of Conduct VI when I violated local, state or federal law by not observing the conditions of a restraining order on or about May 4, 2017.

Def.'s Exh. 6.

In the second enclosed May 10 letter (presumably, the referenced "letter explaining the allegations"), Knowlton-Young wrote:

> Specifically, it is alleged that on or about May 4, 2017[,] you communicated with parties in violation of a restraining order which had been issued for previous behavior that was threatening or harassing.  This continued contact in violation of the restraining order, if true, would be in violation of Standards II and VI.

Def.'s Exh. 6 at 4.  That letter continues, "if you are found responsible for this violation, a likely outcome would be suspension."  Id.

#### B.  Anderson Requests Delay of Proceedings

On May 18, 2017, Anderson emailed Strong, requesting that his disciplinary proceeding be delayed until the criminal charges against him were resolved.  Def.'s Exh. 7.  Strong responded, "I cannot allow you an indefinite delay on responding to the allegations while continuing as a student at Dartmouth. You may finish out the Spring term, but you will need to resolve the judicial case prior to returning to Dartmouth."  Id. Anderson understood that, "to remain enrolled, [he] would . . . have to undergo a COS hearing, . . . where the allegations which

had been raised against [him] would be evaluated."  Def.'s Exh.
39 at 75:21-76:3.

Despite that understanding, Anderson did not attempt to
resolve the disciplinary charges against him until September 4,
2017, when he emailed Clemens and Knowlton-Young:

> I'm coming back to school next week and just
> remembered I'd been told I might have to go through a
> school hearing before classes start in the fall.  I
> just wanted to write and confirm you got the letter
> [from] my lawyer with the results from the court
> hearing, and see if I still need to go through this
> based on the information it contains.

Def.'s Exh. 8.  Anderson also asked, "is there any way I could
do [the judicial hearing] over the phone/skype to minimize how
much this will distract me during the start of fall term?".  Id.

Knowlton-Young responded to Anderson on September 5, 2017,
reiterating that Anderson's case "need[ed] to be resolved prior
to . . . returning to campus."  Def.'s Exh. 9 at 1.  "You still
need to go through the COS hearing[,] whatever the outcome of
your court process," Knowlton-Young wrote.  Id.  Knowlton-Young
instructed Anderson to complete and submit the Statement of
Understanding, which had been provided to him on May 10, and,
once the Statement of Understanding was completed, the COS
hearing would be scheduled.  Id.

Anderson returned the Statement of Understanding on
September 10, 2017, denying both allegations.  The next day,
Knowlton-Young informed Anderson that his COS hearing would be
held on September 21, 2017, and identified the members of the
COS hearing panel.  He invited Anderson to submit written
materials for inclusion in the case packet.  Anderson did not
submit any materials.  Anderson received a copy of the case
packet on September 19, 2017, along with an updated list of COS
hearing panel members.

### C.    September 21, 2017, Hearing

At the September 21, 2017, hearing, Anderson was questioned
about the communications he had sent to his ex-girlfriend that
led to the issuance of the March protective order, and he
"attempted" to answer those questions.  Def.'s Exh. 39 at 85:8-
10.  After being questioned, Anderson gave a final statement to
the hearing panel.  Id. at 88:6-8.

The COS panel deliberated, and found that Anderson had
violated Standard of Conduct II.  The panel imposed a sanction
of separation from the college, effective immediately.  Def.'s
Exh. 15.  Dan Nelson, the Chair of Anderson's panel, met with
him on September 22, 2017, and told him the panel's decision.
In a letter sent that day, also notifying Anderson of the COS
decision, Strong notified Anderson of his right to request

review, and that any request for review had to be submitted by
September 29, 2017.

### D.   Anderson's First Request for Review

On September 25, 2017, Anderson emailed the JAO, requesting
"documents with information regarding the nature of the
committee's decision."  Def.'s Exh. 17.  In response, Strong
emailed Anderson a copy of the "Case Note" from his hearing,
which sets forth "the rationale for the committee's decision in
finding [him] responsible and in determining [his] sanction,"
written by Nelson.  Id.

After requesting and receiving extensions of the September
29, 2017, deadline, Anderson submitted his request for review on
October 4, 2017.  He wrote that the COS's decision should be
reversed because he had not been given reasonable notice of the
"substance of my allegations from the school, because my
advisors and I were able to come to the conclusion . . . that
the COS committee put me on trial for a specific set of actions
I'd committed during the Spring term, which did not encompass
the things I'd done during the Winter term while I was home."
Def.'s Exh. 19.  Therefore, Anderson argued, he had not had an
opportunity "to 'admit' or 'deny' the allegations [he] was found
guilty of [and] it wasn't possible for [him] to know exactly

16

what information it was important for me to provide to the
committee." Id.

Anderson's request for review was considered by Rebecca
Biron, Dartmouth's Dean of the College.  After considering the
materials summited to the COS panel and Anderson's request for
review, Biron granted Anderson's request, and directed that a
new COS hearing be held.  Biron explained:

> You have asserted that a discrepancy between the
> allegation letter you received on May 10, 2017[,] and
> the hearing committee's focus during their process
> constitutes a procedural error that materially
> prejudiced your case.  The allegation letter states
> that "it is alleged that on or about May 4, 2017, you
> communicated with parties in violation of a
> restraining order, which had been issued for previous
> behavior that was threatening or harassing.  This
> continued contact in violation of the restraining
> order, if true, would be in violation of Standards II
> and VI."  The materials in the case packet and the
> recording of the hearing indicate that the Committee
> on Standards did not limit their consideration to your
> actions on or about May 4.  In finding you responsible
> for violating Standard II, the hearing committee
> focused on the connection between your May 4
> communication in violation of the restraining order
> and "previous behavior that was threatening or
> harassing" over time between February 28 and May 4,
> 2017.  This focus does not by itself constitute a
> procedural error.  Rather, it is a reasonable
> interpretation of the phrase "continued contact" to
> consider the violation of the restraining order in the
> context of the entire course of the communications
> from February to May.
>
> However, you assert that your own understanding was
> that the allegation letter and statement of
> understanding concerned only behavior on May 4.  You
> write in your request for the review (page 2) that "if
> this error had not occurred and the substance of the

17

allegations against me were communicated with the care
and attention to detail that students hope and assume
this school will put into things like these, I would
have admitted to the allegations of having committed a
violation of Standard of Conduct II during the Winter
term." This statement demonstrates that the
discrepancy you perceived between the allegation
letter and the committee's focus did significantly
affect your response to the allegations, both in your
denial of responsibility and in the way you answered
questions during the hearing.

Def.'s Exh. 20, at 2-3.

Biron further wrote, because "it appears that there is
sufficient evidence to support the sanction that was imposed,
you will remain not enrolled and are not allowed on campus,"
while the matter remained pending. Id. at 3. Finally, because
of Anderson's repeated references in his request for review to
his "emotional distress,"[2] Biron encouraged him to seek out "all
the counseling and advising resources available . . . for
support." Id.

### E.   Pending Second COS Hearing

Anderson was informed of Biron's determination on October
26, 2017. The next day, Strong sent Anderson a new allegation
letter, which stated: "it is alleged that you engaged in

---

[2]   Anderson writes that, at the time, "plaintiff was in no
regular state of mind, planning how to end his life as
painlessly as possible if certain circumstances arose, was
constantly sleep deprived, unable to eat, and experiencing
regular stress[-]induced chest pains." Pl.'s Opp. to Motion for
Summary Judgment at 21.

harassing behavior or conduct targeted at an individual in
January, February and March of 2017.  Additionally, it is
alleged that you violated a restraining order on or about May 4,
2017." Def.'s Exh. 21.  The first allegation in the Statement
of Understanding attached to the October 27 allegation letter
was also modified to state: "I violated the Dartmouth Standard
of Conduct by engaging in harassing behavior or conduct targeted
at an individual in January, February, March, and/or May of
2017."  Id.

Anderson was distressed by the new allegations.  He
believed that, in the October 27 letter, Dartmouth was raising
allegations against him – allegations relating to his misconduct
in January, February, and March, 2017 – that the JAO had
previously considered in March, 2017, and determined not to
warrant a formal disciplinary process.  To Anderson, it seemed
that the JAO was impermissibly re-visiting its earlier
determination, and reaching a different conclusion.

On November 1, 2017, Anderson emailed Phillip Hanlon, the
President of Dartmouth College, attaching a 22-page letter,
imploring President Hanlon for assistance.  Anderson forwarded
that email to Strong, and his advisor, Anne Hudak, requesting a
delay of his second hearing until "the matters I've written

about in the letter" to President Hanlon "have been resolved."[3]
Def.'s Exh. 23 at 2.

Strong responded the following day.  She wrote:

I have reviewed your petition and have significant
concerns about your ability to engage in the judicial
process at this time.  I am asking that you meet with
someone from Counseling and Human Development (or a
practitioner approved by that office) and sign an
appropriate waiver so that they can confirm your
ability to engage in the process.  Until you have
completed this evaluation and we are notified of your
ability to participate, we will not move forward.

Def.'s Exh. 23 at 2.  Anderson emailed Strong that he
understood.  Id.

On November 9, 2017, Strong again emailed Anderson.  She
noted that she had been informed Anderson was pursuing treatment
options through the College's counseling department ("CHD"), and
that CHD had recommended that his hearing be delayed while
Anderson pursued those treatment options.  Strong asked Anderson
to respond to her by November 14, 2017, either: (1) confirming
that he would be pursuing treatment options through CHD; or (2)
completing the Statement of Understanding, along with written
refusal to pursue CHD treatment options.  Def.'s Exh. 24. at 2-

---

[3]   Anderson's request for President Hanlon's intervention was
denied, as were his later, similar requests to the Provost.  He
was told that his COS hearing was the proper venue for
proceeding, and was encouraged to work with the Judicial Affairs
Office.  See, e.g., Def.'s Exh. 27 at 3, 5.

3.  Strong wrote that Anderson's failure to respond "will result in your Immediate Temporary Suspension."  <u>Id</u>.  at 3.

Anderson responded on November 15, declining both options. He told Strong that he had met with CHD counselor Mark Reed, who told Anderson he was entitled to additional time if necessary. Strong responded that, because Anderson declined both options, and had not requested an extension, she would move forward with scheduling his hearing, and that the College was "enacting an Immediate Temporary Suspension."  <u>Id</u>.  On November 16, Anderson was sent formal notice of the Immediate Temporary Suspension.[4]

Anderson's CHD counselor, Mark Reed, emailed Strong on November 17, recommending that Anderson take a medical leave. Strong agreed that, if Anderson took medical leave, his status with the College would no longer be "suspended."  But, Anderson decided not to take a medical leave.  Strong followed up on November 20, 2017, and again on November 21.  In her November 21 email to Anderson, Strong explained that his current status was "suspended," pending a COS hearing, and that she would be moving forward with scheduling that hearing.

---

[4]     Anderson vigorously disagrees with defendant's characterization of his suspension, and argues that Strong later admitted "that she imposed this sanction upon the plaintiff to remedy procedural issues that had arisen as the result of the unprecedented disciplinary procedures Dartmouth subjected the plaintiff to."  Pl.'s Opp. to Mot. for Summary Judgment at 23.

Anderson then requested a delay of his COS hearing in order to file a lawsuit against Dartmouth.  Def.'s Exh. 29 at 2. Strong responded, "Dartmouth will be happy to consider such a request when a lawsuit is filed, although the hearing may proceed even if you file a lawsuit.  In the meantime, we will proceed with scheduling as I advised you yesterday."  Id.

Anderson's COS hearing was scheduled for January 8, 2018. He was informed of that fact by letter dated December 8, 2017. Along with the date of the hearing, Anderson was given the names of the COS members who would be sitting on the panel,[5] and invited to submit materials for inclusion in the case packet by December 15, 2017.  Dartmouth agreed to pay Anderson's travel expenses to attend the hearing (Anderson had returned to his home state of Washington).

After his first COS hearing but before his second, Anderson repeatedly reached out to the President's Office, requesting that the office intervene on his behalf.  He also reached out to

---

[5]    The COS panel voting members assigned to Anderson's January, 2018, hearing were not the same as the voting members assigned to his first hearing.  Plaintiff disagrees, but the evidence he offers in support -- testimony and emails from JAO staff members and Dartmouth's legal counsel that suggests those staff members and counsel were involved in the administration of both hearings – does not support his position.

To be clear, certain Dartmouth employees may have participated in the administration of both COS hearings.  But, none of those employees were voting members of the COS panels.

the college's Provost with a similar request.  Dartmouth

characterizes Anderson's behavior as "a campaign of harassment

against a variety of Dartmouth officials," but Anderson insists

he was simply pursuing assistance as suggested to him by his CHD

counselor, Mark Reed, and other Dartmouth employees.  Pl.'s Opp.

to Mot. for Summary Judgment at 25.  Dartmouth eventually issued

a "no contact" order against Anderson, which, Anderson says,

prevented him from "acquiring information about his own case, or

using the institution's own mechanisms to encourage its

compliance with its own written policies."  Id.

In any event, Anderson did not submit materials for

inclusion in the case packet by the December 15 deadline.  On

December 21, he emailed Knowlton-Young, requesting additional

time to submit materials.  He wrote:

> it has been virtually impossible for me to complete
> these materials, or prepare what I need to submit to
> the COS before my hearing, because my time in the past
> few months has been spent primarily trying to prevent
> employees of the College from causing me additional
> harm, or get them to provide me information which I
> have been promised.

Def.'s Exh. 32 at 2.  Knowlton-Young emailed Anderson back,

reminding him that the deadline to submit a written statement or

materials for inclusion in the case packet had passed, but:

> if you submit materials prior to the case packet being
> sent out to the COS[,] they would be considered for
> inclusion at the discretion of the Hearing Chair, and

may not be included.  Please send any materials you
want to be included in the packet as soon as possible.
Please be aware that as Anne [Hudak] and I
communicated in our last conversation with you, the
COS Chair will only be allowing materials or
discussion of information related to the allegations
and associated behavior.

The COS is not a venue for addressing your concerns
about the previous hearing or concerns with College
procedures.

Def.'s Exh. 32 at 2.

On January 2, 2018, Anderson submitted materials for
inclusion in the case packet, and the Statement of
Understanding.  He listed as witnesses Clemens, Strong, Biron
and Dartmouth's legal counsel, Kevin O'Leary.  Dartmouth Senior
Associate Dean of Student Affair's Liz Agosto, who was serving
as Chair of Anderson's second COS hearing, reviewed Anderson's
submission, and selected a portion for inclusion in the packet.
The case packet was circulated to COS panel members and Anderson
on January 4, 2018.

F.   Second COS Hearing

Anderson's hearing proceeded as scheduled on January 8,
2018, with one exception: Agosto, the scheduled Chair, was ill,
and could not attend the hearing.  Katherine Burke served as
substitute Chair.  After familiarizing herself with the case
packet, Burke met with Anderson in advance of the hearing, and
they discussed the materials Anderson had submitted for

24

inclusion in the case packet.  Burke explained that the hearing
would be focused on Anderson's alleged conduct, and determining
whether that conduct violated the school's Standards of Conduct.
Def.'s Exh. 41 at 2-:4-14.

Anderson became "very upset and agitated" when Burke told
him that the hearing would be focused on his behavior in
January, February, March and May, rather than on his concerns
regarding the application of Dartmouth's disciplinary process.
Id. at 22:3-15.  Although he had been instructed to the contrary
(see, e.g., def.'s exh. 32 at 2), Anderson still believed he
would have the opportunity to raise his concerns during the COS
hearing.  Burke offered to reschedule the hearing, but, after a
break, Anderson was able to proceed.  Def.'s Exh. 41 at 22:16-
23:21.

The Committee first considered whether Anderson had
violated the College's Standards of Conduct.  Anderson admitted
that he had violated Standard of Conduct II.  See Def.'s Exh. 39
at 112:23-113:18.  The Committee concurred.  See Def.'s Exh. 41
at 30:11-22.  At the hearing, Anderson expressed his
"frustration with the College," and he called Clemens as a
witness regarding their April, 2017, meeting concerning the
protective order.  Def.'s Exh. 36 at 5.  According to the Case

25

Note, Clemens "gave a different account of their interaction."

Id.

The Committee ultimately determined that, "given the nature of the behavior," Anderson's violation "was behavior that should lead to permanent separation from the college."  Def.'s Exh. 41 at 32:3-6.  The Case Note explains:

> Despite [Anderson's] assertion that he accepted
> responsibility and described his behavior as the
> "worst thing" he'd ever done, the student's other
> statements led the Committee to believe that he felt
> his actions during this period were justified, and
> that the [ex-girlfriend], her family and Dartmouth
> were to blame.  Under the circumstances, the panel
> expressed concern for the safety and security of the
> Dartmouth community if the student were to continue
> his education here.  They did not believe that a long
> period of suspension would be appropriate given the
> severity of the behavior, or that it would be
> effective in protecting the community.

Def.'s Exh. 36. at 5.

Anderson was informed of the COS's decision on January 9, 2018, and he received written confirmation of its decision on January 11, 2018.

G.   Anderson's Second Request for Review

On January 23, 2018, Anderson requested review of his second COS hearing.  With his request for review, he attached the documents he had submitted for inclusion in the case packet.

Anderson's request was submitted to David Kotz,[6] the interim Provost for the college at the time of the second hearing.  Kotz denied Anderson's request, and upheld the COS decision.

### H.   Anderson Initiates Civil Action

Anderson filed suit on January 30, 2019, asserting 12 claims: breach of contract, breach of the covenant of good faith and fair dealing, violation of Title IX, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, estoppel and reliance, unfair and deceptive trade practices, negligent training and supervision of employees, fraudulent misrepresentation, fraudulent concealment, and request for equitable relief in the form of declaratory judgment.  Dartmouth has moved for summary judgment as to all of Anderson's claims against it.

---

[6]   Anderson contends that Biron was involved in the denial of his second request for review, because she provided guidance to Kotz regarding the review process.  But, Anderson points to no evidence that might support a finding that Biron influenced Kotz's decision in any way.  The record evidence is to the contrary.  Biron testified that she did not discuss any aspect of Anderson's first hearing or first appeal with Kotz, and provided no "other details or information regarding Mr. Anderson's disciplinary case or any other topic."  Def.'s Exh. 45 at 21:2-19.

**DISCUSSION**

1.   <u>Breach of Contract</u>

Under New Hampshire law, which applies here, the
relationship between a student and his or her college is
contractual in nature.  See <u>Gamble v. Univ. Sys. of New
Hampshire</u>, 136 N.H. 9, 12–13 (1992).[7]  "The proper interpretation
of a contract is a question of law for the court, and the
contract's proper meaning will be determined based on the
meaning that would be attached to it by reasonable persons."
<u>Id</u>. (internal quotations omitted).  However, as the New
Hampshire Supreme Court noted, "the relationship between a
university and its students is distinctive . . . and a strict
doctrinal approach is inappropriate."  <u>Id</u>. at 12–13 (citations
omitted).  "Thus, although the first step of analysis is to
examine the language of the contract under the basic tenets of
contract law, the parties' unique relationship must also be
considered."  <u>Id</u>.

Anderson contends that Dartmouth breached its obligations
under the Student Handbook.  His arguments are generally
premised on his contention that the college violated its

---

[7]   The parties agree that New Hampshire law applies to the
dispute.  See Pl.'s Opp. to Mot. for Summary Judgment at 37-38;
Def.'s Mot. for Summary Judgment at 20.

contractual obligations when the JAO revisited and reversed its determination in March, 2017, that Anderson's conduct prompting the issuance of the protective order did not warrant formal disciplinary action.  More specifically, he says that, by doing so, Dartmouth failed to comply with the Handbook's provisions that, "[t]he JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary allegations," and that "hearings will be scheduled as soon as possible after an incident."  Pl.'s Opp. to Mot. for Summary Judgment at 41.[8]

Anderson's arguments are not persuasive.  First, it is not reasonable to read the Handbook's provision that "the JAO shall determine whether complaints or other information concerning a student shall result in formal disciplinary action" as precluding the JAO from initiating formal disciplinary action in the circumstances described.[9]  Anderson's expectations arise from his view that his misconduct must be considered in isolation,

---

[8]     Anderson also repeatedly argues that the college "violated its own policies," but fails to describe the policies allegedly violated.

[9]     Anderson's reliance on his conversation with Clemens in April, 2017, is misplaced.  Even assuming the veracity of Anderson's version of what occurred during their meeting, the record makes evident that Clemens had no role in the adjudicatory process.  The Handbook plainly vests authority to determine whether to issue disciplinary allegations with the JAO.

and not in context.  The record makes clear, however, that
Anderson engaged in a problematic course of conduct over several
months, conduct that continued through May, 2017, when he was
arrested and charged with violating a protective order.
Violation of the protective order was, of course, conduct
directly related to the conduct that resulted in the order's
issuance.

Anderson correctly notes that the JAO initially learned of
his misconduct in March, 2017, when the protective order was
issued.  Anderson also correctly notes that the JAO decided not
to initiate formal disciplinary action at that time.  But,
Anderson ignores a critical fact: his harassing misconduct did
not cease in March, 2017.  It continued, in that he violated the
order designed to prevent similar future harassment.  While
plaintiff's specific behavior that violated the protective order
may not have been as egregious as the conduct that led to its
issuance,[10] violation of the protective order amounted to
continued harassment of his ex-girlfriend, and would surely have
been seen by her and her family as representing a threat of
future ongoing harassment.  Given Anderson's continued course of

---

[10]    The communications Anderson sent that led to the issuance
of the protective order included appalling language, and
disturbing threats that need not be repeated here.  It is
sufficient to note that the victim was justifiably concerned,
the protective order was unarguably warranted, and the
subsequent violation was, in context, serious.

harassing misconduct, Dartmouth's reevaluation of whether to initiate formal disciplinary action with respect to Anderson's earlier behavior was entirely reasonable.

Thus, Anderson mistakenly argues that, in May, 2017, the college, "arbitrarily re-evaluate[d the] exact same evidence under different standards and [came] to different conclusions." Pl.'s Opp. to Summary Judgment at 2.  The evidence before the JAO in May, 2017, was not the "exact same" evidence as existed in March, 2017.  In May, 2017, the JAO was reviewing evidence tending to show that not only had Anderson engaged in harassing behavior, but he had refused to stop harassing his ex-girlfriend, despite a court order instructing him to stop.  As Dartmouth writes, when Anderson violated the protective order aimed at curing the threat he posed, "the landscape changed." Def.'s Reply in Supp. of Mot. for Summary Judgment at 3.  The college explains: "A pattern of inappropriate conduct had continued, and Plaintiff had not been able to let go of his animosity."  Def.'s Mot. for Summary Judgment at 22.  And, the "continuing nature of the behavior and involvement of the police put Plaintiff's conduct in a more serious light."  Id. at 22.

Anderson's objection to the timeliness of the JAO's decision to initiate formal action in May, 2017, is also unpersuasive.  The record makes clear that Dartmouth initiated

formal disciplinary action against Anderson six days after
receiving notice of his violation of the protective order.  That
violation, as discussed, changed the landscape, sending a clear
message that Anderson was still harassing his ex-girlfriend.
Def.'s Reply in Supp. of Mot. for Summary Judgment at 3.  And,
any delays in the disciplinary process that followed are
attributable to Anderson's own requests for delay, or his
failure to timely comply with his obligations under the
Handbook.

     Anderson also argues that Dartmouth breached its
obligations under the Handbook because the October, 2017,
allegations the JAO raised against him in advance of his second
hearing were "entirely new allegations," and "materially
different in substance than those . . . raised before the
plaintiff's first [hearing]."  Pl.'s Opp. to Mot. for Summary
Judgment at 43-44.  According to Anderson, the May, 2017,
allegations did not include his early-2017 conduct that gave
rise to the issuance of the protective order, while the October,
2017, allegations did.  Anderson says the JAO had previously
determined his earlier conduct did not necessitate the
initiation of formal disciplinary action.  He again argues that
the JAO's reconsideration of its March, 2017, decision, and its
May, 2017, inclusion of allegations that related to his conduct

in January, February, and March, 2017, is "not permitted by the College's policies," and was arbitrary and capricious.  Id.

However, as a preliminary matter, the May, 2017, allegations and the October, 2017, allegations are not, as Anderson contends, "materially different."  Anderson's argument is premised on his contention that the May, 2017, allegations related only to Anderson's violation of the protective order in May, 2017, and his arrest.  But, he misreads the May, 2017, allegations.  While the May, 2017, letter accompanying the Statement of Understanding is not a model of clarity, the May, 2017, Statement of Understanding is clear.  It states: "I violated the Dartmouth Standard of Conduct II through repeated behavior or conduct targeted at an individual during the Spring term."  Def.'s Exh. 6 at 5 (emphasis added).  Fairly read, that allegation encompasses Anderson's conduct that led to the issuance of the protective order.

Nevertheless, after Anderson complained that there had been a "discrepancy between the allegation letter" and the focus of the hearing committee, and recognizing that "Plaintiff's subjective perception of the allegations may have prevented him from participating fully," Biron generously granted Anderson's request for review, relying on his declared subjective misunderstanding in providing for a new hearing at which he

would be fully and accurately informed of the charges against him.  Def.'s Exh. 20.  Anderson received an entirely new COS hearing.[11]  At that point, the October, 2017, allegations were revised and made very clear, resolving Anderson's complaint. The October, 2017, allegations made explicit what ought to have been apparent in May, 2017: at issue before the COS was Anderson's continuing course of harassment and misconduct.  In other words, the revised allegations clarified that the issue was not just Anderson's violation of the protective order, but his violation of that order in the context of his earlier conduct.

Anderson also argues that Dartmouth breached the Handbook because, at his second hearing, he was not permitted to share "information with the COS on subject matter relevant to sanctioning decisions" – information that he had been told by Dartmouth employees he would have an opportunity to share.  Id. at 45.  On that point, the Handbook is unambiguous: "the Chair is empowered to make all procedural rulings, including rulings on relevance and admissibility of information."  Def. Exh. 1 at p. 17.  Indeed, Anderson was reminded of that situation on at

---

[11]    Anderson's contention that the October, 2017, allegations and the January, 2018, hearing were untimely is a non-starter: the timing was entirely a function of Anderson's successful request for review and relief.

least two occasions.  See Def's Exh. 30, Def.'s Exh. 32.  And,
he testified that he was "aware there's something to that effect
in the student handbook."  Def.'s Exh. 39 at 45:21-23.  Given
the Handbook's express language, any expectation Anderson had to
the contrary was not reasonable.

Finally, Anderson contends that the outcome of the COS
hearing was wrong, because "the decision was based on . . .
evaluation of [information] . . . the JAO had evaluated about 6-
months prior to plaintiff's first disciplinary hearing, and
determined it was not appropriate to raise formal disciplinary
allegations upon this review."  Pl.'s Opp. to Mot. for Summary
Judgment at 46.  That argument has been addressed, and need not
be revisited, except to point out that, if a student is found
responsible for violating a Standard of Conduct following a COS
hearing, the Handbook expressly permits the COS to consider "the
student's conduct history" for purposes of determining the
appropriate sanction.[12]  Def.'s Exh. 1 at 22.  Even assuming that
Anderson is correct in arguing that his conduct leading up to
the March, 2017, protective order was "off limits" at the COS
hearing, that conduct would be "off limits" only with respect to
finding a separate violation of the Standards of Conduct.

---

[12]     The Handbook provides that, in "Standards of Conduct cases,
if a student is found responsible, the student's conduct history
may be considered for purposes of imposing an appropriate
sanction."  Id.

(Anderson of course admitted violating Standard of Conduct II at
the second COS hearing.)  But, Anderson, having violated the
protective order (and, thereby, the Standards of Conduct), the
COS was expressly permitted by the Handbook to consider
Anderson's "conduct history" in determining the appropriate
sanction.  Def.'s Exh. 1 at 22.  Anderson's "conduct history"
included the behavior that led to the issuance of the protective
order, which he violated.  So, any expectation Anderson had that
his "conduct history" was entirely off the table for COS
consideration was not reasonable.

Anderson has not sufficiently established any genuine
dispute of material fact with respect to Dartmouth's compliance
with its obligations under the Handbook.  Dartmouth is entitled
to judgment on plaintiff's breach of contract claim.

2.   Breach of the Covenant of Good Faith and Fair Dealing

As the New Hampshire Supreme Court recently reiterated,
"[i]n every agreement, there is an implied covenant that the
parties will act in good faith and fairly with one another."
Skinny Pancake-Hanover, LLC v. Crotix, 172 N.H. 372, 379 (2019)
(quoting Livingston v. 18 Mile Point Drive, 158 N.H. 619, 624
(2009)).  "New Hampshire does not merely have 'one rule of
implied good-faith duty.'"  Id. (quoting Livingston, 158 N.H. at
624).  Instead, New Hampshire "jurisprudence consists of a

series of doctrines, each of which serves different functions,"
and which "fall into three categories: (1) contract formation;
(2) termination of at-will employment; and (3) limitation of
discretion in contractual performance." Id. (quotations
omitted).

Anderson generally contends that Dartmouth breached the
implied covenant of good faith and fair dealing by, inter alia,
mishandling his disciplinary proceedings, disproportionately
sanctioning him for his conduct, and by abusing its discretion
in a manner "antithetical to" its contracts and policies.
Compl. ¶ 192.  In support of his claim, Anderson argues that the
college "attempted to lie and misrepresent its actions at every
step of the plaintiff's disciplinary process," and brought
charges against him "that it had previously determined it was
not appropriate to raise allegations."  Pl.'s Opp. to Mot. for
Summary Judgment at 50.

Anderson's claims fall within the third category: "those
situations in which one party's exercise of contractually-vested
discretion is subject to an implicit limitation in the
performance of its contractual obligations."  Lizzol v. Bros.
Prop. Mgmt. Corp., No. 15-CV-100-SM, 2017 WL 3917014, at *5
(D.N.H. Sept. 6, 2017).

37

> [A]s the New Hampshire Supreme Court has observed, that
> "third category is comparatively narrow." Id. (quoting
> Livingston, 158 N.H. at 624).  Nevertheless, the court
> noted, "its broader function is to prohibit behavior
> inconsistent with the parties' agreed-upon common
> purpose and justified expectations, as well as with
> common standards of decency, fairness, and
> reasonableness.  Id. (citation and internal punctuation
> omitted).  In the context of this case, the implied
> covenant of good faith and fair dealing serves to
> preclude one party from exercising its contractually-
> vested discretion in a manner that would "thwart a
> reasonable expectation of the other party, going to the
> essence of the contract." Centronics [Corp. v. Genicom
> Corp., 132 N.H. 133, 141 (1989)].

Lizzol, 2017 WL 3917014, at *5 (emphasis in original).

Dartmouth is entitled to judgment on Anderson's claim
because Anderson fails to adequately establish any genuine
dispute as to a material fact with regard to whether the
college's exercise of its discretion in the performance of its
obligations under the Handbook "exceeded the limits of
reasonableness." Centronics, 132 N.H. at 144.  As discussed,
Anderson's perception that his underlying conduct in early-2017
was completely off the table for consideration at his first COS
hearing was not consistent with a reasonable reading of the
Handbook or the Statement of Understanding.  The college,
however, concerned that Anderson's subjective belief in that
regard might have adversely affected his defense, and in an
abundance of caution, granted Anderson a new COS hearing to
ensure that he actually understood the allegations and could

offer a responsive defense.  During that new hearing, Anderson doggedly insisted that the college could not bring allegations against him that related to his conduct in early-2017.  The "contract" does not support that view.

Given Anderson's continued misconduct, Dartmouth's exercise of its discretion under the Handbook did not "exceed[] the limits of reasonableness."  Centronics, 132 N.H. at 144. Dartmouth is entitled to judgment on Anderson's good faith and fair dealing claim.

3.   Title IX Claim

Pursuant to Title IX of the Education Amendments of 1972, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Gender-based challenges to college disciplinary proceedings generally fall into two categories: "erroneous outcome" and "selective enforcement."  Haidak v. Univ. of Massachusetts-Amherst, 933 F.3d 56, 74 (1st Cir. 2019) (citing Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994)).

In support of his Title IX claim, Anderson alleges that both the severity of the penalty imposed by Dartmouth, and the College's decision to initiate disciplinary proceedings were

affected by his gender.  So, plaintiff's Title IX claim falls within both categories.

### a.   Erroneous Outcome

Plaintiff's "erroneous outcome" theory of liability is quickly dispatched.  The "applicable standard for [a] Title IX claim challenging [Dartmouth's] disciplinary procedures on erroneous outcome grounds requires that a plaintiff offer evidence" that casts "some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor."  Doe v. Trustees of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) (quoting Yusef v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994)).

Anderson says his Title IX claim is not focused on "the subjective decisions of the COS members who attended these ill-conceived hearings, as he has no reason to believe their decisions (though made under the guidance of biased Dartmouth employees) were motivated by gender bias."  Id.  Anderson thus concedes he has no basis to argue gender bias on the part of those COS voting members who determined he violated the college's Standards of Conduct.  Instead, he argues that the COS voting members' decisions were influenced by biased Dartmouth employees.

First, Anderson fails to show that a genuine issue of material fact exists with respect to whether the outcome of his disciplinary proceeding was plainly erroneous.  He fails to point to evidence that suggests any Dartmouth employees improperly influenced the COS voting members.  While Anderson complains that certain Dartmouth JAO employees and legal counsel were involved in the preparation of materials for the case packet, that involvement is not sufficient to support a claim of improper influence.  The Handbook obligates the JAO to prepare the case packet.  Def.'s Exh. 1 at 14.  Finally, and more critically, the record lacks any evidence to support a claim that any purported "bias" was gender-based, let alone the "motivating factor."  Doe, 892 F.3d at 91.  In other words, "the record does not show that even if there was an interference, gender bias was a motivating factor."  Id. at 92.

### b.   Selective Enforcement

To succeed on a Title IX claim for selective enforcement, Anderson must show that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Haidak, 933 F.3d at 74 (citations omitted).

Anderson contends that he was treated more severely than female students, who were either not formally charged, or not separated from the College, for "the same behavior."  Compl. ¶

41

201.  So, Anderson "alleges that both the decision to initiate charges and the penalty imposed were affected by his sex." Haidak, 933 F.3d at 74.

As Dartmouth points out, however, the record contains no evidence that would support a finding that "gender bias was a motivating factor' in the disciplinary process." Haidak, 933 F.3d at 74 (quoting Yusef, 35 F.3d at 715).  There is no genuine dispute of material fact.  Anderson "concedes [that] part of his complaint here is based upon information he heard from student[s] involved in incidents at Dartmouth, and [he] both was, and remains ignorant of the College's private disciplinary records and decisions."  Pl.'s Opp. to Mot. for Summary Judgment at 53.  Anderson says his ignorance is a function of Dartmouth's refusal to produce that information in response to discovery requests.  Dartmouth answers that Anderson has been provided with responses to interrogatories that concerned other students, sufficient to enable him to "test his claims."  Def.'s Reply in Supp. of Mot. for Summary Judgment.  And, Dartmouth says, Anderson had the opportunity to seek testimony on this topic during depositions of several Dartmouth employees, but did not do so.

The discovery deadline, extended at Anderson's request, has expired.  He did not move to compel additional discovery from

Dartmouth that might support his claim.  And, Anderson had an
opportunity to supplement the summary judgment record to provide
additional evidentiary support for his Title IX claim.  He has
not done so.  Instead of particularized evidence of gender bias
in his case, or evidence of systemic gender bias by Dartmouth,
Anderson offers mere speculation and hearsay, both of which are
plainly insufficient to create a triable issue of fact.

Finally, in further support of his Title IX claim, Anderson
contends that Biron, who authored an article entitled, "Behind
Closed Doors: Rape, Murder, and The Misplaced Confidence of
Men," holds the "belief that men are inherently violent."
Compl. ¶ 203; Pl.'s Opp. to Mot. for Summary Judgment at 54.
Thus, he argues, Biron is an "unfit adjudicator of cases such as
the plaintiff's, and it is clear that the possibility of
plaintiff receiving fair treatment from Dean Biron at the
request for review phase of his disciplinary proceedings was
non-existent."  Pl.'s Opp. to Mot. for Summary Judgment at 54.

His argument concerning Biron's purported bias is not
persuasive because, as Dartmouth responds, (1) Anderson submits
no evidence that might support a finding that Biron was at all
involved in either the JOA's decision to initiate formal
disciplinary action against Anderson, or the COS's determination

43

of an appropriate sanction; and (2) Biron <u>granted</u> Anderson's first request for review, and allowed him a new hearing.

For all the above reasons, Anderson has not sufficiently established a genuine issue of material fact with respect to his Title IX claim. Dartmouth is entitled to judgment on Anderson's Title IX claim.

### 4. <u>Estoppel and Reliance</u>

"Promissory estoppel is a doctrine used 'to enforce promises when consideration is lacking, ... to enforce promises underlying otherwise defective contracts and promises made during the course of preliminary negotiations.'" <u>Beaulac v. All Sys. Satellite Distributors, Inc.</u>, No. 17-CV-162-JD, 2017 WL 6987688, at *2 (D.N.H. Oct. 19, 2017) (quoting <u>Great Lakes Aircraft Co., Inc. v. City of Claremont</u>, 135 N.H. 270, 290 (1992)). New Hampshire law is clear: "application of promissory estoppel is appropriate only in the absence of an express agreement." <u>Great Lakes</u>, 135 N.H. at 290.

In support of its motion for summary judgment on Anderson's estoppel and reliance claim, Dartmouth contends that, because a contract exists between Anderson and Dartmouth (embodied in the Student Handbook), Anderson's claim must be dismissed. Anderson

responds that his estoppel claim falls outside the Handbook, and
is instead based on:

> (1)  his "assumption that Dartmouth would adhere to its own
>      rules and perform its disciplinary hearing procedures
>      in a manner consistent with others that have occurred
>      at the college," and not revisit its March, 2017,
>      disciplinary decision; and

> (2)  "the promise that if plaintiff were subjected to its
>      disciplinary procedures, that these procedures would
>      be performed in accordance with the institution's own
>      written advertised policies."

Pl.'s Opp. to Mot. for Summary Judgment at 60.  In reliance on
those promises, Anderson says, he "passed on opportunities at
comparably prestigious academic institutions" to attend
Dartmouth, and "continued to allocate funds towards attaining
additional credits at Dartmouth that could not be applied
towards attaining a degree elsewhere."  Id. at 59-50.i

As Anderson himself concedes, his estoppel claim is
premised on his assumption that Dartmouth would comply with its
disciplinary policies.  Those policies are set forth in the
Student Handbook.  In other words, the promises upon which
Anderson's estoppel claims rest are found in the express
agreement: the Handbook.  Dartmouth is entitled to judgment on
Anderson's estoppel claim.

5.    Unfair and Deceptive Trade Practices

In his Complaint, Anderson alleges that Dartmouth "advertises that students who join the college will be treated in accordance with its rules, policies, and the Student Handbook," and that students will be "granted opportunities to have allegations they have not been treated in accordance with said policies fairly and unbiasedly reviewed."  Compl. ¶ 233. He further alleges, "in reality," "Dartmouth is indifferent towards such allegations regardless of their veracity, and either knowingly refrains from acknowledging them, or is reckless in its examination of such complaints."  Id.  That conduct, Anderson contends, is violative of New Hampshire's Consumer Protection Act.

New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2, provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  The Act lists several "actions that fall within its prohibition, but that is not an exhaustive list of prohibited methods, acts, or practices."  Moulton v. Bane, No. 14-CV-265-JD, 2016 WL 1091093, at *11 (D.N.H. Mar. 21, 2016) (citing ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007)).  "If the challenged conduct is not listed

in RSA 358-A:2, to be actionable it 'must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'"  Moulton, 2016 WL 1091093, at *11 (quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 675 (2013)).

The New Hampshire Supreme Court "has consistently held that inducing another to enter a contract based on a knowing misrepresentation of the promisor's intent to perform under the contract violates the CPA."  Derry & Webster, LLC v. Bayview Loan Servicing, LLC, No. 14-CV-211-PB, 2014 WL 7381600, at *6 (D.N.H. Dec. 29, 2014) (collecting cases).  However, under New Hampshire law, "[a]n ordinary breach of contract claim . . . is not a violation of the CPA."  George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011).

Anderson fails to point to any admissible evidence that would support a finding that an inducement based on a knowing misrepresentation occurred here.  Rather, Anderson argues that his CPA claim is based on Dartmouth's purported failure "to adhere to its own written policies."  Pl.'s Opp. to Mot. for Summary Judgment at 61.  In other words, Anderson contends that Dartmouth breached its obligations under the Student Handbook. Such an allegation – an ordinary contract claim – does not rise to an actionable level of "rascality" under the Consumer

Protection Act.  Dartmouth is entitled to judgment on Anderson's claim under New Hampshire's Consumer Protection Act.

      6.   <u>Fraudulent Concealment and Fraudulent</u>
           <u>Misrepresentation</u>

Dartmouth is also entitled to judgment on plaintiff's fraudulent concealment claim.  "In New Hampshire, '[t]he fraudulent concealment rule states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence.'"  <u>Sykes v. RBS Citizens, N.A.</u>, 2 F. Supp. 3d 128, 143 (D.N.H. 2014) (quoting <u>Beane v. Dana S. Beane & Co., P.C.</u>, 160 N.H. 708, 714, (2010) (further quotations omitted)).  Anderson has not shown that the doctrine is applicable here.  <u>See</u> <u>Rowe v. John Deere</u>, 130 N.H. 18, 21 (1987) ("This simple statement of the rule would appear to preclude, on its face, the application of the rule to the present fact situation.  The claim raised here is not that the plaintiff was unaware of either his injury at the time it occurred or the causal relation between his damages and the allegedly negligent manufacture of the manure spreader[.]")

To prevail on his fraudulent misrepresentation claim (a claim for intentional misrepresentation or fraud), Anderson must

establish: (1) that Dartmouth made a factual misrepresentation;

(2) with knowledge of its falsity or with a conscious

indifference to its truth; (3) with the intention that he rely

on that misrepresentation; (4) that he did justifiably rely, to

his detriment, upon that misrepresentation; and (5) that he

suffered compensable damages as a consequence.  See, e.g.,

Ridlon v. N.H. Bureau of Secs. Regulation, 172 N.H. 417, 426

(2019); Patch v. Arsenault, 139 N.H. 313, 319 (1995).

Anderson argues that Dartmouth:

> advertises it will adhere to its own written policies
> to create the impression or expectation of certain
> levels of fairness, and gives students the ability to
> anticipate how the institution might act.  However,
> Dartmouth does not intend to uphold these policies.

Pl.'s Opp. to Mot. for Summary Judgment at 64.  But, Dartmouth

did adhere to its written policies concerning disciplinary

procedures.[13]  Anderson's mere unsupported contentions to the

contrary are insufficient to defeat Dartmouth's properly

supported motion for summary judgment.

---

[13]    To the extent that Anderson contends that certain Dartmouth
employees made other factual misrepresentations, he fails to
adequately or plausibly identify those misrepresentations with
the requisite specificity.

7.   Tort-based Claims: Negligence, Intentional Infliction
     of Emotional Distress, Negligent Infliction of
     Emotional Distress, Negligent Training and Supervision

Dartmouth says it is entitled to judgment on Anderson's
tort-based claims because the only duty alleged is a "duty of
care, imposed . . . by [the college's] policies and voluntary
undertaken, to conduct its disciplinary hearing procedures
fairly, consistently, and in accordance with Dartmouth's own
rules and regulations."  Compl. ¶ 207.  Thus, Dartmouth says,
plaintiff has alleged that the college was negligent because it
breached a duty to follow its policies and procedures.  That is
not a claim for negligence, says Dartmouth, but is instead a
duplicative claim for breach of contract.

Plaintiff does not respond.  Instead, he seemingly agrees
to dismissal of the following claims: negligence, negligent
infliction of emotional distress, intentional infliction of
emotional distress, and negligent training and supervision of
employees.  He writes: "based on conversation between defense
counsel and [J]udge Steven J. McAuliffe during the pre-trial
conference, and subsequent readings by plaintiff which seem to
affirm the statements made there, it seems that contract and not
tort law is most pertinent and appropriate to apply to this
claim."  Pl.'s Opp. to Mot. for Summary Judgment at 58.

Accordingly, the court grants Dartmouth's motion for judgment on those claims.

8.  <u>Request for Declaratory Judgment</u>

Anderson's ninth claim is entitled "Equitable Relief in the Form of Declaratory Judgment."  Compl. p. 52.  He asks the court to order Dartmouth to "revert to the decision it reached . . . about April 4, 2017[,] to not impose a sanction upon or raise disciplinary allegations against him based on its investigation of the March 29 report, and overturn all subsequent decisions Dartmouth made to sanction [him] based on these materials, and in violation of Dartmouth's policies;" to "refrain from attempting to take further disciplinary actions against the plaintiff based on materials in the March 29 report;" to "reverse its finding that plaintiff violated its policies;" and to "reinstate plaintiff as a student in good standing."  Compl., at p. 56.

Dartmouth is entitled to judgment on each of Anderson's claims.  Anderson is not, therefore, entitled to declaratory or injunctive relief.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in defendant's memoranda (documents no. 48 and 64), defendant's

Motion for Summary Judgment (document no. 48) is granted as to all claims in plaintiff's complaint.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

        **SO ORDERED.**

                            Steven J. McAuliffe
                            United States District Judge

December 4, 2020

cc:  Mark Anderson, pro se
     Counsel or Record